**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**No. __:___-CV-___-__**

| | | |
|---|---|---|
| CHARLES HALLINAN, JOSEAN KINARD, ARNOLD J. HILL, BENJAMIN D. MCRAE, JOHN DAILEY, LEE M. AYERS, GEORGE B. RIDDICK, JORGE LUIS MALDONADO, ANTWAN HARRIS, ANTHONY BUTLER, and TROY A. TITUS, on behalf of themselves and similarly situated individuals, | ) ) ) ) ) ) ) ) | |
| *Petitioners/Plaintiffs,* | ) ) ) | **Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief** |
| v. | ) ) | **Class Action** |
| THOMAS SCARANTINO, Complex Warden, Federal Correctional Complex Butner; MICHAEL CARVAJAL, Federal Bureau of Prisons Director; and JEFFERY ALLEN, Federal Bureau of Prisons Medical Director, in their official capacities, | ) ) ) ) ) ) ) ) | **IMMEDIATE RELIEF SOUGHT** |
| *Respondents/Defendants.* | | |

## INTRODUCTION

1.  An urgent crisis at Federal Correction Complex Butner ("Butner") unreasonably threatens the life, health, and safety of incarcerated people and staff because of inadequate measures within the facility to control the spread of the virus that causes COVID-19. Even as North Carolina takes tentative steps to reopen, the dangers posed to the medically vulnerable and elderly, particularly in institutional settings, show no sign of abating.

2.  Hundreds of incarcerated people and staff have been infected and ***eight people housed at Butner have already died from COVID-19***. SARS-nCoV-2 ("coronavirus" or "virus")

continues to spread actively through Butner's population, endangering the lives of incarcerated people and staff who work with them.[1]

3. People housed at Butner—a complex that is well over capacity—are packed into crowded dormitories, small cells, and narrow hallways. They cannot physically distance themselves from others or self-quarantine. They cannot ensure that *others* are effectively quarantined if they are infected. Instead, they must sleep within a few feet of one another—often in small cubicles—use communal bath facilities, and line up close to one another several times a day for food and medicine. Butner's health care system is grossly inadequate to treat the growing number of sick men. The Federal Bureau of Prisons ("BOP") has inadequate infection surveillance, testing, quarantine, and isolation practices, further exacerbating the crisis. What is more, people with pre-existing medical conditions often do not receive the treatment needed for their underlying conditions, presumably because the prison's medical resources are over-taxed.

4. BOP knows of these conditions, the extreme threat they pose, and the necessary measures that must be implemented to protect prisoners, and yet has, with deliberate indifference, failed to take critical steps to address the crisis.

5. COVID-19 is a highly contagious and deadly pandemic that has raced across the globe, fundamentally altering life for everyone in just weeks. There is no cure and no vaccine.

6. With more than five million known infections worldwide and more than 345,000 people dead, no one is unaffected.[2] In the United States, more than 1.5 million people have tested positive

---

[1] SARS-nCoV-2 causes the disease COVID-19.

[2] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins*, Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited May 25, 2020).

for the virus, and almost 100,000 have died. Our country's prisons have been especially hard-hit: more than ***25,000*** incarcerated people and nearly 7,000 prison staff have tested positive for the virus, with at least 370 deaths among incarcerated people and 28 deaths among staff.[3]

7. Under even the best of circumstances, with people following rigorous physical distancing and good hygiene practices, the most our society can hope for is to limit the spread of coronavirus and "flatten the curve" to keep from overwhelming hospital resources and allow a better chance of survival for those who develop serious symptoms. But in Butner, where physical distancing and good hygiene practices are impossible, the circumstances are much worse.

8. Testing for COVID-19 in BOP and at Butner, specifically, is limited. Despite the active outbreak at Butner, BOP has not tested all the men incarcerated there. The true number of infected people at Butner is unknown.

9. Overcrowding worsens these dangerous conditions. At Butner, where 4,438 men are crammed into a space meant for no more than 3,998, whatever chance these men have to limit their exposure is even lower than it would be if the prison were even at *maximum* planned capacity.

10. Moreover, Butner houses many of the most medically vulnerable people in BOP custody. It includes a large Federal Medical Center ("FMC"), which houses those needing the most intensive medical care the BOP provides. It also includes a large, low-security prison that houses hundreds of men with serious chronic medical conditions. And others throughout the complex also have serious chronic medical conditions.

---

[3] The Marshall Project, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited May 22, 2020).

11. According to BOP, each of the deceased Butner residents had one or more preexisting medical conditions that the Centers for Disease Control and Prevention ("CDC") identified as putting them at much higher risk of serious illness and death from the virus. These conditions include chronic lung disease, heart conditions, severe obesity, and immune deficiencies. People over 50 years old are at similarly heightened risk.[4]

12. Respondents/Defendants (hereinafter, "Respondents") Director Carvajal, Warden Scarantino, and Medical Director Allen have shown deliberate indifference to the severe and obvious risk of rampant infection and death that COVID-19 poses to people incarcerated at Butner. They have done so in violation of the U.S. Constitution's Eighth Amendment prohibition against cruel and unusual punishment.

13. Respondents have not taken the necessary steps to address the risk faced by the people in their custody. They have opposed motions for compassionate release, and they have failed to order furloughs or transfers to home confinement with sufficient speed and in sufficient numbers. They have failed to make other arrangements within the facility to allow for adequate physical distancing.[5] And they have failed to implement effective isolation, quarantine, testing, screening, hygiene, and disinfecting policies or meaningfully modify movement protocols for staff and incarcerated people.[6]

14. Respondents have made no meaningful attempt to physically distance the men housed at Butner. People with COVID-19 symptoms are housed alongside those with no symptoms. Men sleep in crowded cubicles, and in some instances, even in busy hallways. Staff move

---

[4] *See* Declaration of Joe Goldenson, M.D. ("Goldenson Decl.") (attached as **Ex. 18**) at 2; Declaration of Dr. Chris Beyrer ("Beyrer Decl.") (attached as **Ex. 17**) at 2–3, 28.

[5] Beyrer Decl. at 7–14.

[6] *See, e.g.*, Beyrer Decl. 14–23.

between the complex's facilities, coming into contact with incarcerated people known to be infected, incarcerated people who may be infected, and those ostensibly in quarantine before release. Incarcerated people go to prison jobs where they interact with and prepare food trays for people in different housing units.

15. Respondents' failures not only endanger people incarcerated at Butner, they put Butner's staff, local health care workers, family members, and the broader community at serious risk.[7]

16. Without the ability to physically distance from one another, people incarcerated at Butner remain at extraordinary risk of infection, serious illness, and death from COVID-19.[8] It is extremely difficult for Respondents to effectively distance people in the Butner complex without reducing the overall number of people housed there. In other words, at current population levels, people incarcerated at Butner cannot practice meaningful physical distancing and are at continuing, increased risk of serious illness and death.

17. The situation is urgent. These conditions are well-known to Respondents and, to avoid further extreme harm, they must take act immediately to prevent the further spread of COVID-19 at Butner. The only effective option is to begin immediately releasing Butner residents based on defined categories—including but not limited to those who are medically vulnerable—and to develop and implement a plan to (1) provide for adequate social distancing; (2) effectively test, quarantine, and isolate people at Butner and (3) effectively clean and disinfect the areas used by the population housed at Butner.[9] Without immediate action by this Court, more people will become infected and more people will die.

---

[7] *See, e.g.*, Goldenson Decl. at 3–4; Beyrer Decl. at 14–15, 33.

[8] *See, e.g.*, Beyrer Decl. at 12, 32.

[9] *See, e.g.*, Goldenson Decl. at 5, 7–8; Beyrer Decl. at 32–33. The term "release," as used throughout this Petition, refers to discharge of incarcerated persons from the physical confines of FCC Butner, not necessarily release from custody. Release options may include, but are not limited to: enlargement of

## JURISDICTION AND VENUE

18. Petitioners/Plaintiffs (hereinafter, "Petitioners") bring this class action pursuant to 28 U.S.C. § 2241 (habeas corpus) and 28 U.S.C. § 1331 (federal question jurisdiction) for relief from detention that violates their Eighth Amendment rights under the U.S. Constitution.

19. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. §§ 2201–02 (authority to provide declaratory and other necessary and proper relief), and based on the Court's inherent equitable powers.

20. This Court has jurisdiction over this Class-wide Writ of Habeas Corpus because Petitioners are detained within its jurisdiction in the custody of Thomas Scarantino, Complex Warden of Butner. Petitioners are therefore in custody for the purposes of the federal habeas corpus statute, 28 U.S.C. § 2241.

21. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because the Petitioners and all other class members are in custody in this judicial district.

22. Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to Petitioners' claims occurred in this district.[10]

---

custody, release to parole or community supervision; transfer furlough (as to another medical facility, hospital, or halfway house); or non-transfer furlough, which could entail a released person's eventual return to FCC Butner once the pandemic is over and the viral health threat is abated. Any releases would include requirements for testing, care, and social distancing, as informed by a public health expert. Incarcerated people should not be sent to another dangerous and crowded BOP facility to address the concerns at FCC Butner.

[10] "A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority . . . may, except as otherwise provided by law, be brought in any judicial district in which . . . a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(1)(B).

- 6 -

## PARTIES

23.  PETITIONER Charles Hallinan—BOP Register No. 75107-066—is 79 years old. He suffers from bladder cancer and prostate cancer. Both are in remission but require additional checks or treatment that Mr. Hallinan is not currently receiving due to COVID-related lockdowns at Butner. Mr. Hallinan also suffers from hypertension, cardiovascular disease (including a bypass surgery), and celiac disease (an autoimmune disorder), resulting in anemia. Mr. Hallinan is serving a 14-year sentence for RICO, money laundering, and wire fraud charges. He is housed in FCI Butner Low ("Butner Low"), and his projected release date is July 3, 2030.[11]

24.  PETITIONER Josean Kinard—BOP Register No. 33603-058—is 34 years old and is in good health. He has served about 25 months of a 70-month sentence for two counts of drug possession with intent to distribute and possession of a firearm by a person convicted of a felony. He is housed in Butner Low, and his projected release date is May 9, 2022.[12]

25.  PETITIONER Arnold Hill—BOP Register No. 09077-007—is 67 years old and in BOP custody from a sentence under the D.C. Code. He suffers from hypertension and cardiovascular disease (which required triple bypass surgery in 2019). Mr. Hill also has diabetes. He uses a wheelchair due to a spinal cord injury which required spinal fusion surgery in 2005 and 2016. Mr. Hill has served almost 33 years of a 20-years-to-life sentence for first-degree murder while armed under the D.C. Code. Mr. Hill was granted parole in 2012, but, before his release, his grant of parole was rescinded after the victim's family objected to his release. Mr. Hill is housed in Butner Low.[13]

---

[11] *See generally*, Declaration of Charles Hallinan ("Hallinan Decl.") (attached as **Ex. 4**).

[12] *See generally*, Declaration of Josean Kinard ("Kinard Decl.") (attached as **Ex. 9).**

[13] *See generally*, Declaration of Arnold Hill ("Hill Decl.") (attached as **Ex. 7**).

26. PETITIONER Benjamin McRae—BOP Register No. 87682-007—is 43 years old and in BOP custody from a sentence under the D.C. Code. He suffers from hypertension and has a blood clot in his left leg. He has previously had clots in his right leg and lungs, and currently has an inferior vena cava filter in his chest to trap large clots. He uses a wheelchair due to a history of falls and his blood clot. In addition, he is approximately 5' 10" and 380 pounds, with a Body Mass Index ("BMI") of approximately 54. Mr. McRae is serving a five-year sentence for possession with intent to distribute a controlled substance under the D.C. Code. He is housed in Butner Low, and his projected release date is January 26, 2022.[14]

27. PETITIONER John Dailey—BOP Register No. 39637-004—is 62 years old and suffers from mycosis fungoides (a very rare, terminal form of non-Hodgkins lymphoma), which causes lesions all over the body. He also has a congenital heart defect—which causes fainting—and is immunocompromised due to chemotherapy. Mr. Dailey is housed in Butner Low and is serving a 27-month sentence for Medicare fraud. Mr. Dailey's projected release date is August 20, 2021.[15]

28. PETITIONER Lee Ayers—BOP Register No. 03882-007—is 37 years old and in BOP custody from a sentence under the D.C. Code. He suffers from pernicious anemia (a severe vitamin B deficiency), which has caused an abnormal spinal cord, severe stomach pain, and muscle weakness. He also suffers from atrophic gastritis, a chronic autoimmune disorder that compromises his immune system. Mr. Ayers is serving a reduced 72-month sentence for unlawful distribution of 50 grams or more of cocaine base consecutive with a 108-month

---

[14] *See generally*, Declaration of Benjamin McRae ("McRae Decl.") (attached as **Ex. 12**).
[15] *See generally*, Declaration of John Dailey ("Dailey Decl.") (attached as **Ex. 2**).

sentence for assault with a dangerous weapon, under an aider and abettor theory. Mr. Ayers is housed in FCI Butner Medium II, and his projected release date is March 5, 2022.[16]

29. PETITIONER George Riddick—BOP Register No. 72403-053—is 51 years old and in BOP custody from a sentence under the D.C. Code. Mr. Riddick has lymphoma, which is in remission. He is diabetic and suffers from asthma, sleep apnea, and childhood arthritis. Mr. Riddick had a corneal transplant in February 2019 and takes an immunosuppressant to prevent rejection of the graft. Mr. Riddick has served 15 years of a 15-years-to-life sentence for second-degree murder while armed, possession of a firearm during the commission of a crime, and carrying a pistol without a license. Mr. Riddick is housed in FCI Butner Medium II.[17]

30. PETITIONER Jorge L. Maldonado—BOP Register No. 63756-018—is 52 years old. He has kidney disease and has had two kidney transplants, which require that he remain on immunosuppressant medication for the rest of his life. Mr. Maldonado is experiencing blood in his urine, and based on recent tests, his kidney may be failing; however, due to the current situation at Butner, he is unable to see a nephrologist. Mr. Maldonado also has malignant hypertension due to his kidney disease, and he has tachycardia that may be a side effect of his medication. Mr. Maldonado has served about 41 months of an 84-month sentence for conspiracy, wire fraud, theft of government property, aggravated identity theft, and aiding and abetting. Mr. Maldonado is housed at the minimum security camp adjacent to FCI Butner Medium I.[18]

---

[16] *See generally*, Declaration of Lee Ayers ("Ayers Decl.") (attached as **Ex. 1**).

[17] *See generally*, Declaration of George Riddick ("Riddick Decl.") (attached as **Ex. 14**).

[18] *See generally*, Declaration of Jorge Maldonado ("Maldonado Decl.") (attached as **Ex. 11**).

