**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CHARLES HALLINAN, JOSEAN KINARD, ARNOLD J. HILL, BENJAMIN D. MCRAE, JOHN DAILEY, LEE M. AYERS, GEORGE B. RIDDICK, JORGE LUIS MALDONADO, ANTWAN HARRIS, ANTHONY BUTLER, and TROY A. TITUS, on behalf of themselves and similarly situated individuals, | ) ) ) ) ) ) ) ) | Case No. 5:20-HC-02088-FL |
| *Petitioners/Plaintiffs,* | ) ) ) | **HEARING REQUESTED** |
| v. | ) ) | **IMMEDIATE RELIEF SOUGHT** |
| THOMAS SCARANTINO, Complex Warden, Federal Correctional Complex Butner; MICHAEL CARVAJAL, Federal Bureau of Prisons Director; and JEFFERY ALLEN, Federal Bureau of Prisons Medical Director, in their official capacities, | ) ) ) ) ) ) ) | |
| *Respondents/Defendants.* | ) ) ) ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**PETITIONERS/PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER,**</u>
<u>**PRELIMINARY INJUNCTION, AND WRIT OF HABEAS CORPUS**</u>

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION AND NATURE OF THE CASE ..................................................................1

FACTUAL BACKGROUND.................................................................................................3

I.      COVID-19 Is Highly Dangerous.................................................................................3

II.     COVID-19 Poses Significant Dangers for Everyone at Butner....................................5

     A.      An ongoing, uncontrolled deadly outbreak of COVID-19 rages at Butner ......................5

     B.      Butner houses some of the most medically fragile individuals in federal prisons ...........6

     C.      Without reducing the population, crowding and physical layout of Butner make COVID-19's deadly spread a certainty..........................................................................7

     D.      There is no proper "quarantine," isolation conditions are inhumane and dangerous, and people frequently move between units ............................................................8

III.    Butner's Response to the Outbreak Is Patently Inadequate to Mitigate the Risk of Harm...........11

     A.      Respondents are aware of the substantial risk to Petitioners.........................................11

     B.      People are falling seriously ill and dying at Butner because Respondents' actions have been patently inadequate ...........................................................................13

LEGAL STANDARD ..........................................................................................................16

ARGUMENT .......................................................................................................................17

I.      Petitioners Are Likely to Succeed on the Merits of Their Claim ...............................17

II.     Petitioners Face Irreparable Harm if They Remain Confined at Butner .....................23

III.    Release Would Serve the Public Interest...................................................................23

IV.     The Balance of Equities Tips Heavily in Petitioners' Favor ......................................24

V.      This Court Has Authority to Grant Release...............................................................25

VI.     Respondents Cannot Raise Failure to Exhaust to Avoid Responsibility for Violating Petitioners' Rights...28

CONCLUSION ....................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .................................................................................................................27

*Baez v. Moniz*,
No. CV 20-10753-LTS, 2020 WL 2527865 (D. Mass. May 18, 2020) ..................................26

*Banks v. Booth*,
2020 WL 1914896 (D.D.C. April 19, 2020) .........................................................................23

*Basank v. Decker*,
2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) ..................................................................22, 26

*Beck v. Hurwitz*,
380 F. Supp. 3d 479 (M.D.N.C. 2019) .................................................................................23

*Bent v. Barr*,
2020 WL 1812850 (N.D. Cal. Apr. 9, 2020) .........................................................................22

*Boston v. Bauknecht*,
No. 6:07-0250-GRA-WMC, 2007 WL 3119482 (D.S.C. Oct. 22, 2007) .............................28

*Brown v. Plata*,
563 U.S. 493 (2011) ...........................................................................................................17, 26

*Cameron v. Bouchard*,
No. CV 20-10949, --- F.Supp.3d ----, 2020 WL 2569868 (E.D. Mich. May 21, 2020),
*on reconsideration* 2020 WL 2615740 (E.D. Mich. May 22, 2020), *stay denied*, No. 20-1469
(6th Cir. May 26, 2020) .................................................................................................*passim*

*Condon v. Haley*,
21 F. Supp. 3d 572 (D.S.C. 2014) ........................................................................................23

*Cordaro v. Finley*,
No. 3:10-CR-75, 2020 WL 2084960 (M.D. Pa. Apr. 30, 2020) ...........................................26

*Coreas v. Bounds*,
2020 WL 2201850 (D. Md. Apr. 30, 2020) ...........................................................................23

*Coreas v. Bounds*,
No. CV TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020) ..................................21, 26

*Coreas v. Bounds*,
No. CV TDC-20-0780, 2020 WL 2292747 (D. Md. May 7, 2020) .......................................22

*Coronel v. Decker*,
2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ..................................................................22, 24

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) ................................................................................................................27

*Cox v. Quinn*,
   828 F.3d 227 (4th Cir. 2016) ............................................................................................ 18

*Cristian A.R. v. Decker*,
   2020 WL 2092616 (D.N.J. Apr. 12, 2020) ........................................................................ 22

*De'lonta v. Johnson*,
   708 F.3d 520 (4th Cir. 2013) ............................................................................................ 20

*Dunkley v. Hamidullah*,
   No. 6:06-2139-JFA-WMC, 2007 WL 2572256 (D.S.C. Aug. 31, 2007) .......................... 28

*Elrod v. Burns*,
   427 U.S. 347 (1976) .......................................................................................................... 23

*Farmer v. Brennan*,
   511 U.S. 825, 114 S. Ct. 1970 (1994) ............................................................................... 17

*Hawkins v. Cohen*,
   327 F.R.D. 64 (E.D.N.C. 2018), *modified on reconsideration*, 2018 WL 6445416 (E.D.N.C.
   Dec. 10, 2018) ................................................................................................................... 30

*Helling v. McKinney*,
   509 U.S. 25 (1993) ...................................................................................................... 17, 18

*Hutto v. Finney*,
   437 U.S. 678 (1978) .......................................................................................................... 17

*Martinez-Brooks v. Easter*,
   No. 3:20-CV-00569 (MPS), 2020 WL 2405350 (D. Conn. May 12, 2020) .......... 21, 25, 26

*McPherson v. Lamont*,
   No. 3:20CV534 (JBA), 2020 WL 2198279 (D. Conn. May 6, 2020) ................................ 29

*Native Angels Home Health, Inc. v. Burwell*,
   No. 5:15-CV-234-FL, 2015 WL 12910710 (E.D.N.C. June 4, 2015) ............................... 17

*Oldham v. Beck*,
   75 F. App'x 122 (4th Cir. 2003) ....................................................................................... 18

*Peyton v. Rowe*,
   391 U.S. 54 (1968) ............................................................................................................ 25

*Plata v. Brown*,
   427 F. Supp. 3d 1211 (N.D. Cal. 2013) ............................................................................ 27

*Porter v. Clarke*,
   290 F. Supp. 3d 518 (E.D. Va. 2018), *aff'd*, 923 F.3d 348 (4th Cir. 2019), *as amended* (May
   6, 2019) ............................................................................................................................. 23

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973) .......................................................................................................... 25

*Prieto Refunjol v. Adducci*,
   No. 2:20-CV-2099, 2020 WL 2487119 (S.D. Ohio May 14, 2020) .................................. 24

*Putney v. Likin*,
    656 F. App'x 632 (4th Cir. 2016) ............................................................................................. 17

*Reaves v. Dep't of Corr.*,
    404 F. Supp. 3d 520 (D. Mass. 2019) ...................................................................................... 27

*Ross v. Blake*,
    136 S. Ct. 1850 (2016) ....................................................................................................... 28, 29

*Scinto v. Stansberry*,
    841 F.3d 219 (4th Cir. 2016) ............................................................................................. 17, 18

*Thakker v. Doll*,
    2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) .................................................................... 22, 25

*United States v. El-Hanafi*,
    No. 1:10-cr-00162-KMW (S.D.N.Y. May 19, 2020) ......................................................... 14, 15

*United States v. Taylor*,
    No. 3:18-cr-282, 2020 WL 2084974 (M.D. Pa. Apr. 30, 2020) ............................................. 26

*Valentine v. Collier*,
    -- U.S. --, 2020 WL 2497541 (May 14, 2020) ...................................................................... 11

*Wilson v. Williams*,
    2020 WL 1940882 (N.D. Ohio Apr. 22, 2020), *stay denied*, No. 20-3447 (6th Cir. Apr. 27,
    2020), *stay denied*, 590 U.S. --- (May 26, 2020) ...................................................... *passim*

*Woodall v. Federal Bureau of Prisons*,
    432 F.3d 235 (3d Cir.2005) ...................................................................................................... 28

**Statutes**

18 U.S.C. § 3626 ........................................................................................................................... 26

18 U.S.C. § 3626(a)(3) .................................................................................................................. 27

18 U.S.C. § 3626(g)(2) ............................................................................................................ 26, 28

28 U.S.C. § 2241 ................................................................................................................... *passim*

28 U.S.C. § 2241(c)(3) .................................................................................................................. 25

**Other Authorities**

28 C.F.R. § 542 ............................................................................................................................. 28

85 Fed. Reg. 15337 ......................................................................................................................... 1

ABC News,
    https://abcnews.go.com/Health/timeline-coronavirus-started/story?id=69435165 ................ 28

Amanda Lamb, *Former Inmate Says Butner Officials "Slow-Rolling" Prisoner Releases During Pandemic*,
    https://www.wral.com/coronavirus/former-inmate-says-butner-officials-slow-rolling-prisoner-releases-during-pandemic/19056209 ................................................................................................................20

Attorney General William Barr, *Memorandum for Director of Bureau Prisons*, Office of the Attorney General, 2 (Mar. 26, 2020),
    https://www.justice.gov/file/1262731/download .............................................................................2

Attorney General William Barr, *Memorandum for Director of Bureau of Prisons*, Office of the Attorney General (Apr. 3, 2020),
    https://www.justice.gov/file/1266661/download ...........................................................................11

*BOP COVID-19 Resource Page*,
    https://www.bop.gov/coronavirus/ ..................................................................................................5

*BOP COVID-19* website (March 31, 2020),
    https://www.bop.gov/coronavirus/ ..................................................................................................5

*BOP Implementing Modified Operations*, Federal Bureau of Prisons
    https://www.bop.gov/coronavirus/covid19_status.jsp ...................................................................15

*Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons,
    https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf ......................................6

*COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons,
    https://www.bop.gov/coronavirus/ .......................................................................................1, 12, 15

*COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins*, Johns Hopkins Univ. & Med. Coronavirus Resource Center,
    https://coronavirus.jhu.edu/map.html ..............................................................................................1

*COVID-19 Dashboard by the Centers for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University: Coronavirus Resource Center,
    https://coronavirus.jhu.edu/map.html ............................................................................................12

Dan Kane, *Coronavirus Outbreak at Butner Prison Continues to Surge. Now it's Spreading to Staff*, News & Observer (April 9, 2020),
    https://www.newsobserver.com/news/local/crime/ article241901551.html .....................................5

