# Exhibit 8

**Declaration of Lewis Donnell Huntley**

1. My name is Lewis Donnell Huntley. I am 44 years old.

2. Until May 7, 2020, I was incarcerated at the Camp within FCI Butner Medium I, specifically in the unit Catawba West. My Bureau of Prisons Register Number is 32504-016.

3. Before my release, I had served seven years of a ten-year sentence for conspiracy to distribute and possess with intent to distribute five kilograms or more of powder cocaine and 280 grams or more of cocaine base.

4. In 2008 I was in a motorcycle accident that caused nerve damage to my spine. I am paraplegic and wheelchair-bound as a result of this spinal cord injury. I received physical therapy following the accident, which helped me combat spasms that I experience from my paraplegia and allowed me to largely care for myself. While incarcerated at Butner, I received medications for my spasms. However, even though I made several requests, I was not able to receive any physical therapy. My spasms have gotten worse, and I am no longer able to put on my own shoes.

5. I was also diagnosed with hypertension while incarcerated, and took medication to manage my cholesterol.

6. My unit while at Butner was a dormitory-style unit that typically houses about 75-80 people. The unit is mostly divided into cubicles that are about 6'x10,' each with bunkbeds.

7. I shared a cubicle with one other person. Due to the size of our cubicle and the arrangement of our beds, I could not stay six feet away from him while inside the cubicle.

8. Another area within my unit, referred to as "the beach," contained about 6 bunk beds, divided into 2 rows of 3 sets of bunk beds. People who sleep in these bunk beds are less than 4 feet away from another person when sleeping. Many residents of my unit had to walk through "the beach," between the rows of bunk beds, to get to the restroom.

9.   All of the people in my unit shared the same bathroom, which has 1 handicap accessible stall, about 4 standard stalls, 1 handicap shower, about 5 showers, and about 5 sinks. It was impossible to maintain a distance of 6 feet from other people while in the bathroom.

10. There were only 2 phones available for my entire unit. People would line up against the wall within 18 inches to 2 feet of each other while waiting to use the phone. We were responsible for cleaning the phones ourselves as we used them, using a spray disinfectant that was provided by the BOP. I never saw any facility staff cleaning the phones.

11. There was a room within my unit that had 3 computers at a shared desk, all in a line next to each other, and 4 TVs. All chairs in the room were in rows with about 6 inches of space between each chair. This room was always at least at half capacity, but was often so crowded that people would bring extra chairs into the room.

12. My unit was locked down on about March 13, and shortly after we started getting all of our meals in the unit. Different officers handled mealtime differently. Some officers brought us our meals in our cubicles, but other officers had the entire unit line up at the unit door to get our meals. When we lined up to get our meals, we were between 18 inches to 2 feet from each other, and no effort was made to keep space between people.

13. During the lockdown period, people also had to line up at the unit door for pill call. I got in line for pill call twice a day, but others had to do so three times a day. No effort was made to keep space between people in the pill call line, and we were within 18 inches to 2 feet of each other as we waited.

14. BOP provided soap for us to use in the bathroom through a shared dispenser on the wall. In the weeks before I was released, this dispenser ran out of soap roughly 2 times for a period of 1 to 2 days. When the dispenser was empty, BOP placed small bars of hand soap on the sink for us

to use. I was worried about sharing soap with others who might be sick during this time, so I had to use soap that I purchased from the commissary to wash my hands.

15. We were not provided with hand sanitizer for individual use, but instead used a shared dispenser of hand sanitizer located in the TV room.

16. The staff began wearing masks that appeared to be medical grade shortly after my unit went into lockdown. The people housed in my unit received disposable masks about a week or two after staff began wearing masks, which were then replaced with cloth masks we were told were made at UNICOR. Before my release, I had three cloth masks that I was responsible for cleaning.

17. The only guidance we received from prison officials about prevention of coronavirus was to keep our masks on and to wash our hands.

18. At the beginning of the lockdown, my understanding was that there were no cases of the coronavirus in my unit. At this early stage, people within my unit who worked at UNICOR or the warehouse were still allowed to go to their jobs with people from other housing units and then return to the unit.

19. Correctional officers continued to move between units and facilities as well. My unit manager, for example, worked within both the Camp and Medium I facilities.

