# Exhibit 18

## DECLARATION OF DR. JOE GOLDENSON, M.D.

I, Joe Goldenson, declare as follows:

1. I am a physician who has worked in health care for prisoners for 33 years. I worked for Jail Health Services of the San Francisco Department of Public Health for 28 years. I was the Director and Medical Director for 22 of those years. In that role, I provided clinical services, managed public health activities in the San Francisco County jail, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association.

3. I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco for 35 years.

4. I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5. My resume is attached as Exhibit A.

## COVID-19

6. COVID-19 is a disease that has reached pandemic status. As of May 14, 2020, according to the World Health Organization, more than four million people have been diagnosed with COVID-19 around the world and more than 290,000 people have died.[1] In the United States, over 1.3 million people have been diagnosed and over 82,000 people have died thus far.

7. COVID-19 is a serious illness caused by SARS-CoV-2, a novel coronavirus ("the virus"). In severe cases, COVID-19 can require hospitalization and lead to

---

[1] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report-115, May 14, 2020, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200511-covid-19-sitrep-112.pdf?sfvrsn=813f2669_2.

respiratory failure and death. Symptoms may appear two to 14 days after exposure to the virus and may include fever, cough, and shortness of breath or difficulty breathing. While more than 80% of cases are mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

8. Patients who suffer from serious disease may progress to Acute Respiratory Distress Syndrome (ARDS), which is a type of respiratory failure. Many patients suffering ARDS will require mechanical ventilation. ARDS has a 30% mortality rate overall, and a higher mortality rate in people with other medical conditions.

9. Certain populations are particularly vulnerable to severe cases of COVID-19. The case fatality rate and need for advanced medical intervention and support increase significantly with advancing age in people aged over 50 and for people of any age with certain underlying medical conditions (the "medically vulnerable"). The Centers for Disease Control and Prevention ("CDC") identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals regardless of age, including: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and severe obesity.

10. At this time, there is no vaccine to prevent COVID-19 and there is no known cure or anti-viral treatment available.

11. The virus that causes COVID-19 is highly infectious. It is transmitted from person to person via airborne droplets. The droplets are released by infected individuals when they cough, sneeze or talk and can infect other persons in close proximity (within approximately six feet). The infected droplets can survive in the air for up to three hours. The virus may also be transmitted when a person touches a surface or object that has the virus on it and then touches their own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for varying time periods. For example, studies suggest that the virus can survive for up to 24 hours on cardboard, and for two to three days on plastic or stainless steel.

12. A significant number of those who are infected with COVID-19 do not exhibit any symptoms. Similarly, some people may only experience mild symptoms. However, these asymptomatic and mildly symptomatic individuals can, and do, transmit the virus to others, which has further contributed to its rapid spread. Recognizing the high risk of transmission posed by asymptomatic individuals, CDC recommended everyone in the United States wear cloth face coverings when in public settings where social distancing is difficult to maintain.[2]

13. The only known ways to reduce the risk of transmission of the spread of COVID-19 are maintaining six feet of physical distance between individuals ("social

---

[2] CDC, Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

distancing"); wearing masks in public areas; frequent and thorough handwashing; cleaning and disinfection of surfaces and objects that are frequently touched, especially in common areas (i.e., objects/surfaces not ordinarily cleaned daily such as doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, and telephones) at least several times per day; adequate procedures and practices for isolation and quarantine; widespread testing to identify asymptomatic or presymptomatic individuals; and contact tracing of confirmed and suspect cases.

The Risks of COVID-19 in Detention Facilities

14. COVID-19 poses a very serious risk to detainees, staff and other visitors to detention facilities such as prisons or jails. It is uncontroversial that detention facilities, including prisons like FCC Butner, are associated with high transmission rates for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

15. Living conditions in prisons and jails exacerbate the spread of infectious diseases, particularly diseases like COVID-19 that are transmitted by airborne droplets. In these facilities, large numbers of people are closely confined and are physically unable to practice social distancing, which the CDC has identified as a key method reducing transmission of respiratory diseases such as COVID-19.[3] Further, detainees often have limited access to hygiene and personal protective equipment such as soap, hand sanitizer, masks and gloves.

16. People in jails and prisons typically sleep in close quarters, for example a single room may contain multiple bunkbeds with limited ventilation. A single cell can house multiple people. Detainees are generally forced to share toilets, sinks and showers without disinfection between use. Common areas are shared by large groups of people. The preparation and distribution of food is often centralized, sometimes using a single kitchen or cafeteria for an entire facility.

