# Exhibit 31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                        :

UNITED STATES OF AMERICA      :

                        :

     - v. -               :         S7 10 Cr. 162 (KMW)

                        :

WESAM EL-HANAFI,         :
   a/k/a "Khaled,"          :

                        :

         Defendant.         :

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**OPPOSITION TO DEFENDANT WESAM EL-HANAFI'S MOTION
<u>FOR COMPASSIONATE RELEASE</u>**

 

 

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Michael D. Lockard,
Assistant United States Attorney
   *- Of Counsel -*

## **TABLE OF CONTENTS**

Page

BACKGROUND ...................................................................................................................... 1

    A.  The Indictment, Information, and Guilty Plea ................................................................ 1

    B.  El-Hanafi's Offense Conduct ......................................................................................... 2

    C.  Sentencing ..................................................................................................................... 4

    D.  El-Hanafi's Administrative Requests for Home Confinement
        and Reduction in Sentence .......................................................................................... 5

    E.  El-Hanafi's Motion for Compassionate Release ........................................................... 7

DISCUSSION ......................................................................................................................... 8

    I.  Compassionate Release ................................................................................................. 8

    II.  El-Hanafi's Motion Should Be Denied ....................................................................... 11

        A.  El-Hanafi's Motion is Premature ............................................................................ 11

        B.  El-Hanafi's Motion Does Not Show Extraordinary and Compelling Reasons to
            Reduce His Sentence to Time Served ..................................................................... 13

            1.  COVID-19 Risk Factors .................................................................................. 13

            2.  Risk of exposure at FCI Butner Low, screening, and availability of care ............ 16

            3.  Risk of exposure in proposed home confinement ................................................. 19

        C.  El-Hanafi's Request to Reduce His Sentence Is Inconsistent with the Sentencing
            Factors .................................................................................................................... 22

    CONCLUSION ...................................................................................................................... 24

Pursuant to the Court's orders dated May 1 and 8, 2020, the Government respectfully submits this memorandum of law in opposition to the motion by the defendant, Wesam El-Hanafi ("El-Hanafi" or the "defendant") to reduce his sentence pursuant to the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018) (the "First Step Act"), as codified in 18 U.S.C. § 3582(c)(1)(A). El-Hanafi seeks compassionate release based on the spread of coronavirus infectious disease, COVID-19, at FCI Butner, where El-Hanafi is currently serving his sentence, and El-Hanafi's underlying medical conditions. (D.E. 242, 244). As discussed more fully below, El-Hanafi's request for compassionate release based on risk of COVID-19 exposure is premature, does not demonstrate extraordinary and compelling reasons warranting a sentence reduction, and would be inconsistent with the sentencing factors in 18 U.S.C. § 3553(a). Accordingly, the motion should be denied.

## BACKGROUND

### A.     The Indictment, Information, and Guilty Plea

On September 13, 2011, El-Hanafi and his co-defendant, Sabirhan Hasanoff, were charged in a superseding indictment, S5 10 Cr. 162 (KMW), with conspiring to provide material support to al Qaeda, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count One); providing, and attempting to provide, material support to al Qaeda, in violation of 18 U.S.C. § 2339B & 2 (Count Two); conspiring to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-07, and the Terrorism Sanctions Regulations, 31 C.F.R. Part 595, in violation of 50 U.S.C. § 1705 (Count Three); and violating the Terrorism Sanctions Regulations, in violation of 50 U.S.C. § 1705 (Count Four).

On June 18, 2012, El-Hanfi pleaded guilty, pursuant to a plea agreement, to a two-count superseding information, S7 10 Cr. 162 (KMW) (the "Information") charging him with providing and attempting to provide material support and resources to al Qaeda, in violation of

18 U.S.C. § 2339B; and conspiring to provide material support and resources to al Qaeda, in violation of 18 U.S.C. § 371.

### B.      El-Hanafi's Offense Conduct

In 2003, in the wake of the al Qaeda terrorist attacks on September 11, 2001 on the World Trade Center in New York, the Pentagon in Washington, D.C., and a foiled attack on the U.S Capitol Building, and the U.S.-led coalition invasions of Afghanistan and Iraq, El-Hanafi and his close friends aspired to join al Qaeda and fight as *mujahideen*. Ultimately, El-Hanafi succeeded in his ambitions to join al Qaeda; travelled overseas to swear an oath of allegiance to the terrorist group; provided al Qaeda tens of thousands of dollars, along with electronics equipment and technological expertise; and, at al Qaeda's tasking, directed co-conspirators to conduct surveillance on a major New York City institution to provide al Qaeda with information potentially of use in designing another terrorist attack. El-Hanafi's desire to fight as an armed *mujahideen* was frustrated only by al Qaeda's conclusion that, as a U.S. citizen and a highly educated technology specialist, El-Hanafi was more valuable to the group and its murderous aims away from the battlefield.

El-Hanafi is a U.S. citizen, born in Brooklyn and raised in Brooklyn and Egypt. (PSR ¶¶ 57, 61-62). In 2003, when El-Hanafi's terrorist fervor was growing, he was working as an information technology specialist for a prestigious U.S. financial services company (PSR ¶ 88), which previously had offices in the World Trade Center and relocated after the damages of the 9/11 terror attacks. At the beginning of 2006, El-Hanafi moved from New York to the United Arab Emirates and worked for various Middle East-based financial services and information technology employers. (PSR ¶¶ 85-87). El-Hanafi's friend and co-defendant, Sabirhan Hasanoff moved to the UAE in 2006. (PSR¶ 10).

