# Exhibit 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

UNITED STATES OF AMERICA

v.

WESAM EL-HANAFI,

        Defendant.
---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  May 19, 2020

10-CR-162 (KMW)
**OPINION AND ORDER**

KIMBA M. WOOD, District Judge:

    Defendant Wesam El-Hanafi has moved to reduce his term of imprisonment under the federal compassionate release statute, 18 U.S.C. § 3582(c)(1)(A).  He argues that if he were to contract COVID-19 while incarcerated, he would face a heightened risk of suffering life-threatening illness because of his many serious underlying health conditions.  (ECF No. 242.)  The Government opposes his motion.  (ECF No. 247.)  For the reasons set forth below, the Court GRANTS Defendant's motion and orders his immediate release from prison.  Defendant's sentence is reduced to time served.  He shall abide by all the terms and conditions of supervised release that were imposed at his original sentencing and that are memorialized in his judgment of conviction.  (ECF No. 211.)

## BACKGROUND

    On June 18, 2012, Defendant pleaded guilty to an Information charging two counts: (1) providing, and attempting to provide, material support and resources to a designated foreign terrorist organization, namely, Al Qaeda, in violation of Title 18, United States Code, Section

2339B; and (2) conspiring to provide material support and resources to a designated foreign terrorist organization, namely, Al Qaeda, in violation of Title 18, United States Code, Section 371.

In advance of sentencing, the Court received two expert medical reports and, on January 7, 2015, conducted a one-day hearing focused on Mr. El-Hanafi's medical condition. (*See* Hearing Tr., ECF No. 203.) The Court heard testimony from the authors of the medical reports: Dr. Jeffery Weitz, who testified for the defense, and Dr. James F. McKinsey, who testified for the Government. (*Id.*) Although the doctors assessed the cause and extent of Defendant's disability differently, they agreed that he suffers from deep vein thrombosis. (*Id.*)

The Court sentenced Defendant on January 20, 2015. (Sentencing Tr., ECF No. 209.) The Court cited "a number of factors" that "counsel[ed] for a degree of leniency," including that Defendant's deep vein thrombosis had made the prior four years of incarceration "significantly harsher for the defendant than they would have been for the average inmate." (*Id.* at 33–34.) The Court also explained that Defendant had developed anti-phospholipid syndrome, which put him "at high risk for further damage to his kidneys as well as a fatal pulmonary embolism." (*Id.* at 34–35.) The Court sentenced Defendant to a non-guidelines term of 15 years' incarceration, to be followed by three years of supervised release. (*Id.* at 35.)

Defendant is currently serving his sentence at FCI Butner Low. Over the course of 10 years of incarceration, he has incurred no incident reports. (Def. Mot. at 1, ECF No. 242.) According to Bureau of Prisons ("BOP") records, his projected release date is February 9, 2023.

On April 8, 2020, Defendant submitted a request to the BOP pursuant to 18 U.S.C. § 3624 to serve the remainder of his sentence under home confinement in light of his poor health and the dangers that he faces from COVID-19. (Def. Mot. at Ex. I.) The BOP denied this

request on April 20, 2020, principally because Defendant is incarcerated for a terrorism offense. (Gov. Opp'n at 5–6, ECF No. 247.)

On April 24, 2020, Defendant submitted a request to the BOP pursuant to 18 U.S.C. § 3582 for compassionate release. (Def. Mot. at 19.) Defense counsel wrote to the Warden of FCI Butner Low three days later in support of Defendant's compassionate release application. Counsel also requested that the BOP reconsider Defendant as a candidate for home confinement under Section 12003(b)(2) of the CARES Act. (Def. Mot. at 19, Ex. K.) The Warden denied Defendant's compassionate release application on May 6, 2020. (Gov. Opp'n at 7.)

Defendant filed the present motion on April 30, 2020. The Government submitted its opposition on May 13, 2020, and Defendant replied on May 15, 2020.

## LEGAL STANDARD

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, Pub. L. No. 115–391, 132 Stat. 5194 (Dec. 21, 2018), a court may reduce a defendant's sentence upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant. A defendant may move under Section 3582(c)(1)(A) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

### I.  Exhaustion

Defendant has not satisfied the exhaustion requirements of Section 3582(c)(1)(A). Thirty days have not yet expired since Defendant submitted his compassionate release request to the Warden of FCI Butner Low. And although the Warden has already declined to bring a motion for compassionate release on Defendant's behalf, Defendant has not fully exhausted his

3

administrative rights to appeal that decision.