31. PETITIONER Antwan Harris—BOP Register No. 55584-056—is 38 years old. He suffers from hypertension and has been diagnosed with pre-diabetes. Additionally, he is approximately 5'8" tall and 233 pounds, with a BMI of approximately 35. Mr. Harris is currently serving a 53-month reduced sentence for possession with intent to distribute marijuana consecutive with a 120-month sentence for possession of a firearm in furtherance of a drug trafficking crime. Mr. Harris is housed in Butner Low, and his projected release date is October 4, 2022.[19]

32. PETITIONER Anthony Butler—BOP Register No. 65583-056—is 35 years old. He suffers from diabetes, Hepatitis B, and a heart murmur that causes him shortness of breath. Mr. Butler is currently serving a five-year sentence for one count of felon in possession of a firearm and one count of possession of a firearm in furtherance of a drug trafficking crime. Mr. Butler is housed in Butner Low, and his projected release date is November 1, 2025.

33. PETITIONER Troy A. Titus—BOP Register No. 58299-083—is 54 years old and in good health. Mr. Titus has served about 10 years of a 30-year sentence for wire fraud. He is housed in Butner Low, and his projected release date is January 8, 2035.[20]

34. RESPONDENT Thomas Scarantino is the Warden of Butner and, in his official capacity, has immediate custody of Petitioners and all proposed Class Members.

35. RESPONDENT Michael Carvajal is the Director of BOP and, in his official capacity, is responsible for the safety and security of all persons—including Petitioners and all proposed Class Members—serving federal and D.C. Code sentences at BOP facilities, including Butner.

---

[19] *See generally*, Declaration of Antwan Harris ("Harris Decl.") (attached as **Ex. 6**).
[20] *See generally*, Declaration of Troy Titus ("Titus Decl.") (attached as **Ex. 15**).

36. RESPONDENT Jeffery Allen, M.D. is the Medical Director of the BOP and, in his official capacity, is the final BOP health care authority responsible for all health care delivered to incarcerated people, including making an assessment of each individual's risk factors for severe COVID-19 illness, risks of COVID-19 at the individual's prison facility, and risks of COVID-19 at the location in which an incarcerated person seeks home confinement before the BOP may grant discretionary release.[21] Respondent Allen also evaluates the suitability for and reviews requests for compassionate release.[22]

## NOTICE OF RELATED CASE

37. Per Rule 40.3(b) of the local civil rules of the U.S. District Court for the Eastern District of North Carolina, Petitioners provide notice that this case arises from a common nucleus of operative facts with, and therefore is a "related case" to the following:

   a. *United States v. Anthony Butler*, No. 5:18-CR-00475-BO, Dkt. 56, Apr. 23, 2020. Mr. Butler, a named Petitioner in this case, filed a Motion for Compassionate Release Due to COVID-19 Outbreak with this Court on April 23, 2020. This Motion was denied on May 19. The bases for Mr. Butler's motion and for the instant case arise from a common nucleus of operative facts—in particular the conditions at Butner and BOP's inadequate response to the COVID-19 outbreak there—and the cases call for a determination of similar questions of law and fact.

---

[21] Attorney General William Barr, *Memorandum for Director of Bureau Prisons*, Office of the Attorney General, 2 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download [hereinafter Barr March 26 Memo]; *Program Statement 6010.05*, Federal Bureau of Prisons, Health Services Administration, 3 (June 26, 2014), https://www.bop.gov/policy/progstat/6010_005.pdf.

[22] *Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, Federal Bureau of Prisons, Health Services Administration 6, 13–14 (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

# FACTUAL ALLEGATIONS

## I. COVID-19 Is a Dangerous, Contagious Illness that Poses a Significant Risk of Serious Illness and Death

38. COVID-19 is a deadly and highly contagious disease caused by a novel coronavirus.[23]

39. As of May 25, 2020, there have been more than 5.4 million confirmed cases of COVID-19, and more than 345,000 related deaths.[24] More than 1.6 million of these cases and almost 100,000 deaths were in the United States.[25]

40. The worldwide mortality rate for COVID-19 is 3.4 percent.[26] By comparison, seasonal influenza "generally kills far fewer than 1 percent of those infected."[27]

41. The case fatality rate can be significantly higher depending on the presence of certain demographic and health factors. The rate is higher in men, and varies significantly with advancing age, rising after age 50, and is above 10 percent (1 in 10 cases) for those with pre-existing medical conditions including cardio-vascular disease.[28]

---

[23] On March 11, 2020, the World Health Organization ("WHO") classified COVID-19 as a pandemic. *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.

[24] COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHHU), Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited May 25, 2020).

[25] *Id.*

[26] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 3 March 2020*, World Health Organization (Mar. 3, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---3-march-2020; *cf.* Beyrer Decl. at 2 ("The overall case fatality rate [from COVID-19] has been estimated to range from 0.3 to 3.5% in most countries, but over 7.0% in Italy. In the U.S., the case fatality rate is estimated to be 6.0%.") (citing *Mortality Analysis*, Johns Hopkins University of Medicine, https://coronavirus.jhu.edu/data/mortality (last updated May 24, 2020)).

[27] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 3 March 2020.*

[28] *See, e.g.*, Beyrer Decl. at 2–3, 28.

42.  Coronavirus spreads through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects, where the virus can survive for up to three days.[29]

43.  People who are asymptomatic can unknowingly transmit the virus, making it particularly difficult to slow its spread.[30]

44.  All people, regardless of their age or health, are at some risk of serious illness and death from COVID-19.[31]

45.  Certain categories of people face especially high risks of serious illness or death from COVID-19, including people aged 50 years or older.[32]  If infected, people in this group are more likely to require hospitalization, more likely to be admitted to intensive care units ("ICUs"), and more likely to die.[33]

46.  People of all ages face higher risk of hospitalization and death if they have underlying medical conditions, including diabetes, chronic lung disease, moderate to severe asthma, serious heart conditions, severe obesity, chronic kidney disease undergoing dialysis, liver disease, epilepsy, or compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic

---

[29]  *How COVID-19 Spreads*, Centers for Disease Control and Prevention (Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (attached as **Ex. 26**); *see also* Beyrer Decl. at 4, 9–10, 14.

[30]  *How COVID-19 Spreads; see also* Beyrer Decl. at 15, 18–19, 24.

[31]  *Assessing Risk Factors*, Centers for Disease Control and Prevention (Apr. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/assessing-risk-factors.html (attached as **Ex. 27**).

[32]  *See, e.g.*, Goldenson Decl. at 2; Xianxian Zhao, *et al.*, *Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis* (March 20, 2020), https://cutt.ly/etRAkmt; *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report); *Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (attached as **Ex. 28**).

[33]  Xianxian Zhao, *et al.*; *see also* Beyrer Decl. at 2–3, 27.

disorders, stroke, developmental delay, a history of smoking, or other immune deficiencies.[34] According to the WHO-China Joint Mission Report, the COVID-19 mortality rate increases to 13.2 percent for those with cardiovascular disease, 9.2 percent for diabetes, 8.4 percent for hypertension, 8.0 percent for chronic respiratory disease, and 7.6 percent for cancer.[35] The WHO also reports that people with high blood pressure are more likely to develop serious COVID-19 illness than others.[36]

47. Among people who have more serious forms of the disease, some 30 percent will progress to Acute Respiratory Distress Syndrome, which has a 30 percent mortality rate overall and is higher for those with other health conditions. Some 13 percent of these patients will require mechanical ventilation.[37]

48. People who survive COVID-19 can suffer severe damage to lung tissue, including permanent loss of respiratory capacity, and damage to other vital organs, such as the heart, central nervous system, and liver.[38] COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle.[39]

---

[34] Xianxian Zhao, *et al.*; *see also* Beyrer Decl. at 27.

[35] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.; *see also* Beyrer Decl. at 29.

[36] *Q&A on Coronaviruses (COVID-19)*, World Health Organization, https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited May 19, 2020).

[37] *See, e.g.*, Goldenson Decl. at 2; Beyrer Decl. at 3.

[38] Panagis Galiatsatos, *What Coronavirus Does to the Lungs*, Johns Hopkins Medicine (Apr. 13, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs. COVID-19 can trigger an over-response of the immune system, further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. *Id.*; *see also* Beyrer Decl. at 3.

[39] Beyrer Decl. at 3. Myocarditis can reduce the heart's ability to pump. *Id.*

- 14 -

49. Even young, healthy people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[40]

50. Serious complications from COVID-19 can develop rapidly.[41] Some individuals show the first symptoms of infection within two days of exposure, and their conditions can seriously deteriorate in less than five days.[42]

51. People who develop serious illness often require advanced medical support, including specialized equipment, such as ventilators, and large teams of highly trained care providers, such as ICU doctors, nurses, and respiratory therapists. The artificial ventilation process is itself invasive and dangerous, and some patients must be placed in medically induced comas for such treatment.[43]

**II. The Risk from COVID-19 Is Particularly High in Prisons**

52. According to CDC guidelines, only three measures are known to effectively reduce the spread of this fatal disease: (i) diligent "social or physical distancing" to avoid transmission of the

---

[40] Kerry Kennedy Meltzer, *I'm Treating Too Many Young People for the Coronavirus*, The Atlantic (March 26, 2020), https://www.theatlantic.com/ideas/archive/2020/03/young-people-are-not-immune-coronavirus/608794/; *see also What is ECMO*, 193 Am. J. Respir. Care Med 9–10 (2016), https://www.thoracic.org/patients/patient-resources/resources/what-is-ecmo.pdf (describing function of extracorporeal membrane oxygenation machine to replace function of heart and lungs).

[41] *See* Sarah Jarvis, *Coronavirus: How Quickly do COVID-19 Symptoms Develop and How Long do They last?*, Patient (Apr. 20, 2020), https://patient.info/news-and-features/coronavirus-how-quickly-do-covid-19-symptoms-develop-and-how-long-do-they.last.

[42] *Id.; see also* Beyrer Decl. at 4.

[43] Kathryn Dreger, *What You Should Know Before You Need a Ventilator*, NY Times (Apr. 4, 2020), https://www.nytimes.com/2020/04/04/opinion/coronavirus-ventilators.html.

Case 5:20-hc-02088-FL   Document 1   Filed 05/26/20   Page 15 of 71

virus;[44] (ii) covering the mouth and nose with a mask or cloth;[45] and (iii) vigilant hygiene practices, including frequently washing hands and disinfecting surfaces.[46]

53. Physical distancing is a necessary predicate for hygiene practices, such as handwashing, to have a meaningful impact.[47] Because asymptomatic people can transmit the virus, it is critical to maintain physical distance, even among people who show no signs of illness.[48]

54. But in prisons, incarcerated persons and staff interact at all times in close proximity and cramped quarters designed to confine people rather than distance them. Incarcerated people, by the fact of their incarceration, have little autonomy or control of their movements. As a result, incarcerated people are highly susceptible to rapid transmission of the virus through contact with other people, including asymptomatic carriers, and touching common surfaces.[49]

55. Incarcerated people, correctional staff, and contractors regularly move in and out of correctional facilities and across different housing units within prisons. Such movement creates an ever-present risk that persons, including asymptomatic carriers, will carry the virus in and out of those facilities, spreading infection and triggering outbreaks.

---

[44] *See, e.g.*, *Social Distancing, Quarantine, and Isolation*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (attached as **Ex. 24**); Beyrer Decl. at 4; Goldenson Decl. at 2–3.

[45] *See, e.g., How to Protect Yourself & Others*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (attached as **Ex. 25**); Goldenson Decl. at 2–3.

[46] *See id.*; *see also COVID-19 in Correctional and Detention Facilities – United States, February-April 2020*, Centers for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm (last visited May 22, 2020) [hereinafter *COVID-19 in Correctional and Detention Facilities*] (attached as **Ex. 29**); *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 22, 2020) [hereinafter *Interim Guidance*] (attached as **Ex. 30**); Goldenson Decl. at 2–3; Beyrer Decl. at 20.

[47] *See COVID-19 in Correctional and Detention Facilities*.

[48] *See* Beyrer Decl. at 8, 15, 24.

[49] *See id.* at 8, 15, 23.

- 16 -

56. In addition, prisons are at increased risk from the rapid spread of an infectious disease—like COVID-19—because of the high number of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and limitations on physical distancing.[50]

57. As the chart below illustrates, health conditions that make COVID-19 particularly dangerous are more prevalent in the incarcerated population than in the general public.[51]

| | Prevalence of health condition by population | | | |
|---|---|---|---|---|
| Health condition | Jails | State prisons | Federal prisons | United States |
| Ever tested positive for Tuberculosis | 2.5% | 6.0% | | 0.5% |
| Asthma | 20.1% | 14.9% | | 10.2% |
| Cigarette smoking | n/a | 64.7% | 45.2% | 21.2% |
| HIV positive | 1.3% | 1.3% | | 0.4% |
| High blood pressure/hypertension | 30.2% | 26.3% | | 18.1% |
| Diabetes/high blood sugar | 7.2% | 9.0% | | 6.5% |
| Heart-related problems | 10.4% | 9.8% | | 2.9% |
| Pregnancy | 5.0% | 4.0% | 3.0% | 3.9% |

*Health conditions that make respiratory diseases like COVID-19 more dangerous are far more common in the incarcerated population than in the general U.S. population. Pregnancy data come from our report, Prisons neglect pregnant women in their healthcare policies, the CDC's 2010 Pregnancy Rates Among U.S. Women, and data from the 2010 Census. Cigarette smoking data are from a 2016 study, Cigarette smoking among inmates by race/ethnicity, and all other data are from the 2015 BJS report, Medical problems of state and federal prisoners and jail inmates, 2011-12, which does not offer separate data for the federal and state prison populations. Cigarette smoking may be part of the explanation of the higher fatality rate in China among men, who are far more likely to smoke than women.*

58. In addition to Drs. Joe Goldenson and Chris Beyrer (whose declarations are attached at Exhibits 18 and 17, respectively) multiple public health experts, including Dr. Gregg

---

[50] *See generally* I.A. Binswanger *et al.*, *Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared With the General Population*, 63 J. Epidemiology & Community Health 912 (2009) (concluding that incarcerated people in the U.S. had a higher burden of most chronic medical conditions than the general population, even adjusting for sociodemographic differences and alcohol consumption); *see also* Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020), https://cutt.ly/stERiXk; Beyrer Decl. at 29, 31.

[51] Peter Wagner & Emily Widra, *No Need to Wait for Pandemics: The Public Health Case for Criminal Justice Reform*, Prison Policy Initiative (Mar. 6, 2020), https://cutt.ly/7tJXmlC (color in chart adjusted); *see also* Beyrer Decl. at 29 ("More than 38% of people in correctional custody nationally have a chronic illness.").