*Director M.D. Carvajal Addresses All Staff: COVID-19 Video Update Number 5: April 22, 2020*, Federal Bureau of Prisons (April 22, 2020),
    https://www.bop.gov/resources/news/20200422_dir_message.jsp; *COVID-19 Cases*.......................13

*Director M.D. Carvajal Addresses All Staff: COVID-19 Video Update Number 6: April 29, 2020*, Federal Bureau of Prisons (April 22, 2020),
    https://www.bop.gov/resources/news/20200429_dir_message.jsp.................................................12

*COVID-19 Video Update Number 7: May 6, 2020*,
    https://www.youtube.com/watch?v=wxdS2FKjAUw ......................................................................13

Fed. R. Civ. P. 65(b)(1) ...........................................................................................................................17

Fed. R. Civ. P. 65(c) ................................................................................................................................30

Fed. R. Evid. 706 ..................................................................................................................30

Fei Zhou, *et al.*, *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19* in *Wuhan, China: A Retrospective Cohort Study*, 395 The Lancet 1054 (Mar. 11, 2020),
    https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.......................4

*How COVID-19 Spreads*, Centers for Disease Control and Prevention,
    https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html ..............3

*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention,
    https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf ..........19

Josiah Rich, Scott Allen, and Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, Washington Post (March 17, 2020)........................................................................13

Kathryn Dreger, *What You Should Know Before You Need a Ventilator*, N.Y. Times (Apr. 4, 2020)..........................4

Kerry Kennedy Meltzer, *I'm Treating Too Many Young People for the Coronavirus*, The Atlantic (March 26, 2020),
    https://www.theatlantic.com/ideas/archive/2020/03/young-people-are-not-immune-coronavirus/608794/;..................................................................................................................4

*Memorandum for All Chief Executive Officers: Coronavirus (COVID-19) Phase Six Action Plan*, Federal Bureau of Prisons (Apr. 13, 2020),
    https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf.................................................................................................................................10

Neeltje van Doremalen, *et al*, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med. (March 17, 2020),
    nejm.org/doi/10.1056/NEJMc2004973 .................................................................................3

*Older Adults*, Centers for Disease Control and Prevention,
    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html .....................4

*People Who Are at Higher Risk for Severe Illness*,
    https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.........................................................................................................................19

*Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons,
    https://www.bop.gov/mobile/about/population_statistics.jsp.............................................................1

*Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons,
    https://www.bop.gov/mobile/about/population_statistics.jsp.............................................................7

*Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons,
    https://www.bop.gov/mobile/about/population_statistics.jsp...........................................................25

*Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons,
    https://www.bop.gov/mobile/about/population_statistics.jsp#bop_pop_table ....................................6

*PREA Audit Report*, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 2, 2017),
    https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf ................................................6

vi

Press Release, Inmate Death at FCI Butner I (Apr. 12, 2020),
https://www.bop.gov/
resources/news/pdfs/20200412_press_release_inmate_death_but_covid19.pdf .................................................23

Press Release, NC Governor Roy Cooper, Governor Cooper Declares State Of Emergency To
Respond To Coronavirus COVID-19 (Mar. 10, 2020),
https://governor.nc.gov/news/governor-cooper-declares-state-emergency-respond-
coronavirus-covid-19 ............................................................................................................................1

*Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World
Health Organization 12 (Feb. 28, 2020),
https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-
final-report.pdf ....................................................................................................................................4

Screenshot of BOP COVID-19 website (April 27, 2020),
https://www.bop.gov/coronavirus/ .....................................................................................................5

*U.S. and World Population Clock*, United States Census Bureau,
https://www.census.gov/popclock/ (last visited May 27, 2020, 6:39 p.m.) ......................................12

*WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 3 March 2020*,
World Health Organization (Mar. 3, 2020),
https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-
media-briefing-on-covid-19---3-march-2020 .....................................................................................3

Xianxian Zhao, *et al*., Incidence, clinical characteristics and prognostic factor of patients with
COVID-19: a systematic review and meta-analysis, MedRxiv (March 20, 2020),
https://cutt.ly/etRAkmt; *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart,
https://cutt.ly/ytEimUQ .......................................................................................................................4

## INTRODUCTION AND NATURE OF THE CASE

COVID-19 is a global pandemic that has profoundly changed the world. President Trump and Governor Roy Cooper have declared states of emergency.[1] Globally, over five million people have tested positive and more than 350,000 people have died. In the United States, over 1.7 million people have tested positive, and more than 100,000 have died.[2] While the world has taken dramatic measures to combat COVID-19, for the 4,438 people housed in the Federal Correctional Complex Butner ("Butner"), recommended measures—particularly physical distancing and avoiding close contact with others—are nearly impossible. The result is dire: ten men at Butner have died, and hundreds more (including staff) have tested positive. Two deaths have been reported just since the day this case was filed. Without Court intervention, the disease will continue its rapid spread and more people will die.

Prisons are hotbeds for the transmission of COVID-19, and Butner is worse than most. Indeed, Butner, which houses a disproportionately large number of medically vulnerable people and is well over its maximum capacity, is one of the country's hardest-hit facilities. Over 380 incarcerated people—8 percent of the Butner population—and more than 40 staff members, have tested positive.[3] And because BOP has not implemented widespread testing of incarcerated people and is not testing staff, the true number of infected people is almost certainly higher.

Crowding at Butner exacerbates the risk. All aspects of daily life take place in cramped quarters, and physical distancing is nearly impossible. Many people are housed in large rooms with between 70 and

---

[1]  Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020); Press Release, NC Governor Roy Cooper, Governor Cooper Declares State Of Emergency To Respond To Coronavirus COVID-19 (Mar. 10, 2020), https://governor.nc.gov/news/governor-cooper-declares-state-emergency-respond-coronavirus-covid-19.

[2]  *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins*, Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited May 28, 2020).

[3]  *COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 27, 2020) [hereinafter *COVID-19 Cases*]; *see Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp (last updated May 21, 2020) (showing populations for Butner Low FCI (1,201), Butner Medium I FCI (656), Butner Medium II FCI (1,461), and Butner FMC (909), Butner Camp (211)).

160 people.  They sleep in small cubicles in groups of two or three just a few feet from one another, with only a partial "wall" separating the groups.  They share limited showers, sinks, toilets, computers, and phones, most of which are cleaned only once per day despite frequent use.  They line up closely multiple times a day for food and medicine.  Staff and incarcerated people move from unit to unit, increasing the odds that the virus will spread.  Compounding matters, the testing, illness identification, and treatment are insufficient.  Purported "quarantine" practices are dangerous and ineffective.

Many men at Butner face an even higher risk of serious illness or death from COVID-19 because they are medically vulnerable with pre-existing health conditions.[4]  Indeed, all ten men who have died from COVID-19 at Butner so far were medically vulnerable, and all but one were over age 50.

Respondents/Defendants ("Respondents") know of the COVID-19 outbreak, the associated deaths at Butner, and the extraordinary danger COVID-19 poses.  Weeks ago, Attorney General Barr recognized this grave risk and directed the BOP to transfer, on an expedited basis, certain incarcerated persons to home confinement without the need for individualized requests.[5]  Yet Respondents have failed to do so in any meaningful way—even now, months after Governor Cooper declared a state of emergency and Attorney General Barr issued his directive.  Meanwhile, the virus rages on inside the facility.  Plaintiffs/Petitioners ("Petitioners"), who seek to represent the men in custody at Butner, remain at an extreme risk of irreparable harm, and Respondents have failed to take appropriate steps to protect their constitutional rights.

Accordingly, Petitioners seek a writ of habeas corpus under 28 U.S.C. § 2241 and a temporary restraining order ("TRO") and/or preliminary injunction under Rule 65 ordering (i) the appointment of a court-appointed expert to define the Medically Vulnerable Subclass and determine appropriate categories

---

[4]  Medically vulnerable people make up more than 38 percent of the prison population (*see* Declaration of Dr. Chris Beyrer ("Beyrer Decl.") (attached as **Ex. 17** to Declaration of Jeff Wilkerson ("Wilkerson Decl.") at 29).  The percentage of the population is likely to be even higher at Butner, where there is a dedicated medical facility.

[5]  Attorney General William Barr, *Memorandum for Director of Bureau Prisons*, Office of the Attorney General, 2 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download (attached as **Ex. 21** to Wilkerson Decl.) [hereinafter Barr March 26 Memo].

of release;[6] (ii) immediate consideration for release of persons in the Medically Vulnerable Subclass according to the expert's plan; and (iii) preparation of a detailed and feasible COVID-19 mitigation plan, containing measures for immediate and medically sound screening, testing, quarantine, and medical isolation (where appropriate) of the remaining incarcerated persons after release of the Medically Vulnerable Subclass. This relief is constitutionally required to avoid the continued loss of life and severe illness caused by Respondents' insufficient response to COVID-19.

## FACTUAL BACKGROUND

### I. COVID-19 Is Highly Dangerous

The virus that causes COVID-19 is highly contagious, with no vaccine and no known cure.[7] It spreads mainly through person-to-person contact, "respiratory droplets,"[8] and contact with contaminated objects.[9] Asymptomatic people can transmit the virus, making it particularly difficult to prevent.[10] COVID-19 is deadly, with an overall mortality rate of 3.4 percent.[11] The disease can cause pneumonia, acute

---

[6]   The term "release," as used here, refers to discharge of incarcerated persons from Butner's physical confines, not necessarily release from custody. Release options may include, but are not limited to: enlargement of custody; release to parole or community supervision; transfer furlough (to another facility, hospital, or halfway house); or non-transfer furlough, which could entail a released person's eventual return to Butner once the pandemic is over and the viral health threat is abated. Any releases should include requirements for testing, care, and distancing, as informed by a public health expert.

[7]   Declaration of Dr. Joe Goldenson, M.D. ("Goldenson Decl.") (attached as **Ex. 18** to Wilkerson Decl.), at 2; Declaration of Dr. Chris Beyrer, M.D., M.P.H. ("Beyrer Decl.") (attached as **Ex. 17** to Wilkerson Decl.) at 2.

[8]   *How COVID-19 Spreads*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 26, 2020) (attached as **Ex. 26** to Wilkerson Decl.); Goldenson Decl. at 2; Beyrer Decl. at 4.

[9]   *Id. See also* Neeltje van Doremalen, *et al*, Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, New England J. Med. (March 17, 2020), nejm.org/doi/10.1056/NEJMc2004973 (noting lengths of time SARS-nCoV-2 can survive in the air (3 hours), on cardboard (24 hours), plastic (3 days), and steel (2 days)); Goldenson Decl. at 2.

[10]  *Person-to-Person Spread*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 26, 2020); Goldenson Decl. at 2; Beyrer Decl. at 4.