20. I first heard of someone in my unit becoming sick and having to be removed in early April, after which it felt like a chain reaction within the camp. I learned of an older person who had been approved for home confinement in a different unit of the camp, Hatteras East, who became ill, was removed from the facility, and subsequently passed away. Then suddenly it seemed as if everyone in my unit was ill. We began having our temperature checked every morning by a nurse. People in my unit complained of diarrhea, loss of smell and taste, and shortness of breath. At night, I would

hear coughing all throughout the unit. I personally experienced loss of smell and taste, headaches and shortness of breath.

21. My entire unit was tested for coronavirus on or around April 23, 2020. We were not isolated or separated from one another in any way while we waited for results. On or around April 30, 2020, Dr. Beyer gathered our unit together and told us that the entire unit had tested positive for coronavirus. She also told us that as many as 80% of the entire camp population tested positive for coronavirus, and that a large number of people testing positive for the virus had only mild or no symptoms.

22. I filed an emergency motion for compassionate release in early April of 2020 because of the worsening spasms from my spinal cord injury and because this injury and my hypertension could increase my risk of serious coronavirus. My motion was supplemented to inform the court that I had tested positive for the coronavirus. The United States opposed my motion for compassionate release at every stage.

23. On or around May 2, 2020, about 30 people from my unit who were believed to still be sick were moved to another unit. I was no longer experiencing symptoms at this time. Roughly 45 people, including myself, remained in my unit. Though we still received temperature checks every morning, my unit was never re-tested for coronavirus.

24. A judge ordered the BOP to release me on May 7, 2020, after granting my emergency motion for compassionate release on May 5, 2020. The order granting my motion for compassionate release is attached as Exhibit A to my declaration.

25. I am now at home with my wife in Maryland. I am relieved to be at home, but I am still very concerned for the health and lives of those who remain at Butner. I fear that remaining in prison with so many people sick will be a death sentence for them.

26. I am making this statement in support of a lawsuit to make FCC Butner change its policies and practices relating to the protection of people in its custody from the risk of coronavirus.

Pursuant to 28 U.S.C. § 1764, I declare under penalty of perjury that the foregoing is true and correct.

Executed May _19_, 2020

By: _Lewis D. Huntley_
Lewis Donnell Huntley

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| v. | ) |
|  | ) |
| LEWIS DONNELL HUNTLEY, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

Crim. Action No. 13-0119-1 (ABJ)

*** **SEALED** ***

## <u>ORDER</u>

Pending before the Court is defendant Lewis Huntley's Emergency Motion to Reduce Sentence pursuant to the Compassionate Release Statute 18 U.S.C. § 3582(c)(1)(A)(i) [Dkt. # 250] ("Def.'s Mot.").[1]  He is serving a sentence of 120 months (ten years) of incarceration, Judgment [Dkt. # 177] at 2, at Butner Medium I Federal Correction Institution, and has asked the Court to reduce of his term of imprisonment to the seven years he has already served.  *See* Def.'s Mot. at 1, 34.

He seeks the reduction because he suffers from a spinal cord injury and other health conditions and also because these conditions put him at increased risk of death or serious illness from the novel coronavirus.  *Id.* at 1, n.1–2, citing Centers for Disease Control and Prevention ("CDC"), Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, (Mar. 12, 2020), at App'x A, https://www. cdc.gov/coronavirus/2019-ncov/ downloads/community-mitigation-strategy.pdf; Emily Bamforth, *Hypertension could be a leading*

---

1       Defendant attached public exhibits to his motion.  Def.'s Mot., Exs. A–V [Dkt. ## 250-1–250-5], and filed separately under seal additional exhibits attaching private medical records.  Def.'s Sealed Exhibits A–S [Dkt. # 253].

*factor in coronavirus deaths: Here's what to know*, Cleveland.com (Mar. 12, 2020), https://www.cleveland.com/news/2020/03/hypertension-could-be-a-leading-factor-ncoronavirus-deaths-heres-what-to-know.html. The government opposed defendant's motion, Gov't Opp. to Def.'s Mot. [Dkt. # 255] ("Gov't Opp."), and defendant filed a reply brief. Reply to Gov't Opp. [Dkt. # 256] ("Def.'s Reply").