17. Additionally, the likelihood of exposure is heightened due to the constant "churn" (*i.e.*, exit and entry) of both staff and detainees in jails, and population mixing of staff and detainees. Staff have regular direct physical contact with detainees, for example when handcuffing or removing handcuffs from detainees who are entering or exiting the facility.

18. These factors led to outbreaks of COVID-19 in multiple detention facilities in China, where the virus was introduced into facilities by staff. Notably, in the first

---

[3] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

3

days of the COVID-19 outbreak at Rikers Island detention facility in New York City, the majority of cases were among prison staff, not detainees.

19. Jails and prisons generally lack the medical care infrastructure and resources required to cope with an outbreak of infectious disease. Some do not have onsite medical facilities at all. Medical facilities within jails and prisons are generally designed and resourced to administer medical care for the ordinary day to day needs of detainees. They are not designed or equipped to cope with an influx of cases of a highly infectious disease like COVID-19, especially in addition to the regular case load. Medical facilities within detention facilities are generally not designed or equipped to administer the resource-intensive advanced care required by patients with serious cases of COVID-19.

20. Jails and prisons often need to rely on external facilities such as hospitals and emergency departments to provide intensive medical care. This places additional strain on the resources of those facilities which may already be overwhelmed during a pandemic.

21. During an outbreak, prison staff also become infected, fall ill and therefore cannot report to work. This can result in understaffing of crucial roles, such as medical staff, cleaning staff and security staff, placing further strain on the facility's ability to cope with the outbreak. This will not only result in a decreased ability to adequately address the health and public health issues related to COVID-19, but will also impact the care of patients with acute and chronic problems not related to the current pandemic.

22. Prison outbreaks can pose serious risks to communities beyond the prison. For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region.

23. Medically vulnerable people within jails and prisons are at even higher risk than other detainees. As described herein, compared to the general population, they are at a higher risk of death or severe illness from COVID-19. They also require ongoing medical care for their underlying medical conditions. However, medical units within detention facilities may not have the resources to administer adequate care during the course of a pandemic. Failure to provide those individuals with adequate medical care for chronic underlying health conditions will also result in increased risk of morbidity and mortality related to those underlying conditions. In turn, that results in increased risk of COVID-19 infection and increased risk of COVID-19-related morbidity and mortality if they do become infected.

24. While jails and prisons should take all measures possible to reduce exposure to infection in detention, given the rapid spread of COVID-19 it is now likely impossible to achieve and sustain those measures quickly enough to mitigate the

4

risk of transmission. It is therefore an urgent priority to reduce the number of persons in detention as quickly as possible.

25. This is consistent with guidance from the World Health Organization, which recommended that "enhanced consideration should be given to resorting to non-custodial measures at all stages of the administration of criminal justice, including at the pre-trial, trial and sentencing as well as post-sentencing stages." Indeed, the pandemic has prompted the release of prisoners around the world. In California, 3,500 inmates were granted early release. France released 5,000 inmates. Many cities and counties across the US, including San Francisco, Chicago, Cleveland and New York, are also releasing prisoners to reduce the risk of COVID-19.

Medically Vulnerable Persons at FCC Butner Are At Grave Risk of Death or Serious Illness

26. I have reviewed the following materials regarding the conditions at FCC Butner: Declarations of Charles Hallinan, John Dailey, Lewis Huntley, Arnold Hill, Josean Kinard, Benjamin McCrae, Lee Ayers, George Riddick, Jorge Maldonado, Roger Goodwin, Randy Ortiz, Matthew Harrigan, Troy Titus, William Whyte, Antwan Harris, and John Krokos. My understanding of conditions at FCC Butner comes from these declarations, unless otherwise noted.

27. Based on my review of these materials, my experience working on public health in jails and prisons, and my review of the materials above, it is my opinion that medically vulnerable persons at FCC Butner are at grave risk of death or serious illness. To reduce that risk, the persons at FCC Butner who are medically vulnerable should be removed, to the extent possible, from FCC Butner. For any people who remain incarcerated at FCC Butner, the facility must make changes to enable effective social distancing, frequent and thorough handwashing, and frequent cleaning and decontamination of surfaces/objects, as well as the other prevention activities noted above in paragraph 13. The reasons for this conclusion are described below.