In the UAE, El-Hanafi and Hasanoff met a member of al Qaeda ("CC-2"), and established additional contacts within al Qaeda through this individual. (PSR¶ 10). Through CC-2, El-Hanafi and his friends made regularly payments to al Qaeda, applying various tools of financial deception to evade law enforcement scrutiny. (*See, e.g.*, PSR ¶¶ 12, 15, 17). Over the course of approximately two years—from El-Hanafi's introduction to CC-2 until approximately 2010, when El-Hanafi and his friends began tempering their contact with their al Qaeda contacts for fear of law enforcement attention—El-Hanafi and his co-conspirators provided a total of approximately $67,000 to al Qaeda. (Govt. Sent. Memo. (D.E. 153) at 10-11).

CC-2 introduced El-Hanafi and his co-conspirators to al Qaeda operatives in Yemen, in particular, an operative named "Suffian," who also connected El-Hanafi with a more senior al Qaeda member, "The Doctor." (PSR ¶ 11; Govt. Sent. Mem. at 6). El-Hanafi developed enough trust to be invited to meet the men in Yemen, where he travelled in early 2008. (PSR ¶¶ 21-28, 30; Govt. Sent. Mem. at 7-17). While in Yemen, El-Hanafi spent several days with Suffian and the Doctor, and delivered them $12,000 in cash, a laptop, and a translation device. He swore an oath of allegiance to al Qaeda and received both training in operational security and numerous taskings: for his physical and doctrinal readiness, the recruitment of additional al Qaeda members, the procurement of technologies desired by al Qaeda, and for the surveillance of potential target attacks in New York City, specifically, the New York Stock Exchange. (Got. Sent. Mem. at 7-17, 19-20).

After his trip to Yemen, El-Hanafi continued sending al Qaeda money, and also recruited another co-conspirator—a cooperating witness (CW)—to join al Qaeda. El-Hanafi travelled to New York in approximately May 2008 to administer the oath of allegiance to the CW and to task the CW on behalf of al Qaeda. (Govt. Sent. Mem. at 18-19). El-Hanafi also procured various

remote control technology and digital watches for al Qaeda, and later supplied al Qaeda with additional digital watches and GPS devices. (*Id*. at 12, 16, 19, 22). El-Hanafi relayed his surveillance tasking to his co-conspirator Hasanoff, who surveilled the target and sent a short report to Suffian. (*Id*. at 19-21).

Throughout his dealings with al Qaeda, El-Hanafi's principal desire was to fight as a *mujahideen*. (Govt. Sent. Mem. at 11, 14-15, 22-26). El-Hanafi and his co-conspirators planned to sell their homes and belongings, evidencing their intent to die in battle. (*Id*.). Suffian and the Doctor's failure to make arrangements for the co-conspirators to join the battlefield—because al Qaeda believed they were more valuable elsewhere (*id*. at 17)—caused a rift in their relationship. (*Id*. at 22). El-Hanafi and his co-conspirators explored making their own arrangements, and their relationship with Suffian and the Doctor cooled by late 2009 in the face of fears that they were under law enforcement scrutiny. (*Id*. at 22-25; PS ¶ 37).

### C.    Sentencing

Prior to sentencing, the Court received expert reports from medical experts for the Government and the defendant concerning El-Hanafi's deep vein thrombosis ("DVT"), and held an evidentiary hearing on January 7, 2015.[1] On January 20, 2015, the Court sentenced El-Hanafi principally to a term of imprisonment of 15 years, to be followed by three years' supervised release. Judgment was entered on February 20, 2015. (D.E. 211).

---

[1] El-Hanafi claimed, among other things, that his deep vein thrombosis was caused by the conditions of his arrest and incarceration and that he received inadequate medical care while in pretrial detention. El-Hanafi also brought a separate civil lawsuit against the Bureau of Prisons based on the same allegations. *El-Hanafi v. United States*, 13 Civ. 2072 (GHW) (S.D.N.Y.). Following a bench trial, El-Hanafi's claims were dismissed. *Id.*, Dkt. Entry No. 131 (May 20, 2016).

In imposing sentence, the Court adopted the parties' agreement on the application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), which resulted in a total offense level of 37, a Criminal History Category of VI, and an advisory sentencing range of 360 months' imprisonment to life. Because the statutory maximum sentence of the offenses of conviction was 20 years, the resulting Guidelines sentencing range was 20 years. (Sent. Tr. 31). The Court observed that El-Hanafi's offense was "extremely serious and demands a substantial sentence both to impose just punishment and to effect general deterrence." (*Id.*; *see also id.* 31-33). The Court found that El-Hanafi had expressed some level of remorse (*id.* at 34),[2] and gave considerable weight to the conditions of El-Hanafi's confinement prior to sentencing based on the pain and limitations on physical activity caused by his deep vein thrombosis. (*Id.* at 34-35).

El-Hanafi is currently serving his sentence at the Federal Correctional Institution Butner Low ("FCI Butner Low"), which is part of the Butner Federal Correctional Complex. According to BOP records, his projected release date (including calculation of good-time credit) is February 9, 2023.