The Court has authority to waive Section 3582(c)(1)(A)'s exhaustion requirement. Other judges in this district have ably explained why, and this Court will not belabor an issue that has been cogently and comprehensively examined elsewhere. *See, e.g.*, *United States v. Scparta*, No. 18-CR-578, 2020 U.S. Dist. LEXIS 68935, at *31 (S.D.N.Y. Apr. 19, 2020) (Nathan, J.); *United States v. Russo*, No. 16-CR-44, 2020 U.S. Dist. LEXIS 65390 (S.D.N.Y. Apr. 14, 2020) (Liman, J.); *United States v. Haney*, No. 19-CR-541, 2020 WL 1821988, at *2 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.). Rather, it suffices to review briefly some of the principal reasons that Section 3582(c)(1)(A)'s exhaustion requirement is amenable to equitable exceptions.

To begin, the language of Section 3582(c)(1)(A) is not jurisdictional. Unless Congress has clearly stated that a rule is jurisdictional, courts must treat it as non-jurisdictional. *See Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013). Section 3582(c)(1)(A) makes no mention of jurisdictional elements and is not contained within the jurisdictional portion of the United States Code. *Russo*, 2020 U.S. Dist. LEXIS 65390 at *9 (citing *United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015)). Furthermore, the Second Circuit has deemed a related provision, Section 3582(c)(2), non-jurisdictional. *See United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013)); *Haney*, 2020 U.S. Dist. LEXIS 63971, No. 19-CR-541, at 5–7.

The exhaustion requirement in Section 3582(c) is therefore properly understood as a claim-processing rule, a non-jurisdictional directive that "seek[s] to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). "[T]he exhaustion requirement in Section 3582(c)(1)(A) merely controls who—the BOP or defendant—may move for compassionate release and when such a motion may be made. It simply delineates the process for a party to

4

obtain judicial review, not referring to the adjudicatory capacity of the courts." *Haney*, 2020 U.S. Dist. LEXIS 63971 at *6. Claim-processing rules may be, but are not always, mandatory.

"Of paramount importance" to this question "is congressional intent." *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) (citation and quotation marks omitted). Generally, Congress imposes exhaustion requirements in order to "serve[] the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *Id.* at 145. Here, "the statute does not necessarily require the moving defendant to fully litigate his claim before the agency (i.e., the BOP) before bringing his petition to court. Rather, it requires the defendant either to exhaust administrative remedies or simply to wait 30 days after serving his petition on the warden of his facility before filing a motion in court." *Haney*, 2020 U.S. Dist. LEXIS 63971, at *8. Moreover, only a judge—not the BOP—may order a person's compassionate release. Even if Defendant followed the statute's exhaustion requirements, he could, at best, expect the BOP to bring a motion on his behalf, to be adjudicated in court. Thus, the "hybrid" nature of the exhaustion requirement "substantially reduces the importance of the first purpose [of protecting administrative agency authority]." *Id.* at *8–9. And because the exhaustion requirement "unquestionably reflects congressional intent for the defendant to have the right to a meaningful and prompt *judicial* determination of whether he should be released," it would undermine the goal of judicial efficiency and "pervert congressional intent" to treat the requirement "as a substantial obstacle to effective judicial review." *Russo*, 2020 U.S. Dist. LEXIS 65390 at *7.

In sum, Section 3582(c)(1)(A)'s text and purpose counsel in favor of concluding that its exhaustion requirement is subject to equitable exceptions. Here, waiting for Defendant to exhaust his administrative appeal rights would both be futile and cause him irreparable harm.

*See Scparta*, 2020 U.S. Dist. LEXIS 68935, at *12. Thus, the Court waives exhaustion and turns to the merits of Defendant's motion.

## II.     Extraordinary and Compelling Reasons for Release

A court may reduce a defendant's sentence if the court finds that "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A)(i). In making this determination, the court must consider the "the factors set forth in [18 U.S.C. § 3553(a)] to the extent that they are applicable." *Id.* § 3582(c)(1)(A).