Gonsalves,[52] Dr. Ross MacDonald,[53] Dr. Marc Stern,[54] Dr. Oluwadamilola T. Oladeru and Dr. Adam Beckman,[55] Dr. Anne Spaulding,[56] Dr. Homer Venters,[57] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[58] and Dr. Josiah Rich[59] have strongly cautioned that incarcerated people are likely to face serious, even grave, harm due to the COVID-19 outbreak.

59. The CDC and WHO have also identified prisons as especially susceptible to rapid outbreaks of infection due to close person-to-person contact among large, confined populations.[60] According to the CDC:

   a. Environments like prisons "heighten[] the potential for COVID-19 to spread once introduced";

   b. There are "many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress";

---

[52] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak*, Connecticut Mirror (Mar. 11, 2020), https://cutt.ly/BtRSxCF.

[53] Craig McCarthy & Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo.

[54] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.

[55] Oluwadamilola T. Oladeru, *et al.*, *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind* (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

[56] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Facility*, Emory Center for the Health of Incarcerated Persons (Feb. 26, 2020), https://ccao.org/wp-content/uploads/COVID-for-Corrections-vers.-2.26.20.pdf.

[57] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (Mar. 12, 2020), https://cutt.ly/jtRSPnk.

[58] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland (Mar. 25, 2020), https://cutt.ly/stERiXk.

[59] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[60] *See COVID-19 in Correctional and Detention Facilities; Interim Guidance*; *Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention: Interim Guidance* (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf?ua=1.

c. "Options for medical isolation of COVID-19 cases are limited";

d. Incarcerated persons and staff may have medical conditions that increase their risk of severe disease from COVID-19; and

e. Incarcerated persons have limited ability to exercise disease prevention measures—such as frequent handwashing—due to restrictions put in place by prison officials.[61]

60. Among the specific recommendations from the CDC for mitigating the risk of COVID-19—tailored to the realities of prison—is implementing physical distancing strategies—"*regardless of the presence of symptoms*."[62] This includes reassigning and/or rearranging bunks to provide more space, enforcing distance requirements in common areas, staggering recreation times, and staggering meals.[63]

61. The CDC also recommends, among other things: (i) individually quarantining and medically monitoring close contacts of confirmed COVID-19 cases—including testing for COVID-19;[64] (ii) implementing daily temperature checks in housing units where COVID-19 cases have been identified;[65] (iii) requiring face masks for all individuals showing symptoms of COVID-19 and immediately placing them under *individual* medical isolation in single cells

---

[61] *COVID-19 in Correctional and Detention Facilities – United States, February-April 2020*, Centers for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm.

[62] *Interim Guidance*, at 11 (emphasis added).

[63] *Id.* at 11; Beyrer Decl. at 24–25.

[64] *COVID-19 in Correctional and Detention Facilities – United States, February-April 2020* at 19.

[65] *Id*. at 22.

with solid doors and walls;[66] (iv) actively encouraging staff to stay home when sick;[67] and (v) frequent and thorough cleaning and disinfection of surfaces, objects, and areas.[68]

### III.  COVID-19 Is Spreading Rapidly at Butner

62.  Butner is a complex of BOP facilities—FMC Butner, Butner Low, FCI Butner Medium I ("Medium I"), and FCI Butner Medium II ("Medium II")—collectively housing approximately 4,438 men.[69]

63.  The complex was designed to hold no more than 3,998 people, meaning it is currently at approximately 111 percent of its maximum designed capacity.[70]  Thus, Butner is overcrowded, making it impossible to adequately physically distance people and contain the spread of COVID-19 without reducing the population of men incarcerated there.[71]  Even if it were at its maximum designed capacity, Butner could not enable the incarcerated people in its custody to adequately physically distance.

64.  Butner is experiencing of one of the worst COVID-19 outbreaks of any BOP facility.

65.  Eight people held at Butner have already died from COVID-19.[72]

---

[66] *Id*. at 15–16 (emphasis added).  CDC defines "medical isolation" as "confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission."  *Id*. at 4.

[67] *Id*.

[68] *Id.* at 9.

[69] *See Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp (last updated May 21, 2020) (showing populations for Butner Low FCI (1,201), Butner Medium I FCI (656), Butner Medium II FCI (1,461), and Butner FMC (909).  FCI Butner Medium I also houses another 211 men in an adjacent, minimum security satellite camp. *Id*.

[70] *See PREA Audit Report*, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 2, 2017), https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf.

[71] Beyrer Decl. at 7–8, 32–33.

[72] *COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 25, 2020) [hereinafter *COVID-19 Cases*].

66. Despite limited testing, at least 369 incarcerated people and 44 staff members at Butner have tested positive for the virus.[73]

67. Given the frequent asymptomatic transmission documented by the CDC and various departments of public health, the lack of widespread testing by BOP, and the already large number of people known by the BOP to be infected at Butner, it is likely that there are many other infected and highly contagious—but untested—people among the incarcerated people and staff at Butner.[74]

## IV. Respondents Are Aware that the Conditions at Butner Put People Incarcerated There at a Very High Risk

68. Respondents are aware of the conditions at Butner including, as described above, the overcrowding.

69. The increased risks due to overcrowding are exacerbated by the presence of a large number of medically vulnerable people housed at the prison.[75]

70. Despite the known high risk, Respondents have not conducted widespread testing of people incarcerated at Butner.[76]

71. Whether a person already at Butner will be quarantined appears to be determined solely by whether the person has a high temperature.[77] Butner has occasionally checked the

---

[73] *Id.*

[74] In fact, recent testing of all 700 incarcerated people in a North Carolina state prison found that 444 were infected—an 11-fold increase from the previously known 39 cases. Kevin Johnson, *Mass Virus Testing in State Prisons Reveals Hidden Asymptomatic Infections; Feds Join Effort*, USA Today (Apr. 25, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/. Critically, 90 percent of the newly diagnosed cases were asymptomatic. *Id.*

[75] *See, e.g.*, McRae Decl. at 3 ("At least half of the people in my housing unit are elderly and/or have serious medical conditions.").

[76] *See, e.g.*, Ayers Decl. at 5; Dailey Decl. at 4; Hill Decl. at 4; McRae Decl. at 3; Riddick Decl. at 5.

[77] *See, e.g.*, Ayers Decl. at 5; Hill Decl. at 4; *See* McRae Decl. at 3; Riddick Decl. at 5.

temperatures of all people in a housing unit, but people usually get their temperatures checked only if they put in for sick call, which requires a $2.00 co-pay, or in some—but not all—cases, if they are required to leave their unit for work assignments or outside-hospital visits.[78]

72. Rather than take well-known measures to stop the spread of the virus, around April 1, Butner purported to "lock down" in response to the outbreak of the disease.[79] This had a number of adverse effects—described in more detail in the sections that follow—such as:

   a. People housed in facilities other than the FMC with serious known medical conditions and who ordinarily receive treatment at the FMC could no longer go there and did not receive their needed treatments as a result.[80]

   b. People housed in celled units were limited in the times they could come out of their cells.[81] This means that large groups of people try to use the showers, phones, and computers in a short period of time, concentrating the use of these facilities and ensuring that people congregate in these confined areas.[82]

   c. At the Camp and the low security facilities, BOP started placing people believed to have COVID-19 in solitary confinement cells called the Special Management Unit or Special Housing Unit ("SHU").[83] This is not medical isolation; rather, it is essentially punitive solitary confinement, with some reporting that they were denied access to necessary

---

[78] *See, e.g.*, Titus Decl. at 3.

[79] *See e.g.*, Ayers Decl.at 3; Hallinan Decl. at 2; Riddick Decl. at 2.

[80] *See, e.g.*, Hill Decl. at 4; Riddick Decl. at 5.

[81] *See, e.g.*, Ayers Decl.at 3; Riddick Decl. at 2.

[82] *Id.*

[83] *See, e.g.*, Riddick Decl. at 5; Ayers Decl. at 5; Hill Decl. at 4; McRae Decl. at 19.

medications, phone usage, and hot water.[84]  In Medium II, BOP is also placing people in the SHU for isolation.

    d.   Meals are now delivered to housing units.[85]  As a result, people in dormitory-style housing units have to line up in a confined space three times a day to receive their meals.[86]

73.   In many facilities within the complex, pill call has not changed.[87]  People in dormitories have to line up to receive their medications.[88]

74.   All these conditions further increase the risk of infection, serious illness, and death for people incarcerated in the complex.[89]  These conditions and risks are known to Respondents.

    **A.   FMC Butner**

75.   FMC Butner is an administrative security federal medical center housing men designated as Care Level 4.[90]  This is the highest level of healthcare need in the BOP.[91]

---

[84]  *Id.*; Declaration of Roger Duane Goodwin ("Goodwin Decl.") (attached as **Ex. 3**) at 5–6; Beyrer Decl. at 22.

[85]  *See, e.g.*, Hill Decl. at 3; Kinard Decl. at 2; McRae Decl. at 2.

[86]  *See, e.g.*, Hill Decl. at 3; Kinard Decl. at 2; McRae Decl. at 2.

[87]  *See, e.g.*, Declaration of Lewis Donnell Huntley ("Huntley Decl.") (attached as **Exhibit 8**) at 2; Government's Response to Motion for Compassionate Release, *United States v. El-Hanafi*, S7 10-cr-162 (KMW), Dkt. No. 247 (filed May 13, 2020) (reporting that, as of May 8, 2020, approximately 459 coronavirus tests have been administered to inmates at the Butner complex, out of a total of approximately 4,550 total inmates, and that 318 tested positive and 141 tested negative).

[88]  *See, e.g.*, Huntley Decl. at 2; Hill Decl. at 3; McRae Decl. at 2.

[89]  *See e.g.*, Hallinan Decl. (describing lack of physical distancing, limited hygiene and sanitation efforts, lack of access to necessary medical care, and limited or ineffectual efforts to mitigate the spread of COVID-19); *see generally* Beyrer Decl.

[90]  *See Bureau of Prisons: Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs*, United States Government Accountability Office, 64 (June 2017), https://www.gao.gov/assets/690/685686.pdf; *PREA Audit Report* at 2.  The FMC houses people at Care Level 4 for medical and mental health reasons.

[91]  *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons, 2–3 (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf.

76. Patients at Care Level 4 "require services available only at a BOP Medical Referral Center, which provides significantly enhanced medical services and limited inpatient care."[92] Examples of conditions that result in a Care Level 4 are: "Cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical treatment, and high-risk pregnancy."[93]

77. FMC Butner provides specialized services in all areas of medicine and is BOP's primary referral center for oncology, providing chemotherapy and radiation therapy.[94]

78. FMC Butner also manages a broad range of subacute and chronically ill incarcerated men.[95]

79. FMC Butner is not, however, equipped to provide advanced support in an ICU setting with ventilators, as serious COVID-19 cases often require.[96]

80. Instead, based on BOP press releases about the eight people who have already died at Butner, BOP leaves people in their Butner facility—without ICU-level care—until they are already experiencing respiratory failure.[97] It is only at that point that they may be transferred to a local hospital.[98]

---

[92] *Id.* at 3.

[93] *Id.*

[94] *Id.*

[95] *Bureau of Prisons: Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs*, United States Government Accountability Office, 64 (June 2017) https://www.gao.gov/assets/690/685544.pdf.

[96] *See id.*

[97] *See, e.g.*, Press Release, Inmate Death at FCI Butner I, U.S. Dep't of Justice Federal Bureau of Prisons (Apr. 13, 2020), https://www.bop.gov/resources/news/pdfs/20200413_3_press_release_butner.pdf ("John Doe, went into respiratory failure at the Federal Correctional Institution (FCI) Butner I . . . . He was evaluated by institutional medical staff and transported to a local hospital for further treatment and evaluation.") (attached at **Ex. 20**).

[98] *See id.*

81. Even if FMC Butner were equipped to provide the requisite level of care to treat serious coronavirus infections, it is already well over its maximum capacity.[99] The facility was designed to hold 513 people for inpatient treatment and another 250 people to work in the facility.[100] BOP reports that 909 men are currently housed there,[101] exceeding the facility's maximum capacity of 743 people by approximately 22 percent.[102]

82. The fifth floor of FMC Butner houses patients who are extremely ill, including those on hospice care.[103] The fourth floor houses patients undergoing treatment for cancer.[104] The third floor houses patients who are having ambulatory surgeries.[105]

83. Each of these floors house about 240 people, mostly in two-person cells.[106]

84. The fourth floor, which houses patients receiving treatment for cancer, is divided into four units of roughly 60 people each.[107] While each cell has its own sink, shower, and toilet, the residents of each unit must all share two phones.[108]

85. At least some cells on the fourth floor of the FMC share ventilation systems such that individuals in one cell can hear those in the cell next to them when they speak or cough.[109]

---

[99] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp.

[100] *PREA Audit Report*, at 2.

[101] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp.

[102] *See PREA Audit Report*, at 1.

[103] *See, e.g.*, Declaration of Randy Flores Ortiz ("Ortiz Decl.") (attached as **Ex. 13**) at 2.

[104] *Id.*; *see also* Declaration of Michael Harrington ("Harrington Decl.") (attached as **Ex. 5**) at 2.

[105] *See, e.g.*, Ortiz Decl. at 2.

[106] *See, e.g.*, *id.* at 1–2.

[107] *See, e.g.*, Harrington Decl. at 2.

[108] *Id.*

[109] *See, e.g.*, *id.* at 3.

86. Since the lockdown began at the beginning of April, Respondents have been quarantining some people who transfer into Butner on the fourth floor of the FMC—the floor where the residents are immunocompromised due to cancer treatment.[110] According to Randy Ortiz, a cancer patient housed on the fourth floor, as of May 21, there were two individuals quarantined in his 32-cell section of the fourth floor.[111]

87. People who work on the fourth floor of FMC bring food and medicine to the patients and those in quarantine.[112]

88. Movement of patients within the FMC has continued during the lockdown, despite the presence of coronavirus within the facility.[113]

89. Further, testing of the patients within the FMC has been sporadic and inconsistent. According to Michael Harrington, a terminal cancer patient also housed on the fourth floor, he tested negative for the virus on or about April 29 after reporting shortness of breath and pain in his chest – weeks after being moved into a new cell with a new cell mate, who was not tested for COVID-19 at any point.[114]

90. Importantly, the serious risks from COVID-19 to Petitioners and others in Butner with existing chronic illnesses does not come solely from the infection itself. As part of Butner's response to COVID-19, medical visits and treatments at FMC Butner for *existing* serious chronic illnesses have been severely curbed or halted for people residing in other parts of

---

[110] *See, e.g.*, Ortiz Decl. at 1.