[11]  *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 - 3 March 2020*, World Health Organization (Mar. 3, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---3-march-2020. By comparison, seasonal influenza "generally kills far fewer than 1% of those infected." *Id.*; Beyrer Decl. at 2.

respiratory distress syndrome, respiratory failure, heart failure, or sepsis.[12]  Current treatments for severe cases of COVID-19 are highly invasive and include isolation, oxygen, and mechanical ventilation.[13]  Those who survive COVID-19 can suffer severe and permanent damage to the lungs and other vital organs.[14]

All people risk serious illness and death from COVID-19, but some face especially high risks.[15] People over 50 are more likely to require hospitalization, admission to intensive care units, and/or die.[16] People with certain underlying medical conditions—regardless of age—face higher risk of hospitalization and death.[17]  Such conditions include diabetes, chronic lung disease, blood disorders, moderate to severe asthma, serious heart conditions, severe obesity, chronic kidney disease undergoing dialysis, chronic liver disease, endocrine disorders, metabolic disorders, neurological and neurologic and neurodevelopmental conditions, compromised immune systems as a result of cancer treatment, organ, or bone marrow transplants, prolonged use of corticosteroids, HIV, high blood pressure,  a history of smoking, or other immune deficiencies.[18]  The World Health Organization estimates a mortality rate of 13.2 percent for those with cardiovascular disease, 9.2 percent for diabetes, 8.4 percent for hypertension, 8 percent for chronic respiratory disease, and 7.6 percent for cancer.[19]

---

[12]  Fei Zhou, *et al.*, *Clinical Course and Risk Factors for Mortality of Adult Inpatients with COVID-19* in *Wuhan, China: A Retrospective Cohort Study*, 395 The Lancet 1054 (Mar. 11, 2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

[13]  Kathryn Dreger, *What You Should Know Before You Need a Ventilator*, N.Y. Times (Apr. 4, 2020), https://www.nytimes.com/2020/04/04/opinion/coronavirus-ventilators.html.

[14]  Beyrer Decl. at 2.

[15]  *See, e.g.*, Kerry Kennedy Meltzer, *I'm Treating Too Many Young People for the Coronavirus*, The Atlantic (March 26, 2020), https://www.theatlantic.com/ideas/archive/2020/03/young-people-are-not-immune-coronavirus/608794/; Goldenson Decl. at 2; Beyrer Decl. at 2-3.

[16]  *See, e.g.*, Goldenson Decl. at 2; Beyrer Decl. at 2-3, 28; Xianxian Zhao, *et al.*, Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis, MedRxiv (March 20, 2020), https://cutt.ly/etRAkmt; *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report); *Older Adults*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited May 22, 2020) (attached as **Ex. 28** to Wilkerson Decl.).

[17]  Xianxian Zhao, *et al.*; *see also* Beyrer Decl. at 28.

[18]  Xianxian Zhao, *et al.*; *see also* Goldenson Decl. at 2; Beyrer Decl. at 28.

[19]  *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf; *see also* Beyrer Decl. at 29.

Only three measures are known to reduce the spread of this fatal virus: (i) "social or physical distancing," of at least six feet of space between people;[20] (ii) covering the mouth and nose with a mask;[21] and (iii) vigilant hygiene practices, including frequently washing hands and regularly disinfecting surfaces.[22] The most important of these is distancing, without which even vigilant efforts to improve hygiene will not slow the virus.[23] Because asymptomatic people can transmit the virus, everyone—not just those with symptoms—must practice distancing and other preventative measures.[24]

## II. COVID-19 Poses Significant Dangers for Everyone at Butner

All prisons are at increased risk for rapid spread of COVID-19.[25] But the conditions at Butner and Respondents' failure to sufficiently address the risks posed by COVID-19 render it a death trap.

### A. An ongoing, uncontrolled deadly outbreak of COVID-19 rages at Butner

COVID-19 was first confirmed at Butner in late March 2020.[26] As of March 30, two incarcerated people and a staff member were diagnosed with COVID-19.[27] Less than a month later, the number of confirmed cases had risen to more than 200.[28] As one person formerly incarcerated at Butner put it, COVID-19's spread was "like a chain reaction."[29] As of the date of this filing, over 400 people at Butner— 377 incarcerated people and 44 staff—have tested positive.[30] Ten have died: Charles Richard Rootes (age 81), Gary Edward Nixon (age 57), Andre Williams (age 78), John Doe (age 46), Fabian Tinsley (age 67),

---

[20] *See Social Distancing, Quarantine, and Isolation*, Centers for Disease Control and Prevention, (attached as **Ex. 24** to Wilkerson Decl.); Goldenson Decl. at 2-3; Beyrer Decl. at 4.

[21] *See How to Protect Yourself & Others*, Centers for Disease Control and Prevention, (attached as **Ex. 25** to Wilkerson Decl.); Goldenson Decl. at 2-3; Beyrer Decl. at 20-21.

[22] *See id.*; Goldenson Decl. at 2-3; Beyrer Decl. at 4, 19-20.

[23] Beyrer Decl. at 4.

[24] Goldenson Decl. at 2-3; Beyrer Decl. at 4.

[25] Goldenson Decl. at 3-5; Beyrer Decl. at 29.

[26] Dan Kane, *Coronavirus Outbreak at Butner Prison Continues to Surge. Now it's Spreading to Staff*, News & Observer (April 9, 2020), https://www.newsobserver.com/news/local/crime/article241901551.html.

[27] Archived screenshot of BOP COVID-19 website (March 31, 2020), https://www.bop.gov/coronavirus/ (attached as **Ex. 36** to Wilkerson Decl.).

[28] Screenshot of BOP COVID-19 website (April 27, 2020), https://www.bop.gov/coronavirus/ (attached as **Ex. 37** to Wilkerson Decl.).

[29] Declaration of Lewis Donnell Huntley ("Huntley Decl."), (attached at **Ex. 8** to Wilkerson Decl.) at 3-4.

[30] *BOP COVID-19 Resource Page*, https://www.bop.gov/coronavirus/ (last visited May 25, 2020).

William Walker Minto (age 73), William E. Miller (age 58), Jerry Lynn Dempsey (age 59), Eric Spiwak (age 73), and Isaac Byers (age 52).[31]  Per Respondents' press releases, all of these men were medically vulnerable, and at least eight went into respiratory failure *before* BOP brought them to the hospital.[32]

**B.    Butner houses some of the most medically fragile individuals in federal prisons**

Butner houses 4,438 men,[33] including some of the most medically vulnerable in BOP custody.  One facility within Butner, FMC Butner, is a hospital serving people with health care needs classified as Care Level 4, the BOP's highest classification.[34]  Butner also houses hundreds, if not thousands, of men whose health care needs are classified as Care Level 3.[35]  Much of the population at Butner is over age 50,[36] and many suffer from ailments like cancer,[37] hypertension and heart disease,[38] compromised immune systems,[39] and diabetes[40]—the very conditions that the CDC has recognized as making people particularly vulnerable to severe illness or death if they contract COVID-19.[41]  In FMC Butner alone, a whole floor of some 240

---

[31]  U.S. Department of Justice, Federal Bureau of Prisons Press Releases on Inmate Deaths at FCI Butner I Prison (attached as **Ex. 20** to Wilkerson Decl.).

[32]  *Id.*

[33]  *Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp#bop_pop_table.

[34]  *Care Level Classification for Medical and Mental Health Conditions or Disabilities*, Federal Bureau of Prisons, https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf, at 3. Conditions that result in Care Level 4 include "cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, [and] major surgical treatment." *Id.*

[35]  *See PREA Audit Report*, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 2, 2017), https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf at 2 [hereinafter *PREA Audit Report*]; *see also* Declaration of Arnold J. Hill ("Hill Decl.") (attached as **Ex. 7** to Wilkerson Decl.) at 1; Declaration of Benjamin D. McRae ("McRae Decl.") (attached as **Ex. 12** to Wilkerson Decl.) at 1; Declaration of George B. Riddick ("Riddick Decl.") (attached as **Ex. 14** to Wilkerson Decl.) at 1.

[36]  *See, e.g.*, Declaration of Charles Hallinan ("Hallinan Decl.") (attached as **Ex. 4** to Wilkerson Decl.) at 3-4; McRae Decl. at 3.

[37]  *See, e.g.*, Declaration of Randy Ortiz ("Ortiz Decl.") (attached as **Ex. 13** to Wilkerson Decl.) at 1; Declaration of Michael Harrington ("Harrington Decl.") (attached as **Ex. 5** to Wilkerson Decl.) at 1; Declaration of John Dailey ("Dailey Decl.") (attached as **Ex. 2** to Wilkerson Decl.) at 1; Hallinan Decl. at 1; Riddick Decl. at 1.

[38]  *See, e.g.*, Hill Decl. at 1; Hallinan Decl. at 1; McRae Decl. at 1; Declaration of Antwan Harris ("Harris Decl.") (attached as **Ex. 6** to Wilkerson Decl.) at 1.

[39]  *See, e.g.*, Declaration of Jorge Maldonado ("Maldonado Decl.") (attached as **Ex. 11** to Wilkerson Decl.) at 1 (noting kidney transplants); Ortiz Decl. at 1; Dailey Decl. at 2; Declaration of Lee Ayers ("Ayers Decl.") (attached as **Ex. 1** to Wilkerson Decl.) at 2.

[40]  *See, e.g.*, Hill Decl. at 1.

[41]  *See supra* note 16.

people are seriously immunocompromised because they are undergoing active treatment for cancer.[42]

### C. Without reducing the population, crowding and physical layout of Butner make COVID-19's deadly spread a certainty

Further exacerbating the inherent dangers of an infectious disease outbreak in a prison populated largely with sick and elderly people is the crowded layout of Butner.[43] Butner houses approximately 4,438 men,[44] hundreds more than the maximum population for which it was built.[45] Even if it were functioning at only maximum capacity, Butner's housing layout is designed perfectly to spread this virus. In much of the facility, people live in large open rooms that hold as many as 150 people.[46] The rooms have cubicles set up with partial "walls" to divide them, but they provide no protection from an airborne illness.[47] As many as four people are crammed into each cubicle, each sleeping within a few feet of one another.[48] Other men are housed in rows of bunk beds along walls or in hallways others pass through.[49] To access the bathroom there, a man must pass by other bunks on both sides, without room to distance and without control over whether an individual in those bunks will cough or sneeze.[50] In a separate section, men are housed in celled units of about 120 people.[51] Like the cubicles, the cells hold between one and four people.[52] Whether housed in cubicles or cells, the men cannot maintain a six-foot distance from other men around them.[53]

---

[42] Ortiz Decl. at 1.

[43] Beyrer Decl. at 7-14.

[44] *See Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp (last updated May 21, 2020).

[45] *See PREA Audit Report* at 1 (listing capacity at 3,998 men).

[46] *See* Declaration of Josean Kinard ("Kinard Decl.") (attached as **Ex. 9** to Wilkerson Decl.) at 1; McRae Decl. at 1; Hill Decl. at 2; Dailey Decl. at 2; Hallinan Decl. at 2; Maldonado Decl. at 4.

[47] Declaration of John Krokos ("Krokos Decl.") (attached as **Ex. 10** to Wilkerson Decl.) at 2; Kinard Decl. at 1; McRae Decl. at 2; Hill Decl. at 2; Hallinan Decl. at 2.

[48] *See* Hill Decl. at 2; Hallinan Decl. at 2; McRae Decl. at 2; Dailey Decl. at 4; Krokos Decl. at 2.