On April 13, defendant filed a Notice of 4 Inmate Deaths at Butner Medium I FCI [Dkt. # 254], and on April 27, he filed a supplement to his reply [Dkt. # 257]. On April 30, he filed a second supplement to his reply, advising the Court that he had tested positive for COVID-19. 2d Suppl. [Dkt. # 258]. On May 1, the Court issued a minute order stating that any response by the government to defendant's second supplement was due by May 4. Min. Order (May 1, 2020). On May 1, defendant filed a third supplement to his reply brief, 3d Suppl. [Dkt. # 259], and on May 2, he filed a reply in an anticipation of the government's response to the Court's minute order. Reply in Anticipation of Gov't Response [Dkt. # 260]. On May 4, the government filed it response to defendant's second supplemental filing. Gov't Response to 2d Suppl. [Dkt. # 261].

Upon consideration of the parties' filings and exhibits, for the reasons set forth below, the Court will grant defendant's motion.

Defendant is paraplegic, having suffered a spinal cord injury in a 2008 motorcycle accident. Def.'s Mot. at 3. He also suffered a broken wrist and damage to his left bicep in the accident and was hospitalized for six months. *Id.* According to defendant, "strenuous physical therapy" after his release from the hospital allowed him to be able to stand for a limited period of time and do a limited amount of walking assisted with leg braces and a walker, although he remains confined to a wheelchair. *Id.* at 4.

Before his accident, defendant had been convicted for three drug felonies:  distribution of cocaine in 1992, attempted possession of cocaine with intent to distribute in 1994, and possession of cocaine with intent to distribute in 2006.  Gov't Opp. 17.  In 2013, five years after the accident, he was indicted for conspiracy to distribute and possess powder cocaine and cocaine base with intent to distribute and for possessing a firearm during a drug trafficking offense.  Indictment (Apr. 18, 2013) [Dkt. # 6]; Superseding Indictment (Apr. 30, 2013) [Dkt. # 17]; Second Superseding Indictment (May 28, 2013) [Dkt. # 21].  In January of 2014, he pled guilty to one count of conspiracy to distribute and possess with intent to distribute five kilograms or more of powder cocaine and 280 grams or more of cocaine base.  Plea Agreement (Jan. 22, 2014) [Dkt. # 147] at 1. Pursuant to Fed. R. Crim. Proc. 11(c)(1)(C), the parties agreed that the mandatory minimum term of ten years of incarceration, followed by five years of supervised release, would be an appropriate sentence, *id*. at 2, and the Court accepted the plea and imposed that sentence on April 7, 2014. Judgment at 1.

The statute defendant invokes in the instant motion authorizes a court to reduce a term of imprisonment under specific circumstances, and it sets forth procedural and substantive requirements that must be satisfied in order to obtain relief.  18 U.S.C. § 3582(c)(1)(A)(i). Procedurally, a defendant may only file a motion under this provision after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  *Id*. § 3582(c)(1)(A).[2]

_____

2      This provision was amended in 2018 by the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), to allow defendants to file motions under the statute directly with a court.  Before this amendment, only the Bureau of Prisons ("BOP") could file such a motion.

There is no dispute that defendant has satisfied this procedural requirement.  *See* Def.'s Mot. at 16–17; Exs. J–Q to Def.'s Mot. [Dkt. # 250-4] (defendant's prior requests to BOP for a "RIS" or reduction in sentence and BOP's denials); Gov't Opp. at 9–10 ("We agree that defendant has exhausted his administrative remedies, and that his motion is thus properly before this Court."). Accordingly, the only issue for the Court to decide is whether defendant's circumstances satisfy the substantive requirements for a reduction.

A court may reduce a term of imprisonment if "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it makes two findings:  first, that "extraordinary and compelling reasons warrant such a reduction"[3] and second, "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).[4]   The policy statement issued by the Commission tracks the language of the statute, reiterating the need for a defendant to show that "extraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A), and it adds the requirements that a "defendant is not a danger to the safety of any other person or to the community," *id.* § 1B1.13(2), and the reduction is consistent with the policy statement.  *Id.* § 1B1.13(3).   The Commission lists examples of the "extraordinary and compelling reasons" that would satisfy the statute, including a showing that the defendant is:

---

[3]    The statute also allows for reduction of a prison term for defendants who are at least seventy years old, which is not applicable here.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii); Def.'s Mot. at 13 (stating defendant is forty-four years old).

[4]    *See* 28 U.S.C. § 994(a)(2) (requiring the Commission to promulgate a general policy statement on the sentence modification provisions in section 3582(c) of title 18); *id.* § 994(t) (providing that the policy statement "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").

(I)    suffering from a serious physical or medical condition,

(II)   suffering from a serious functional or cognitive impairment, or

(III)  experiencing deteriorating physical or mental health because of the aging process

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, Appl. Note 1(A)(ii).