28. My understanding from Plaintiffs' Counsel is that FCC Butner is complex of four prisons, including (1) a medium security facility that has a population of 671 and an adjacent minimum security satellite camp of more than 200 prisoners; (2) a second medium security facility with a population of almost 1,500 prisoners; (3) a low security facility that houses over 1,200 prisoners, many of whom have chronic medical conditions; and (4) a Federal Medical Center housing over 900 people, more than 500 of whom are there for treatment of serious medical or mental health conditions.

29. I understand that many incarcerated people at FCC Butner are housed in large open dormitories housing between 70 and 162 people in cubicles that have partial walls. I understand that some housing units contain as many as 120 people living in multiple-person cells, and some contain rows of bunkbeds in hallways. I

5

understand that in all locations other than the Federal Medical Center and FCI Butner II, most of the people in the housing units must share a relatively small number of toilets, sinks, and showers, and must stand in line multiple times a day to receive medications and meals. I understand that in all locations other than the Federal Medical Center at Butner, people must share shower facilities and other common areas. I understand that in all locations other than the Federal Medical Center people must share phones and computers and are in close proximity to each other when they are using them and when they are waiting for them.

30. Plaintiffs' counsel has informed me that BOP reports that there have been 318 confirmed cases of COVID-19 at FCC Butner and that eight people have died of COVID-19 there. Plaintiffs' counsel has informed me that BOP reports that there have been only about 459 tests for COVID-19 done for the 4,550 people incarcerated at FCC Butner, and that BOP is not testing staff. From the declarations, I understand that most of the people incarcerated at FCC Butner have not been tested for the virus. I understand that people are placed in isolation only if they have a temperature, and that at different times during this outbreak, people could have their temperature taken only if they signed up for sick call. Failure to conduct widespread testing in a prison that has a significant number of cases places the people incarcerated there at risk, as does the failure to medically isolate people who are symptomatic if they either do not have a temperature or do not sign up for sick call.

31. I understand the FCC Butner houses a large population of people who are especially vulnerable to COVID-19 because of their age or medical conditions.

32. Many detainees at FCC Butner, including medically vulnerable detainees, are not able to practice social distancing. I understand that many cells and cubicles are shared by two or more incarcerated people, and that the cells and cubicles are not large enough for people to maintain a distance of six feet apart from each other or from people in the adjacent cubicles. Similarly, based on the declarations, I understand that people incarcerated at FCC Butner are not able to socially distance in the bathrooms, meal lines, medication lines, and in the phone and computer areas. The inability to socially distance places prisoners at increased risk of contracting COVID-19.

33. I also understand that there are many surfaces, including bathroom surfaces, phones and computers, that are touched by many incarcerated people and that they are not disinfected as frequently as they would need to be to prevent the spread of the virus. The failure to routinely and frequently disinfect these high-touch surfaces places prisoners at risk of contracting COVID-19.

34. I understand that masks have been distributed to staff and incarcerated people, but that some staff and some incarcerated people do not wear the masks consistently.

6

Failure to do wear masks consistently places prisoners at increased risk of infection.

35. I understand that staff and some incarcerated people move between housing units. I understand that there are incarcerated people who go to jobs in areas outside the housing unit in which they live, and that they are in close proximity to people from other housing units when they are in these jobs. It is my understanding that two incarcerated people who were working in the kitchen in the low security facility, where food is prepared for all areas of the low security facility, were recently taken out of the kitchen because they had fevers and were placed in the solitary confinement unit where people are placed if they are believed to have COVID-19. It is further my understanding that there is an incarcerated person whose job it is to clean the solitary confinement unit where people believed to have COVID-19 are housed, who then returns to his housing unit after his work is complete. I understand that staff move between housing units as they conduct counts and do other tasks. People moving between housing units increases the likelihood of spread of the virus within a facility.

36. I understand that people who are believed to have contracted COVID-19 are placed in solitary confinement cells. I understand that the solitary confinement cells are dirty.

37. I understand that some people who are transferred into FCC Butner are quarantined in the same unit that houses people who are undergoing treatment for cancer. Unless these individuals who are quarantined have a separate ventilation system, this is an extremely dangerous practice for the people who are undergoing treatment for cancer.

38. Under these conditions, incarcerated people cannot practice social distancing or good hygiene, nor can they frequently disinfect shared surfaces. The incarcerated people at FCC Butner are unable to take basic steps to protect themselves from the virus. There is a high risk that an ever-growing number of incarcerated people at FCC Butner will become infected with COVID-19, which means that all of them, and particularly the medically vulnerable people face a grave risk of death or serious illness.