### D.    El-Hanafi's Administrative Requests for Home Confinement and Reduction in Sentence

According to BOP records, El-Hanafi submitted an administrative request to be placed in home confinement pursuant to 18 U.S.C. § 3624 on April 8, 2020.  El-Hanafi sought a home confinement placement based on his risk of exposure to COVID-19 and underlying medical conditions of chronic kidney disease and high blood pressure. (Dec. Mot. Ex. I). According to

---

[2] Despite voicing remorse, El-Hanafi failed to take any action carrying through on that expressed sentiment. For example, El-Hanafi offered to participate in a proffer, but under conditions so limiting—such as refusing to provide information about other individuals, and insisting on proffering only in the presence of his co-defendant—that, in light of those limitations and El-Hanafi's vacillating on wanting even that limited meeting, the proffer never occurred and would not have been useful to law enforcement. (Govt. Sent. Mem. at 42-43).

the BOP, this request was denied, principally because El-Hanafi was convicted of a terrorism

offense. *See* Attorney General, Memorandum: Prioritization of Home Confinement As

Appropriate Response to COVID-19 Pandemic (Mar. 26, 2020) ("March 26 Memorandum"), at

2; *available at* https://www.justice.gov/file/1262731/download (some offenses of conviction will

render an inmate ineligible for placement in home confinement, and other serious offenses will

weigh more heavily against consideration). The assessment of El-Hanafi's eligibility for

placement in home confinement was made by his unit team and the Regional Reentry

Management Office. El-Hanafi may administratively appeal this decision, *see* 28 C.F.R.

§ 571.63(a) and 28 C.F.R. Part 542, Subpart B; but the BOP's placement decision is not subject

to judicial review. 18 U.S.C. § 3621(b).

According to BOP records, El-Hanafi submitted an administrative request for a

compassionate release, or a reduction in sentence ("RIS") on April 24, 2020. On April 27, 2020,

El-Hanafi's counsel submitted a request for compassionate release pursuant to 18 U.S.C.

§ 3582(c)(1)(A) or, in the alternative, for placement in home confinement Section 12003(b)(2) of

the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-36 (Mar.

27, 2020), *codified at* 18 U.S.C. § 3261, note.  (Def. Mot. Ex. K). In his administrative request,

El-Hanafi sought a reduction of his sentence to time served based on his risk of COVID-19

exposure, combined with his underlying conditions of chronic kidney disease, hypertension, and

history of multiple blood clots with clotting disorder. El-Hanafi advised that, if his request were

granted, he would apply for Medicaid upon his release, and identified the Brooklyn Hospital

Center as the facility for continuing care. In his counselled letter, El-Hanafi expounded on his

concerns about COVID-19 exposure and medical conditions. (*Id.*).

In a letter dated May 6, 2020, the Warden of FCC Butner denied El-Hanafi's request for a reduction in sentence. The warden denied the request because El-Hanafi does not meet the BOP's criteria for compassionate release based on medical conditions, such as a terminal medical condition, debilitated medical condition, or status as an elderly inmate with medical conditions. *See generally* BOP Program Statement No. 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. BOP medical staff concluded that El-Hanafi has medical conditions that remain under control, he is independent, and able to complete his own activities of daily living. The determination of El-Hanafi's eligibility for a reduction in sentence was made by medical staff, social work staff, and the Warden. The Government is not aware whether El-Hanafi has appealed the Warden's decision, but he is entitled to do so. *See* 28 C.F.R. §  571.63(a) and 28 C.F.R. Part 542, Subpart B.

According to BOP, it is not currently considering El-Hanafi for furlough pursuant to 18 U.S.C. § 3622.

### E.    El-Hanafi's Motion for Compassionate Release

On April 30, 2020, El-Hanafi filed a counselled motion with the Court, styled as an emergency motion, seeking a reduction of his sentence to time-served, with a term of supervised release of three years and a condition of home confinement for 33 months. (Def. Mot. at 1, 21).

El-Hanafi argues that the Court should hear his motion immediately, rather than upon the lapse of 30 days from submitting his request to the warden of the facility, based on purportedly emergency circumstances and further arguing that the administrative exhaustion requirement of 18 U.S.C. § 3582(c)(1) can be excused. (Def. Mot. at 15-18) (collecting cases).

El-Hanafi argues that he is entitled to compassionate release because the COVID-19 pandemic and El-Hanafi's underlying medical conditions constitute "extraordinary and

7

compelling reasons" for a sentence reduction. (Def. Mot. at 11-12). El-Hanafi argues that he "squarely falls within the CDC's high-risk classification because he suffers from immune-compromising diseases, hypertension, and kidney disease" (*id*. at 6), including "recurrent, extensive deep vein thromboses" throughout his incarceration (*id*.); "severe post-thrombotic syndrome and antiphospholipid syndrome" (*id*. at 7); hypertension (*id*.); and chronic kidney disease. (*Id*.). El-Hanafi argues that he is at higher risk of death because of his elevated D-Dimer levels and a "mysterious blood clotting complication that is killing COVID-19 patients." (*Id*. at 8). El-Hanafi argues that "the decision to release him could mean life or death." (*Id*.).

El-Hanafi argues that he is at high risk of exposure at FCC Butner based on conditions that make it difficult to practice social distancing (Def. Mem. at 9-11), and the reported number of COVID-19 cases at FCC Butner and the increase in reported over time. (*Id*. at 10). El-Hanafi argues that "the BOP has failed to take heed and protect those in its custody in any kind of concerted or systematic way." (*Id*. at 13).

On May 1, 2020, the Court directed the Government to respond to El-Hanafi's motion by May 7, 2020. (D.E. 243). The response was extended to May 12, 2020. (D.E. 246). On May 7, 2020, El-Hanafi supplemented his April 30, 2020 motion (D.E. 244), principally discussing the difficulty in practicing social distancing from other inmates within El-Hanafi's unit.