Congress delegated responsibility to the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t)). The Sentencing Commission has determined that a defendant's circumstances meet this standard when, *inter alia*, the defendant is "suffering from a terminal illness" or a "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," or if, in the judgment of the BOP, the defendant's circumstances are extraordinary and compelling for "other reasons." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A), (D). Following the passage of the First Step Act, courts may independently determine whether such "other reasons" are present in a given case, without deference to the BOP's judgment. *See United States v. Lisi*, No. 15-CR-457, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) (Failla, J.). In addition, the Sentencing Commission has resolved that a court should reduce a defendant's sentence only after determining that "[t]he defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

Here, the mutually reinforcing risks of Defendant's living environment and his severe underlying health conditions give rise to extraordinary and compelling reasons for his release.

COVID-19 presents increased dangers in prison settings, where it is difficult to practice consistent social distancing, to maintain strict hygiene, and to take other preventative cautions. As of May 18, 2020, the top three clusters of COVID-19 cases in the United States—and ten of the top fifteen—were connected to prisons and jails.[1] And the problem of COVID-19 infection in jails and prisons likely runs deeper than we know. Tellingly, mass testing, in the few correctional facilities that have undertaken it, revealed vast hidden asymptomatic outbreaks.[2]

The Butner complex is one of the hardest-hit facilities. According to the Government, 318 inmates at the Butner complex have tested positive for COVID-19. (Gov. Opp'n at 17.) The Butner complex has the third highest number of confirmed cases of any BOP facility. (Def. Mot. at 6.)[3] The pace of infection shows no signs of abating. On May 18, 2020, the BOP website listed 32 currently infected inmates at FCI Butner Low, the low-security facility within the Butner complex where Defendant resides. This number represents an increase of nearly 50% in five days.[4] At least two staff members are also currently infected at FCI Butner Low,[5] although, remarkably, the Government concedes that no staff have been tested by the BOP; the number of positive cases among staff is self-reported. (Gov. Opp'n at 17.)

Defendant has no ability to avoid contact with infected areas or people. The Government acknowledges that at least one inmate and two staff members who tested positive "may have had exposure to the unit where Mr. El-Hanafi is assigned before they tested positive." (Gov. Opp. at 16.) Defendant is housed in a dormitory with 150-160 inmates. (Def. Motion at 6.) The space is

---

[1] *See Coronavirus in the U.S.: Latest Map and Case Count*, NEW YORK TIMES, at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last accessed May 18, 2020).
[2] Linda So & Grant Smith, *In Four U.S. State Prisons, Nearly 3,300 Inmates Test Positive for Coronavirus -- 96% Without Symptoms*, REUTERS (April 25, 2020), available at https://www.reuters.com/article/us-health-coronavirus-prisons-testing-in/in-four-u-s-state-prisons-nearly-3300-inmates-test-positive-for-coronavirus-96-without-symptoms-idUSKCN2270RX.
[3] *See* Covid-19 Cases, BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed May 18, 2020)
[4] *Id.*; Def. Supplemental Letter, ECF No 251.
[5] *Id.*

divided into two- and three-person cubicles, with four-foot high walls. (*Id.*) Two aisles run the length of the cubicles, so that 75-80 inmates regularly stream past to access restrooms, to converse with one another, and to go to work. (*Id.*) Every day, approximately 48 inmates leave Defendant's unit to work throughout the facility. (Def. Reply at 6, ECF No. 250.) Two of those inmates are tasked with cleaning the medical isolation unit. (*Id.*) Defendant states that telephones and computers shared by 150 inmates are not cleaned or disinfected between uses. (*Id.* at 7.) The BOP provided the inmates at FCI Butner with three masks each, but Defendant states that his fellow inmates do not always wear them. (Def. Mot. at 11.) According to Defendant, one sick inmate was housed in his unit from April 27 through April 29, and spent time, unmasked, playing cards with other unmasked inmates at tables in the unit's common area. (Def. Reply at. 6.) It is difficult to conceive of an environment more conducive to the rapid spread of infection than the type of prison dormitory where Defendant resides.

For Defendant, infection from COVID-19 could well be fatal. He suffers from hypertension, stage 3 kidney failure, and severe anti-phospholipid syndrome with recurrent deep vein thrombosis. These chronic health problems place him firmly in the category of high-risk individuals.[6] The BOP has classified him at "Care Level 3," the second highest care level, for "outpatients who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications." (See Def. Mot. at 6, Exhibit C.)