[111] *Id*.

[112] *Id*.

[113] *See, e.g.*, Harrington Decl. at 3−4 (noting that Harrington was moved to a new cell with a new cellmate in mid-April, despite the presence of coronavirus within his unit).

[114] *Id*.

Butner.[115]  People in other Butner facilities who need treatment at the FMC Butner can no longer go there until the lockdown is lifted.[116]  This policy creates an additional, substantial medical risk for those medically vulnerable people housed at all facilities in the complex.

91.   In addition to patients, there are also people incarcerated at FMC Butner who work jobs maintaining the facility.  Upon information and belief, there are approximately 120 such people housed in the Cadre Unit, a dormitory-style unit with cubicles roughly 6' x 9'.  The cubicles are separated by walls about six feet high and house two or three people each.

92.   Upon information and belief, the Cadre Unit has communal phones and computers, which people are required to wait in lines to use, and a shared TV room and restroom facilities in which it is not possible for people to maintain distance from each other.

93.   Upon information and belief, some men in the Cadre Unit work jobs that require them to travel to other units within the FMC, such as those who work in the Inmate Companion Program (through which they assist FMC nurses with incarcerated or committed patients who cannot care for themselves).

94.   Upon information and belief, people who leave the unit for work have their temperatures taken regularly, but others only have their temperatures taken during sick calls.

95.   Upon information and belief, no one within the Cadre Unit has been tested for the coronavirus.

---

[115] *See* Hallinan Decl. at 1 ("I am supposed to continue to receive periodic [cancer] treatments . . . because my cancer was a type of cancer that frequently recurs . . . . I was supposed to have another treatment at the end of April 2020, but I was not taken for treatment because of the lockdown due to COVID-19."); Riddick Decl. at 5 ("People who need treatment at the FMC Butner can no longer go there until the lockdown is lifted."); Hill Decl. at 4 ("Since the lockdown . . . the men in facilities other than the FMC who would ordinarily receive treatment for their medical conditions in the FMC can no longer go there and cannot receive their treatments as a result at the FMC.").

[116] *See* Hallinan Decl. at 1; Riddick Decl. at 5; Hill Decl. at 4

96. As of May 24, 2020, at least five people incarcerated at FMC Butner and nine staff members have tested positive for coronavirus.[117]

### B. Butner Low

97. Butner Low[118] is a low security federal correctional institution.

98. A primary function of Butner Low is to house individuals designated as Care Level 3.[119] These are men "who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications, . . . [such as] [c]ancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe congestive heart failure, and end-stage liver disease."[120] In other words, Butner Low houses a large number of medically vulnerable people, including several Petitioners.[121]

99. Butner Low contains eight dormitory-style housing units, each holding about 140–160 men.[122]

100. The housing units are large, open rooms divided into cubicles.[123] Estimates of cubicle sizes range from about 9' x 7' to about 11' x 7', with walls about 5' or 6' high.[124] The photo below, published by the Associated Press, purports to show a dorm at Butner.

---

[117] *COVID-19 Cases*. BOP reports that one incarcerated person and seven staff members have recovered. *Id.*

[118] Butner Low is sometimes referred to as LSCI Butner.

[119] *PREA Audit Report*, at 2.

[120] *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf., at 5.

[121] *See, e.g.*, Dailey Decl. at 1–2; Hill Decl. at 1–2; McRae Decl. at 1.

[122] *See, e.g.*, Dailey Decl. at 2 ("I am housed in a dormitory-style housing unit of 162 men. We live in cubicles that are about 11' x 7'. There are 3 people in my cubicle.").

[123] *Id.*

[124] *See, e.g., id.* at 2 (housed in 11' x 7' cubicle); Hallinan Decl. at 2 (housed in 9' x 7' cubicle); Kinard Decl. at 1 (housed in 8' x 10' cubicle).

- 28 -



101. Most cubicles house two or three people, though a small number house only one, often due to that person using a wheelchair.[125] All or nearly all cubicles are occupied.[126] There is only about a 4' x 5' space to move around in those cubicles, if that.[127]

102. Because of the cubicle arrangement, most people housed in Butner Low sleep within six feet of several other people.[128] In other words, the hundreds of men in Butner Low—many of them elderly or medically vulnerable—spend several hours *every night* within the CDC's suggested minimum physical distancing zone.

103. Like all facilities in the complex, Butner Low is currently on "lockdown" due to the COVID-19 outbreak, meaning certain normal activities are curtailed.

---

[125] *See, e.g.*, Hill Decl. at 2 ("Because I use a wheelchair, I am housed in my own cubicle."); McRae Decl. at 1–2.

[126] *See, e.g.*, McRae Decl. at 1–2 (describing about 150 men housed in about 50 cubicles, most with three people per cubicle).

[127] *See, e.g.*, *id.*; Titus Decl. at 4.

[128] *See, e.g.*, Dailey Decl. at 3 (sleeps within six feet of seven or eight people); Hallinan Decl. at 2 (sleeps within six feet of five people); Kinard Decl. at 1 (sleeps within three feet of nearest person).

104. People requiring medication must line-up at one or more of three daily "pill calls."[129] William Whyte, for instance, must wait in the pill line for refills of his blood thinner.[130] He reports that people are not physically distanced in the pill line.[131] Sometimes these lines have 60 people in them.[132] Thus, every day—and sometimes more than once per day—medically vulnerable people are forced to stand in very close proximity to each other for extended periods of time to get their medications. The same medical staff conduct multiple pill calls per shift across multiple housing units, and they do not change protective gear, disinfect equipment, or otherwise decontaminate themselves as they move amongst units.[133]

105. The situation is similarly grim at meal time. Petitioners housed in Butner Low uniformly report that, although they are no longer taken to the cafeteria for meals, they are instead forced to line up in their housing units to receive their meals.[134] People in line are about one to two feet apart,[135] and, upon information and belief, it takes at least ten minutes to get through the line. And, in at least one case, men from one unit were made to line up with men from another unit, substantially defeating any intended purpose behind the current meal-time process.[136]

---

[129] *See, e.g.*, Dailey Decl. at 3 (reporting that people "line up [during pill call] with little space between them").

[130] Declaration of William Robert Whyte ("Whyte Decl.") (attached as **Ex. 16**) at 2.

[131] *Id.; see also* Hill Decl. at 3; McRae Decl. at 2.

[132] *See, e.g.*, Declaration of John Krokos ("Krokos Decl.") (attached as **Ex. 10**) at 3.

[133] *See, e.g.*, Titus Decl. at 4.

[134] *See, e.g.*, Kinard Decl. at 2 ("We are no longer allowed to go to the cafeteria for meals, and have been getting our meals by lining up as a unit just outside of the unit door. It is not possible to maintain distance from others when lining up for meals.").

[135] *See, e.g.*, Hallinan Decl. at 3 ("People in the lines are right on top of each other, with only 1'–2' between them.").

[136] *See* Kinard Decl. at 2.

106. Likewise, access to phones and computers is problematic, with people densely packed in lines for extended periods of time.[137] Petitioners report that the six to eight phones shared in each unit—which are in regular use—are about two feet apart, and they are not disinfected in between uses.[138] People wait about 30 to 60 minutes in line to use the phone.[139] Computers are also within a few feet of one another, in regular use, and rarely, if ever, cleaned.[140]

107. TV rooms are closed, but according to some Petitioners, the TVs are on and visible from an area just outside the computer room.[141] These people "are all very close to each other in the area just outside the computer room."[142] Because the TV rooms are closed, people use the common area for other purposes, like as a makeshift seating area for playing games.[143] Notably, because the lockdown allows for limited opportunities to exercise, people also exercise in the common area, leading to more close contact with others.[144]

---

[137] *See, e.g.*, Hallinan Decl. at 3 ("There is no social distancing in the phone lines . . . . People mill around, close to each other, outside the computer room while they wait to get on the computer."); McRae Decl. at 2 ("There is no social distancing in the phone lines."); Hill Decl. at 3 ("There is no social distancing in the phone lines.").

[138] *See, e.g.*, Kinard Decl. at 1 ("The phones are cleaned once in the morning by an orderly, but I am not aware of them being cleaned at any other point by BOP staff."); Hill Decl. at 3; McRae Decl. at 2.

[139] *See, e.g.*, Titus Decl,. at 2; Hill Decl. at 3.

[140] *See, e.g.*, Hallinan Decl. at 3 ("There are five computers in a computer room . . . Four of them are on one side of the room, with one to two feet between them . . . . The[ ] computers are pretty much always in use . . . . I haven't seen the computers get cleaned or disinfected."); Hill Decl. at 3; McRae Decl. at 2.

[141] *See e.g.*, Dailey Decl. at 4 ("There are also chairs in the area outside the computer room where people sit so that they can watch the television in the TV room. The TV room itself is closed, so this is where people sit if they want to watch it.").

[142] *Id*.

[143] *See, e.g.*, Krokos Decl. at 3.

[144] *Id*.

108. People housed in Butner Low share a small number of toilets, showers, and sinks across the entire housing unit.[145] The fixtures are all within three feet of each other, meaning, people "are in very close contact in the bathrooms."[146]

109. There is little fresh air in the housing units.[147] Windows are not opened, and "the only chance [one Butner Low resident] had for a breath of fresh air was if a [staff member] would distribute meals at the open entry door of the unit."[148]

110. Some Petitioners report being given cloth masks.[149] Some do not fit.[150] Some are made of thin, translucent material.[151] People housed at Butner Low are responsible for cleaning their own masks,[152] but at points during the lockdown, laundry access has been limited.[153] If masks are damaged or lost, there is no means to repair or replace them.[154] Petitioners are not given gloves.[155]

---

[145] *See, e.g.*, Krokos Decl.at 4 (162 people in the unit share 16 toilets, 12–14 showers, and 10 sinks); Hallinan Decl. at 2 ("All 140 or 150 people in the housing unit share about 16 toilets, 12 showers, and 10 sinks."); Hill Decl. at 2–3 ; McRae Decl. at 2.

[146] *See, e.g.*, Hallinan Decl. at 2; Hill Decl. at 2–3; McRae Decl. at 2.

[147] *See, e.g.*, Krokos Decl. at 3.

[148] *Id.*

[149] *See, e.g.*, Dailey Decl. at 4 ("We were given cloth masks."); Hill Decl. at 3; Kinard Decl. at 2 ("Everyone in my unit was given 2 fabric masks that we were told were made at UNICOR."); McRae Decl. at 3.

[150] *See, e.g.*, Dailey Decl. at 4.

[151] *See, e.g.*, Krokos Decl. at 5.

[152] *See, e.g.*, Dailey Decl. at 4.

[153] *See, e.g.*, Krokos Decl. at 4.

[154] *See, e.g.*, Titus Decl. at 3.

[155] *Id.*

- 32 -

111. Critically, BOP's enforcement of the requirement to wear masks is also inconsistent.[156]  Not all staff wear their masks.[157]  Some incarcerated people also do not wear their masks.  As explained by Petitioner Kinard, "[W]hether to wear a mask seems to be up to the discretion of the individual."[158]

112. Many people have frequent contact with people from other housing units.[159]  For example, Butner Low has a UNICOR operation where many people from different housing units work.[160]  Petitioner Hallinan reports that at least two dozen people in his housing unit have jobs with UNICOR where they "work with people from other housing units."[161]  Petitioners Hill and McRae report the same.[162]  Similarly, people work in the kitchen with incarcerated people from other housing units.[163]

113. Petitioner Dailey reports that one person in his housing unit is an orderly assigned to clean the SHU, where some people who have COVID-19 are housed.[164]

---

[156]  *See* Kinard Decl. at 3.

[157]  *See, e.g.*, Hill Decl. at 4 ("*Most* staff wear their masks.") (emphasis added); Dailey Decl. at 4 ("Most but not all staff wear masks."); McRae Decl. at 3 ("Most staff wear their masks."); Krokos Decl. at 5 (estimating that 40 percent of guards wore masks only when higher ranking BOP staff entered the units).

[158]  Kinard Decl. at 3.

[159]  *See, e.g.*, Hill Decl. at 4 (describing people in his unit who work with others at UNICOR); Krokos Decl. at 6 (describing guards working in different housing units and people in his unit going to various jobs in different units); McRae Decl. at 3 (describing people in his unit who leave his unit to go to work and come back).

[160]  *See* Hallinan Decl. at 5 ("About two dozen people in my housing unit have jobs with UNICOR.").

[161]  *Id.*

[162]  Hill Decl. at 4; McRae Decl. at 3.

[163]  *See, e.g.*, Hallinan Decl. at 4; Whyte Decl. at 8.

[164]  Dailey Decl. at 5.

114. According to Declarant Whyte, a man in his housing unit "has a job cleaning personal protective equipment used by sick people in other housing units," which means that person comes into frequent contact with items used by people with COVID-19.[165]

115. Similarly, correctional officers and other staff move between housing units. For example, during count, the officers in one housing unit help the officers in another, and vice versa.[166] There is at least one staff member who works in the kitchen and in the SHU, where sick people are held for isolation.[167]

116. There is no widespread testing for coronavirus in Butner Low.[168] Almost all Petitioners from Butner Low report that they do not know a single person tested in their respective housing units.[169] Moreover, temperature checks are sporadic, ineffectual, and inconsistent across units. For example, Petitioner Hallinan states that "[s]hortly after the lockdown started on April 1, medical staff was taking the temperature of [everyone] in the housing unit every day," but that practice lasted only a week.[170] After that, a person had to request a sick call in order to get a temperature check.[171] Notably, a sick call costs $2.00.[172] On one day during the second week in May, everyone in his unit again had their temperature checked. Petitioner Harris reports that his unit had a single temperature check around May 7 but has not had any

---

[165] Whyte Decl. at 8.

[166] *See, e.g.*, Dailey Decl. at 5.

[167] *See* Krokos Decl. at 7.

[168] *See, e.g.*, Dailey Decl. at 4 ("There has been no widespread testing for coronavirus in my housing unit."); Hill Decl. at 4 (same); McRae Decl. at 3 ("I don't know of a single person in my housing unit who has been tested for the coronavirus.").

[169] *See, e.g.*, Dailey Decl. at 4; Hill Decl. at 4.

[170] Hallinan Decl. at 4.

[171] *E.g.*, Hallinan Decl. at 4*;* Hill Decl. at 4; McRae Decl. at 3.