[49] *See, e.g.*, Declaration of Roger Goodwin ("Goodwin Decl.") (attached as **Ex. 3** to Wilkerson Decl.) at 3; Huntley Decl. at 1.

[50] *See* Huntley Decl. at 1.

[51] *See* Ayers Decl. at 2; Riddick Decl. at 1.

[52] *See* Ayers Decl. at 2; Riddick Decl. at 3.

[53] *See* Hallinan Decl. at 2; Dailey Decl. at 2-3; Hill Decl. at 2; Krokos Decl. at 2; Maldonado Decl. at 6; McRae Decl. at 2; Harris Decl. at 1; Ayers Decl. at 2; Riddick Decl. at 2-3.

The men at Butner must also share common areas to meet their most basic needs. Men in cubicles must share bathrooms with everyone in their unit.[54] Men in the celled units share toilets and sinks with cellmates and share showers with everyone in the unit.[55] Most shared bathrooms are cleaned just once a day, despite use by scores of men.[56] The men in a housing unit also share phones and computers. Men are shoulder to shoulder as they use this equipment and while they wait their turn.[57] Like bathrooms, most phones and computers are cleaned once daily.[58] They are not disinfected between their near-constant use.[59]

In the cubicle-based units, men line up, close together, multiple times per day to receive meals and medications. In celled units, meals and medications are brought to each cell,[60] resulting in frequent direct contact with different individuals—including staff who visit other units and incarcerated people housed elsewhere.[61]

Butner could hardly have been designed to more efficiently transmit a deadly virus from person to person. Even if it were operating only at maximum capacity, the risk of COVID-19 there is too great. The overcrowding of the facility only serves to exacerbate an already unacceptable risk that Respondents have chosen not to prevent.

### D. There is no proper "quarantine," isolation conditions are inhumane and dangerous, and people frequently move between units

To prevent the spread of COVID-19, it is critical to separate those with the virus from those without it.[62] Quarantine is used at Butner for incarcerated people transferring into the facility and those slated to

---

[54] *See* Hallinan Decl. at 2; Dailey Decl. at 3; Hill Decl. at 2-3; Krokos Decl. at 4; McRae Decl. at 2; Harris Decl. at 2.

[55] Riddick Decl. at 3; Ayers Decl. at 3. Only in the hospital unit do the cells contain a toilet, sink and shower, shared only by the cellmates. *See* Ortiz Decl. at 2.

[56] Dailey Decl. at 3. In one housing unit at FCI Butner Low, the bathrooms are cleaned twice a day. *See* Hill Decl. at 2; Harris Decl. at 2.

[57] *See, e.g.*, Ayers Decl. at 5; *see also* Riddick Decl. at 4.

[58] *See, e.g.*, Ayers Decl. at 4-5; Dailey Decl. at 3-4; Kinard Decl. at 2; Krokos Decl. at 4; Hill Decl. at 3.

[59] *See, e.g.*, Dailey Decl. at 3-5; Hill Decl. at 3; Ayers Decl. at 4-5; Kinard Decl. at 1; Harris Decl. at 3.

[60] *See, e.g.*, Riddick Decl. at 3-4; Ayers Decl. at 4.

[61] *See, e.g.*, Ortiz Decl. at 1.

[62] Beyrer Decl. at 22-23.

leave BOP.[63]  Men believed to have COVID-19 are placed in isolation.[64]  Neither Butner's quarantine nor its isolation is medically sound or effective.[65]  And the constant flow of people between units is counterproductive and dangerous.[66]

If a person incarcerated at Butner is suspected or confirmed to have COVID-19, he is placed in isolation in the Special Housing Unit ("SHU").[67]  But this is *not* medical isolation with proper monitoring;[68] this is solitary confinement.  For example, Roger Goodwin, who takes daily medications to control his diabetes and has a rare immunodeficiency disorder, was taken to "isolation" in a filthy room in the SHU after testing positive for COVID-19, and was not given any of his medications, his toiletries, or even a cup to drink from for days.[69]  Other than the direction to drink fluids and once or twice-daily checks of his vital signs, he received no medical advice or treatment for COVID-19 while in isolation.[70]  After 17 days in isolation, he was transported back to the Camp on a bus with about 20 to 30 other men.[71]  He was not re-tested for COVID-19, and he does not know how (or if) Respondents determined that it was safe for him to return to the general population.[72]

Moreover, Respondents are not timely isolating people who exhibit symptoms or even those who test positive.  After one housing unit was tested, Respondents did not move some residents who tested positive until *five days* after receiving the test results.[73]  Thus, with full knowledge of the danger, Respondents kept known COVID-positive people in close quarters with uninfected people for five days.

---

[63]  *See, e.g.*, Ortiz Decl. at 1, Goodwin Decl. at 3.
[64]  *See, e.g.*, Riddick Decl. at 5; Ayers Decl. at 5; Hill Decl. at 4; McRae Decl. at 3.
[65]  Beyrer Decl. at 22-23, 27.
[66]  *Id.* at 26-27.
[67]  *See, e.g.*, Ayers Decl. at 5; Hill Decl. at 4; Hallinan Decl. at 4-5; Dailey Decl. at 4; Riddick Decl. at 5; McRae Decl. at 3.
[68]  Beyrer Decl. at 22-23, 27; Hill Decl. at 4
[69]  Goodwin Decl. at 5-6.
[70]  *Id.* at 6.
[71]  *Id.* at 7.
[72]  *Id.*
[73]  *See* Maldonado Decl. at 7.

Respondents' quarantine practices are similarly problematic.[74] Quarantine is necessary for prisoners "who are close contacts of a known or suspected case" and for new entrants into the facility, as a way of limiting the outbreak in the facility.[75] Respondents set up quarantine in a deeply and obviously flawed manner:

- Men in quarantine share a bathroom with other men from a housing unit not under quarantine.[76]

- Men in quarantine are separated from the men not in quarantine only by a "make-shift wall."[77]

- A prisoner orderly, not in quarantine, cleans the bathroom after men in quarantine use it, then returns to his housing unit (not in quarantine).[78]

- In FMC Butner, men transferring into Butner (whose COVID-19 status is unknown) are "quarantined" in cells on the floor where cancer patients are housed.[79] The same workers deliver food and medicine to their cells as to the cells of the cancer patients.[80] Housing these men on a floor filled with immunocompromised cancer patients is extremely dangerous.[81]

- Based on the number of confirmed COVID-19 cases at Butner, a significant number of the men housed there have been in close contact with others who have tested positive for the virus.[82]

- Of the 15 Petitioners and declarants in contact with someone who tested positive, none stated that they were put in quarantine.[83]

Instead of properly isolating those with COVID-19, incarcerated people and staff move frequently between units. Incarcerated people work in other parts of Butner and regularly interact with people housed

---

[74] Beyrer Decl. at 22-23.
[75] *See Memorandum for All Chief Executive Officers: Coronavirus (COVID-19) Phase Six Action Plan*, Federal Bureau of Prisons (Apr. 13, 2020), https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Phase-6-Plan-2020-04-13.pdf ("*Phase Six Action Plan*") (attached as **Ex. 23** to Wilkerson Decl.) at 2-3.
[76] *See, e.g.,* Maldonado Decl. at 5.
[77] *See, e.g., id.*
[78] *Id.*
[79] *See, e.g.*, Ortiz Decl. at 1.
[80] *Id.*
[81] Goldenson Decl. at 7.
[82] *Id.*
[83] Ayers Decl. at 5; Dailey Decl. at 5; Hallinan Decl. at 5; Harrington Decl. at 4; Harris Decl. at 6; Hill Decl. at 5; Huntley Decl. at 5; Kinard Decl. at 4; Krokos Decl. at 6-7; Maldonado Decl. at 8; McRae Decl. at 4; Ortiz Decl. at 3; Riddick Decl. at 6; Declaration of Troy Aurelius Titus ("Titus Decl.") (attached as **Ex. 15** to Wilkerson Decl.) at 3; Declaration of William Robert Whyte ("Whyte Decl.") (attached as **Ex. 16** to Wilkerson Decl.) at 9-10.

in other units—including the SHU (where people presumed to be sick with COVID-19 are housed), then return to their housing units each night.[84]

## III.    Butner's Response to the Outbreak Is Patently Inadequate to Mitigate the Risk of Harm

"[I]n this pandemic . . . inmates everywhere have been rendered vulnerable and often powerless to protect themselves from harm." *Valentine v. Collier*, -- U.S. --, 2020 WL 2497541, at *3 (May 14, 2020) (statement of Justice Sotomayor, joined by Justice Ginsburg). Because incarcerated people cannot take direct steps to decrease their risk of serious illness and death from COVID-19, they must rely on BOP to do so on their behalf.[85] Respondents know of their "profound obligation to protect the health and safety of all [incarcerated people]"[86] and the risk to the people in custody.[87] Yet their response is patently inadequate to safeguard the health and safety of those in their charge.[88] Tragically, some practices at Butner that purportedly protect against the virus' spread appear to have the opposite effect, including the lockdown protocol's systemic impact on meals, laundry access, telephone and computer use.[89] Respondents' inadequate response poses an immediate threat to incarcerated persons' lives, and reducing the Butner population is the only way to halt the serious ongoing and irreparable harm of COVID-19.[90]

### A.    Respondents are aware of the substantial risk to Petitioners

Months into this pandemic, Respondents are well aware of the obvious and substantial risk of harm from COVID-19. In late March, Attorney General Barr, the head of the agency that includes the BOP, acknowledged that the BOP must "minimize the risk of COVID-19 to those in [BOP] custody," and directed Respondent Carvajal to maximize the use of home confinement to "protect the health and safety of BOP

---

[84]    *See, e.g.,* Ayers Decl. at 6; Dailey Decl. at 4-5.

[85]    *See* Declaration of Dan Pacholke ("Pacholke Decl.") (attached as **Ex. 19** to Wilkerson Decl.) at 2-3 (suggesting significant reduction in population at Butner).

[86]    Attorney General William Barr, *Memorandum for Director of Bureau of Prisons*, Office of the Attorney General (Apr. 3, 2020), https://www.justice.gov/file/1266661/download (attached as **Ex. 22** to Wilkerson Decl.) [hereinafter Barr April 3 Memo].

[87]    Barr March 26 Memo.

[88]    *See generally* Beyrer Decl.

[89]    *Id.; see also* Ayers Decl. at 3-5 (explaining that it was "impossible" to do laundry during lockdown), Riddick Decl. at 2; Dailey Decl. at 3-4; Kinard Decl. at 2; Krokos Decl. at 4; Hill Decl. at 3.