Defendant asserts that his spinal cord injury and other medical conditions, in and of themselves, present sufficient reasons to reduce his sentence under the statute. Def.'s Mot. at 17–19. He argues that has BOP has not provided him with "proper care" for his paraplegia, denying him physical therapy, orthotics, and a walker that he requested, and that he suffers complications: "severe back spasms; his left wrist does not bend and his fingers do not move on that hand; his right wrist is now experiencing severe numbness and pain from peripheral neuropathy; his feet have sores, crusting, and open wounds; and he is diagnosed with hypertension." *Id.* at 17–18.

BOP disagreed with this assessment in 2019, denying defendant's request for a reduction in sentence on this ground. *See* Ex. K to Def.'s Mot. (March 29, 2019 letter from BOP denying defendant's request for compassionate release because defendant "require[s] no assistance with [his] activities of daily living (ADLs)," demonstrates "independence in [his] functioning," and is able to function in his current setting); Ex. M to Def.'s Mot. (May 21, 2019 denial of appeal for the same reasons, noting that defendant "continue[s] to receive comprehensive medical care from [his] primary care medical team"); Ex. O to Def.'s Mot. (July 1, 2019 denial of RIS because

defendant is "able to perform . . . Activities of Daily Living independently with the use of durable medical equipment").[5]

The government still disagrees with defendant's position now.  It maintains that defendant does not qualify for "compassionate release under the current criteria," and it points to the determination it made a year ago. Gov't Opp. at 13–15, citing Def.'s Ex. M (May 2019 letter from BOP denying defendant's request for a RIS because he continues "to receive comprehensive care from [his] primary care medical team").  But BOP's past denials of defendant's requests do not address the more recent medical information provided to the Court, and are not determinative in any event. *See United States v. Beck*, 425 F.Supp.3d 573, 579 (M.D.N.C. 2019) ("[T]he First Step Act . . . was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BoP finds they are not appropriate.").

Reports from the very primary care medical team touted by the government show that defendant's condition has deteriorated:  he can only accomplish two out of six Activities of Daily Living at this time.  Def.'s Mot. at 18, citing Def.'s Sealed Ex. O (July 17, 2019 Clinical Encounter notes from defendant's primary care physician).  They also indicate that as defendant has asserted, he has not received specific medical assessments or accommodations recommended by various specialists.  *Id*., citing Def.'s Sealed Ex. P (Sept. 5, 2019 Clinical Encounter note ordering radiographs that "neurosurgeon recommended . . . some time ago and were never done"); Def.'s Sealed Ex. R (Sept. 9, 2019 Radiologic Report) (showing radiograph was completed but results

---

5       Defendant appealed the decision but never received a response.  Def.'s Mot. at 11.

were difficult to read: "Limited assessment of the upper half of the thoracic spine due to images being acquired with the patient in wheelchair").[6]

Importantly, BOP's 2019 denials based on defendant's medical conditions at the time do not address the dangers that the coronavirus presents to the defendant now. The novel coronavirus was first detected in December 2019 and declared to be a global pandemic by March 2020.[7] The government does not deny that defendant faces increased serious risks from the disease as a result of his spinal cord injury. Gov't Opp. at 13–14, n.11. In a footnote, it cites guidance from the CDC that states the following:

> **Appendix A: Underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age.**
>
> \* \* \*
>
> • **Neurological and neurologic and neurodevelopment conditions** [including disorders of the brain, spinal cord, peripheral nerve, and muscle such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury].

CDC, Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, App'x A. Accordingly, based on CDC guidance, this defendant faces increase risk of serious COVID-19. Regardless, the government takes the position that this is not an

---

6       Defendant also asserts that he never received a referral in 2017 to be evaluated for orthotics and physical rehabilitation in 2017 as referenced in his medical file. Def.'s Mot. at 18, citing Def.'s Sealed Ex. K (Oct. 26, 2017 record from Duke Health stating defendant would be referred "to prosthetics and orthotics for evaluation of bracing options" and "physical medicine and rehabilitation" to help his range of symptoms).

7       *See* Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), Office of the President of the United States, https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ ("Proclamation of Nat'l Emergency").

"extraordinary and compelling reason" that warrants release, given the safeguards BOP has implemented to protect inmates from the coronavirus.  Gov't Opp. at 10–13 ("Taken together, these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution."); *see also id.* at 15 ("[T]he possibility that defendant might, while incarcerated, contract a disease that is also present in the community at large does not, in and of itself, constitute extraordinary and compelling circumstances.").