39. In my opinion, the only viable course of action is risk mitigation, and the best form of risk mitigation for medically vulnerable people is to release them from FCC Butner, given the heightened risks to their health and safety.

40. Release of the most vulnerable people also reduces the burden on the health care infrastructure within FCC Butner, because the released people will not require treatment related to COVID-19 infection and will no longer require treatment for underlying conditions. Releasing medically vulnerable incarcerated people also reduces the burden on nearby hospitals, which will otherwise need to treat these

individuals when infected, freeing up those resources to treat other members of the public.

41. Releasing as many incarcerated people as possible is important to protect the health of incarcerated people, staff, health care workers at the prison, and the community as a whole.

42. Medically vulnerable incarcerated people at FCC Butner should be released to the extent and as soon as possible. Those incarcerated people should be released to a place where they can be appropriately quarantined for at least 14 days and receive any necessary healthcare for underlying chronic conditions.

43. To protect people who remain incarcerated at FCC Butner, the facility must make changes to its practices to ensure that incarcerated people can socially distances effectively, that those incarcerated can wash their hands frequently, that shared common spaces and surfaces can be adequately cleaned and disinfected, and to ensure that quarantine and isolation, testing, and contact tracing practices are medically sound.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day in May 2020 in Alameda County, CA.

*[Signature]*

Joe Goldenson, M.D.

**Exhibit A**

# CURRICULUM VITAE

**JOE GOLDENSON, MD**
1406 CYPRESS STREET
BERKELEY, CA 94703
(510) 557-1086
jgoldenson@gmail.com

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

**Consulting**

| | |
|---|---|
| 6/16-8/19 | Consultant to Los Angeles Department of Health Services re: provision of health care services in the LA County Jail |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Newsome*, Class Action Lawsuit re: prisoner medical care in California State Prison System |
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, U.S.A. v. Cook County, et al., United States District Court for the Northern District of Illinois, No. 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al.*, re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen*, Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al*, Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |

| | |
|---|---|
| 2/98 | Medical Expert, Department of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

## Work Related Committees

| | |
|---|---|
| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
| 10/11 to 5/19 | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-1/15 | Director's Cabinet, San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |
| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |

1/93-7/93    Medical Staff Bylaws Committee, San Francisco Department of Public Health

## ACADEMIC APPOINTMENT
1980-2015    Assistant Clinical Professor
University of California, San Francisco

## PROFESSIONAL AFFILIATIONS
Society of Correctional Physicians, Member of President's Council, Past-Treasurer and Secretary
American Correctional Health Services Association, Past-President of California Chapter
American Public Health Association, Jails and Prison's Subcommittee
Academy of Correctional Health Professionals

## PROFESSIONAL PRESENTATIONS
*Caring for the Inmate Health Population: A Public Health Imperative*, Correctional Health Care Leadership Institutes, July 2015

*Correctional Medicine and Community Health*, Society of Correctional Physicians Annual Meeting, October, 2014

*Identifying Pulmonary TB in Jails: A Roundtable Discussion*, National Commission on Correctional Health Care Annual Conference, October 31, 2006

*A Community Health Approach to Correctional Health Care*, Society of Correctional Physicians, October 29, 2006

*Prisoners the Unwanted and Underserved Population, Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities*, Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine*, American Public Health Association Annual Conference, 11/19/2003

*Hepatitis in Corrections*, CA/NV Chapter, American Correctional Health Services Association Annual Meeting, 1/17/02

*Correctional Medicine*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections*, CA/NV Chapter, American Correctional Health Services Association Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care*, California Tuberculosis Controllers Association Spring Conference, 5/12/98

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program. Correctional Health Care: Practice, Administration, and Law.* Kingston, NJ: Civic Research Institute. 2017.

*Structure and Administration of a Jail Medical Program – Part II.* Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I.* Correctional Health Care Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail.* Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use.* Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector*, Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3–S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting.* Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County Jail*, American Journal of Public Health, 98:2182–2184, 2008

*Public Health Behind Bars*, Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail*, American Journal of Public Health, 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition*, Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility*, Mark Lobato, MD and Joe Goldenson, MD, *Clinical Practice in Correctional Medicine, 2nd Edition*, Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up.* American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness* Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice.* Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up*, American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings*, Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent*

*Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis,* International Journal of STD & AIDS; 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998,* International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release,* American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail,* International Journal of Tuberculosis Lung Disease, 2(6):506-512, 1998

## AWARDS

Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

## LICENSURE AND CERTIFICATION

Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)