## DISCUSSION

### I.    Compassionate Release

"The court may not modify a term of imprisonment once it has been imposed" except in certain defined circumstances. 18 U.S.C. § 3582(c). Section 3582(c)(1)(A)(i) authorizes a district court to modify a defendant's sentence based on "extraordinary and compelling reasons." Prior to the enactment of the First Step Act, only the BOP could move for a sentence reduction under

this provision, and its decision not to move for compassionate release was not reviewable by the district court. *See, e.g., Stewart v. United States*, 13 Civ. 5279 (JGK), 02 Cr. 395 (JGK), 2013 WL 4044756, *3-6 (S.D.N.Y. Aug. 9, 2013); *see also United States v. Iosifidis*, 13 Cr. 170 (JFK), 2016 WL 3267329, *2 (S.D.N.Y. June 9, 2016). The First Step Act amended this subsection to permit inmates to file motions for compassionate release following the exhaustion of their administrative remedies or 30 days after submitting a request to the appropriate Warden, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

The First Step Act did not alter the requirements for eligibility for compassionate release, which are set forth in § 3582(c)(1)(A) and Section 1B1.13 of the Guidelines. The court may modify a sentence only if it finds, as relevant here, that "extraordinary and compelling reasons warrant such a reduction," § 3582(c)(1)(A)(i). The proposed reduction "must be consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). In addition, the district court must "consider[ ] the factors set forth in section 3553(a) to the extent that they are applicable." *Id*.

The relevant policy statement is found in Section 1B1.13 of the Guidelines. *See* U.S.S.C. § 1B1.13(3). Among other things, the Guidelines provide that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, app. n.3.

The Guidelines provide that "extraordinary and compelling reasons" based on the defendant's medical condition exist when (i) "[t]he defendant is suffering from a terminal illness;" or (ii) the defendant is suffering from a "serious physical or medical condition," "serious functional or cognitive impairment," or "deteriorating physical or mental health because of the aging process" that "substantially diminishes the ability of the defendant to provide self-

care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A).

Extraordinary and compelling reasons may also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" of note 1. *See* U.S.S.G. § 1B1.13, cmt. n.1(D). Some district courts have concluded that, under the plain language of the Guidelines, only the BOP can make a determination of extraordinary and compelling reasons under this policy statement. *See, e.g.*, *United States v. Willingham*, No. CR113-010, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. Lynn*, Cr. No. 89-0072-WS, 2019 WL 3805349, at *3-4 (S.D. Ala. Aug. 13, 2019); *United States v. Johns*, No. CR 91-392-TUC-CKJ, 2019 WL 2646663 (D. Ariz. June 28, 2019); *United States v. Gross*, No. 2:04-CR-32-RMP, 2019 WL 2437463 (E.D. Wash. June 11, 2019); *United States v. Heromin*, No. 8:11-cr-550-T-33SPF, 2019 WL 2411311 (M.D. Fla. June 7, 2019); *United States v. Willis*, 382 F.Supp.3d 1185 (D.N.M. 2019); *United States v. Shields*, No. 12-cr-00410-BLF-1, 2019 WL 2359231 (N.D. Ca. June 4, 2019). Other courts have concluded that the First Step Act implicitly authorizes the court to make this determination in the place of the BOP, despite the fact that the Commission has not amended the Guidelines to expand the policy statement in this manner. *See, e.g.*, *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994 (S.D.N.Y. Feb. 24, 2020); *United States v. Rivernider*, No. 10 Cr. 222 (RNC), 2020 WL 597393, at *3 (D. Conn. Feb. 7, 2020); *United States v. Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Bucci*, 409 F. Supp. 3d 1 (D. Mass. 2019).

II.     **El-Hanafi's Motion Should Be Denied**

El-Hanafi's motion for compassionate release based on his health conditions and risk of exposure to COVID-19 should also be denied. First, the motion is premature. El-Hanafi submitted his request for a reduction of his sentence to the BOP on April 24, 2020, and neither of the requirements under 18 U.S.C. § 3582(c)(1) have been satisfied: 30 days have not yet lapsed, and El-Hanafi has not exhausted his administrative remedies. *See* 28 C.F.R. § 571.63(a). Second, El-Hanafi has not demonstrated "extraordinary and compelling reasons" for a reduction in his sentence. El-Hanafi's underlying medical conditions are currently being controlled by the medical care he is receiving at FCI Butner; the risk of COVID-19 spread is being managed by appropriate measures at the BOP; and El-Hanafi's proposed place of home confinement is squarely in the epicenter of the COVID-19 pandemic in the United States. Third, the requested reduction in sentence would be contrary to the sentencing factors in 18 U.S.C. § 3553(a), especially in light of the extraordinary seriousness of El-Hanafi's terrorism offense and the sentencing leniency he already has received based on his underlying medical conditions.

A.      **El-Hanafi's Motion is Premature**

El-Hanafi's motion is premature. By the plain language of 18 U.S.C. § 3582(c)(1)(A), El-Hanafi cannot make his motion until May 25, 2020, 30 days from the date he requested a reduction in sentence from the BOP. El-Hanafi has the right to appeal the warden's decision to the Regional Director and, if he is not satisfied with the Regional Director's decision, to the BOP General Counsel. 28 C.F.R. § 542.15.