In support of his motion for compassionate release, Defendant submits the informative report of Dr. Thomas T. Ward. (Def. Reply at Ex. M.) Dr. Ward is a Professor Emeritus in the Infectious Diseases Division in the Department of Medicine for Oregon Health Services

---

[6] *See* CDC: COVID-19: What if You are High Risk, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last accessed May 15, 2020)

University.  (*Id.*)  He has practiced infectious disease and internal medicine for 45 years, and serves on the COVID-19 Advisory Task Force for the Oregon Health Authority.  Dr. Ward states that "Both Mr. El-Hanafi's underlying hypertension, and likely more important, his underlying anti-phospholipid syndrome, poses risks for severe complications following a COVID-19 infection."  (*Id.*)

Dr. Ward elaborates that anti-phospholipid syndrome is too uncommon to be identified in observational studies as a known risk factor, but it "much more likely than not" to contribute to severe illness and complications from COVID-19.  It "shares with other recognized risk factors for severe COVID-19 disease the fact that it is a chronic inflammatory condition," even when controlled with medication.  (*Id.*)  Dr. Ward concludes that Defendant is "at very high risk for severe illness and death while residing in a large congregate setting and during ongoing significant prevalence of coronavirus disease."  (*Id.*)

The Court finds that the COVID-19 pandemic, the conditions of incarceration that diminish Defendant's ability to protect himself from exposure, and Defendant's serious underlying health challenges, in combination, give rise to "extraordinary and compelling reasons" for reducing his sentence.

### III.     The Section 3553(a) Factors

The sentencing factors set forth in 18 U.S.C. § 3553(a) do not "outweigh the 'extraordinary and compelling reasons' warranting compassionate release" in Defendant's case. *United States v. Ebbers*, No. 02-cr-1144-3, 2020 U.S. Dist. LEXIS 3746, at *20 (S.D.N.Y. Jan. 8, 2020) (Caproni, J.)

Defendant's offense was exceptionally serious, but the considerations that counseled leniency at the time of sentencing are even more salient today.  First, the Court recognized at

sentencing that Defendant's "childhood was marked by abuse and poverty, but he nonetheless became a pillar of strength and supportive love to his relatives."  (Sentencing Tr. at 33.) Defendant remains "exceptionally close" to his family, in spite of his long incarceration, and he will return to the caring home of his wife and three children.  (Def. Mot. at 21.)

The Court also remarked at sentencing that "[a]part from his very serious offense in this case, his record is unblemished," and that Defendant had demonstrated "signs of remorse and rehabilitation" during his four years of pre-sentence incarceration. (Sentencing Tr. at 33–34.) Defendant has maintained a spotless institutional record throughout ten years of incarceration and has participated in a long list of educational, rehabilitative, and job-readiness programs. (Def. Mot. at 20, Ex. C.)  In a "Risk and Needs Assessment" conducted pursuant to the First Step Act, employing the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"), Defendant's "Recidivism Risk Level" was determined to be "minimum." (*See id.* at 4, Ex. D.)   The Court is convinced that Defendant is a rehabilitated offender who poses no danger to the community.  His continued incarceration is not necessary to effectuate specific deterrence.

Finally, at sentencing, the Court found that Defendant's health problems caused significant suffering and magnified the ordinary challenges and hazards of incarceration. (Sentencing Tr. at 34–35.)  Plainly, that concern is now more relevant and pressing than ever.

 In light of Defendant's extensive health challenges and the other considerations addressed here, the Court concludes that the COVID-19 pandemic renders the previously imposed term of incarceration greater than necessary to achieve the goals of sentencing. Releasing Defendant 33 months early from a 180-month sentence in order to protect his life and health during an unprecedented global pandemic will not undermine general deterrence.

Defendant's previously imposed sentence is no longer just punishment where there is a real risk that it could be transformed into a death sentence. *See United States v. Field*, No. 18-cr-426, 2020 U.S. Dist. LEXIS 78112, at *6 (S.D.N.Y. May 4, 2020) (Oetken, J.).

## CONCLUSION

For the foregoing reasons, Defendant's motion for a compassionate release under § 3582(c)(1)(A) is GRANTED. Defendant shall be resentenced to time served, and shall be released from the custody of the Bureau of Prisons immediately. Upon release, Defendant shall be placed on supervised release status and shall be for three years subject to all the mandatory conditions, standard conditions, and special conditions of supervised release stated in the original judgment and sentence in this case.

SO ORDERED.

Dated: New York, New York
       May 19, 2020                                         /s/ Kimba M. Wood
                                                          KIMBA M. WOOD
                                                       United States District Judge