[172] Hallinan Decl. at 4*;* Hill Decl. at 4; McRae Decl. at 3.

since.[173]  Petitioner Titus reports that "men working limited work details were checked sporadically for a fever," and daily checks for those going to work are not being enforced.[174]

117. Making all these issues worse, Butner Low is overcrowded.  The facility was designed to hold 992 people, but as of May 22, 2020, BOP reports that 1,201 men are housed there,[175] exceeding the facility's maximum capacity of 992 people by approximately 21 percent.[176]

118. All these conditions—overcrowding of already tight quarters; shared use of limited facilities with frequent close contact; lengthy, daily line-up requirements; inconsistent mask use amongst staff and incarcerated people; and limited testing and screening—create the extraordinarily dangerous conditions that sustain the ongoing COVID-19 outbreak at Butner.

119. As of May 24, 2020, at least 141 people incarcerated at Butner Low and nine staff members have tested positive for coronavirus.[177]

### C.  FCI Butner Medium I and Camp

120. FCI Butner Medium I is made up of a medium security federal correctional institution and a minimum security camp ("Camp").

121. Like Butner Low, Medium I also houses men whose health care needs are classified as Care Level 3.[178]

---

[173] Harris Decl. at 4.  Mr. Harris believes that men in another housing unit received daily temperature checks, indicating that any BOP policy on temperature checks is inconsistently applied.  *See id*.

[174] Titus Decl. at 3.

[175] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp.

[176] *PREA Audit Report*, at 1.

[177] *COVID-19 Cases*.  BOP reports that 39 incarcerated people and 6 staff members have recovered.  *Id*.

[178] *See FCC Butner Doctoral Psychology Internship 2019–2020 Brochure*, Federal Bureau of Prisons, 11 (July 15, 2018), https://www.bop.gov/jobs/docs/BUX%20Brochure%202019-2020.pdf ("Additionally, Care Level Three inmates (chronically mentally ill persons) who can function adequately on an outpatient basis are housed throughout the complex.").

122. Many of the conditions at the Camp are substantially similar to those at Butner Low.[179]  For instance, the Camp has dormitory-style housing divided into shared cubicles that do not allow for physical distance from bunkmates.[180]  However, some units in the Camp are so overcrowded that they have an area known as the "beach," where people new to the unit are forced to sleep in two rows of three bunk beds less than four feet apart.[181]  Residents must walk through the "beach" in order to go to the restroom, meaning the men in those bunks are subjected to a constant stream of close-proximity traffic.[182]

123. People in each Camp housing unit share a single bathroom with about five stalls, five showers, and five sinks.[183]  People line up within two feet of each other to use the phones, and they are responsible for cleaning them between uses.[184]

124. Petitioner Maldonado reports that several men are housed in the chapel behind his housing unit.[185]  These men have tested positive for the virus and were sent to the SHU for some time to be isolated before being sent to the chapel.[186]  Some of the men housed in the chapel use the same bathroom as the men in Petitioner Maldonado's unit.[187]  The only safeguards against infection from these men are a "make-shift wall" installed by BOP staff in the bathroom to separate the people in the chapel from the others and an orderly *from the same housing unit*

---

[179] *See generally* Huntley Decl.; Maldonado Decl.; Goodwin Decl.

[180] *See, e.g.*, Huntley Decl. at 1.

[181] *Id*.; *see also* Goodwin Decl. at 3 (describing "beach" in Hatteras West unit).

[182] *See, e.g.*, Huntley Decl. at 1.

[183] *See, e.g.*, *id*. at 2.

[184] *See, e.g.*, *id*.  Unlike in Butner Low, however, it appears that spray disinfectant is sometimes provided for cleaning the phones in the Camp.  *See, e.g.*, *id*.

[185] Maldonado Decl. at 5.

[186] *Id*.

[187] *Id*.

as Petitioner Maldonado who cleans the bathroom after the men who have tested positive for coronavirus leave.[188]

125. People in the housing units at the Camp share three computers—all right next to each other on a shared desk—and the unit's TVs are in the same room.[189]  The room is always crowded, making social distancing impossible.[190]

126. Meals are handled inconsistently.[191]  Some staff bring meals directly to cubicles, but others make entire housing units line up at the unit door for meals.[192]  Like in Butner Low, people lining up for meals are no more than two feet from one another.[193]

127. Much like at meal time, people line up three times per day for pill call.[194]  And, much like at meal time, people in line are no more than two feet apart the entire time.[195]

128. People housed in the Camp have been given cloth masks made at UNICOR, but there appears to be no mandatory use policy.[196]  According to Petitioner Maldonado, BOP staff in the Camp did not start wearing masks until his unit manager was out sick for two weeks.[197]

129. In March, the Camp Administrator held a town hall meeting with at least one housing unit, Hatteras East, during which she told people housed in that unit that they should not worry

---

[188] *Id*.  The orderly does not change his clothes after cleaning the bathroom and before returning to Mr. Maldonado's unit.  *See id*.

[189] *See, e.g.*, Huntley Decl. at 2.

[190] *See, e.g.*, *id*.

[191] *See, e.g.*, *id*.

[192] *See, e.g.*, *id*.

[193] *See, e.g.*, *id*.

[194] *See, e.g.*, *id*.

[195] *See, e.g.*, *id*.

[196] *See, e.g.*, *id*. at 3.

[197] Maldonado Decl. at 7.  Mr. Maldonado reports that several BOP staff members, including those who hand out meals, have been out sick.  *Id*.

about the virus or masks.[198]  The Assistant Warden told men in that unit that wearing a mask would result in a disciplinary write-up commonly referred to as a "shot."[199]

130. Some people housed at the Camp continue to go to work at the UNICOR operation at Medium I or elsewhere, alongside people from other housing units.[200]

131. Staff also move freely between units.[201]

132. Upon information and belief, when people housed in the Camp report symptoms to BOP staff, they are ignored, and people with COVID-19 symptoms but no fever receive no medical treatment.  For example, Roger Goodwin, who suffers from a rare autoimmune disease, passed out in his unit and was taken to medical only to be told that he should drink more water before being returned to his unit in the Camp.  It was only after he passed out in his unit for a second time the following day that medical staff tested Declarant Goodwin and discovered that he was COVID-19 positive.[202]

133. Given the conditions at the Camp and inconsistent adherence to whatever policies BOP purports to have put in place to address COVID-19, it is unsurprising that the disease spread rapidly through the Camp.[203]  As one person housed in the Camp explained:

---

[198] *Id.*

[199] *See, e.g.*, Declaration of Roger Duane Goodwin ("Goodwin Decl.") (attached as Ex. 3) at 2.

[200] *See, e.g.*, Huntley Decl. at 3.

[201] *See, e.g.*, *id.*

[202] Goodwin Decl. at 4–5.

[203] *See, e.g.*, *Huntley Decl.* at 3–4 (describing rapid spread in Catawba West housing unit).

"I first heard of someone in my unit becoming sick and having to be removed in early April, after which it felt like a chain reaction within the camp. . . . [S]uddenly it seemed as if everyone in my unit was ill. . . . At night, I would hear coughing all throughout the unit. . . . My entire unit was tested for coronavirus on or around April 23, 2020. We were not isolated or separated from one another in any way while we waited for results. On or around April 30, 2020, Dr. Beyer gathered our unit together and told us that the entire unit had tested positive for coronavirus. She also told us that as many as 80% of the entire camp population tested positive for coronavirus, and that a large number of people testing positive for the virus had only mild or no symptoms.[204]

134. And, like Butner Low, FCI Medium I also has a UNICOR operation where people from within the facility work.[205]

135. BOP reports that 867 men are housed in FCI Butner Medium I.[206]

136. As of May 24, at least 259 people incarcerated at FCI Butner Medium I and 26 staff members have tested positive for coronavirus.[207] Eight people incarcerated in Medium I have died so far from the disease.[208]

### D. FCI Butner Medium II

137. Medium II is another medium security federal correctional institution.

138. Like the other facilities at Butner, many people in Medium II are at high risk of serious illness or death from COVID-19.[209]

---

[204] *Id*.

[205] *PREA Audit Report*, at 2.

[206] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp.

[207] *COVID-19 Cases*. On May 24, BOP reported that, in Medium I, 178 incarcerated people and 22 staff members had recovered, and 8 incarcerated people had died. *Id*. There is reason to be cautious of BOP's reporting. For instance, on May 24, BOP reported a total of 45 incarcerated people were infected and 178 incarcerated people had recovered (a total of 223 people infected at some point), but on May 11, BOP reported that 207 incarcerated people were infected and 52 had recovered (a total of 259 people infected at some point). It is not clear why BOP now reports fewer total infections.

[208] *Id*.

[209] *See, e.g.*, Ayers Decl. at 5 ("There are quite a few people on my unit that are elderly or have serious medical conditions."); Riddick Decl. at 4 ("At least half of the people in my housing unit are elderly

139. People incarcerated in Medium II are housed in celled units of about 120 people, with one to four people per cell.[210] Cells range from 8' x 6' to 8' x 8', depending on the number of people housed in them.[211] People housed in these cells sleep on bunk beds, and in four-person cells, the beds are about two feet apart in an L shape.[212]

140. Medium II is also home to a SHU where some people with COVID-19 symptoms have been placed.[213] The SHU is not a medical isolation unit;[214] it is typically used for administrative detention (such as inmate transfers) or disciplinary segregation.[215]

141. Medium II has a UNICOR operation at which numerous people housed in Medium II work.[216] Many people in general population in Medium II have jobs with either UNICOR or a private contractor.[217] And, like those men who work in the other UNICOR operations, they work side-by-side with men from other housing units.[218]

142. Staff move between housing units.[219] They also move into the community. One staff member informed Petitioner Riddick that he had recently been responsible for watching three incarcerated people with COVID-19 in their rooms at Duke University hospital.[220]

---

and/or have serious medical conditions. . . . I believe all 12 units at FCI Butner Medium II also house people who are elderly and/or have serious medical or mental health conditions."); Beyrer Decl. at 31.

[210] *See, e.g.*, Ayers Decl. at 2; Riddick Decl. at 2.

[211] *See, e.g.*, Ayers Decl. at 2; Riddick Decl. at 2.

[212] *See, e.g.*, Riddick Decl. at 2–3.

[213] *See* Ayers Decl. at 5; Riddick Decl. at 5.

[214] Riddick Decl. at 5; Beyrer Decl. at 22–23.

[215] *Low Security Correctional Institution Butner, North Carolina, Inmate Handbook*, Federal Bureau of Prisons, 60 (Jan. 22, 2009), https://www.bop.gov/locations/institutions/buf/BUF_aohandbook.pdf.

[216] *PREA Audit Report*, at 2.

[217] Ayers Decl. at 6. Those who work under private contract, including Mr. Ayers, are not currently going to work, but those who work at UNICOR are still working. *See id.*

[218] *See id.*

[219] *Id.* at 6.

[220] Riddick Decl. at 6.

- 40 -

143. Medium II is overcrowded. BOP reports that 1,461 men are housed there,[221] exceeding the facility's maximum capacity of 1,152 people by approximately 27 percent.[222]

144. Each cell has a shared toilet and sink, and people in each 120-person housing unit share about 12 showers spaced about three feet apart.[223]

145. As in other facilities, there are communal phones spaced a few feet apart; people stand in close proximity to each other in long lines waiting for the phones.[224] There is no physical distancing in these lines.[225] Incarcerated people can use rags or socks to wipe the phones between uses, but they do not have supplies readily available to disinfect the phones.[226]

146. The situation in the computer rooms is similar to that in other facilities: a common room where people work shoulder to shoulder at computers that are constantly in use and groups of people waiting in close proximity for their turn to use the computers.[227]

147. People housed in Medium II have been provided cloth masks that are very thin and ill-fitting.[228] And, as in other facilities, they report that not all staff wear masks.[229]

148. As in Butner Low, Petitioners report no widespread testing for the virus.[230]

---

[221] *See Population Statistics: Inmate Population Breakdown*, https://www.bop.gov/mobile/about/population_statistics.jsp.

[222] *See PREA Audit Report*, at 1.

[223] *See, e.g.*, Ayers Decl. at 3; Riddick Decl. at 3.

[224] *See, e.g.*, Ayers Decl. at 4; Riddick Decl. at 4.

[225] *See, e.g.*, Ayers Decl. at 4; Riddick Decl. at 4.

[226] *See, e.g.*, Ayers Decl. at 4; Riddick Decl. at 4.

[227] Ayers Decl. at 5; see also Riddick Decl. at 4.

[228] *See, e.g.*, Ayers Decl. at 5; Riddick Decl. at 4.

[229] *See, e.g.*, Ayers Decl. at 5; Riddick Decl. at 4 ("*Most* staff wear their masks.") (emphasis added).

[230] *See, e.g.*, Ayers Decl. at 5.

149. And, if a person in the unit is sick, they must request a $2.00 sick call to get a temperature check.[231] Those with high enough temperatures are taken to the SHU.[232]

## V. BOP's Prevention and Mitigation Measures Are Inadequate to Address the Risk of Harm to Petitioners

### A. BOP Is Aware of the Risks to Petitioners

150. Respondents have a "profound obligation to protect the health and safety of all [incarcerated people]."[233] Despite this obligation, BOP as a whole—and Butner in particular—have failed for nearly two months to adequately protect the incarcerated people under their charge.

151. Based on confirmed cases, COVID-19 has entered approximately 72 of the 193 facilities run by BOP, including at least three out of the four facilities at Butner (FMC Butner, Medium I, and Butner Low).[234]

152. As of May 24, 2020, BOP houses 136,956 people and has a staff of approximately 36,000, for a total on-site population of approximately 173,000.[235] As of the same date, at least 4,761 incarcerated people and 589 BOP staff had tested positive for coronavirus, for a total of 5,350 *known* positive individuals—an increase of 3,723 known positive cases since April 27, 2020.[236]

---

[231] *See, e.g.*, Riddick Decl. at 5; Ayers Decl. at 5.

[232] *See, e.g.*, Riddick Decl. at 5; Ayers Decl. at 5.

[233] Attorney General William Barr, *Memorandum for Director of Bureau Prisons*, Office of the Attorney General, (Apr. 3, 2020), https://www.justice.gov/file/1266661/download ("Barr April 3 Memo") (attached as **Ex. 22**), at 1.

[234] *COVID-19 Cases*.

[235] *Id*.

[236] *Id*. The significant week-to-week jump in positive cases may be a result of increased testing within BOP, but the point remains.