[90]    Beyrer Decl. at 31-33; *see also* Pacholke Decl. at 5.

personnel and the people in our custody," noting that for some "home confinement might be more effective in protecting their health."[91] After Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Attorney General Barr found that "emergency conditions are materially affecting the functioning" of BOP, noting the "significant levels of infection" at several BOP facilities.[92] He directed Respondent Carvajal to review immediately for potential home confinement *all* at-risk individuals, not just those previously considered eligible.[93]

But even without those directives, Respondents knew the danger. According to BOP, as of May 27, 2020, BOP houses 136,610 incarcerated people and has a staff of about 36,000, for a total on-site population of about 172,610.[94] As of the same date, 5,043 incarcerated people and 600 BOP staff had at some point tested positive for COVID-19, for a total of 5,643 *known* positive individuals.[95] Based on BOP's own numbers, its infection rate as a percent of the total on-site population is about 3.2 percent. That rate is *more than six times* the current infection rate in the rest of the United States.[96] And 64 people held in BOP facilities have died from COVID-19 so far, including ten at Butner.[97] As of May 27, 2020, Butner is tied for the *highest number* of COVID-19 deaths across all BOP facilities, and is among the top five federal prisons for number of confirmed cases (over 440).[98]

---

[91] *See* Barr March 26 Memo.

[92] *Id.*

[93] *Id*.

[94] *COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 25, 2020).

[95] *Id*.

[96] As of May 25, 2020, total U.S. population is about 329,707,516. *U.S. and World Population Clock*, United States Census Bureau, https://www.census.gov/popclock/ (last visited May 27, 2020, 6:39 p.m.). As of May 25, 2020, there were around 1,695,776 confirmed COVID-19 infections in the United States. *COVID-19 Dashboard by the Centers for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University: Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited May 25, 2020, 6:40 p.m.). Total infections divided by total population yields about 0.0051 or 0.51 percent.

[97] *COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 25, 2020).

[98] *Id.* The number of people with COVID-19 at Butner is likely much higher than the confirmed numbers reflect. Respondent Carvajal confirmed that BOP performed testing on 2,700 mostly asymptomatic individuals residing in some of the worst-affected federal prisons, and an astonishing *70 percent* of them tested positive. That testing does not appear to include the men at Butner. *See, e.g.*, *Director M.D. Carvajal Addresses All Staff: COVID-19 Video Update Number 6: April 29, 2020*, Federal Bureau of

**B.** **People are falling seriously ill and dying at Butner because Respondents' actions have been patently inadequate**

Despite ten deaths and a large outbreak of a deadly disease, Respondents have taken only minimal steps to protect the medically vulnerable men at Butner from COVID-19.[99] In addition to the raw numbers, dire reports from inside Butner confirm that Respondents' efforts to protect incarcerated people from COVID-19 are ineffective at best and deadly at worst.

As discussed in this brief, Respondents' grossly inadequate efforts expose Petitioners to inevitable COVID-19 infection and all that it entails. Attorney General Barr directed Respondents—*nearly two months ago*—to take immediate and aggressive steps to transfer people to home confinement, recognizing that "time is of the essence."[100] So too, public health experts urge rapid release from custody of those most vulnerable to COVID-19.[101] Respondents have failed to use their available statutory authority to reduce the population of Butner with sufficient speed or in sufficient volume to mitigate the severe risk posed by COVID-19. Since Attorney General Barr's first memo, Respondents Carvajal and Allen have transferred, on average, only one person per facility every other day to home confinement.[102] Very few have been transferred from Butner.[103] For example, Petitioner John Dailey, who has terminal cancer, was approved for transfer from Butner on April 23 or 24 because of the high risk he faces from COVID-19.[104] He has since been informed that he will be not be transferred out of Butner until August—three months from

---

Prisons (April 22, 2020), https://www.bop.gov/resources/news/20200429_dir_message.jsp; *COVID-19 Video Update Number 7: May 6, 2020*, https://www.youtube.com/watch?v=wxdS2FKjAUw.

[99] Beyrer Decl. at 28-32.

[100] Barr April 3 Memo.

[101] *See, e.g.*, Josiah Rich, Scott Allen, and Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, Washington Post (March 17, 2020), https://wapo.st/2JDVq7Y; *See also* Goldenson Decl. at 7-8; Beyrer Decl. at 32-33.

[102] *Director M.D. Carvajal Addresses All Staff: COVID-19 Video Update Number 5: April 22, 2020*, Federal Bureau of Prisons (April 22, 2020), https://www.bop.gov/resources/news/20200422_dir_message.jsp; *COVID-19 Cases*.

[103] *See, e.g.*, Ayers Decl. at 4; Hallinan Decl. at 5; Hill Decl. at 5; McRae Decl. at 4; Riddick Decl. at 6; Titus Decl. at 5; *see also* Beyrer Decl. at 32.

[104] Dailey Decl. at 5.

now.[105]  Respondents also continue to oppose motions for compassionate release.[106]  For example, they opposed motions by Declarants Huntley and Krokos, which courts nevertheless granted.[107]  On May 19, another court ordered the release of a person whose motion for compassionate release Respondents opposed.[108]  Each of the members of the Medically Vulnerable Subclass is at increased risk from COVID-19, either because of age, underlying medical condition, or both.[109]  Respondents' opposition to the release of medically vulnerable people exhibits deliberate indifference in violation of the Eighth Amendment.

Respondents also have failed to adjust conditions to permit physical distancing at Butner.  Because Respondents have not released people, incarcerated people cannot maintain the recommended six feet of distance from others.[110]  People sleep within a few feet of multiple other people.[111]  They wait in close-packed lines multiple times a day to receive meals, medicines, and other items.[112]  They are close to others when they use, or wait for, bathrooms, phones and computers.[113]  Respondents' failure to take even elementary steps to implement physical distancing constitutes deliberate indifference.

---

[105] *Id.*

[106] *See, e.g.*, Ayers Decl. at 1-2, 6-7; Goodwin Decl. at 1-3; Harrington Decl. at 1, 4; Hill Decl. at 1-2, 4-5; Maldonado Decl. at 1, 3-4, 7-8; Huntley Decl. at 4; Krokos Decl. at 1, 7.

[107] Huntley Decl. at 4; Krokos Decl. at 1, 7.

[108] Opinion and Order Granting Defendant Wesam El-Hanafi's Motion for Compassionate Release, *United States v. El-Hanafi*, No. 1:10-cr-00162-KMW (S.D.N.Y. May 19, 2020), ECF No. 252 (attached as **Ex. 33**).

[109] *See* Hallinan Decl. at 1-2 (79 years old, bladder cancer and prostate cancer in remission, hyptertension, cardiovascular disease, and an autoimmune disorder (celiac)); Dailey Decl. at 1 (62 years old, suffers from an aggressive and terminal case of non-Hodgkins lymphoma); Hill Decl. at 1-2 (68 years old, hypertension and cardiovascular disease, which required triple bypass surgery in 2019, spinal cord injury causing confinement to wheelchair, diabetes); McRae Decl. at 1 (43 years old, hypertension, blood clots in lungs and limbs, severe obesity); Ayers Decl. at 1-2 (37 years old, pernicious anemia, autoimmune disorder); Riddick Decl. at 1 (52 years old, in remission from lymphoma, diabetes, high cholesterol, childhood arthritis, severe obesity); Maldonado Decl. at 1-4 (52 years old, kidney disease leading to two prior transplants, kidney function currently in decline, must take immune-suppressing medication, malignant hypertension, tachychardia).  Plaintiff Anthony Butler suffers from diabetes, Hepatitis B, and a heart murmur that causes him shortness of breath.  *See* Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief, Dkt. No. 1.

[110] *See* Beyrer Decl. at 4, 7; Goldenson Decl. at 2, 6.

[111] *See, e.g.*, Ayers Decl. at 2; Hallinan Decl. at 2; McRae Decl. at 2; Hill Decl. at 2; Dailey Decl. at 3.

[112] *See, e.g.*, Krokos Decl. at 5; Hallinan Decl. at 3; Hill Decl. at 3. Dailey Decl. at 3; McRae Decl. at 2.

[113] *See, e.g.*, Hill Decl. at 3; Kinard Decl. at 2; McRae Decl. at 2.

Respondents' testing process is also inadequate.  As of May 8, 2020, just 459 COVID-19 tests had been administered to incarcerated people at Butner, out of approximately 4,550 people.[114]  Approximately 318 tested positive.[115]  Respondents do not test Butner staff; instead, they rely on "self-reporting and temperature checks."[116]  As of May 22, BOP reported 44 Butner staff had tested positive for COVID-19.[117]

Even when Respondents do conduct tests, they fail to conduct them in a manner that would limit the virus's spread.[118]  After conducting testing in one housing unit, Respondents did not move some people who tested positive out of the unit until *five days after receiving the test results.*[119]  During that time, those who tested positive were not quarantined or isolated, and they shared the same bathrooms and other areas with those who had tested negative.[120]  When testing is not conducted, Respondents only sporadically check temperatures.[121]  Other times, a person with symptoms of COVID-19 must request sick call to get his temperature taken.[122]  Respondents have not waived the co-pay for sick call.[123]  Without widespread testing and tracing, it is impossible to know COVID's reach at Butner; Respondents' failure to ascertain this critical information constitutes deliberate indifference to the people incarcerated there.

Butner's quarantine practices are also unsafe and ineffective.[124]  For example, Respondents placed some people transferring into Butner in "quarantine" on a floor with cancer patients,[125] putting the cancer patients at extreme risk.[126]  One housing unit was emptied to serve as a quarantine area for people slated

---

[114] Gov't Opp. to Mtn. Compassionate Release, *United States v. El-Hanafi*, No. 1:10-cr-00162-KMW (S.D.N.Y. May 13, 2020) ECF No. 247 (attached as **Ex. 31** to Wilkerson Decl.).

[115] *Id*.

[116] *See BOP Implementing Modified Operations*, Federal Bureau of Prisons https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 22, 2020).

[117] *COVID-19 Coronavirus: COVID-19 Cases*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 25, 2020).

[118] Beyrer Decl. at 18–20.

[119] *See* Maldonado Decl. at 7.

[120] *Id.*

[121] *See, e.g.,* Dailey Decl. at 4; Hallinan Decl. at 4; Krokos Decl. at 6; Goodwin Decl. at 7; Beyrer Decl. at 19.

[122] *See, e.g.*, Dailey Decl. at 4; Krokos Decl. at 5; Hallinan Decl. at 4-5.

[123] *Id*.; *see also* Hill Decl. at 4; McRae Decl. at 3; Riddick Decl. at 5.

[124] *See* Beyrer Decl. at 23-24; Goldenson Decl. at 7.

[125] *See, e.g.,* Ortiz Decl. at 1.

[126] Goldenson Decl. at 7.

for release.[127]  But this arrangement meant that the people who had been housed there were transferred to other units, which led to significant crowding in those units, thereby making physical distancing even more difficult.[128]  Butner set up a quarantine area; however, men in the quarantine unit shared a bathroom with a non-quarantined housing unit.[129]  An orderly from the non-quarantined housing unit cleans the bathroom after the quarantined men use it, then returns to the non-quarantined housing unit.[130]

Respondents' decision to have staff and incarcerated people move between units and interact with people in different housing units increases the likelihood that the virus will spread. For example, incarcerated people go to work in their jobs at UNICOR and in the kitchen, where they interact with people from other housing units.[131]  On about May 13, two kitchen workers had fevers and were taken from the kitchen to the SHU.[132]  Some incarcerated people are required to clean the areas used by people believed to have COVID-19; they then return to their own housing units.[133]

In sum, conditions at Butner remain largely the same as they were before the outbreak: housing remains cramped and crowded, men must line up for meals and medications, bathrooms and common areas are shared, hygiene products are limited, and people move between units.  The disparity between infection rates and deaths outside and inside Butner makes clear that Respondents' minimal efforts *simply are not working*.  Instead, more incarcerated persons fall ill with COVID-19, and the death toll rises.  Although conditions cannot be corrected fully to prevent the existing illnesses—nor save those who have already met an untimely and tragic death—this Court can, and should, step in now to prevent more tragedy.