But the Court's ruling is not predicated on the presence of the virus within the BOP "in and of itself;" it is based on *this* defendant's specific conditions and characteristics, including:  his specific spinal cord injury and other medical conditions, the limits they impose on his ability to carry out activities of daily living, his inability to obtain medical equipment, assessments, and accommodations recommended by specialists and his BOP physician, coupled with the danger the virus poses to him in particular.[8]   Taken together, the Court finds that his medical conditions, coupled with his now-diagnosed COVID-19, constitute "extraordinary and compelling reasons" that warrant reducing defendant's sentence.[9]

---

[8]     Also, while this decision is not based on any assessment of the adequacy of BOP's efforts to protect the prison population in general, or the agency's commitment to that goal, the assurances in the government's opposition concerning the efficacy of those efforts have been eclipsed by the new information acknowledged in the government's response to the defendant's second submission:  that more than seventy-five percent of the inmates in the defendant's facility have tested positive.  Gov't Response to 2d Suppl. at 3.

[9]     The government also argues that defendant is not "more likely to contract COVID-19" in his facility than if released. Def.'s Opp. at 13–14.  The fact that defendant has now contracted COVID-19 renders this argument moot, but it does not, as the government suggests, render the motion moot.  *See* Gov't Response to 2d Suppl. at 3 (arguing that release will not provide defendant relief from the risk of contracting COVID-19 and that it is "undetermined that release is required").  The relief defendant seeks is a reduction of his sentence.

The Court's decision also takes into consideration the section 3553(a) factors, as required by the statute. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The Court recognizes that the defendant was convicted of a serious offense, and it sentenced him to a lengthy term of incarceration and supervised release commensurate with that offense. But he has already served a significant portion of that sentence. *See* Gov't Opp. at 4 (stating that defendant has served seventy percent of his incarceration period and has a projected release date of December 2, 2021); Def.'s Mot. at 13 (stating that "[a]s of April 15, 2020, he will have been incarcerated for approximately 7 years" excluding the good time credit he has earned). The Court finds that the seven years served is sufficient to punish the defendant, reflect the seriousness of the offense, and deter future criminal conduct, and it is further persuaded that release is appropriate given that defendant is little more than a year away from release to home confinement. Def.'s Mot. at 13 (noting he has a projected release date to home confinement of June 2, 2021).

The Court further finds that defendant is not a danger to the safety of any other person or to the community and that the reduction he requests is consistent with the Sentencing Commission's policy statement on sentence reductions. The government argues – with some force – that the defendant managed to operate his drug trafficking business successfully while confined to a wheelchair before he was incarcerated. Gov't Opp. at 18. And, it points out that given his long history of involvement in the distribution of controlled substances, and the fact that he has continued undeterred after previous convictions and sentences, he poses a clear recidivism risk. *Id.* But the defendant asserts his physical abilities have deteriorated since he has been incarcerated, Def.'s Mot. at 4, 9–10, and the medical records bear this out. Def.'s Sealed Ex. O (July 17, 2019 Clinical Encounter notes); *see also* Def.'s Mot. at 17. Further, during his seven years of incarceration, the defendant has had only one disciplinary infraction: possession of a cell

phone.   Inmate Program Review, Def.'s Ex. U.   He has completed drug education and nonresidential drug treatment, participated in numerous programs provided by BOP, including educational programs, and has worked in grounds maintenance at his facility.  *Id.; see also* Def.'s Ex. V (Inmate Education Data).

Under all of these circumstances, the Court is of the view that the reduced sentence is consistent with all of the goals and considerations set forth in section 3553.   It emphasizes, however, that this order does not eliminate or alter that portion of defendant's sentence imposing five years of supervised release, and it reminds the defendant that his days of guns and drugs are over.   If defendant is found to have violated any aspect of his supervision, the Court will not be inclined towards lenience in the future.

For all of these reasons, the defendant's motion is **GRANTED**.   But it is essential that his release be carried out in a manner that does not endanger the public – including members of his own family – given the positive test results that were obtained between the time the motion was filed and the date of this order.   Therefore, this order will become effective, and the defendant may be released, after he has been quarantined for at least fourteen days, and it has been determined by medical personnel, in accordance with the Centers for Disease Control and Prevention criteria, that he no longer requires medical isolation precautions.  *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Medicalisolation.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  May 5, 2020