El-Hanafi's argument that the exhaustion requirement can be deemed waived by emergency circumstances is incorrect. Recently, the exhaustion requirement of § 3582(c)(1)(A) was extensively analyzed by Circuit Judge Richard J. Sullivan in *United States v. Ogarro*, 18

Cr. 373 (RJS), 2020 WL 1876300 (S.D.N.Y. Apr. 14, 2020). As the court noted, the statute's exhaustion requirements "clearly are mandatory." *Id*., *3. "Because the statutory language is unambiguous and mandatory, it must be 'strictly enforce[d].'" *Id*. (*quoting Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004)). *See also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release at this point."). Judge Sullivan noted the critical distinction between judge-made exhaustion requirements, which are subject to judge-made exceptions, or Congressionally imposed exhaustion requirements that are susceptible to Congressionally authorized exceptions, on the one hand; and Congressionally-mandated exhaustion requirements, which are mandatory, on the other. *Ogarro*, 2020 WL 1876300, *4-5. *Accord, e.g.*, *United States v. Roberts*, 18 Cr. 528 (JMF), 2020 WL 1700032, at *2-3 (S.D.N.Y. Apr. 8, 2020); *United States v. Woodson*, 18 Cr. 845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020); *United States v. Hernandez*, 19 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, 18 Cr. 602 (WHP), 2020 WL 1428778, at *2 (S.D.N.Y. Mar. 24, 2020); *United States v. Monzon*, 99 Cr. 157 (DLC), 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020). The cases upon which El-Hanafi relies (Def. Mot. at 16-17) either blur this distinction and conflate judge-made and statutory requirements, *see, e.g., United States v. Scparta*, 18 Cr. 578 (AJN), 2020 WL 1910481, at *5 (S.D.N.Y. Apr. 20, 2020); or wholly abandon the notion of statutory interpretation at all. *See, e.g.*, *United States v. Livingston*, 18 Cr. 416, 2020 WL 1905202 (E.D.N.Y. Apr. 17, 2020). The Court should decline El-Hanafi's invitation to similarly abandon the mandatory requirements of the statute.

### B.   El-Hanafi's Motion Does Not Show Extraordinary and Compelling Reasons to Reduce His Sentence to Time Served

The basis for El-Hanafi's motion is his risk of exposure to COVID-19 and his underlying medical conditions. El-Hanafi's motion overstates both issues, and understates the appropriateness of FCI Butner Low's response to the COVID-19 pandemic. Moreover, the thrust of El-Hanafi's request is to move him from the BOP—where he has access to medical care and regular medical screenings—to Brooklyn, New York, where he has no medical coverage and would be living in an uncontrolled environment in the epicenter of the pandemic.

At bottom, El-Hanafi's request is not based on extraordinary and compelling reasons justifying a reduction in his sentence. El-Hanafi seeks is a sentencing response to a public health crisis—a permanent termination of the remainder of his incarceratory sentence in response to a public health crisis that, while unquestionably serious, is of unknown duration and severity. *Roberts*, 2020 WL 1700032, at *3 ("[T]he only way to grant [defendant] the relief she seeks . . . under Section 3582(c) is to reduce her sentence to time served — in other words, to *permanently* release her."). The BOP, like all public and private institutions, is responding to the public health crisis with public health measures. *See Raia*, 945 F.3d 954 (noting BOP's "extensive and professional efforts to curtail the [novel corona]virus's spread").

#### 1.   COVID-19 Risk Factors.

El-Hanafi does not fall "squarely. . . within the CDC's high-risk classification" for COVID-19. (Def. Mot. at 6). According to the Centers for Disease Control, "those at high-risk for severe illness from COVID-19" include people 65 years and older; people living in a nursing home or long-term care facility; and people "with underlying medical conditions, *particularly if not well controlled*." Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): People Who Are at Higher Risk for Severe Illness (Apr. 15, 2020), *available at*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

The CDC specifically identifies the relevant underlying medical conditions to include people (1)

"who have serious heart conditions;" (2) who are "immunocompromised," such as suffering

from poorly controlled HIV, undergoing cancer treatment, smokers, and people who have

undergone bone marrow or organ transplants; (3) and "with chronic kidney disease who are

undergoing dialysis." *Id*. "Serious heart conditions" are conditions such as "heart failure,

coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary

hypertension." Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): Groups at

Higher Risk for Severe Illness (May 12, 2020), *available at*

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

El-Hanafi has medical conditions, but none of his conditions meet the CDC's high-risk

criteria. El-Hanafi suffers from hypertension, but has not been diagnosed with pulmonary

hypertension[3] or another serious heart disease; and his hypertension is managed by medications

that keep his blood pressure generally within normal limits. El-Hanafi suffers from chronic

kidney disease, but does not require dialysis.[4] His kidney disease is managed by the care he

receives at FCI Butner Low: according to BOP medical records ████████████████████

---

[3] Pulmonary hypertension is not the same as ordinary hypertension. Pulmonary hypertension is a
type of high blood pressure that affects the arteries in the lungs and the right side of the heart.
*See* Mayo Clinic, Pulmonary hypertension (Mar. 20, 2020), *available at*
https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-
20350697. El-Hanafi has been diagnosed with hypertension, which is managed with medication.
He has not been diagnosed with pulmonary hypertension, and his BOP medical records ████████
████████████████████████████

[4] El-Hanafi's motion notes that his most recent eGFR test result was 45, indicating a loss of
kidney function. According to the Mayo Clinic, this is consistent with "mild to moderate loss of
kidney function." *See* Mayo Clinic, End-stage renal disease (Aug. 17, 2020), *available at*
https://www.mayoclinic.org/diseases-conditions/end-stage-renal-disease/diagnosis-treatment/drc-
20354538.