- 42 -

153. Based on these numbers, the BOP infection rate as a percent of the total on-site population is approximately 3.1 percent. That rate is more than *six times* the current infection rate in the rest of the United States.[237]

154. So far, 59 people held in BOP facilities have died from COVID-19.[238] Eight of those people died while incarcerated at Butner.[239]

155. In a March 26, 2020 memorandum to Respondent Carvajal regarding the COVID-19 "crisis" (the "March 26 Memo"), Attorney General William Barr identified home confinement as "[o]ne of BOP's tools to manage the prison population and keep [incarcerated people] safe" from COVID-19.[240]

156. The Attorney General directed Respondent Carvajal "to prioritize the use of [the BOP's] various statutory authorities to grant home confinement for [incarcerated people] seeking transfer in connection with the ongoing COVID-19 pandemic," because "for some eligible [people], home confinement might be more effective in protecting their health."[241]

157. Attorney General Barr further identified "[t]he age and vulnerability of the [incarcerated person] to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines," as one of the critical, discretionary factors for consideration.[242]

---

[237] As of May 22, 2020, the total U.S. population was approximately 329,684,572. *U.S. and World Population Clock*, United States Census Bureau, https://www.census.gov/popclock/ (last visited May 22, 2020, 2:51 p.m.). As of May 22, 2020, there were approximately 1,588,322 confirmed COVID-19 infections in the United States. *COVID-19 Dashboard by the Centers for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University: Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited May 22, 2020, 2:52 p.m.). Total infections divided by total population yields approximately 0.0048 or approximately 0.48 percent.

[238] *COVID-19 Cases*.

[239] *Id.*

[240] Barr March 26 Memo at 2.

[241] *Id.*

[242] *Id.*

158. Eight days later, following dramatic increases in confirmed COVID-19 cases at BOP facilities, Attorney General Barr issued a second memorandum underscoring the BOP's "profound obligation to protect the health and safety of all [incarcerated people]" and found that "emergency conditions are materially affecting the functioning" of the BOP.[243]

159. The Attorney General recognized that BOP efforts to prevent the spread of COVID-19 within BOP "have not been perfectly successful."[244] He ordered Respondent Carvajal to take more aggressive steps—immediately—to transfer incarcerated people to home confinement where possible, even if electronic monitoring will be not be available, explaining that "time is of the essence."[245]

160. Additionally, in an acknowledgment of the risk posed by COVID-19, BOP issued a COVID-19 Action Plan and implemented modified operations.[246] The Action Plan requires quarantine for all new admissions, all close contacts of confirmed or suspected cases, and all incarcerated people set for release.[247]

161. Finally, as noted above, on April 1, Respondents issued an order to lock down Butner because of COVID-19.[248] This, too, is an acknowledgment of the risk posed by the virus.

162. Despite knowing full well the urgency of the situation and the need to reduce prison populations, BOP is not releasing enough incarcerated people to have a meaningful impact

---

[243] *See* Barr April 3 Memo at 1.

[244] *Id*. at 2.

[245] *Id*.

[246] *BOP Implementing Modified Operations*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 22, 2020).

[247] *See Memorandum for All Chief Executive Officers: Coronavirus (COVID-19) Phase Six Action Plan*, Federal Bureau of Prisons (Apr. 13, 2020), https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf ("*Phase Six Action Plan*") (attached as **Ex. 23**).

[248] *See, e.g.*, Hallinan Decl. at 4.

- 44 -

on both those most in need of release and those whose safety while in continued custody in a BOP facility depends on the ability to practice physical distancing.

**B.** **Respondents Have Failed to Meaningfully Respond to the Grave Risk Facing Incarcerated People at Butner**

163. Respondents know the risk to incarcerated people at Butner but have not taken well-known and essential measures to address the risk.

164. Instead, Respondents have taken only minimal measures. The failure to adequately respond to the deadly virus ravaging Butner constitutes deliberate indifference to Petitioners' health and safety in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

**1.** **Respondents have failed to use the tools available to them to reduce the population at Butner**

165. Because of the severity of the threat posed by COVID-19, and its proven ability to rapidly spread through a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19.[249] Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a prison and the broader community.[250] Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[251]

---

[249] *See, e.g.*, Josiah Rich, Scott Allen, and Mavis Nimoh, *We Must Release Prisoners to Lessen the Spread of Coronavirus*, Washington Post (March 17, 2020), https://wapo.st/2JDVq7Y; Beyrer Decl. at 32–33.

[250] Goldenson Decl. at 7–8; Beyrer Decl. at 32–33.

[251] Goldenson Decl. at 7; *see also* Beyrer Decl. at 17, 32–33.

- 45 -

166. Internationally, governments and jail staff have recognized the threat posed by COVID-19 and released large numbers of detained persons. For example, France released approximately one-seventh of its total prison population.[252] In Iran, more than 85,000 people were released from jails to curb the spread of coronavirus.[253]

167. Domestically, jail administrators in Washington County, Oregon;[254] Cuyahoga County, Ohio;[255] Los Angeles, California;[256] San Francisco, California;[257] Jefferson County, Colorado;[258] and the State of New Jersey,[259] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.

168. On March 26, Attorney General Barr instructed Respondent Carvajal to prioritize transferring people from BOP facilities to home confinement because of the risk from COVID-19.[260] On March 27, President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, giving the Attorney General expanded power to immediately release

---

[252] Benjamin Dodman, *As France Releases Thousands, Can Covid-19 End Chronic Prison Overcrowding?*, FRANCE24.COM (April 27, 2020), https://www.france24.com/en/20200427-as-france-releases-thousands-can-covid-19-end-chronic-prison-overcrowding.

[253] Morning Edition, *Iran Releases 85,000 Prisoners But Not Siamak Namazi*, NPR (March 18, 2020), https://www.npr.org/2020/03/18/817606513/iran-releases-85-000-political-prisoners-but-not-siamak-namazi.

[254] KATU, *Washington Co. Jail Releases Inmates to Meet Social Distancing Guidelines*, KCBY (April 28, 2020), https://kcby.com/news/local/washington-co-jail-releases-inmates-to-meet-social-distancing-guidelines.

[255] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic*, (March 20, 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.

[256] Alene Tchekmedyian, *More L.A. County Jail Inmates Released Over Fears of Coronavirus Outbreak*, L.A. Times, (March 19, 2020 6:55 p.m.), https://cutt.ly/ltRSCs6.

[257] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26*, San Francisco Chronicle (March 20, 2020), https://cutt.ly/0tRSVmG.

[258] Jenna Carroll, *Inmates Being Released Early from JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR Colorado (March 19, 2020 2:29 pm.), https://cutt.ly/UtRS8LE.

[259] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (March 23, 2020), https://cutt.ly/QtRS53w.

[260] *See* Barr March 26 Memo.

prisoners on account of COVID-19. On April 3, Attorney General Barr instructed Respondent Carvajal to take aggressive steps—immediately—to transfer people in BOP custody to home confinement where possible, explaining that "time is of the essence."[261]

169. Nevertheless, since March 26 (the date of Attorney General Barr's first memo), BOP has placed only *two percent* of the approximately 153,000 people then in BOP custody into home confinement (3,179 incarcerated people nationwide, which is a *nationwide* average of approximately 61 total per day across *all* BOP facilities; in other words, an average of only one person per BOP facility every other day).[262]

170. Many people at Butner should have been transferred to home confinement pursuant to these instructions from Attorney General Barr. As discussed above, Butner houses a large number of people who are very medically vulnerable. Further, nearly 1,500 people in the facility, including many of the medically vulnerable population, are considered either minimum or low security prisoners.

171. However, Respondents have transferred very few of the people incarcerated at Butner to home confinement due to their vulnerability to COVID-19.[263]

---

[261] *See* Barr April 3 Memo at 2.

[262] *Director M.D. Carvajal Addresses All Staff: COVID-19 Video Update Number 5: April 22, 2020*, Federal Bureau of Prisons (April 22, 2020), https://www.bop.gov/resources/news/20200422_dir_message.jsp; *COVID-19 Cases*. BOP has not disclosed the number of incarcerated people it typically released per day prior to Attorney General Barr's memos, nor has it disclosed how many new incarcerated people have entered BOP custody during the same time period, so there is some uncertainty as to whether any BOP efforts since the March 26 memo have had any real impact on the size of the population at BOP.

[263] *See, e.g.*, Ayers Decl. at 4; Hallinan Decl. at 5; Hill Decl. at 5; McRae Decl. at 4; Riddick Decl. at 6; Titus Decl. at 5; Beyrer Decl. at 32. In fact, while Attorney General Barr directed BOP to release *more* vulnerable incarcerated people, BOP paradoxically *heightened* the standard for eligibility, *decreasing* the number of people eligible for home confinement. Ian MacDougall, *Bill Barr Promised to Release Prisoners Threatened by Coronavirus—Even as the Feds Secretly Made It Harder for Them to Get Out*, ProPublica (May 26, 2020), https://www.propublica.org/article/bill-barr-promised-to-release-prisoners-threatened-by-coronavirus-even-as-the-feds-secretly-made-it-harder-for-them-to-get-out.

172. Respondents could also support the people in their custody in their efforts to obtain compassionate release. They have chosen not to. For example, Declarant Huntley filed a motion for compassionate release based on, among other things, hypertension that made him especially vulnerable to COVID-19.[264] Respondents opposed Declarant Huntley's motion.[265] The court granted the motion on May 7.[266] Similarly, Respondents opposed Declarant Krokos's motion for compassionate release over the course of nine months, before a court granted the motion and he was released on May 12.[267] On May 19, another court ordered the release of a person whose motion for compassionate release Respondents had opposed.[268]

173. In spite of the spread of COVID-19 at Butner, infecting hundreds and killing eight men already, Respondents have chosen not to use the tools available to them to move the most vulnerable people out of Butner. This failure to release people is deliberate indifference because the incarcerated people must expose themselves to a deadly infectious disease that constitutes a certain risk to health, particularly for the Medically-Vulnerable Subclass as defined herein.

---

[264] Huntley Decl. at 4.

[265] *Id.*

[266] *Id.*

[267] Krokos Decl. at 1, 7.

[268] Opinion and Order Granting Defendant Wesam El-Hanafi's Motion for Compassionate Release, *United States v. El-Hanafi*, No. 1:10-cr-00162-KMW (S.D.N.Y. May 19, 2020), ECF No. 252 (attached as **Ex. 33**); *see also* Ayers Decl. at 1–2, 4 (noting BOP opposition to request for compassionate release of 37-year-old pernicious anemic with atrophic gastritis); Goodwin Decl. at 1–3 (noting BOP opposition to request for compassionate release of 61-year-old with immunodeficiency disorder, diabetes, hypertension and heart disease); Harrington Decl. at 1, 4 (noting government opposition to motion for sentence reduction of terminal cancer patient with roughly 13-month life expectancy); Hill Decl. at 1–2, 4–5 (noting opposition to request for compassionate because he is a Washington D.C. Code Offender and delay in responding to second request); Maldonado Decl. at 1, 3–4, 7–8 (noting BOP opposition of request for compassionate release of 51-year-old kidney transplant recipient with hypertension and tachycardia experiencing symptoms of kidney failure).

174. Moreover, Respondents have opposed the incarcerated people's efforts to avail themselves of the possibility of release from the facility. Releasing people from Butner is essential to control the spread of this deadly virus, but Respondents have chosen not to release people.

### 2. Respondents have not created conditions to allow for social distancing at Butner

175. To prevent the spread of the virus, the CDC recommends that people should maintain a distance of at least 6 feet between themselves and other people.

176. CDC recommends rearranging bunks in prisons so that people have more space between them when they sleep.[269] In Butner, because Respondents have failed to release people or transfer them to home confinement, no such rearrangement has occurred. People sleep within a few feet of multiple other people.[270] Nearly every cubicle and cell is full.[271]

177. Further, the crowding in dormitories results in people being forced to wait in close-packed lines multiple times a day while meals and medicines are distributed.[272] Respondents have chosen not to reduce the population to a level where meal and medication distribution can be accomplished in a manner that does not require scores of men to line up close to each other multiple times a day. Respondents have also chosen to distribute meals and medications by making the men line up, rather than staggering meals, or delivering meals and medications to the men in their living spaces.

178. Similarly, Respondents have not taken steps to ensure social distancing with regard to the use of phones and computers.[273] The people incarcerated at Butner are in close proximity to

---

[269] *Interim Guidance* at 11–12 (emphasis added).

[270] *See, e.g.*, Ayers Decl. at 2; Hallinan Decl. at 2; McRae Decl. at 2; Hill Decl. at 2; Dailey Decl. at 3.

[271] *See, e.g.*, Dailey Decl. at 3; Hallinan Decl. at 2.

[272] *See, e.g.*, Krokos Decl. at 5; Hallinan Decl. at 3; Hill Decl. at 3. Dailey Decl. at 3; McCrae Decl. at 2.

[273] *See, e.g.*, Hallinan Decl. at 3; Dailey Decl. at 3; Hill Decl. at 3; Riddick Decl. at 4.

- 49 -

each other when they use the phones and computers. Because there are so many people at Butner, the phones and computers are in constant use during the hours people are allowed to use them. Further, people wait for the phones and computers in areas that do not provide for social distancing. Respondents have failed to take any measures to enable people to use the equipment without being in close proximity to other people.

### 3. Respondents have chosen not to find out who in Butner has COVID-19, a crucial step for addressing the risk from the virus.

179. Despite the deaths of at least eight men from COVID-19 at Butner, Respondents have not conducted widespread testing. As of May 8, 2020, just 459 coronavirus tests had been administered to incarcerated people at the Butner complex, out of a total of approximately 4,550 people. Of these 459 tests, approximately 318 tested positive and 141 tested negative.[274]

180. Respondents do not test Butner's staff.[275] Instead, they rely on "self-reporting and temperature checks."[276] As of May 22, BOP reported that 44 staff members at Butner had reported to BOP that they had tested positive.[277]

---

[274] Gov't Opp. to Mtn. Compassionate Release, *El-Hanafi* S7 10-cr-162 (KMW) at 16. As noted above, there is some reason to be skeptical of BOP's reported statistics. For instance, as of May 12, 2020, BOP's data showed 358 people (including staff) at FCC Butner had tested positive *at some point*, including those who had tested positive and recovered. However, as of May 17, 2020, BOP's reported data showed only 341 people having tested positive at some point at FCC Butner—17 people fewer than five days earlier. While there may be legitimate reasons for the disparity, it appears that BOP data on COVID-19 infections in its facilities do not present the full picture.

[275] Gov't Opp. to Mtn. Compassionate Release, *El-Hanafi* S7 10-cr-162 (KMW) at 16.

[276] *See BOP Implementing Modified Operations*, Federal Bureau of Prisons https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 22, 2020).

[277] *COVID-19 Cases*.