## <u>LEGAL STANDARD</u>

To obtain a TRO or preliminary injunction, a plaintiff must establish "1) that it is likely to succeed on the merits; 2) that it is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the

---

[127] *See* Goodwin Decl. at 3.
[128] *See id*. at 3-4.
[129] *See* Maldonado Decl. at 5.
[130] *Id*.
[131] *See, e.g.*, Ayers Decl. at 6; Hill Decl. at 4; Krokos Decl. at 6; McRae Decl. at 3.
[132] Hallinan Decl. at 4.
[133] *See e.g.*, Dailey Decl. at 5; Maldonado Decl. at 5; Whyte Decl. at 8.

balance of equities tips in his favor; and 4) that an injunction is in the public interest." *Native Angels Home Health, Inc. v. Burwell*, No. 5:15-CV-234-FL, 2015 WL 12910710, at *2 (E.D.N.C. June 4, 2015) (citation omitted). A court may issue a TRO without awaiting a response if it finds "immediate and irreparable injury … will result to the movant before the adverse party can be heard in opposition." Fed R. Civ. P. 65(b)(1). Once a plaintiff shows entitlement to preliminary relief, courts have broad power to fashion equitable remedies to address constitutional violations in prisons. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). Courts "must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners [and] . . . may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

## ARGUMENT

### I.  Petitioners Are Likely to Succeed on the Merits of Their Claim

Petitioners are likely to show that confining the Medically Vulnerable Subclass at Butner places them at substantial risk of harm from COVID-19, violating their Eighth Amendment rights. Prison officials are required to provide for reasonable safety of incarcerated persons and address their serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970 (1994); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Prison officials must provide incarcerated persons with "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care," and they must "take reasonable measures to guarantee the safety of the [incarcerated people]." *Farmer*, 511 U.S. at 832 (internal quotation marks omitted). They must address the serious medical needs of incarcerated persons, even where the risk of harm is far less immediate or certain than is the case here. *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (nonsmoking incarcerated person stated Eighth Amendment claim for relief because of exposure to environmental tobacco smoke); *Putney v. Likin*, 656 F. App'x 632, 637 (4th Cir. 2016) (remanding case in which the court "erred by ignoring the *risk of harm* posed by depriving someone of a mattress for over four months") (emphasis in original).

Prison officials violate the Eighth Amendment when they show "deliberate indifference" to a substantial risk of serious harm. *Scinto*, 841 F.3d at 225 (finding inference of deliberate indifference where

prison officials denied plaintiff insulin and failed to provide aid in an alleged medical emergency); *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016). A prison official acts with deliberate indifference when he "kn[ows] of and disregard[s] an excessive risk to [an incarcerated person's] health or safety." *Scinto*, 841 F.3d at 225. A court may conclude that a prison official knows of a substantial risk if, as here, the risk is obvious. *Id*. at 226.

The deliberate indifference standard is met when prison officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even absent current symptoms. *Helling*, 509 U.S. at 33–34; *Oldham v. Beck*, 75 F. App'x 122, 125 (4th Cir. 2003) (lower court prematurely dismissed claims where exposure to tobacco smoke "caused [the plaintiff] various serious health problems and also caused existing health problems to worsen at an accelerated rate"). "That the Eighth Amendment protects against future harm to [incarcerated people] is not a novel proposition," and prison officials "may [not] be deliberately indifferent to the exposure of [incarcerated people] to a serious, communicable disease." *Helling*, 509 U.S. at 33–34.

Here, Petitioners will be able to establish a substantial risk of serious harm to which Respondents have been, and continue to be, deliberately indifferent.

### A.   Petitioners face a substantial risk of serious harm from COVID-19, which is both highly contagious and deadly

As set forth *supra* in Section I, COVID-19 is a highly contagious and deadly disease, particularly for members of the Medically Vulnerable Subclass. Because of their confinement at Butner in the midst of an active, poorly managed outbreak of a highly contagious, incurable, and deadly disease, Petitioners face substantial risk of serious harm. They are housed in close quarters and forced to eat, bathe, and perform all daily life activities in a communal setting where they cannot adequately distance from others or protect themselves from this dangerous disease.[134] Incarcerated people and staff at Butner travel between different parts of the compound—including areas intended to isolate ill patients—potentially bringing the lethal virus

---

[134] *See, e.g.*, Ayers Decl. at 2-3; Dailey Decl. at 2.

with them.[135]  Petitioners are forced to line up in tightly packed lines multiple times per day to receive food and medications.[136]  If a person exhibits symptoms of COVID-19, he is not removed from the housing unit he shares with scores of other people unless he requests a "sick call," pays the co-pay, and has a high enough temperature,[137] even though a high temperature is only one potential symptom of COVID-19.  Even then, any treatment (if he receives it at all) is tragically delayed and insufficient.[138]

The situation of one particular individual at Butner is instructive.  Charles Hallinan is 79 years old. He has hypertension, cardiovascular disease, severe and chronic celiac disease, and he has had bladder cancer and prostate cancer.  He sleeps each night within six feet of five other men.  His ill health makes Mr. Hallinan more susceptible to serious illness if he contracts the virus.[139]  Just like Mr. Hallinan, other members of the Medically Vulnerable Subclass are at a particularly high risk of suffering serious illness or death from COVID-19.[140]

### B.  Respondents are aware of the risks but have not taken reasonable steps to mitigate them

Respondents know of and have disregarded the risk facing Petitioners.  As discussed above, they have been directly informed of the risk by the head of the agency for which they work, Attorney General Barr.[141]  Respondent Carvajal, the highest official in the BOP, has acknowledged the risk.  And ten men are dead from COVID-19 at Butner.  Indeed, as one court recently noted, "the danger COVID-19 poses to the [detainees] and in particular to the Medically-Vulnerable [detainees] is practically common knowledge." *Cameron v. Bouchard*, No. CV 20-10949, --- F.Supp.3d ----, 2020 WL 2569868, at *21 (E.D. Mich. May

---

[135] *See, e.g.*, Ayers Decl. at 4; Dailey Decl. at 4-5; Harris Decl. at 5-6; McRae Decl. at 3.

[136] *See, e.g.*, Dailey Decl. at 3; Harris Decl. at 2; McRae Decl. at 2; Maldonado Decl. at 2.

[137] *See* Ayers Decl. at 4; Dailey Decl. at 4; Harris Decl. at 2.

[138] Maldonado Decl. at 3-4.

[139] See Hallinan Decl. at 1-2.

[140] Beyrer Decl. at 28-32; *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (attached as **Ex. 30** to Wilkerson Decl.), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (Mar. 23, 2020); *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 25, 2020).

[141] Barr April 3 Memo.

21, 2020), *on reconsideration* 2020 WL 2615740 (E.D. Mich. May 22, 2020), *stay denied*, No. 20-1469 (6th Cir. May 26, 2020).

Further acknowledging the risk, Respondents have taken minimal actions, such as "locking down" the facility.[142]  But these actions are so inadequate in the face of the risk facing the men at Butner that they constitute deliberate indifference to the Petitioners' and the Class's health and safety.  The mere fact that prison officials have taken *some* action does not foreclose a finding of deliberate indifference.  *See De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("just because [prison officials] have provided De'lonta with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with *constitutionally adequate* treatment") (emphasis in original); *see also Cameron*, 2020 WL 2569868, at *22–25 (finding detainees likely to succeed on the merits of their challenge to jail officials' COVID-19 response, although officials had carried out testing, reduced the jail population, and released some medically vulnerable detainees).

Despite Attorney General Barr's directives, Respondents have failed to release more than a tiny handful of the many medically vulnerable prisoners at Butner.[143]  For people who are medically vulnerable, "home confinement or early release is the only reasonable response to this unprecedented and deadly pandemic."  *Cameron*, 2020 WL 2569868, at *24.  The conditions at Butner have not been altered "to any extent that would make it safe enough to protect the Medically-Vulnerable Subclass from the potentially lethal combination of their unique vulnerabilities and COVID-19's health-shattering consequences."  *Id.* at 24 ("[a]ny response other than release or home confinement constitutes deliberate indifference").

Like the defendants in *Cameron*, Respondents here, despite having been given "authority to take action to release medically-vulnerable inmates" and exhorted by the Attorney General to do so, "are exercising their authority at a pace that disregards the seriousness of the risk faced by medically-vulnerable

---

[142] *See supra* at 12–13.
[143] *See, e.g.*, Amanda Lamb, *Former Inmate Says Butner Officials "Slow-Rolling" Prisoner Releases During Pandemic*, posted Apr. 14, 2020 7:49 PM updated Apr. 14, 2020 8:40 PM, https://www.wral.com/coronavirus/former-inmate-says-butner-officials-slow-rolling-prisoner-releases-during-pandemic/19056209/

inmates." *Id*. at * 24. Such failure to act meaningfully in the face of an unprecedented pandemic is deliberate indifference that leaves Petitioners—and particularly the Medically Vulnerable Subclass—at imminent risk of serious harm, and even death. *Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *23 (D. Conn. May 12, 2020) ("Under the circumstances of the present crisis, the [FCI Danbury] Warden's failure to make prompter, broader use of this authority [to transfer BOP prisoners to home confinement] to protect the lives of vulnerable inmates is likely to constitute deliberate indifference."). Indeed, in *Martinez-Brooks*, the court found that, even if it accepted the defendants' account that the prison had implemented effective "screening, testing, quarantining, isolation of COVID-19 positive inmates, enhanced sanitation, and widespread use of personal protective equipment," by itself, defendants' "inadequate implementation of the home confinement authority in the CARES Act constitutes 'deliberate indifference' under the Eighth Amendment." *Id.*

Beyond failing to release medically vulnerable people from Butner, Respondents have failed to take other necessary measures. They have failed to take steps to enable the men in their custody to maintain a six-foot distance between them. In *Cameron*, in response to the defendants' justification of their housing practices, the court found that a jail's actions that would make social distancing possible in multi-person cells only "if inmates remain in the same positions on opposite corners of the cell" could support a finding of deliberate indifference. *Cameron*, 2020 WL 2569868, at *23. Here, for the men in the cubicles, even the absurdity proposed by the defendants in *Cameron* would not enable them to maintain a six-foot distance from others: If all the men stayed in their corners in the cubicles, they would be within a couple of feet of someone in an adjacent cubicle.[144] Respondents have done nothing to enable the men to socially distance in their sleeping arrangements. This failure alone demonstrates deliberate indifference. *Cameron*, 2020 WL 2569868, at *23; *Wilson v. Williams*, 2020 WL 1940882, at *3 (N.D. Ohio Apr. 22, 2020), *stay denied*, No. 20-3447 (6th Cir. Apr. 27, 2020), *stay denied*, 590 U.S. --- (May 26, 2020); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *10 (D. Md. Apr. 3, 2020) (finding that housing detainees in close

---

[144] *See* Dailey Decl. at 2.

quarters, in dormitory-like facilities that hold up to 32 people or two-person cells, could support finding of deliberate indifference during COVID-19 outbreak).