Finally, El-Hanafi's hypercoagulable condition is not a risk factor under CDC guidance, and his condition has been effectively managed by medication while at FCI Butner Low. El-Hanafi's medications and blood clotting are regularly monitored, and he has not suffered a deep vein thrombosis in the past five years. El-Hanafi speculates that his hypercoagulation may be a risk factor based on preliminary reports of a possible correlation between pulmonary clotting and COVID-19 death rates, but these preliminary studies do not report that individuals with coagulation disorders are at higher risk. Indeed, a study at Mr. Sinai has been reported showing that individuals on blood thinners (which El-Hanafi takes to control his hypercoagulation) are at lower risk of severe COVID-19 complications. *See* Science Daily, Blood thinners may improve survival among hospitalized COVID-19 patients (May 7, 2020), *available at* https://www.sciencedaily.com/releases/2020/05/200507194907.htm.

In short, while El-Hanafi unquestionably suffers from underlying medical conditions, those medical conditions do not fall within CDC guidelines for COVID-19 high risk factors. El-Hanafi's conditions are regularly monitored and evaluated, and are controlled by medication and treatment.

---

This is similar to the deferring of non-emergency medical care at hospitals across the country. *US hospitals postpone non-emergency procedures amid coronavirus pandemic*, THE GUARDIAN (Mar. 25, 2020), *available at* https://www.theguardian.com/world/2020/mar/25/us-hospitals-coronavirus-pandemic-postpone-elective-surgery-procedures.

## 2.    Risk of exposure at FCI Butner Low, screening, and availability of care.

Like many institutions both public and private, COVID-19 has affected the Butner Complex. However, the reported number of COVID-19 infections at the low security institution where El-Hanafi is housed remain relatively low, and BOP has taken steps to limit the risk of spreading infections.

FCC Butner consists of five facilities: a medical center, two medium-security facilities, FCI Butner Low, and a camp. According to BOP, since the COVID-19 pandemic, inmates and staff do not move among the facilities except for inmates who are placed in a medical isolation unit located within FCI Butner Low. Inmates who are not housed in the isolation unit do not interact with inmates who are. According to BOP, and contrary to El-Hanafi's assertion (Def. May 7, 2020 Ltr. at 1), inmates who are on work detail with health services do not work in the medical isolation unit.

As of May 12, 2020, BOP reports that 17 inmates at FCI Butner Low are positive for COVID-19, 3 staff members are positive, and there have been no inmate or staff deaths. 39 inmates and 4 staff have recovered from COVID-19. According to BOP, the figures for FCI Butner Low include inmates in the medical isolation unit, regardless of where those inmates were housed before being moved into the isolation unit, and thus do not reflect the number inmates who contracted COVID-19 from FCI Butner Low. There are presently approximately 1,227 inmates assigned to FCI Butner Low.

According to BOP, of the inmates and staff who have tested positive for COVID-19, one inmate and two staff members may have had exposure to the unit where El-Hanafi is assigned before they tested positive. The two staff members had assignments that could have brought them in contact with the unit, but BOP is presently unable to confirm whether or not that

occurred. One inmate self-surrendered as required by his sentencing judge, was quarantined for two weeks in order to screen for potential COVID-19 symptoms, and after showing no symptoms was assigned to El-Hanafi's unit.[6] The inmate later exhibited symptoms and was then moved to the isolation unit. (*Compare* Def. Ltr. at 11). As of today, no other inmates in El-Hanafi's unit have reported COVID-19 symptoms.

BOP reports that, as of May 8, 2020, approximately 459 COVID-19 tests have been administered to inmates at the Butner complex, out of a total of approximately 4,550 total inmates.[7] Of these 459 tests, approximately 318 tested positive and 141 tested negative. BOP does not administer tests to staff; staff test numbers are reported by staff members or their health care providers; based on these reports, 39 total staff members have tested positive COVID-19 and 9 have tested negative, out of a total staff of approximately 1,309 at the complex.

Currently, inmates at FCI Butner Low are tested if they are moved to the isolation unit, for quarantine purposes; or if they exhibit or complain of symptoms. This is consistent with CDC guidance on testing. According to CDC guidelines, high priority for COVID-19 testing (subject to state and local health department guidance) are (1) hospitalized patients with symptoms, (2) healthcare facility workers, workers in congregate living settings, and first responders with symptoms; and (3) residents in long-term care facilities or other congregate living settings, including prisons and shelters, with symptoms. Priority for COVID-19 testing

---

[6] A second inmate similarly self-surrendered, was quarantined for two weeks, and was assigned to a different unit after showing no symptoms; this inmate later showed symptoms and was moved to the medical isolation unit. Two other inmates in that unit later showed symptoms and were also moved to the medical isolation unit.

[7] BOP does not have these figures broken down by individual facility at Butner.

are (1) persons with symptoms, and (2) persons without symptoms who are prioritized by health departments or clinicians. Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19) (May 5, 2020), *available at* https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html.