181. Even when they do conduct tests, Respondents fail to conduct them in a manner designed to help limit the spread of the virus.[278] On information and belief, Respondents tested one entire housing unit of FCI Butner Medium I around April 18, and eventually moved those people who tested positive to a different unit, Catawba East. However, Respondents did not move some people who tested positive out of the unit until about *five days after it learned they had tested positive.*[279] Thus, with full knowledge of the danger, Respondents kept known COVID-positive people in close quarters with uninfected people for five days. In all that time, the people who tested positive were not quarantined or isolated, and they shared the same common bathrooms and other resources with those who had tested negative.[280]

182. Instead of proactively testing for the virus, Respondents sporadically conduct temperature checks.[281] Between the days that temperature checks are taken, an incarcerated person who is symptomatic has to request sick call even to get his temperature taken.[282] And Respondents have not waived the requirement of paying for sick call.[283]

183. Respondents have chosen to remain willfully ignorant as to who at Butner has COVID-19 until they are forced to acknowledge that some individual or another has it. In so doing, they limit the numbers of people who are deemed to require quarantine or isolation, leaving an

---

[278] Beyrer Decl. at 19 ("Without widespread testing and tracing of all prisoners and staff, it will be impossible to know how COVID-19 is moving through FCC Butner to help mitigate the continued spread and to properly isolate and care for those that have contracted the virus."); *id.* at 18–19.

[279] Maldonado Decl. at 7.

[280] *See id.*

[281] *See, e.g.*, Dailey Decl. at 4; Hallinan Decl. at 4; Krokos Decl, at 6; Goodwin Decl. at 7; Beyrer Decl. at 18.

[282] *See, e.g.*, Dailey Decl. at 4; Krokos Decl, at 5; Hallinan Decl. at 4–5.

[283] *See, e.g.*, Dailey Decl. at 4; Krokos Decl, at 5; Hallinan Decl. at 4–5; Hill Decl. at 4; McRae Decl. at 3; Riddick Decl. at 5.

untold number of people infected with the virus in the general population where they can infect others.

### 4. Respondents have failed to establish safe and effective quarantine and isolation practices at Butner

184. BOP has issued a COVID-19 Action Plan that requires quarantine for all new admissions, all close contacts of confirmed or suspected cases, and all incarcerated people set for release.[284] Those with symptoms are required to be placed in single-cell medical isolation until seven days after the onset of symptoms and 72 hours after symptoms have improved.[285] Neither of these policies is being followed.[286]

185. According to the Action Plan, quarantine is supposed to last for 14 days, but it automatically resets if the quarantined person or someone quarantined with him becomes symptomatic.[287] Respondents reset the quarantine, but take few precautions to prevent people from becoming infected while in quarantine.

186. The quarantine practices at Butner are ineffective and dangerous.[288] For example, some people transferring into Butner are quarantined on a floor with cancer patients who are immunocompromised.[289] The same people distribute food and medicine to the people in quarantine and to the rest of the people on the floor.[290] The use of the cancer treatment floor for quarantine puts the cancer patients at extreme risk.[291]

---

[284] *See Phase Six Action Plan* at 3–4.

[285] *Id*. at 3–4.

[286] *See, e.g.*, Huntley Decl. at 3–4; Goodwin Decl. at 6–7.

[287] *Phase Six Action Plan* at 4.

[288] *See* Beyrer Decl. at 23; Goldenson Decl. at 7.

[289] Ortiz Decl. at 1.

[290] *Id*.

[291] Goldenson Decl. at 7.

187. The Hatteras East unit of the FCI Butner Medium I was emptied to serve as a quarantine area for about 43 people slated for release.[292] But this arrangement meant that the people incarcerated in the housing unit were transferred to other units, which led to significant overcrowding, thereby reducing further the space between people.[293] Declarant Goodwin, who was moved out of Hatteras East into the adjacent Camp unit Hatteras West, reported having to sleep in a makeshift sleeping area of bunk beds set up in the unit's TV room for several days before being moved to a cubicle.[294]

188. Butner set up a quarantine area in the chapel in the Camp; however, men in the quarantine unit used the bathroom in the Catawba West unit and were separated from the men not in quarantine only by a "make-shift wall."[295] And an orderly from the Catawba West unit cleans the bathroom after men in the chapel quarantine use it.[296]

189. Even amongst those in "quarantine," physical distancing is impossible. In some units, quarantined people are not kept in individual cells, but in close quarters with dozens of others.

190. Like the rest of Butner, use of masks appears to be optional in the quarantine area.

191. Even in the rare instance when a sick individual is placed in isolation following a positive test, isolation procedures are more akin to punishment than treatment.

192. Declarant Goodwin, who was moved to the SHU after testing positive for coronavirus, reported being confined to a cell with dirty floors and no hot water, without toiletries, necessary medications, or even a cup to drink from for the first few days.[297] He was not given

---

[292] Goodwin Decl. at 3.
[293] *See id.* at 3–4.
[294] *Id.* at 4.
[295] Maldonado Decl. at 5.
[296] *Id.*
[297] Goodwin Decl. at 5–6.

any specific instructions or treatment for COVID-19.[298]  Despite feeling better after only a few days of isolation, he was confined in the SHU for 17 days.[299]  He was not re-tested, and states that he does not know how the officials at Butner determined when he should be released back to his housing unit.[300]

### 5. Respondents have failed to prevent people from having contact with people in other housing units, thereby facilitating the spread of the virus from housing unit to housing unit.

193. Respondents have not eliminated contact between people in different housing units.

194. Staff move between housing units, often not wearing masks.

195. Incarcerated people go to work in their jobs at UNICOR, where they interact with people from other housing units.[301]

196. Incarcerated people go to work in their jobs in the kitchen, where they interact with people from other housing units and prepare food for people in all the housing units.  On or about May 13, two people working in the kitchen had a fever and were taken from the kitchen to the isolation units.[302]

197. Some incarcerated people have jobs requiring them to clean the areas used by people believed to have COVID-19.[303]  They then return to their own housing units.

198. Respondents' decision to require staff and incarcerated people to move between housing units or interact with people from other housing units increases the likelihood that the virus will spread from housing unit to housing unit.

---

[298] *Id.* at 6.

[299] *Id*. at 6–7.

[300] *Id*. at 7.

[301] *See, e.g.*, Ayers Decl. at 4; Hill Decl. at 4; Krokos Decl. at 6; McRae Decl. at 3.

[302] Hallinan Decl. at 4.

[303] *See, e.g.*, Dailey Decl. at 5; Maldonado Decl. at 5; Whyte Decl. at 8.

6. **Respondents have failed to take even the most basic measures to prevent the spread of the virus.**

199. Respondents have not undertaken to adequately clean and disinfect living spaces and common-use equipment, such as bathroom facilities, phones, and computers.[304] Bathrooms that are used by more than 100 people are cleaned only once a day. Phones and computers, if they are cleaned, are cleaned once a day. In the meantime, scores of men in a housing unit touch the surfaces in the bathrooms, and on the phones and computers—one after another.

200. Further, Respondents are not enforcing mask use by staff, thereby increasing the likelihood that staff will spread the virus.[305]

7. **Respondents have made it extremely difficult, if not impossible, for incarcerated people at Butner to access any assistance in mitigating the risk from COVID-19.**

201. Respondents have created obstacles preventing people incarcerated at Butner from seeking assistance in mitigating their risk themselves.

202. The Administrative Remedies Process ("ARP") is unavailable as a mechanism for seeking to address the risks faced by the men at Butner.

203. If the ARP were functioning, it would not be capable of use for the purpose of reducing the risk from COVID-19. COVID-19 has devastated Butner—and the world—over the course of the last two months. A person who contracts the virus usually begins to show symptoms within 14 days, and can seriously deteriorate within just five days of becoming infected. The ability to respond quickly to reduce the risk is necessary for relief to be available. But the ARP is not a quick process. The ARP is a five-step process that begins with presenting the issue informally to staff within 20 days of the date of the occurrence giving rise to the request,

---

[304] *See, e.g.*, Dailey Decl. at 3; Ayers Decl. at 3; Hill Decl. at 3; McRae Decl. at 2–3; Riddick Decl. at 4.
[305] Goodwin Decl. at 7; Kinard Decl. at 2; Krokos Decl. at 5.

though the staff have no deadline to respond.[306]  If the informal request is unsuccessful, the

prisoner must submit up to four more requests or appeals, a process that can take at least 110

days, *assuming BOP does not grant itself up to 60 days' worth of extensions*.[307]  If a person

incarcerated at Butner had begun the ARP on the day the first case of COVID-19 appeared

at Butner, the process would only be only about half complete today.  Eight people have died

in the meantime.  The ARP, even if it were functioning, is not capable of use for the pertinent

purpose; it is thus unavailable as a manner of administrative exhaustion.  *Ross v. Blake*, 136

S. Ct. 1850, 1859 (2016).

204. But the ARP is not functioning.  Respondents have informed the people incarcerated at

Butner that the ARP was backlogged and requests were not being processed normally.[308]

205. Moreover, there are other obstacles to accessing even this time-consuming and delayed

process.  Incarcerated people are supposed to request the packet of forms from their

counselors.[309]  But individuals housed within Butner have had periods recently without

knowledge of an assigned counselor.[310]  Additionally, they are often given packets missing

---

[306] 28 C.F.R. § 542.13(a)–(b).

[307] After the informal request, prisoners must submit a Request for Administrative Remedy to the warden on a BP-9 form within 20 calendar days from the date of the occurrence giving rise to the request.  28 C.F.R. § 542.14(a).  The Warden then has 20 calendar days to respond.  28 C.F.R. § 542.18.  When that fails, the prisoner must file an appeal on a BP-10 form with the appropriate BOP Regional Director within 20 calendar days from the date of the Warden's signed response (or within 20 days after the Warden's response deadline, if the Warden fails to respond).  28 C.F.R. § 542.15(a).  The Regional Director then has 30 calendar days to respond.  28 C.F.R. § 542.18.  And when that fails, the prisoner must then file an appeal on a BP-11 form to the BOP's General Counsel within 30 calendar days from the date of the Regional Director signed the response (or within 30 days after the Regional Director's response deadline, if the Regional Director fails to respond).  *Id.*  The General Counsel has 40 calendar days to respond.  28 C.F.R. § 542.18.  In addition, the ARP includes extensions of at least 20 days at the institution, regional, and Central Office levels.  *Id.*

[308] *See, e.g.*, Hallinan Decl. at 5; Dailey Decl. at 5; Krokos Decl. at 7; Titus Decl. at 5.

[309] Krokos Decl. at 7.

[310] *See e.g.* Kinard Decl. at 3–4.

the requisite forms if they do manage to obtain a packet. Declarant Krokos explains that an ARP submission must include four copies, but the packets sometimes have only three copies.[311] If a person submits the ARP form with just three copies, it is denied on that ground.[312]

206. Finally, the ARP process is simply a dead end. Petitioner John Dailey has submitted approximately 60 ARP requests at Butner.[313] He has received written responses to just six of them.[314]

207. Nonetheless, several of the petitioners have attempted to use the ARP to seek assistance mitigating the risks of COVID-19.[315]

208. Another avenue for seeking assistance with mitigating the risk is through the assistance of legal counsel. However, upon information and belief, access to legal calls has been limited and sporadic. Calls from lawyers to schedule calls to communicate with people incarcerated at Butner about the situation there lead to dead ends in the form of lines that are never answered and transfers to voicemail boxes to leave messages that are never returned.

209. Respondents have failed to mitigate the risk to the people in their custody at Butner from COVID-19. At the same time, they have cut off the already limited ability of the people in Butner to seek assistance with mitigating the risk.

### 8. Respondents are failing to follow the lead set by other courts

210. Respondents are also failing to follow the precedent set by other courts for release. Just this week, in *U.S. v. El-Hanafi*, the Southern District of New York recognized that "the pace of

---

[311] Krokos Decl. at 7.

[312] *Id*.

[313] Dailey Decl. at 5.

[314] *Id*.

[315] *See, e.g*., Ayers Decl. at 4; Hallinan Decl. at 5; Hill Decl. at 4–5.

infection shows no sign of abating" at Butner. Pointing to housing conditions, the lack of disinfectants, and failure to provide personal protective equipment, the court went so far as to say that it was "difficult to conceive of an environment more conducive to the rapid spread of infection than the type of prison dormitory" at Butner. No. 1:10-cr-00162-KMW, Dkt. 252 (S.D.N.Y. May 19, 2020); *see also Miller v. United States,* No. CR 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (compassionate release granted involving prisoner at Butner due to COVID-19 concerns); *United States v. Dunlap*, 2020 WL 2062311 (M.D.N.C. Apr. 29, 2020) (same); *United States v. Krokos*, No. 12-cr-00527, Dkt. 1016 (C.D. Cal. May 1, 2020) (same); *United States v. Thompson*, No. 15 CR 00448, Dkt. 80 (N.D. Ill. Apr. 17, 2020) (same); *United States v. Scparta*, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020) (expressing particular concern about quarantine because "many inmates who are on the cusp of relief to home confinement to protect them from COVID-19, which is spreading rampantly at FCI Butner, are housed together in closed quarters for at least 14 days").

## VI. BOP's Lack of Adequate Prevention and Mitigation Measures at Butner also Poses a Serious Risk to Public Safety

211. Conditions at Butner have an impact on the broader community as well as on those incarcerated.

212. Prison staff interact routinely and frequently with the people incarcerated at Butner. As stated above, at least 44 staff at Butner have at some time reported to BOP that they tested positive for the virus. But because Respondents do not test staff, the real number of infected staff is unknown.

213. Respondents' failure to implement meaningful precautionary and mitigating efforts put the health and lives of Butner staff at just as grave a risk as the incarcerated people.

- 58 -

214. More than 1,400 people work at Butner.[316]  Some of the employees may themselves be medically vulnerable.  And every one of them presumably returns home to the Granville County area after their shift ends.

215. Doubtless many of the Butner employees live with one or more family members or roommates, some of whom may be medically vulnerable.  And, unless the Butner employees have managed to completely isolate themselves from contact with any person outside of the prison, they come into contact with other members of their communities.[317]

216. Moreover, every single person incarcerated at Butner who has died from COVID-19 did so at a nearby hospital.[318]  People at Butner will continue to need to go to outside hospitals for care as long as COVID-19 spreads through the prison.

## VII. Immediate Release of Eligible People Is Necessary to Save Lives

217. Hundreds of people at Butner have already been infected with coronavirus.  Eight people have already died.

218. The population is medically vulnerable.  The complex is overcrowded, exacerbating the already inherent difficulty in practicing effective physical distancing.

219. BOP's failures in screening, testing, quarantining, and isolating people—as well its failures in providing regular, adequate access to hygiene and disinfecting products, enabling effective physical distancing, and enforcing mask use policies—will certainly lead to even more

---

[316] *See PREA Audit Report* (indicating 1,475 staff at FCC Butner).

[317] *See* Beyrer Decl. at 14–17.