Respondents have also failed to conduct widespread testing of the Butner population, despite evidence of a large and growing outbreak.[145] Rather, they assume, without testing, that a person does not have COVID-19 if his temperature is not sufficiently high (or if the person does not have his temperature taken).[146] Without testing, there is no way to know how many people at Butner have the virus. The failure to test supports a finding of deliberate indifference. *Wilson*, 2020 WL 1940882, at *2, 8; *see also Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 2292747, at *4 (D. Md. May 7, 2020).

Respondents have failed to institute quarantine and isolation practices that actually serve to keep infected or potentially infected people away from people who are not infected.[147] This places Petitioners and class members at risk and demonstrates deliberate indifference to that risk. *Cameron*, 2020 WL 2569868, at *23. Further, Respondents have not addressed the risk of shared toilets, sinks, showers, and other communal spaces and items that are not disinfected between each use.[148] Their lockdown protocol made it "impossible" for incarcerated people to clean their bedding.[149] And they are not enforcing the use of masks by prison staff.[150] These failings, too, support a finding of deliberate indifference to the risk faced by the Petitioners and the Class. *Cameron*, 2020 WL 2569868, at *22.

Respondents' failure to take adequate measures in the face of the deadly virus coursing through Butner is a paradigmatic case of deliberate indifference.[151]

---

[145] *See* Dailey Decl. at 4 ("There has been no widespread testing for coronavirus in my housing unit."); Hill Decl. at 4 (same); Ayers Decl. at 4. (same); McRae Decl. at 3 ("I don't know of a single person in my housing unit who has been tested for the coronavirus.").

[146] *See* Ayers Decl. at 4; Hill Decl. at 4; *See* McRae Decl. at 3; Riddick Decl. at 5.

[147] *See* Ortiz Decl. at 1; Maldonado Decl. at 5, 7; Goodwin Decl. at 3–4, 5–6.

[148] *See* Dailey Decl. at 3; Ayers Decl. at 3; Hill Decl. at 3; McRae Decl. at 2–3; Riddick Decl. at 4.

[149] *See* Ayers Decl. at 4; Krokos Decl. at 4.

[150] *See* Goodwin Decl. at 7; Kinard Decl. at 2; Krokos Decl. at 5.

[151] In addition to the cases already cited, other federal courts across the country have granted TROs or preliminary injunctions on behalf of vulnerable individuals in custody who are at heightened risk for COVID-19. *See, e.g., Cristian A.R. v. Decker*, 2020 WL 2092616, at *4 (D.N.J. Apr. 12, 2020); *Bent v. Barr*, 2020 WL 1812850, at *1 (N.D. Cal. Apr. 9, 2020); *Thakker v. Doll*, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Coronel v. Decker*, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Basank v. Decker*,

## II. Petitioners Face Irreparable Harm if They Remain Confined at Butner

Petitioners are already suffering irreparable harm. As discussed above, they are being subjected to a substantial risk of serious harm through the deliberate indifference of Respondents in violation of the Eighth Amendment. "As a general rule, 'the denial of a constitutional right ... constitutes irreparable harm for purposes of equitable jurisdiction.'" *Porter v. Clarke*, 290 F. Supp. 3d 518, 533 (E.D. Va. 2018), *aff'd*, 923 F.3d 348 (4th Cir. 2019), *as amended* (May 6, 2019). The deprivation of constitutional rights "'for even minimal periods of time' constitutes irreparable injury." *Condon v. Haley*, 21 F. Supp. 3d 572, 588 (D.S.C. 2014) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Petitioners also face the concrete (and irreparable) harm of contracting COVID-19 and the suffering, permanent injury, and death that may ensue. Ten men at Butner with pre-existing medical conditions—men who would have been part of the Medically Vulnerable Subclass had they lived—have died already.[152] Failure to act now will result in additional serious illness and death.[153]

As the court in *Wilson* recognized, "[w]hile not every inmate who contracts the virus will die, the subclass members are at a much greater risk of doing so. They have a very serious medical need to be protected from the virus." *Wilson v. Williams*, 2020 WL 1940882, at *3. Even for the healthy and young men in the Class, some will require hospitalization and some will die. The harm is irreparable and can be prevented only with a restraining order, preliminary injunction, or writ of habeas corpus from this Court.

## III. Release Would Serve the Public Interest

The current conditions at Butner violate the Eighth Amendment. The public interest is served by preventing the continuing violation of Petitioners' and the Class's constitutional rights. *Beck v. Hurwitz*, 380 F. Supp. 3d 479, 484–85 (M.D.N.C. 2019) (noting public interest in "upholding the constitutional rights of incarcerated persons to receive adequate and essential medical care while in prison").

---

2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Banks v. Booth*, 2020 WL 1914896 (D.D.C. April 19, 2020); *Coreas v. Bounds*, 2020 WL 2201850, at *3 (D. Md. Apr. 30, 2020).

[152] *See, e.g.*, Press Release, Inmate Death at FCI Butner I (Apr. 12, 2020), https://www.bop.gov/resources/news/pdfs/20200412_press_release_inmate_death_but_covid19.pdf.

[153] *See* Goldenson Decl. at 7-8; Beyrer Decl. 32-33.

The public interest in minimizing the spread of COVID-19 is impossible to overstate. Respondents have demonstrated that they are unable to manage the spread of COVID-19 without reducing the population at Butner. Petitioners and other members of the class and subclass cannot physically distance from other people. They cannot quarantine or isolate themselves effectively if they have been exposed to or contracted COVID-19. And even with proper hygiene supplies and protective equipment, the virus will continue to spread so long as the men at Butner cannot physically distance themselves.

Apart from protecting Petitioners and the class, release would mitigate against an even larger crisis outside the complex walls than already exists. It is statistically inevitable that COVID-19 will spread from Butner to the larger community.[154] Forty-four staff members at Butner have tested positive and are carrying the virus home and into communities outside the prison's walls. "[A] COVID-19 outbreak at a detention facility could quickly overwhelm" not only the facility's medical system, but "surrounding community hospitals" as well. *Coronel*, 2020 WL 1487274, at *7. The resulting effect on "public health and safety" would harm the public interest. *Id.* The spread of COVID-19 "endangers the staff's families who come into contact with [the prison]'s undoubtedly exposed staff." *See Wilson*, 2020 WL 1940882, at *3. By contrast, the Medically Vulnerable Subclass members are an easily identifiable and traceable group who could effectively quarantine for 14 days upon release, and would have no need to travel to jobs during that time. Public interest is served by release.

## IV.    The Balance of Equities Tips Heavily in Petitioners' Favor

The most equitable result here is to immediately consider release of the Medically Vulnerable Subclass and put protocols in place to protect the remaining incarcerated individuals. Any argument that release of the Medically Vulnerable Subclass as a whole presents a danger to public safety is groundless, and in any event cannot overcome the very real, immediate harm to both Petitioners and the public if the outbreak reaches beyond prison walls. *See Prieto Refunjol v. Adducci*, No. 2:20-CV-2099, 2020 WL 2487119, at *28 (S.D. Ohio May 14, 2020) ("Petitioners have also put forward persuasive evidence that the

---

[154] *See* Goldenson Decl. 7-8; Beyrer Decl. at 14-17.

current large cluster of positive [COVID-19] cases at Morrow creates a larger threat to public health than does releasing some or all of these detainees from custody."). Any asserted threat to public safety is diminished under current conditions and far outweighed by the harms of continued detention in a prison racked by COVID-19, including potential death. *Cf. Thakker,* 2020 WL 1671563, at \*9 (holding balance of equities favors releasing detainees because of COVID-19 in part because failure to appear already carries grave consequences and travel is currently restricted). The Medically Vulnerable Subclass is made up of individuals who are older and seriously ill. Butner houses nearly 1,500 men who are considered minimum or low security; the remainder are only medium security.[155] Most fundamentally, "public safety" considerations must include not only the hypothetical risk of re-offense by released persons, but also the very real risk posed by a disease that has killed more than 100,000 Americans in a matter of weeks. On balance, the equities favor the Medically Vulnerable Subclass's release to home confinement or other appropriate placement as compared with remaining in a facility where they are at extreme risk of harm and have insufficient medical care.

## V.  This Court Has Authority to Grant Release

A court may order the release of incarcerated persons, including the Medically Vulnerable Subclass here, when a person is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (§ 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself).

Section 2241 is an appropriate basis for persons in federal custody to seek release from confinement because COVID-19 poses a risk that is too great to be countenanced under the Constitution. *Martinez-*

---

[155] Nearly half the Butner population is in the low security facility or minimum security Camp, and the highest security level at Butner is medium security. There is no maximum security section at Butner. *See Population Statistics: Inmate Population Breakdown*, Federal Bureau of Prisons, https://www.bop.gov/mobile/about/population_statistics.jsp (last updated May 21, 2020) (showing populations for Butner Low (1,201), Butner Medium I (656), Butner Medium II (1,461), and FMC Butner (909)).

*Brooks v. Easter*, 2020 WL 2405350, at \*13-14 (finding that § 2241 was appropriate basis to order transfer from BOP facility to home confinement due to spread of COVID-19 in the facility); *United States v. Taylor*, No. 3:18-cr-282, 2020 WL 2084974, at \*5 (M.D. Pa. Apr. 30, 2020) ("[E]mergency petitions for release, based on COVID19 are properly construed pursuant to 28 U.S.C. § 2241."); *see also Coreas*, 2020 WL 1663133, at \*7 (noting that "although the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is "the heart of habeas corpus."); *Cordaro v. Finley*, No. 3:10-CR-75, 2020 WL 2084960, at \*2 (M.D. Pa. Apr. 30, 2020); *Basank*, 2020 WL 1481503, at \*4.

The Court need not wait until finally deciding the merits to order release. Instead, "[d]istrict courts have inherent authority to grant enlargement to a defendant pending a ruling on the merits of that defendant's habeas petition." *Wilson*, 2020 WL 1940882, at \*4 (finding "the exceptional circumstances at [FCI] Elkton and the Petitioners' substantial claims, that are likely to succeed at the merits stage, necessitate the exercise of that authority and that such relief is proper for members of the [medically-vulnerable] subclass" and granting preliminary injunction seeking the release of the subclass). As in *Wilson*, this Court should exercise its inherent enlargement authority to grant preliminary injunctive relief to the subclass in the form of release.

Nor does the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, bar this Court from granting release. Petitioners seek a writ of habeas corpus based on Respondents' inability to provide constitutional conditions of confinement absent a significant reduction in the Butner population, and they seek preliminary injunctive relief. The PLRA does not extend to habeas proceedings challenging the fact of confinement in prison. 18 U.S.C. § 3626(g)(2); *Wilson*, 2020 WL 1940882, at \*10; *Martinez-Brooks*, 2020 WL 2405350, at \*16; *Baez v. Moniz*, No. CV 20-10753-LTS, 2020 WL 2527865, at \*2 (D. Mass. May 18, 2020).