It does not appear that El-Hanafi has been tested. According to his BOP medical records, he has not exhibited or complained of symptoms consistent with COVID-19. Currently, medical staff at FCI Butner Low are taking every inmate's temperature daily and following a screening questionnaire for symptoms. Inmates on work details similarly have their temperatures taken and respond to a symptoms questionnaire before being permitted to go out on their details. In addition, any inmate can report symptoms to the medical staff or make a sick call. Each inmate has a primary care team, consisting of an assigned medical doctor and either a nurse practitioner or physician's assistant. FCI Butner Low has medical staff present at all times. Moreover, any inmate who presents difficulty breathing, chest pains, or other symptoms that would warrant hospital care would be taken immediately to a local emergency room. The Government is not aware of any reports that local hospitals in North Carolina suffer from an overload of COVID-19 patients or related staffing or equipment shortages. According to the North Carolina Department of Health, as of May 12, 2020, there have been 475 COVID-19-related hospitalizations in the entire state. *See* North Carolina Department of Health and Human Services, COVID-19 North Carolina Dashboard (May 12, 2020), *available at* https://covid19.ncdhhs.gov/dashboard.

Staff at the Butner complex have their temperatures taken before being allowed into the facility for work. Any staff members running a temperature or exhibiting symptoms consistent with COVID-19 is not permitted to enter the facility.

In sum, the number of reported COVID-19 cases at FCI Butner Low is low, both in absolute terms and compared to the total inmate population; and all of those inmates are in medical isolation. COVID-19 testing criteria are consistent with CDC guidance. The facility is presently screening all inmates daily for fever and any self-reported COVID-19 symptoms, and inmates can submit sick calls at any time; inmates on work detail are similarly screened for fever and self-reported symptoms before being allowed to report for work. Neither inmates nor staff move between facilities at the Butner complex, and staff are screened for fever and self-reported symptoms before being allowed to report for work. The risk of COVID-19 exposure cannot be completely eliminated at FCI Butner Low or anywhere else, but the risk is being appropriately managed.

### 3. Risk of exposure in proposed home confinement.

El-Hanafi paradoxically asks the Court to reduce his sentence based on fears of COVID-19 exposure, so that he can move to the epicenter of the COVID-19 pandemic in the United States. The coronavirus remains extremely prevalent in New York City, and limiting the risk of exposure has required drastic public efforts and constant individual vigilance.

As of May 12, 2020, the New York City Department of Health reports that 184,319 New York City residents have tested positive for COVID-19; there have been 48,939 COVID-19-related hospitalizations; and there have been 15,101 confirmed and an additional 5,136 probable COVID-19-related deaths. New York City Department of Health, COVID-19: Data (May 12, 2020), available at https://www1.nyc.gov/site/doh/covid/covid-19-data.page. According to data by zip code, the area where El-Hanafi proposes to live has at leas ███████ positive cases, with a ███████ positive test rate; the immediately surrounding zip codes bring the total to ██████ cases.

New York City coronavirus cases by zip code, ABC (May 11, 2020), *available at*

https://abc7ny.com/coronavirus-tracking-map-zip-code-nyc-update/6084283/.[8]

      In all likelihood, the reported numbers dramatically understate the prevalence of

COVID-19 in the community. COVID-19 testing is not universal, despite the extraordinarily

high numbers of COVID-19 cases. Testing is prioritized for frontline workers, including all first

responders, health care workers, and essential employees who interact with the public; or for

individuals who are authorized by a health care provider and meet screening criteria based

principally on exhibiting symptoms or being in close contact with someone who has tested

positive for COVID-19. *See* New York State Department of Health, COVID-19 Testing (May

12, 2020), *available at* https://coronavirus.health.ny.gov/covid-19-testing. In April, a statewide

random testing study indicated that nearly 14% of New York State residents had been infected

with COVID-19, with more than 21% of tested New York City residents testing positive for

COVID-19 antibodies. *New York antibody study estimates 13.9% of residents have had the*

*coronavirus, Gov. Cuomo says*, CNBC (Apr. 23, 2020), *available at*

https://www.cnbc.com/2020/04/23/new-york-antibody-study-estimates-13point9percent-of-

residents-have-had-the-coronavirus-cuomo-says.html. In a city with a population of nearly 8.4

million, 21% would total more than 1.76 million infections, nearly ten times higher than the

confirmed 184,319.

      Like many communities, New York has attempted to slow the rate of infection with

legislation and executive orders prohibiting public gatherings of virtually any size, and

---

[8] El-Hanafi proposes to live in his family home, with his wife and their two children. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Probation has not conducted a home assessment, which ordinarily occurs only after an inmate is approved for release home confinement. Probation similarly has not conducted its own risk assessment, which includes information from the PSR, a detailed questionnaire, and other sources of information.

prohibiting certain businesses from operating, and requiring the use of face coverings in public. The CDC has published guidelines for meeting household needs while limiting the risk of COVID-19 exposure that highlight how everyday interactions carry the risk of infection: grocery shopping, going to the bank; going to the pharmacy to fulfill prescriptions, getting the mail, obtaining medical care, getting gasoline, and getting food for takeout or delivery all bring the risk of potential exposure. Centers for Disease Control, Coronavirus Disease 2019 (COVID-19): Running Essential Errands (May 11, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/essential-goods-services.html. These drastic measures and prohibitions have slowed the spread but not sufficiently to lift the restrictions; the Governor's "PAUSE" order will permit some non-essential businesses to begin operating in limited parts of the State, but currently New York City is not expected to permit non-essential businesses to operate until at least June 2020. *See Cuomo: Statewide Shutdown Ends May 15; 3 Regions Meet Criteria to Begin Reopening*, NBC (May 12, 2020), *available at* https://www.nbcnewyork.com/news/local/cuomo-expected-to-give-key-pause-update-monday-nyc-on-brink-of-20000-deaths/2411142/. Though the numbers of new cases, new hospitalizations, and new deaths are dropping, there are still hundreds of new cases and hospitalizations daily. The nation's top public health officials continue to warn of the risk of subsequent outbreaks. *See, e.g.*, Sheryl Gay Stohlberg, *At Senate Hearing, Government Experts Paint Bleak Picture of the Pandemic*, N.Y. TIMES (May 12, 2020), *available at* https://www.nytimes.com/2020/05/12/us/politics/fauci-cdc-coronavirus-senate-testimony.html.