[318] *See, e.g.*, Press Release, *Inmate Death at FCI Butner I*, U.S. Dep't of Justice Federal Bureau of Prisons (Apr. 13, 2020), https://www.bop.gov/resources/news/pdfs/20200413_3_press_release_butner.pdf ("John Doe, went into respiratory failure at the Federal Correctional Institution (FCI) Butner I . . . . He was evaluated by institutional medical staff and transported to a local hospital for further treatment and evaluation.").

infections and deaths. This is especially true of those who are over 50 and/or medically vulnerable.[319]

220. The immediate release of medically vulnerable people incarcerated at Butner will undoubtedly save lives.[320] It is the sole effective remedy for the ongoing Constitutional violations described herein.

221. Reducing the population at Butner will give other mitigation strategies the greatest chance of success by allowing for more effective physical distancing and by allowing BOP to more closely focus its health and safety resources and planning on those remaining in custody.

## CLASS ACTION ALLEGATIONS

222. Petitioners bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and a class of similarly situated individuals.

223. Petitioners seek to represent a class of all current and future incarcerated persons at Butner (the "Class") during the outbreak of COVID-19.

224. The class includes a subclass of all current and future persons who are:

   a. Over the age of 50, *or*

   b. Of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g., bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure, and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from

---

[319] Beyrer Decl. at 2–3, 6–7, 28.
[320] *See, e.g.*, Beyrer Decl. at 32–33.

cancer or cancer treatment, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; and/or (k) a developmental disability (the "Medically Vulnerable Subclass").

225. Petitioners Hallinan, Hill, McRae, Dailey, Ayers, Riddick, Maldonado, Harris, and Butler are also representatives of this Medically Vulnerable Subclass.

226. This action has been brought and may properly be maintained as a class action under federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

227. Joinder is impracticable because (i) the Class and Medically Vulnerable Subclass are numerous; (ii) the Class and Medically Vulnerable Subclass include future members, and (iii) the Class and Medically Vulnerable Subclass members are incarcerated, limiting their ability to institute individual lawsuits.

228. Based on available information, there are currently approximately 4,438 people in the proposed Class. Everyone in Butner is a proposed class member.[321]

229. There are significantly more than 50 people in the proposed Medically Vulnerable Subclass. On the fourth floor of FMC Butner alone, there are more than 200 people who are immunocompromised due to cancer treatment.

230. Common questions of law and fact exist as to all members of the proposed Class, namely whether:

   a. All are at unreasonable risk of serious harm, including death, from contracting coronavirus due to the conditions in Butner;

---

[321] *See Population Statistics: Inmate Population Breakdown*.

b. All are at unreasonable risk of serious harm, including death, from Respondents' failure to take reasonable and proactive measures to ensure their safety from the disease;

c. All have a right to adequate COVID-19 prevention, testing, and treatment;

d. Respondents have been deliberately indifferent to the risk of harm to the Class from COVID-19; and

e. The conditions in Butner expose them to heightened risk of contracting COVID-19.

231. Common questions for all members of the Medically Vulnerable Subclass include whether the conditions in Butner expose them to heightened risk of serious illness, injury, or death, whether Respondents have taken adequate steps to protect them from that risk, and whether Respondents have been deliberately indifferent to the risk of harm to the Subclass from COVID-19.

232. Petitioners' claims are typical of the Class and the Medically Vulnerable Subclass members' claims. Respondents have placed Petitioners at significant risk of harm by failing to take appropriate steps to address the risk of contracting, and being rendered seriously ill or injured by, COVID-19 in Butner. Petitioners, like every person in Butner, face heightened risk of contracting the virus if they are not adequately protected by Respondents.

233. Petitioners have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Petitioners have no interests adverse to the interests of the proposed class. Petitioners retained pro bono counsel with experience and success in the prosecution of civil rights litigation and specifically in the prosecution of prisoners' civil rights litigation. Counsel for Petitioners know of no conflicts among proposed class members or between counsel and proposed class members.

234. Respondents have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Petitioners therefore seek class certification under Rule 23(b)(2).

## FIRST CAUSE OF ACTION

### Unconstitutional Confinement in Violation of
### the Eighth Amendment to the U.S. Constitution
### *Petitioners Hallinan, Kinard, Hill, McRae, Dailey, Ayers, Riddick, Maldonado,*
### *Harris, Butler, and Titus versus Respondents Scarantino and Carvajal*
### *28 U.S.C. § 2241 (Habeas Corpus)*

235. Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

236. Petitioners bring this claim on their own behalf and on behalf of the Class.

237. The Eighth Amendment guarantees incarcerated persons who have been sentenced the right to necessary and adequate medical care, and to be free from cruel and unusual punishment.  *See* U.S. Const., amend. VIII.  As part of the right, the government cannot subject incarcerated persons to a substantial risk of serious harm to their health and safety.  *See, e.g.*, *Farmer*, 511 U.S. at 828; *Estelle*, 429 U.S. at 104.

238. Petitioners at Butner are under the custody and control of Respondents and are not able to take steps to protect themselves—such as physical distancing and avoiding high-touch surfaces—and the government has not provided adequate protections from the risk of harm from COVID-19.  As COVID-19 continues to rapidly spread at Butner, the incarcerated men have no ability to protect themselves from this disease.

239. Respondents are aware that the Petitioners are confined at Butner and cannot avoid the spread of COVID-19 due to their confinement.

240. Respondents know of and have disregarded excessive risks to Petitioners' health and safety.

241. Respondents have failed to take reasonable steps to mitigate these significant risks, which continuously subject Petitioners to a grave and serious risk of harm from serious illness, permanent injury, and death.

242. Respondents' failure to take reasonable steps to protect Petitioners from these conditions by releasing them from the conditions altogether constitutes deliberate indifference to the health, safety, and serious medical needs of Petitioners and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

**SECOND CAUSE OF ACTION**

**Unconstitutional Conditions of Confinement in Violation of
the Eighth Amendment to the U.S. Constitution**
*Petitioners Hallinan, Kinard, Hill, McRae, Dailey, Ayers, Riddick,
Maldonado, Harris, Butler, and Titus versus All Respondents
28 U.S.C. § 1331*

243. Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

244. Petitioners bring this claim on their own behalf and on behalf of the Class.

245. The Eighth Amendment guarantees incarcerated persons who have been sentenced the right to necessary and adequate medical care, and to be free from cruel and unusual punishment. *See* U.S. Const., amend. VIII. As part of the right, the government cannot subject incarcerated persons to a substantial risk of serious harm to their health and safety. *See, e.g.*, *Farmer*, 511 U.S. at 828; *Estelle*, 429 U.S. at 104.

246. Petitioners at Butner are under the custody and control of Respondents and are not able to take steps to protect themselves from the spread of the virus. The government has not provided adequate protections. As COVID-19 continues to spread at Butner, the already deplorable conditions at Butner are only exacerbated further.

- 64 -

247. Respondents are aware of these conditions, which were and are obvious throughout Butner.

248. Respondents know of and have disregarded an excessive risk to health and safety.

249. Respondents have failed to take reasonable steps, including the release of medically vulnerable persons, to mitigate these significant risks, which continuously subject Petitioners to a grave and serious risk of harm from serious illness, permanent injury, or death.

250. Respondents' failure to protect Petitioners from these conditions by releasing prisoners and otherwise remedying the conditions of confinement constitutes deliberate indifference to the health, safety, and serious medical needs of Petitioners and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

251. Federal courts have inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

### THIRD CAUSE OF ACTION

**Unconstitutional Conditions of Confinement in Violation of
the Eighth Amendment to the U.S. Constitution
*Petitioners Hallinan, Kinard, Hill, McRae, Dailey, Ayers, Riddick,
Maldonado, Harris, Butler, and Titus versus All Respondents***

252. Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

253. Petitioners bring this claim on their own behalf and on behalf of the Class.

254. The Eighth Amendment guarantees incarcerated persons the right to reasonable safety. Respondents' failure to provide a safe environment during a widespread outbreak of a contagious disease constitutes deliberate indifference to the health and safety of persons at Butner, thereby establishing a violation of the Eighth Amendment.

255. Respondents have failed to provide adequate protections at Butner, where Petitioners are not able to take steps to protect themselves through physical distancing and adequate hygiene, cleaning, and disinfection. As COVID-19 rapidly spreads throughout the facility, the already unsafe conditions at Butner will be intensified, and the risks to the people incarcerated there will grow.

256. Respondents' failure to protect Petitioners constitutes a violation of their Eighth Amendment rights.

257. Federal courts have inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

## REQUEST FOR RELIEF

258. Wherefore, Petitioners and the Class members respectfully request that the Court order the following relief:

    A.    Certify this action as a class action, for the reasons stated in this Petition and Complaint, and appoint the undersigned as class counsel pursuant to Fed. R. Civ. P. 23(g);

    B.    Pursuant to 28 U.S.C. §§ 2243, 1331, and 2201–02, immediately:

        a.    Enter a temporary restraining order or preliminary injunction ordering respondents to identify, within one day, all people incarcerated at Butner who fit within the Medically Vulnerable Subclass;

b. Enter a temporary restraining order or preliminary injunction appointing an expert to determine appropriate categories of release for each within 48 hours of entrance of the order or injunction (the "Expert List");

c. Enter a temporary restraining order, preliminary injunction, and/or writ of habeas corpus requiring Respondents to release, within twenty-four (24) hours of the creation of the Expert List, and without quarantining at Butner, all persons identified by the court-appointed expert as appropriate for release;

C. Pursuant to 28 U.S.C. §§ 1331 and 2201–02 and the Court's inherent authority to fashion injunctive relief for constitutional violations, immediately:

a. Enter a temporary restraining order or preliminary injunction requiring Respondents to prepare and implement a COVID-19 mitigation plan to be submitted to the Court within 48 hours and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

   i. Immediate screening of all people incarcerated at Butner for COVID-19 symptoms.

   ii. Immediate testing for all people incarcerated at Butner showing any symptoms or known to have been in close proximity with anyone showing any symptoms or having tested positive for coronavirus, including the waiver of any sick call fees.

   iii. Regular retesting of people incarcerated at Butner who meet the criteria set forth in the preceding paragraph, including the waiver of any sick call fees.

iv.   Immediate implementation of daily screening of BOP staff for COVID-19 symptoms.

v.   Immediate, effective quarantine in accordance with community standards of care—including keeping quarantined people individually isolated—for all people incarcerated at Butner known to have been in close contact with anyone showing any symptoms of COVID-19 or known or suspected to have COVID-19.

vi.   Immediate medical isolation for all people incarcerated at Butner who show any symptoms—as soon as they develop symptoms of COVID-19—or who have tested positive for COVID-19, in compliance with CDC guidelines for medical isolation, including in a location that allows for timely notification and management of clinical symptoms, should they arise.

vii.   Additional specific mitigation efforts, in line with CDC guidelines, to prevent exposure to COVID-19 by every Class Member not immediately released, including: (1) appropriate social distancing and hygiene practices across all units at Butner; (2) limitations on travel between units by Butner staff and Class Members; (3) limitations on the mixing of Class Members from different housing units in their work assignments; (4) mandatory mask usage by all staff at Butner; (5) appropriate medical treatment for incarcerated people exhibiting symptoms of COVID-19; and (6) appropriate medical treatment for incarcerated people not exhibiting symptoms of COVID-19 but who have other medical needs.

viii.    Additional specific efforts to ensure that there is no spread of COVID-19 from outside the quarantine or isolation areas to the quarantine or isolation areas, or vice versa, including: (1) requiring staff and Class Members who enter the quarantine area from the non-quarantine area to wear masks; (2) ensuring proper access to products/materials for proper hygiene; (3) ensuring individuals in the quarantine or isolation area are able to comply with physical distancing guidelines; and (4) frequently disinfecting and cleaning the quarantine or isolation area.

b.   Require a change to the policy of "restarting" the clock during the quarantine area every time someone exhibits symptoms of COVID-19 while in quarantine; and

c.   Require a housing or support plan for any released Class or Subclass Members for whom testing confirms exposure to or infection with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

d.   Appoint an expert monitor to ensure BOP's adequate compliance with the above requirements.

D.     All further actions required to release Class Members outside the Medically Vulnerable Subclass to ensure that all remaining persons incarcerated at Butner are incarcerated under conditions consistent with CDC guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them;

E.     If immediate release is not granted on the basis of this Petition alone, expedited review of this Petition, including oral argument, via telephonic or videoconference if necessary;

F.     If immediate release is not granted on the basis of this Petition alone, use of enlargement to alter Petitioners' place of custody to home confinement or other appropriate placement pending the outcome of this habeas action;

G.     A declaration that Butner's policies and practices violate the Eighth Amendment right against cruel and unusual punishment with respect to the Class and Subclass;

H.     Award Petitioners costs, expenses, and reasonable attorneys' fees pursuant to the Equal Access to Justice Act and any other applicable laws; and

I.     Any further relief that this Court deems just, necessary, or appropriate.

Respectfully submitted this 26th day of May, 2020.

/s/ Jeffrey S. Wilkerson
Jeffrey S. Wilkerson [N.C. State Bar No. 51209]
Gretchen Scavo [N.C. State Bar No. 48589]*
Elizabeth Ireland [N.C. State Bar No. 47059]*
Patrick Doerr [N.C. State Bar No. 50673]*
Ashley R. Anderson [N.C. State Bar No. 51741][†]
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
jwilkerson@winston.com
gscavo@winston.com
eireland@winston.com
pdoerr@winston.com
aanderson@winston.com

Maria V. Morris[†]
[N.Y. State Bar No. 4091435]
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, DC 20005
Tel.: (202) 548-6607
mmorris@aclu.org

Sarah Hinger[†]
[N.Y. State Bar No. 4823878][†]
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
New York, NY 10004
Tel.: (212) 519-7882
shinger@aclu.org

Jonathan M. Smith [D.C. Bar No. 396578][†]
Emily Gunston [D.C. Bar No. 1032056][†]
Lyndsay A. Niles [D.C. Bar No. 1003427][†]
WASHINGTON LAWYERS' COMMITTEE
FOR CIVIL RIGHTS & URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 319-1000
Fax: (202) 319-1010
jonathan_smith@washlaw.org
emily_gunston@washlaw.org
lyndsay_niles@washlaw.org

Emily Seawell [N.C. Bar No. 50207]
Jaclyn Maffetore [N.C. Bar No. 50849]
Kristi Graunke [N.C. Bar No. 51216]
AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA
LEGAL FOUNDATION
Post Office Box 28004
Raleigh, NC 27611
Tel.: (919) 834-3466
Fax: (866) 511-1344
eseawell@acluofnc.org
jmaffetore@acluofnc.org
kgraunke@acluofnc.org

* Admission Forthcoming
† Special Appearance Forthcoming

*Counsel for Petitioners/Plaintiffs*