Even if the Court were to conclude that Section 2241 does not afford the relief requested, the Court has the inherent authority to order the release of prisoners when necessary to cure an ongoing constitutional violation. *See Brown v. Plata,* 563 U.S. 493, 502 (2011) (affirming prisoner release order when necessary

to cure ongoing denial of adequate medical and mental health care); *see also Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 327 (2015) (recognizing federal courts' inherent equitable authority to order injunctive and declaratory relief to remedy violations of the Constitution by federal actors); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("Injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). Moreover, the PLRA provisions regarding prisoner release orders (18 U.S.C. § 3626(a)(3)) do not prevent this court from granting relief. Petitioners seek discharge of incarcerated persons from the physical confines of Butner, not necessarily release from custody.[156] Release options may include, for example, enlargement of custody to home confinement, or to another facility, hospital, or halfway house.[157] Such relief is not a "prisoner release order" as defined by the PLRA; the incarcerated people would remain in BOP custody, but their confinement would be enlarged to enable Respondents to meet their constitutional obligations. *Wilson*, 2020 WL 1940882, at *10. Moreover, the PLRA release provisions do not prevent a court from ordering transfer of incarcerated people out of a prison to correct the violation of a constitutional right where crowding is not the primary cause of the violation. *Cameron*, 2020 WL 2569868, at *27; *see also Plata v. Brown*, 427 F. Supp. 3d 1211, 1222-24 (N.D. Cal. 2013); *Reaves v. Dep't of Corr.*, 404 F. Supp. 3d 520, 522-24 (D. Mass. 2019). As explained in *Cameron*:

> [T]here are obvious scenarios, unrelated to crowding, where the transfer of prisoners would be necessary to protect their constitutional rights . . . And if a prison were in the path of rising flood waters, a tornado, *or a highly contagious and deadly viral pandemic*, which threatened cruel and unusual punishment to inmates if not released, and their jailors were not responding adequately to protect them from serious harm, *surely a single judge should possess the authority to quickly remedy the situation* rather than proceeding through the procedural requirements of § 3626(a)(3).

2020 WL 2569868, at *28 (emphasis added). Such is the case here. This Court can and should exercise its authority to remedy the constitutional violations by ordering Petitioners moved out of harm's way.

---

[156] *See supra*, at n.6.
[157] *Id.*

## VI. Respondents Cannot Raise Failure to Exhaust to Avoid Responsibility for Violating Petitioners' Rights

Finally, Respondents cannot avoid the remedy by asserting a failure to exhaust.  Petitioners seek a writ of habeas corpus under 28 U.S.C. § 2241.  The PLRA's requirement for exhaustion of administrative remedies does not apply to habeas petitions.  18 U.S.C. § 3626(g)(2); *Cameron*, 2020 WL 2569868, at *14.

The exhaustion requirements for Section 2241 are judicially imposed rather than statutory and may be waived when exhaustion would be futile.  *See, e.g.*, *Dunkley v. Hamidullah*, No. 6:06-2139-JFA-WMC, 2007 WL 2572256, at *2 (D.S.C. Aug. 31, 2007); *Boston v. Bauknecht*, No. 6:07-0250-GRA-WMC, 2007 WL 3119482, at *2 (D.S.C. Oct. 22, 2007); *see also Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir.2005).  Here, exhaustion would be futile.  The only administrative process in the BOP—the Administrative Remedy Program ("ARP")—is useless for the purpose of seeking protection from the coronavirus.  Even under normal circumstances, the ARP is a five-step process that takes five months (150 days) to complete.  *See* 28 C.F.R. § 542.  Waiting so long for a result is untenable given the immediate threat to Petitioners here.  Under the statutory 150-day timeline, the ARP still would not be complete even if an incarcerated person at Butner had started it *on the day the first COVID-19 case in the United States was reported* (January 21, 2020).[158]  And despite these unprecedented times—and Attorney General Barr's directives to release incarcerated persons to home confinement—Butner has informed incarcerated persons that grievances are "backlogged" and are taking even longer than usual.[159]  Further, even before the COVID-19 outbreak and the development of the "backlog," Respondents simply did not respond to ARP submissions.[160]  Any requirement for exhaustion under § 2241 must be waived.

Moreover, even if the Court concludes that this case is properly viewed as a civil matter, governed by the PLRA, there is no available administrative remedy to exhaust.  *Ross v. Blake*, 136 S. Ct. 1850, 1853 (2016) (requiring exhaustion only of "available" remedies).  Under the PLRA, "an inmate is required to

---

[158] "Timeline: How coronavirus got started," ABC News, https://abcnews.go.com/Health/timeline-coronavirus-started/story?id=69435165 (last visited May 11, 2020).

[159] *See, e.g.*, Hallinan Decl. at 5; Dailey Decl. at 5; Krokos Decl. at 7; Titus Decl. at 5.

[160] Dailey Decl. at 5.

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859. The ARP, as explained above, is not capable of use to obtain the relief required in this crisis: immediate release in the face of a fast-developing outbreak of a deadly disease. The ARP takes 150 days ordinarily and is currently backlogged. More people at Butner will be dead before anyone exhausts their administrative remedies. Such a grievance process "is 'practically speaking, incapable of use' for resolving COVID-19 grievances." *McPherson v. Lamont*, No. 3:20CV534 (JBA), 2020 WL 2198279, at *10 (D. Conn. May 6, 2020), *quoting Ross*, 136 S. Ct. at 1859 (finding administrative remedies unavailable in the context of COVID-19 because a grievance could take up to 105 business days to resolve). Moreover, the ARP process at Butner is a dead end, and as such, is unavailable. *Ross*, 136 S. Ct. at 1859. Petitioner Dailey alone has submitted sixty ARP requests while at Butner; he has received responses to just six of them.[161]

Finally, despite the futility and unavailability of the ARP process, several of the Petitioners have, nonetheless, attempted to grieve Respondents' failure to address the risk of harm to which they are currently being subjected.[162]

## CONCLUSION

The situation inside Butner is dire. Petitioners, many of whom are medically vulnerable, must not be forced to sit helpless, hoping that chance favors them while Respondents' inaction and defective practices roll the dice with their lives. For the reasons explained above, as well as in Petitioner's Petition and Complaint (Dkt. No. 1), this Court should issue a writ of habeas corpus, a temporary restraining order and/or preliminary injunction against Respondents Thomas Scarantino, Michael Carvajal, and Jeffery Allen:

(1) ordering Respondents to identify, within one day, all people incarcerated at Butner who fit within the Medically Vulnerable Subclass;

---

[161] Dailey Decl. at 5.
[162] *See, e.g.*, Ayers Decl. at 4; Hallinan Decl. at 5; Hill Decl. at 4–5.

(2) appointing an expert to determine appropriate categories of release for each Subclass member within 48 hours of entrance of the order or injunction (the "Expert List");

(3) requiring release—without quarantining at Butner—of all persons identified as appropriate for release within twenty-four (24) hours of creation of the Expert List; and

(4) ordering Respondents to prepare a COVID-19 mitigation plan to be submitted to the Court within 48 hours and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

i.      Immediate testing for all people incarcerated at Butner known to have been in close proximity with anyone showing any symptoms or having tested positive for COVID-19;

ii.     Immediate medically sound quarantine for all people incarcerated at Butner known to have been in close proximity to anyone showing symptoms or having tested positive for COVID-19;

iii.    Immediate medically sound isolation for all people incarcerated at Butner showing any symptoms or who have tested positive for COVID-19, in compliance with CDC guidelines;

iv.     Appropriate medical treatment for incarcerated people exhibiting symptoms of COVID-19, including the waiver of any sick call fees;

v.      Additional specific efforts to ensure no spread of COVID-19 from outside the quarantine area to the quarantine area, including: (1) requiring staff who enter the quarantine area to wear masks; (2) ensuring proper access to products/materials for proper hygiene; (3) ensuring individuals in the quarantine area are able to comply with physical distancing guidelines; and (4) frequent disinfecting and cleaning.

Petitioners request that the Court waive security for the TRO and/or preliminary injunction under Federal Rule of Civil Procedure 65(c). *See Hawkins v. Cohen*, 327 F.R.D. 64, 88 (E.D.N.C. 2018), *modified on reconsideration*, 2018 WL 6445416 (E.D.N.C. Dec. 10, 2018) (waiving bond requirement where plaintiffs and class members were indigent public assistance recipients).

Respectfully submitted this 28th day of May, 2020.

/s/ Jeffrey S. Wilkerson
Jeffrey S. Wilkerson [N.C. State Bar No. 51209]
Gretchen Scavo [N.C. State Bar No. 48589]*
Elizabeth Ireland [N.C. State Bar No. 47059]*
Patrick Doerr [N.C. State Bar No. 50673]*
Ashley R. Anderson [N.C. State Bar No. 51741][†]
WINSTON & STRAWN LLP
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Tel: (704) 350-7700
Fax: (704) 350-7800
jwilkerson@winston.com
gscavo@winston.com
eireland@winston.com
pdoerr@winston.com
aanderson@winston.com

Maria V. Morris [N.Y. Bar No. 4091435]**
AMERICAN CIVIL LIBERTIES UNION
915 15th Street N.W., 7th Floor
Washington, DC 20005
Tel: (202) 548-6607
mmorris@aclu.org

Sarah Hinger [N.Y. Bar No. 4823878]
AMERICAN CIVIL LIBERTIES UNION
125 Broad St.
New York, NY 10004
Tel.: (212) 519-7882
shinger@aclu.org

Jonathan M. Smith [D.C. Bar No. 396578][†]
Emily Gunston [D.C. Bar No. 1032056][†]
Lyndsay A. Niles [D.C. Bar No. 1003427][†]
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS & URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, DC 20005
Tel: (202) 319-1000
Fax: (202) 319-1010
jonathan_smith@washlaw.org
emily_gunston@washlaw.org
lyndsay_niles@washlaw.org

Emily Seawell [N.C. Bar No. 50207]
Jaclyn Maffetore [N.C. Bar No. 50849]
Kristi Graunke [N.C. Bar No. 51216]
AMERICAN CIVIL LIBERTIES UNION
OF NORTH CAROLINA
LEGAL FOUNDATION
Post Office Box 28004
Raleigh, NC 27611
Tel: (919) 834-3466
Fax: (866) 511-1344
eseawell@acluofnc.org
jmaffetore@acluofnc.org
kgraunke@acluofnc.org

* Admission Forthcoming
** Admission to DC Bar Pending
† Special Appearance Forthcoming

*Counsel for Petitioners/Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Jeffrey S. Wilkerson, hereby certify that a true copy of the foregoing was served on Respondents/Defendants' counsel of record with the Clerk of the Court via the CM/ECF Document Filing System.

This 28th day of May, 2020.

/s/ Jeffrey S. Wilkerson _____

Winston & Strawn LLP
300 S. Tryon Street, 16th Floor
Charlotte, NC  28202
(704) 350-7700

Counsel for Plaintiffs/Petitioners