In sum, it is far from obvious that El-Hanafi's risk of exposure to COVID-19 would be less in the community than it is at FCI Butner Low; it may well be greater, and would be heavily dependent on the behaviors of El-Hanafi and each member of the household. Moreover,

if El-Hanafi were exposed to COVID-19 and required treatment, it is far from obvious that he would be better off in Brooklyn than at FCI Butner. As El-Hanafi advised in his application for a reduction in sentence to the BOP, he would lack medical benefits if released and would have to apply for Medicaid. At FCI Butner Low, he (and all inmates) are currently having their temperatures taken daily and monitored daily for COVID-19 symptoms, and have medical staff available at all times. If hospitalization were required, the North Carolina hospital system has not undergone anything like the COVID-19 stress that the New York City hospital system has undergone, with 474 hospitalizations in the entire state of North Carolina versus nearly 50,000 in New York City alone.

For all of these reasons, El-Hanafi's motion has not shown extraordinary and compelling reasons to reduce his sentence.

### C.    El-Hanafi's Request to Reduce His Sentence Is Inconsistent with the Sentencing Factors

Even if the Court were to find that El-Hanafi's motion demonstrated extraordinary and compelling reasons, the requested reduction would still be inconsistent with the sentencing factors in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Lisi*, 15Cr. 457 (KPF), 2020 WL 881994 (S.D.N.Y. Feb. 20, 2020) (denying compassionate release motion where "The sentencing factors weigh heavily against the reduction of [the defendant's] sentence to time served); *United States v. Daugerdas*, 09 Cr. 581 (WHP), 2020 WL 2097653, at *4 (S.D.N.Y. May 1, 2020) (same). As in *Lisi* and *Daugerdas*, the sentencing factors "weigh heavily against" reducing El-Hanafi's sentence to time served.

With respect to the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1), El-Hanafi's offense was extraordinarily serious. (Sent. Tr. 31). Shortly after the most deadly terrorist attack on American soil, El-Hanafi decided to join the terrorist organization that

committed that attack and desired most to travel overseas to participate in armed battle against U.S. and U.S-allied forces. El-Hanafi fostered that desire for at least three years before successfully introducing himself to the al Qaeda terrorist organization, and for the succeeding two or three years consistently sought to receive military-style training and arrangements to travel to conflict zones; provided al Qaeda with tens of thousands of dollars and technologies highly sought-after by the organization; travelled to remote and dangerous places to meet senior operatives and swear an oath of allegiance; gave instructions, tasking, and oaths of allegiance to his co-conspirators; employed deceptive financial techniques, coded languages, and secure communications techniques to evade law enforcement detection; and surveilled potential targets of future attack in New York City. During the years that El-Hanafi harbored his desire to join al Qaeda and, as a member, provided financing and technology to the group, al Qaeda and its affiliates were responsible for numerous bombings, kidnappings, shootings, and other attacks against military and civilian targets around the world, principally aimed at U.S. and U.S.-allied personnel or undermining U.S. policy and security objectives. *See, e.g.*, *Timeline: Major Attacks By al Qaeda*, REUTERS (May 11, 2011), *available at* https://www.reuters.com/article/idINIndia-56711920110502. It is exactly these kinds of attacks that El-Hanafi knowingly and purposefully sought to support and, ultimately, participate in.

A reduction of El-Hanafi's sentence to time served thus would be contrary to the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence. 18 U.S.C. § 3553(a)(2)(A), (B). Not only is El-Hanafi's offense extremely serious, but the sentence imposed of 15 years' imprisonment already represents a significant variance from the advisory Guidelines range of 20 years—a range that, in turn, is substantially below the sentencing range

of 30 years' imprisonment to life that would apply absent the statutory maximum. The sentence

is also lower than the 18-year sentence imposed on El-Hanafi's co-defendant, Sabirhan

Hasanoff, though El-Hanafi's participation in the offense was more serious and culpable. The

Court imposed El-Hanafi's sentence based on individualized sentencing factors, including the

harsh conditions of confinement that El-Hanafi described based on his deep vein thrombosis

and concerns about the risk of recurrence. (Sent. Tr. 34-35). After the imposition of sentence

and the dismissal of El-Hanafi's civil suit against the Bureau of Prisons, however, his medical

records indicate no recurrence of deep vein thromboses and no reports of pain related to his

prior DVT. As described above, El-Hanafi's medical conditions have been appropriately

managed by the BOP and its medical staff at FCI Butner Low.

Eliminating an additional three years from El-Hanafi's sentence, by imposing a sentence

of time served, is contrary to the sentencing factors and does not appropriately reflect the

gravity of El-Hanafi's offense. This is especially so

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court enter an

order denying El-Hanafi's motion.

Dated: New York, New York
        May 12, 2020

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney


                            by:     _____/s/ Michael D. Lockard_____
                                        Michael D. Lockard
                                        Assistant United States Attorney
                                        (212) 637-2193


24