IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:20-HC-2088-FL

CHARLES HALLINAN, JOSEAN )
KINARD, ARNOLD J. HILL, )
BENJAMIN D. McRAE, JOHN DAILEY, )
LEE M. AYERS, GEORGE B. RIDDICK, )
JORGE LUIS MALDONADO, ANTWAN )
HARRIS, ANTHONY BUTLER, and )
TROY A. TITUS, on behalf of themselves )
and similarly situated individuals, )
        Petitioners/Plaintiffs, )
  )
  ) MEMORANDUM OF LAW IN
   v. ) SUPPORT OF RESPONDENTS'
  ) MOTION TO DISMISS, OR IN THE
  ) ALTERNATIVE, MOTION FOR
THOMAS SCARANTINO, Complex ) SUMMARY JUDGMENT
Warden, Federal Correctional Complex )
Butner; MICHAEL CARVAJAL, Federal )
Bureau of Prisons Director; and JEFFERY )
ALLEN, Federal Bureau of Prisons )
Medical Director, in their official )
capacities, )
        Respondents/Defendants. )

## **INTRODUCTION**

Courts are "ill equipped to deal with the difficult and delicate problems of
prison management." Thornburgh v. Abbott, 490 U.S. 401, 407–08 (1989) (internal
quotations omitted). Yet, that is precisely what Petitioners ask the Court to do.
Through a procedurally defective class-action habeas petition, Petitioners
inappropriately seek to challenge allegedly unconstitutional conditions of
confinement amid the novel coronavirus ("COVID-19") pandemic. They ask the Court
to substitute its judgment for that of Congress and the Bureau of Prisons ("BOP"), to

take charge of prison management and policy-making, and to sanction a release or transfer en masse of federal inmates—including potentially child molesters; sexually dangerous persons and mentally ill and dangerous persons who have been civilly committed specifically to the Federal Correctional Complex in Butner, North Carolina ("FCC Butner") for mental health treatment; drug traffickers; and, in the cases of Petitioners Arnold Hill and George Riddick, convicted murderers. Perhaps worse, Petitioners seek that blanket release or transfer on a class basis, irrespective of any inmate's individual circumstances (including gang affiliations; security levels; need for medical, substance-abuse, or sex-offender treatment; and record of custodial incidents) and the dangers they may pose to other inmates and the community. The Court should not indulge Petitioners' requests. To the contrary, the petition, on its face, is foreclosed by Fourth Circuit precedent, and should be dismissed in its entirety.

Petitioners are a group of inmates incarcerated at three institutions located at the FCC Butner, purporting to represent a diverse class consisting of all current and future inmates over the age of 50 or who experience medical conditions that make them vulnerable to COVID-19 located at any of the five institutions at FCC Butner. See Petition for Writ of Habeas Corpus [hereinafter "Petition"], D.E. 1 at 60 ¶ 224. Petitioners allege their constitutional rights are being violated because of the possibility they may contract COVID-19 while incarcerated. Id. at 59–60 ¶¶ 217–21. Petitioners seek injunctive relief in the form of immediate release or an

"enlargement" of custody to "alter Petitioners' place of custody." Id. at 66–70 ¶ 258. If granted in its entirety, the habeas petition could result in hundreds (or even thousands) of inmates – some of whom are murderers, drug traffickers, child predators, and gang members – being released into the community without a plan to address safety and security, or the inmates' successful re-entry into society. The petition should be dismissed for myriad reasons.

**First**, the Court lacks jurisdiction over the petition because Petitioners are challenging the conditions of their confinement. Although "the Supreme Court [has] held that a writ of habeas corpus is the exclusive remedy for inmates seeking release from their confinement," this Court has expressly held that "release from confinement is not a remedy available for an Eighth Amendment conditions of confinement claim." Hunt v. Johns, No. 5:10-HC-2176-FL, 2011 WL 3664553, at *2 (E.D.N.C. Aug. 18, 2011) (unpublished). Rather, the appropriate cause of action for allegedly unconstitutional conditions of confinement would, in this case, be one pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), which Petitioners have deliberately declined to pursue. Id.; see Rodriguez v. Ratledge, 715 F. App'x 261, 265 (4th Cir. 2017) (unpublished); Preiser v. Rodriguez, 411 U.S. 475 (1973); Strader v. Troy, 571 F.2d 1263, 1269 (4th Cir. 1978).[1] The

---

[1] The Court should not convert Petitioners' petition into a Bivens action for multiple reasons. First, Respondents are represented by 13 lawyers from two nationwide organizations and one nationwide law firm, who presumably considered the available remedies for relief and intentionally rejected pursuing a Bivens claim despite the clear state of the law. The Court need not liberally construe the petition as it would if Petitioners were acting pro se. Cf. Text Order, D.E. 15 at 2 (refusing to "act on

3

appropriate remedy for any such <u>Bivens</u> claim, moreover, is not the release from custody that Petitioners seek, but a judicially mandated change in conditions.

Petitioners' attempt to sidestep these limitations on habeas jurisdiction by insisting they are challenging the "fact of their confinement" not the "conditions of their confinement." <u>See</u> Memorandum of Law in Support of Petitioners' Motion for Temporary Restraining Order, Preliminary Injunction, and Writ of Habeas Corpus [hereinafter "Pet. Mem."] D.E. 25 at 34. But that is a semantical distinction without a jurisdictional difference. As several district courts recently observed, "but for" conditions related to COVID-19, Petitioners' claims "would not exist." <u>See</u> <u>Wragg v. Ortiz</u>, No. 20-5496, 2020 WL 2745247, at *1 (D.N.J. May 27, 2020); <u>Alvarez v. Larose</u>, No. 20-cv-00782, 2020 WL 2315807, at *3 (S.D. Cal. May 9, 2020). Moreover, neither the Supreme Court nor the Fourth Circuit has never recognized any actual "exceptional circumstance" that would allow Petitioners to challenge their conditions of confinement in these circumstances, particularly because Petitioners have at their disposal a litany of statutory and regulatory avenues (such as the CARES Act) to seek (and possibly obtain) the relief that they seek through this petition. Indeed, some of the Petitioners have even been granted relief under the CARES Act.

*Second*, the petition should be dismissed because Petitioners failed to exhaust

---

petitioners' request in their petition for immediate injunctive relief in the absence of a properly supported motion"). Even if the Court were to liberally construe the petition as a <u>Bivens</u> action, it would still fail. Respondents are expressly named in their official capacity, not their individual capacity, and the allegations do not support the personal involvement by Respondents required to make a <u>Bivens</u> claim.

4

their administrative remedies under the Prison Litigation Reform Act ("PLRA"). Under this statute, "no action shall be brought with respect to **prison conditions** . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) There is no exception to this exhaustion requirement, and recent court decisions hold that this exhaustion requirement applies to COVID-19-related habeas petitions brought under 28 U.S.C. § 2241. See, e.g., United States v. Montanez, No. 15-CR-122-FPG, 2020 WL 2183093, at *11 (W.D.N.Y. May 5, 2020); Nellson v. Barnhart, No. 1:20-cv-00756-PAB, 2020 WL 1890670, at *5 (D. Colo. Apr. 16, 2020).

*Third*, Petitioners' habeas petition fails on its merits. Conditions at FCC Butner are far less dire than Petitioners' often generic and sensationalized allegations suggest. Notably, as of June 1, 2020, the Centers for Disease Control and Prevention ("CDC") reports that the COVID-19 mortality rate in the United States is approximately 5.8% (104,396 deaths out of 1,787,680 cases), and that the COVID-19 mortality rate in North Carolina is approximately 3.1% (886 deaths out of 28589 cases). See Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), "Cases in the U.S." (last updated June 1, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited June 2, 2020). As of June 2, 2020, FCC Butner has a total population of 4,386 inmates. See Declaration of Phillip Clark [hereinafter "Clark Decl."], Respondents' Appendix [hereinafter "R.A."] 012 ¶ 5. Approximately 700 of those inmates have tested positive for the COVID-19 virus, and 15 have died as a result of the virus and

5

its interaction with their other co-morbid medical conditions.  See Declaration of Kellie Harden [hereinafter "Harden Decl."], R.A. 353–54 ¶ 6; Declaration of Dr. Andrew Stock [hereinafter "Stock Decl."], R.A. 121 ¶ 149.  The 15 inmates who have died had long-term, pre-existing medical conditions which the CDC lists as risk factors for developing more severe COVID-19 disease.[2]  See Stock Decl., R.A. 121 ¶ 149.  Thus, although the FCC Butner infection rate may be higher than the general population, the FCC Butner mortality rate of approximately 2.1% is lower than the rates for the general population.  Contrary to Petitioners' claims then, FCC Butner's efforts have been more effective in managing infections and treating inmates than those of medical facilities in the general population.  Accordingly, FCC Butner's conditions and responses to the crisis cannot possibly be constitutionally deficient.

*Finally*, the Court should strike Petitioners' class allegations.  Petitioners cannot satisfy any of the Rule 23(a) elements for class certification because habeas petitions are highly fact-specific, and the proposed class members (including Petitioners) have different preexisting medical conditions and security classifications and designations, and are located in different facilities within the FCC Butner Complex.  As one court recently held in denying class status to a COVID-19-related petition, "simply put, there is no way to decide which inmates should stay, and which inmates should go, without diving into an inmate-specific inquiry" antithetical to a class action lawsuit.  Money v. Pritzker, No. 20-cv-2093, 2020 WL 1820660, at *15

---

[2] See https://www.bop.gov/resources/press_releases.jsp.

(N.D. Ill. Apr. 10, 2020).

## **STATEMENT OF FACTS**[3]

As demonstrated in detail in Respondents' Statement of Material Facts, filed contemporaneously with this memorandum, Respondents have taken an inordinate amount of precautionary steps in order to prevent and reduce the spread of COVID-19 within at FCC Butner.

FCC Butner is a federal prison complex that houses five separate institutions: a Federal Medical Center ("FMC Butner" or "FMC"), two medium Federal Correctional Institutions ("FCI Butner I" or "FCI I", and "FCI Butner II" or "the FCI II")), a Low Security Institution ("LSCI Butner" or "LSCI")), and a federal prison camp, ("the Camp", "FPC Butner", or "FPC"). See Clark Decl., R.A. 012 ¶ 5. The current population of the complex is 4,360. Id.

Since January 2020, in order to combat the spread of COVID-19 at its institutions, BOP has been coordinating with subject-matter experts at multiple organizations and agencies, including the World Health Organization ("WHO") and the CDC. See Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited May 30, 2020). Specifically, in January 2020, BOP implemented an action plan consistent with WHO and CDC recommendations, to combat the spread on COVID-19 in

_____

[3] Because Respondents are moving in the alternative for summary judgment, Respondents are filing contemporaneously herewith a Statement of Material Facts and Appendix pursuant to the Local Civil Rules.

7

individual facilities.  See Declaration of Mary Strassel [hereinafter "Strassel Decl."], R.A. 132–33 ¶ 7.  Over the course of the crisis, BOP has updated that plan on several occasions.  Currently, BOP has implemented seven phases of the plan.  See Strassel Decl., R.A. 155 ¶ 73.  As a result of this plan, FCC Butner has initiated screening tools for inmates and staff.  See Strassel Decl., R.A. 133, 134–35 ¶¶ 8, 13.  FCC Butner also modified operations to ensure social distancing between inmates and staff, including altering inmate movement, so that smaller groups went to dining hall, education, recreation, chapel, and other activities at any given time.  See Strassel Decl., R.A. 135 ¶ 14.  Each institution across the Complex had modified movement schedules to increase social distancing and limit contact between inmates.  See Strassel Decl., R.A. 135 ¶ 14.  Subsequently, FCC Butner began satellite feeding all inmates in their assigned units or cells, and small group gatherings were halted for education, chapel, recreation, and all other instances where inmates were previously permitted to meet.  FCC Butner began providing those services in a modified manner in the individual cells and housing units.  See Strassel Decl., R.A. 137 ¶ 22.

FCC Butner also began quarantining all incoming inmates and established quarantine and isolation units at each institution.  See Strassel Decl., R.A. 135–36 ¶¶ 14, 18.  FCC Butner has continually educated both staff and inmates on the procedures set up as well as the prevention, contraction, and transmission of the virus.  See Strassel Decl., R.A. 136–37 ¶¶ 19, 20.  All staff have been provided with Personal Protection Equipment ("PPE") which includes surgical masks and N-95

masks.  See Strassel Decl., R.A. 140 ¶ 32.  All inmates have been provided with cloth masks which are to be worn at all times.  See Strassel Decl., R.A. 148 ¶ 56.  FCC Butner is also conducting COVID-19 testing in accordance with CDC guidelines.  See Harden Decl., R.A. 353 ¶ 5.  FCC Butner is also isolating inmates who present with COVID-19-like symptoms; and quarantining asymptomatic inmates who have contracted the virus.  See Stock Decl., R.A. 104–05 ¶¶ 61–66.

During the course of the crisis, FCC Butner also implemented enhanced sanitation plans including daily cleaning and sanitizing all common areas; and providing inmates with disinfectant cleaners, and continuous access to soap, water, and sanitizers.  See Declaration of Luis Martinez [hereinafter "Martinez Decl."], R.A. 358, 360 ¶ 8–9, 14.

Additionally, in accordance with the Attorney General's direction to maximize its authority to place inmates on home confinement for service of their sentence of imprisonment, FCC Butner staff have evaluated at least 932 inmates under the CARES Act.  See Clark Decl., R.A. 021 ¶ 32.  At least 87 inmates have been referred for placement on home confinement, 42 inmates have been transferred to home confinement and 9 inmates have been transferred to Residential Re-entry Centers ("RRC").  See Clark Decl., R.A. 021 ¶ 32.  An additional 24 inmates are pending transfer to home confinement or an RRC.  See Clark Decl., R.A. 021 ¶ 32.  Twenty-four inmates are currently awaiting final decision from the BOP's Residential Reentry Management Office regarding their referral for home confinement.  See

9

Clark Decl., R.A. 022 ¶ 33.  Since late March 2020, an additional 56 inmates have been released from FCC Butner via compassionate release granted by the individual's sentencing court based upon various issues, including COVID-19.  <u>See</u> Clark Decl., R.A. 022 ¶ 34.

On May 26, 2020, Petitioners filed the instant petition alleging Respondents have "not taken the necessary steps to address the risk faced by the people in their custody."  <u>See</u> Petition, D.E. 1 at 4 ¶ 13.  Prior to filing their petition, not a single one of the named Petitioners filed a single administrative remedy related to COVID-19, unconstitutional conditions of confinement, or the alleged deliberate indifference of Respondents in reference to COVID-19.  <u>See</u> Declaration of Christina Kelley [hereinafter "Kelley Decl."], R.A. 401–02 ¶¶ 9–16.

## **STANDARD OF REVIEW**

### A.  **Motion to Dismiss Pursuant to Rule 12(b)(1).**

Federal district courts are courts of limited subject matter jurisdiction.  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>, 545 U.S. 546, 552 (2005).  When a district court lacks subject matter jurisdiction, the matter must be dismissed.  <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 506–07 (2006).  When a defendant challenges subject matter jurisdiction, the burden of proving subject matter jurisdiction rests with the plaintiff.  <u>See</u> <u>United States ex rel. Vuyyuru v. Jadhav</u>, 555 F.3d 337, 347 (4th Cir. 2009); <u>Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.</u>, 166 F.3d 642, 647 (4th Cir. 1999); <u>Adams v. Bain</u>, 697 F.2d 1213. 1219 (4th Cir. 1982).  Courts have recognized two

distinct types of challenges under 12(b)(1): a facial challenge to the subject matter jurisdiction, arguing that the allegations in the complaint are insufficient to establish jurisdiction; or a factual challenge asserting "that the jurisdictional allegations of the complaint [are] not true." Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). In regards to a facial challenge, a court can properly dismiss for lack of subject matter jurisdiction where a claim fails to allege facts upon which the court may base jurisdiction. Adams, 697 F.2d at 1219. In that case, all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under Fed. R. Civ. P. 12(b)(6). Id. A factual challenge contends that the jurisdictional allegations of the complaint are not true, allowing a trial court to go beyond the allegations of the complaint in an evidentiary hearing to determine if there are facts to support the jurisdictional allegations. Id. Respondents makes both here.

**B.      Motion to Dismiss Pursuant to Rule 12(b)(6).**

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when it contains factual allegations that permit the court to reasonably infer the defendant is liable for the alleged misconduct. Ashcroft, 556 U.S. at 678. Although a court must take all factual allegations as true for purposes of a Rule

11

12(b)(6) motion, the court need not "accept as true a legal conclusion couched as a factual allegation." Id. (quoting Twombly, 550 U.S. at 555). A court "need not accept factual allegations that constitute nothing more than legal conclusions or naked assertions." Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, L.L.C., 713 F.3d. 175, 182 (4th Cir. 2013) (internal quotation marks omitted). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a motion to dismiss pursuant to 12(b)(6), a court is not confined to the "four corners of the complaint." United States ex rel Oberg v. Penn Higher Educ. Assist. Agency, 745 F.3d 131, 136 (4th Cir. 2014). The court may consider exhibits to pleadings and documents attached to the motion to dismiss, "so long as they are integral to the complaint and authentic" or subject to judicial notice. Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) (quoting Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009)); Clatterbuck v. City of Charlottesville, 708 F.3d 549 (4th Cir. 2013) (in addition to the complaint, the court may also consider documents incorporated by reference in the complaint and matters subject to judicial notice).

### C.    Motion for Summary Judgment Pursuant to Rule 56.

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving

for summary judgment has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that he or she is entitled to judgment as a matter of law. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004). Once a motion for summary judgment is made, the opposing party has the burden of showing that there is a genuine factual dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). A court must view the facts, and the inferences drawn from the facts, in the light most favorable to the non-moving party. Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 332 (4th Cir. 2009). To avoid summary judgment, the plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007). The plaintiff instead must affirmatively show genuine disputes over material facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) ("At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'").[4]

A party "cannot create a genuine issue of material fact through mere

---

[4] A dispute is "genuine" only if it shows a true conflict between established facts. Thompson Everett, Inc. v. Nat'l Cable Adv., 57 F.3d 1317, 1323 (4th Cir. 1995). A dispute is "material" only if it bears directly on "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

13

speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)). Unsupported speculation is insufficient to defeat a summary judgment motion. Ash v. United Parcel Serv., 800 F.2d 409, 411–12 (4th Cir. 1986); Ross v. Commc'n Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). A plaintiff's "naked opinion, without more," as to the merits of the case does not prevent summary judgment. Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). "Only disputes over facts that might affect the outcome of the [litigation] . . . will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is thus proper "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there [being] no genuine issue for trial." Matsushita, 475 U.S. at 587 (internal quotations marks omitted).

### D. Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241.

Title 28 U.S.C. § 2241 "gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" Maleng v. Cook, 490 U.S. 488, 490 (1989) (emphasis omitted) (quoting 28 U.S.C. §§ 2241(c)(3), 2254(a)). Under the federal habeas statute, federal courts may consider "not only constitutional claims but claims of statutory interpretation as well." Bowrin v. United States INS, 194 F.3d 483, 487 (4th Cir. 1999). In addition, only "attacks on the execution of a

14

sentence are properly raised in a § 2241 petition." <u>In re Vial</u>, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997).

## **ARGUMENT**

As explained herein, this Court should dismiss Petitioners' § 2241 petition, both for lack of jurisdiction and for failure to state a legally viable claim of a constitutional violation. Alternatively, this Court should grant summary judgment for the Respondents because Petitioners cannot establish Respondents acted with deliberate indifference. Finally, the Court should strike Petitioners' class allegations.

### A. **The petition must be dismissed for lack of jurisdiction because challenges to conditions of confinement are not cognizable under habeas corpus.[5]**

Petitioners had at their disposal multiple legal avenues for challenging the conditions of their confinement and seeking their release, including a <u>Bivens</u> action for alleged Eighth Amendment violations, a request for home confinement pursuant to the CARES Act, and a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1) and the First Step Act. Choosing to ignore all of those potential causes of action, Petitioners pursue instead a novel legal theory founded in principles of habeas corpus and unsupported by this Court's and the Fourth Circuit's precedent. Petitioners' decision – made through counsel – is fatal to their claim.

Conditions-of-confinement cases are not cognizable under habeas corpus.

---

[5] To the extent the Court disagrees that this issue is jurisdictional, Respondents respectfully request the Court construe it as a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

<u>Wilborn v. Mansukhani</u>, 795 F. App'x 157, 162–64 (4th Cir. 2019) (per curiam) (unpublished) (collecting cases); <u>Hunt v. Johns</u>, No. 5:10-HC-2176-FL, 2011 WL 3664553, at *2 (E.D.N.C. Aug 18, 2011) (unpublished).[6]  To avoid that conclusion, Petitioners contend that they challenge not the "conditions of their confinement" but rather the "fact of their confinement."  <u>See</u> Pet. Mem., D.E. 25 at 34.  Petitioners' factual allegations belie their artful construction.  Nowhere in their 71-page pleading (not to mention the hundreds of pages of attachments) do Petitioners contend that they or any other inmate at FCC Butner were wrongly convicted and sentenced in violation of the laws and Constitution of the United States.  Rather, for page after page, Petitioners complain only about their conditions of confinement.

District courts in this Circuit routinely dismiss such habeas petitions for lack of subject matter jurisdiction.[7]  For good reason—such relief is expressly foreclosed

---

[6] Although the Supreme Court has theoretically left open the door to habeas relief in a conditions-of-confinement case, neither it nor the Fourth Circuit has yet allowed for such a use of § 2241.  <u>See</u> <u>Muhammad v. Close</u>, 540 U.S. 749, 751 n.1 (2004) (observing that the Court has never followed the speculative dicta in <u>Presier</u>); <u>Wilborn</u>, 795 F. App'x at 163–64.

[7] <u>See, e.g.</u>, <u>Rodriguez</u>, 715 F. App'x at 266 (holding that the district court properly found petitioner's request to be transferred to another institution as not cognizable under § 2241, as it challenged a condition of confinement, rather than its fact or duration); <u>Braddy v. Wilson</u>, 580 F. App'x 172, 173 (4th Cir. 2014) (finding that when petitioner alleged constitutional violations "regarding only the conditions of his confinement" not the fact or duration of his sentence, his claims were properly brought under <u>Bivens</u> not § 2241); <u>Lee v. Winston</u>, 717 F.2d 888, 892 (4th Cir. 1983) ("Although there may ultimately be an area of limited substantive overlap between … habeas corpus and § 1983, the main thrusts of the two are obviously quite different.  The former is primarily a vehicle for attack by a confined person on the legality of his custody and the traditional remedial scope of the writ has been to secure absolute release—either immediate or conditional—from that custody.  Conversely § 1983

16

by Fourth Circuit precedent that was reaffirmed less than seven months ago. Wilborn, 795 F. App'x at 162–64. More recently, at least two district courts within the Fourth Circuit have declined to grant habeas relief to a prisoner based on the potential spread of COVID-19. See United States v. Johnson, No. RBD-14-0441, 2020 WL 1663360, at *5 (D. Md. Apr. 3, 2020) ("As the Defendant is challenging the conditions of his confinement—namely, the potential spread of COVID-19—§ 2241 and § 2255 are not the appropriate vehicles for his petition.); McCarson v. Reherman, No. 2:20-01386-HMH-MGB, 2020 WL 2110770, at *1 (D.S.C. May 4, 2020) ("Although McCarson seeks relief pursuant to § 2241, the substantive content of her petition, coupled with her motion for injunctive relief, demonstrate that her claims are raised pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 12003(b)(2) (2020), and the First Step Act, Pub. L. No. 115-391, December 21, 2018, 132 Stat. 5194. McCarson does not question the validity or constitutionality of her sentence, but rather contests her conditions of confinement. Therefore, McCarson's claims are not cognizable under § 2241.) (citing Rodriguez, 715 F. App'x at 266) (internal citations omitted)).[8]

---

cannot be used to seek release from illegal physical confinement[.]"); Wilborn v. Mansukhani, 795 F. App'x 157, 164 (4th Cir 2019) ("This case presents no basis to deviate from our previous holdings. Therefore, we conclude Wilborn's claim seeking to have the BOP reconsider where he is being housed is one that would not fall within the scope of habeas corpus.").

[8] Moreover, other district courts outside of the Fourth Circuit have similarly ruled that habeas relief is not available to prisoners filing petitions based on the spread of COVID-19. See Livas v. Myers, No. 20-422, 2020 WL 1939583, at *19–22 (W.D. La. Apr. 22, 2020) (declining to exercise jurisdiction over habeas petition challenging

17

The Court's "inherent equitable authority" is no silver bullet to that jurisdictional bar. Contra Petition, D.E. 1 at 65, 66 ¶¶ 251, 257. "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied . . . limitations," and "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 327–28 (2015).[9] As explained above, courts lack subject matter jurisdiction to consider habeas petitions seeking to redress allegedly unconstitutional conditions of confinement. Because subject matter jurisdiction "is an Article III . . . requirement" that "functions as a restriction on federal power," courts have no "inherent equitable authority" to manufacture habeas remedies where none exist.

Particularly here. As the Supreme Court has explained, district courts "should

_____

conditions related to COVID-19 or serve as a "serve as a de facto 'super warden'"); see also Grinis v. Spaulding, No. 20-10738, 2020 WL 2300313, at *5 (D. Mass. May 8, 2020) ("There is a substantial question whether the relief the petitioners seek," which is release because of COVID-19, is properly sought by means of a habeas petition under § 2241."); Wragg v. Ortiz, No. 20-5496, 2020 WL 2745247, at *18 (D.N.J. May 27, 2020) ("True, Petitioners seek early release from prison, but they do not do so on the basis that their convictions or sentences are invalid. Instead, they seek injunctive relief based on unconstitutional conditions of confinement, a type of challenge that neither the Supreme Court nor the Third Circuit has yet recognized as a cognizable habeas claim."); see also Mendez v. Kallis, No. 20-cv-924, 2020 WL 2572524 (D. Minn.); Cardona v. Bledsoe, 681 F.3d 533, 537 (3d Cir. 2012). Thus, the petition should be dismissed for lack of subject matter jurisdiction.

[9] That Petitioners cite Armstrong for the general notion that courts have, in certain circumstances, equitable authority to enjoin unconstitutional actions by federal officials betrays, at best, a fundamental misunderstanding of Armstrong's actual holding.

withhold relief in [a] collateral habeas corpus action where an adequate remedy available in the criminal proceeding has not been exhausted." Stack v. Boyle, 342 U.S. 1, 6–7 (1951); accord Cole v. Spear, 747 F.2d 217, 220–21 (4th Cir. 1984) (en banc) (holding that district court should have declined to exercise jurisdiction over habeas action where petitioner, who sought separation from military service as a conscientious objector, failed to exhaust her remedies under the military system of justice); see also Archuleta v. Hedrick, 365 F.3d 644, 648–49 (8th Cir. 2004) (noting that "habeas corpus is an extraordinary remedy typically available only when the petitioner has no other remedy"); Taniguchi v. Schultz, 303 F.3d 950, 955 (9th Cir. 2002).

Opposing this conclusion, Petitioners contend that "Respondents have created obstacles preventing people incarcerated at Butner from seeking assistance in mitigating their risk themselves" and that "[t]he Administrative Remedies Process . . . is unavailable." Petition, at 55 ¶ 201–02. Both generally and with respect to specific named inmates, Petitioners are wrong. BOP is not delaying, harassing, or engaging in bad faith in order to prevent Petitioners from exercising the orderly process of seeking home confinement or compassionate release. Consistent with guidance from the Attorney General of the United States, see Petition, D.E. 1 at 43–44 ¶¶ 155–59, BOP is instead considering (and granting) home confinement requests on an increasingly frequent basis to inmates that are suitable for such relief based on fact-specific and individualized determinations. See Clark Decl., R.A. 021 ¶ 30, 32.

19

Although Petitioners disagree with the pace of and conclusions reached during those home-confinement reviews, <u>see</u> Petition, D.E. 1 at ¶¶ 165–74, their disagreement does not somehow create a constitutional violation for deliberate indifference.[10]

With specific respect to Petitioners Dailey, Maldonado, Kinard, Hallinan, Hill, Ayers, and Butler, all have filed requests with their respective FCC Butner warden requesting a compassionate release. <u>See generally</u> Clark Decl., R.A. 026–035 ¶ 51–90. Each request was subsequently denied by the respective warden, meaning that Petitioners could then utilize the administrative remedy system to seek redress prior to filing a motion for compassionate release with their sentencing court pursuant to 18 U.S.C. § 3582(c)(1)(A). In fact, Petitioners Dailey, Maldonado, and Butler have all filed motions for compassionate release with their sentencing courts as of the date of this filing. <u>See</u> Sealed Document 171 Motion to Reduce Sentence, <u>United States v. Dailey</u>, No. 4:17-CR-00304-RLW-1, D.E. 174 (E.D. Mo. filed Apr. 13, 2020); Emergency Motion to Reduce Sentence Amended Emergency Motion for Compassionate Release, <u>United States v. Maldonado</u>, No. 4:15-CR-00044-MW-MAF, D.E. 494 (N.D. Fla. filed May 4, 2020); Pro Se Motion for Compassionate Release, <u>United States v. Butler</u>, No. 5:18-CR-00475-BO, D.E. 56 (E.D.N.C. filed Apr. 23,

---

[10] Furthermore, although the CARES ACT gives BOP broad discretion to expand the use of home confinement during the COVID-19 pandemic, courts have no authority under that provision to place a prisoner in home confinement. <u>See</u> <u>United States v. Gray</u>, No. 4:12-cr-54-FL, 2020 U.S. Dist. Lexis 70270, *6–7 (E.D.N.C. April 22, 2020) (denying the defendant's motion for home confinement on the grounds that the court was without jurisdiction to order the BOP to place him in home confinement). The Court should not permit Petitioners to bypass, through artful pleading, statutory restrictions on the Court's authority and manufacture jurisdiction where none exists.

20

2020). Those petitioners' respective sentencing courts have denied all three requests for compassionate release, which shows not only that the orderly process for raising and adjudicating individual claims works, but that FCC Butner's decision not to release those petitioners was legitimate. See United States v. Dailey, No. 4:17-CR-00304-RLW-1, D.E. 180 (E.D. Mo. Apr. 20, 2020); United States v. Maldonado, No. 4:15-CR-00044-MW-MAF, D.E. 501 (N.D. Fla. May 13, 2020); United States v. Butler, No. 5:18-CR-00475-BO, D.E. 60 (E.D.N.C. May 19, 2020).[11]

Additionally, the BOP has reviewed Petitioners for release to home confinement, consistent with the First Step Act and CARES Act. See Clark Decl., R.A. 026 ¶ 50. According to Complex Case Management Coordinator Phil Clark, Petitioners McCrae and Dailey have both been approved for home confinement under the CARES Act, with Petitioner McCrae eligible on June 9, 2020, and Petitioner Dailey eligible on August 20, 2020. Id. at R.A. 028, 30 ¶¶ 59, 66. Similarly, it appears that Petitioner Maldonado might also soon be eligible for home confinement. Id. at R.A. 032 ¶ 78. The remaining Petitioners have each been reviewed for home confinement eligibility under the CARES Act, but are not currently appropriate for home confinement for varying reasons, including, but not limited to, inadequate completion of his sentence, high PATTERN scores, and history or current offense

---

[11] Petitioner Harris has also filed a motion for home confinement, house arrest, or to vacate his sentence, which has not been ruled on by his sentencing court as of the date of this filing. See Pro Se Motion for home confinement, house arrest or vacate sentence, United States v. Harris, No. 5:11-CR-00247-BO, D.E. 109 (E.D.N.C. filed May 18, 2020).

history of violence.  See generally Clark Decl., R.A. 026–035 ¶ 51–90.  As Petitioners are eligible to utilize these alternative means of release, habeas relief is not appropriate here.

That conclusion is consistent with long-standing principles of finality.  Once a criminal judgment (including a custodial sentence) becomes final, for instance, a court has no inherent authority to reconsider or alter that judgment.  Dillon v. United States, 560 U.S. 817, 825 (2010) ("A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances." (alterations and quotations omitted)); cf. Teague v. Lane, 489 U.S. 288, 309 (1989) (plurality opinion) (recognizing that finality is an important attribute of criminal judgments and "essential to the operation of our criminal justice system").  Rather, a court may only modify a sentence pursuant to statutory authorization.  See United States v. Addonizio, 442 U.S. 178, 189 n.16 (1979) (except by rule or statute, "[t]he beginning of the service of the sentence in a criminal case ends the power of the court even in the same term to change it"); United States v. Goodwyn, 596 F.3d 233, 235 (4th Cir. 2010).  Given the Court's limited authority to alter or amend final judgments, Petitioners should be required to plead appropriate causes of action and cite to correct legal authority.  Petitioners have not done so here – despite being represented by no fewer than 13 lawyers – and their petition fails as pled.

However, "even where a habeas court has the power to issue the writ," the

question remains "whether . . . that power ought to be exercised." <u>Munaf v. Geren</u>, 553 U.S. 674, 693 (2008) (quotation and alteration omitted). As explained, neither the Supreme Court nor the Fourth Circuit has ever recognized a condition-of-confinement claim that might qualify for habeas relief. <u>See</u> <u>Muhammad v. Close</u>, 540 U.S. 749, 751 n.1 (2004) (observing that the Court has never followed the speculative dicta in <u>Presier</u>); <u>Wilborn</u>, 795 F. App'x at 163–64. Nor does this case present extraordinary circumstances that would warrant deviation from that line of binding precedent.

Both the BOP and FCC Butner have already, and proactively, implemented numerous measures to mitigate the spread of COVID-19. FCC Butner modified operations to ensure social distancing between inmates and staff, including altering inmate movement, so that smaller groups went to dining hall, education, recreation, chapel, and other activities at any given time. <u>See</u> Strassel Decl., R.A. 135 ¶ 14. Each institution across the Complex had modified movement schedules to increase social distancing and limit contact between inmates. <u>See</u> Strassel Decl., R.A. 135 ¶ 14.

FCC Butner also began quarantining all incoming inmates and established quarantine and isolation units at each institution. <u>See</u> Strassel Decl., R.A. 135–36 ¶¶ 14, 18. FCC Butner has continually educated both staff and inmates on the procedures set up as well as the prevention, contraction, and transmission of the virus. <u>See</u> Strassel Decl., R.A. 136–37 ¶¶ 19, 20. All staff have been provided with Personal Protection Equipment ("PPE") which includes surgical masks and N-95

23

masks, and all inmates have been provided with cloth masks which are to be worn at all times.  See Strassel Decl., R.A. 148 ¶ 56.  FCC Butner is also conducting COVID-19 testing in accordance with CDC guidelines.  See Harden Decl., R.A. 353 ¶ 5.  FCC Butner is also isolating inmates who present with COVID-19-like symptoms; and quarantining asymptomatic inmates who have contracted the virus.  See Stock Decl., R.A. 104–05 ¶¶ 61–66.  FCC Butner also implemented enhanced sanitation plans including daily cleaning and sanitizing all common areas; and providing inmates with disinfectant cleaners, and continuous access to soap, water, and sanitizers.  See Martinez Decl., R.A. 358, 360 ¶ 8–9, 14.

In addition, BOP is considering (and granting) home confinement requests on an increasingly frequent basis to inmates that are suitable for such relief based on fact-specific and individualized determinations required by the regulations.[12] Inmates are also at liberty at any time to file a compassionate release request under 18 U.S.C. § 3582(c)(1)(A) after they satisfy that provision's exhaustion requirement.[13] Thus, this Court lacks jurisdiction.

---

[12] Congress has decreed that BOP's decisions concerning an inmate's "designation of a place of imprisonment" are "not reviewable by any court."  18 U.S.C. § 3621(b); Moore v. United States Att'y Gen., 473 F.2d 1375 (5th Cir. 1973).  Furthermore, the Supreme Court has consistently held that a prisoner has no constitutional right to confinement in any particular place—including home confinement.  See McKune v. Lile, 536 U.S. 24, 39 (2002).

[13] According to 18 U.S.C. § 3582(c)(1)(A), a motion for compassionate release must be filed in the sentencing court.  Thus, unless Petitioners were criminally sentenced by the United States District Court for the Eastern District of North Carolina, this Court does not have jurisdiction to consider Petitioners' request for compassionate release from custody.

24

Finally, because the Court lacks jurisdiction over the petition, there is no basis to grant bail pending habeas. A grant of bail pending review of a habeas petition is "an exceptional form of relief in a habeas corpus proceeding[.]" <u>Landano v. Rafferty</u>, 970 F.2d 1230, 1239 (3d Cir. 1992). Federal Rule of Appellate Procedure 23(c) provides that, when the State appeals a decision granting habeas corpus, the habeas petitioner "must" be released from custody "unless the court or judge rendering the decision ... orders otherwise." Fed. R. App. P. 23(c). A bail decision is a highly particularized one which involves detailed consideration of a number of factors, such as the nature and circumstances of the offense of conviction, the history and characteristics of the petitioner, and the nature or seriousness of any danger to the community from the release of the prisoner. 18 U.S.C. § 3142(g). Petitioners have made no effort to conduct such an individualized assessment. Nor can they, for individualized assessments are antithetical to the class-action lawsuit Petitioners have chosen to pursue.

In this case, as noted above, there is no legal basis for the Court to exercise jurisdiction over the petition, and Petitioners have other avenues of possible relief available to them. Additionally, the Petitioners do not address any of the considerations that might guide this Court as laid out in 18 U.S.C. § 3142(g), instead basing their request for bail on the circumstances of their confinement alone, rather than the particularized factors as applied to each petitioner. Thus, Petitioners are not appropriate for bail pending a final determination of their habeas petition.

**B.** **The Petition should be dismissed because Petitioners failed to exhaust their available administrative remedies prior to filing the instant petition.**

Additionally, Petitioners' petition should be dismissed for failure to exhaust their administrative remedies under the PLRA. The PLRA states that "[n]o action shall be brought **with respect to prison conditions** under section 1983 of this title, or **any other Federal law**, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997(e)(a) (emphasis added). The language is mandatory, and the Supreme Court has made clear that the exhaustion requirement applies to all suits regarding prisoner life, Porter v. Nussle, 534 U.S. 516, 532 (2002), and that "unexhausted claims cannot be brought in court," Jones v. Bock, 549 U.S. 199, 211 (2007). Indeed, the well-established doctrine of exhaustion of administrative remedies requires that in order for an individual to assert claims for judicial relief, he must first exhaust the prescribed administrative remedy made available to him. See Woodford v. Ngo, 548 U.S. 81, 88–89 (2006) (citing McKart v. United States, 395 U.S. 185, 193 (1969)).

The principle of exhaustion of administrative remedies in section 2241 cases is "so well established that the Fourth Circuit consistently summarily affirms dismissals of section 2241 petitions for failure to exhaust administrative remedies." See Van Buren v. Atkinson, No. 5:14-HC-2251-D, D.E. 14 n.2 (E.D.N.C. Aug. 31, 2015); see, e.g., Wallace v. Federal Bureau of Prisons, 604 F. App'x 329, 329 (4th Cir.

26

2015) (per curium) (unpublished); <u>Hairston v. Wilson</u>, 532 F. App'x 359, 359 (4th Cir. 2013) (per curium) (unpublished); <u>Arce v. FCI-Williamsburg</u>, 411 F. App'x 651, 651 (4th Cir. 2011). The exhaustion requirement also applies when an inmate seeks injunctive relief. <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994) (holding that in cases seeking injunctive relief to address "current" prison conditions, inmates are not "free to bypass adequate internal procedures and bring their health and safety concerns directly to court."). The Fourth Circuit has treated exhaustion of administrative remedies in a section 2241 action as jurisdictional. <u>See, e.g.</u>, <u>Timms v. Johns</u>, 627 F.3d 525, 533 (4th Cir. 2010).

Proper exhaustion of administrative remedies demands compliance with an agency's deadlines and other critical procedural rules. <u>Woodford</u>, 548 U.S. at 90. An inmate must complete all stages of the administrative remedy process before the process is considered properly exhausted. <u>Woodford</u>, 548 U.S. at 88–89; <u>Wright v. Morris</u>, 111 F.3d 414, 417 n.3 (6th Cir. 1997).

The only exception to exhaustion is when the administrative remedy process is unavailable, <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1858 (2016), but it is a high burden for an inmate to make such a showing. <u>See</u> <u>Tuckel v. Grover</u>, 660 F.2d 1249, 1254 (10th Cir. 2011) (indicating that although defendants bear the initial burden to show that a plaintiff has failed to exhaust, upon making the showing, "the onus falls on the plaintiff to show that remedies were unavailable to him"). The Supreme Court, in <u>Ross</u>, identified only three circumstances in which a prisoner can show that the

27

administrative remedy process is "unavailable": (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it' and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1859–60.

An administrative process has been implemented within the BOP. Title 28 C.F.R. § 542.10, et seq., sets forth the BOP's Administrative Remedy Program, which provides formal review of any complaint that relates to any aspect of the inmate's confinement. Under this process, inmates are encouraged to first attempt resolution of their complaints informally by discussing the matter with a member of the Unit Team. See 28 C.F.R. § 542.13. If informal resolution is unsuccessful, the inmate may then file an administrative remedy request with the Warden within 20 calendar days following the date on which the basis for the request occurred. 28 C.F.R. § 542.14(a). If the inmate is dissatisfied with the Warden's response, he may submit an appeal on the appropriate form to the appropriate Regional Director within 20 calendar days of the date the Warden signed his or her response. 28 C.F.R. § 542.15. If the inmate is dissatisfied with the regional response, he may file an appeal with the National Appeals Administrator at the Bureau of Prisons' Central Office, in Washington, D.C. 28 C.F.R. § 542.15(a). The Central Office appeal is the final level of administrative

review in the Bureau of Prisons' administrative remedy process.  Id.

Here, Petitioners contend the administrative remedy process is "unavailable as a mechanism for seeking to address the risks faced by the men at Butner." Petition, D.E. 1 at 55 ¶ 202.  The Court should take this for what it truly is: Petitioners' self-serving opinion made without any factual support in an effort to avoid dismissal of their petition for failing to exhaust their administrative remedies. As discussed fully in the Declaration of Christina Kelley, while several of the Petitioners have utilized the administrative remedies process in other contexts, to include appealing the denial of their compassionate release requests, not a single one of the Petitioners has filed any administrative remedy request related to COVID-19, allegedly unconstitutional conditions of confinement, or the purported deliberate indifference of FCC Butner in reference to COVID-19.  See Kelley Decl., R.A. 401–02 ¶¶ 9–16.  Therefore, the BOP had no opportunity to administratively review these claims prior to being hauled into federal court.

Here, Petitioners present no evidence – and there is none – that the administrative remedy process is truly unavailable.  Rather, Petitioners opine that the process takes too long and the system is overloaded.  However, Petitioners' argument that the process takes time in order to be effective fails, as it does not meet any of the exceptions outlined in Ross.  And Petitioners' argument that the system is somehow overloaded, excusing their requirement to exhaust, is similarly meritless, as Petitioner Dailey has been able to utilize the administrative remedy process all

29

the way to a Central Office appeal on the issue of his compassionate release. <u>See</u> Kelley Decl., R.A. 401 ¶ 12. So it appears that it is not "unavailable" at all, but rather merely inconvenient for Petitioners, who want this Court to rule on their motion without following proper procedure. But as the Supreme Court has made clear, the Court lacks jurisdiction to do so, and should instead dismiss Petitioners' petition for failure to exhaust under the PLRA.

### C. Alternatively, Respondents are entitled to summary judgment as Petitioners cannot demonstrate that Respondents acted with deliberate indifference.

Even if the Court had jurisdiction to consider Petitioners' habeas petition, it would fail on its merits. To demonstrate an Eighth Amendment violation, Petitioners must establish that Respondents acted with "deliberate indifference" towards Petitioners' well-being by consciously disregarding an excessive risk of harm to their safety. <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986) ("[O]nly the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment" (internal quotations omitted)). This entails proving two elements: first, Petitioners must show objectively that Respondents' actions "constitute an unnecessary and wanton infliction of pain or [are] repugnant to the conscience of mankind." <u>Estelle v. Gamble</u>, 429 U.S. 97, 105–06 (1976). In the context of exposing prisoners to risk of disease, a claim must be dismissed if it does not pose a threat that is so severe that it would be "contrary to current standards of decency for **anyone** to be so exposed." <u>Helling v. McKinney</u>, 509 U.S. 25, 35 (1993) (emphasis

30

added); <u>Farmer v. Brennan</u>, 511 U.S. 825, 844–45 (1994) ("A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions."). Second, Petitioners must show the Respondents "know[] of and disregard[] an excessive risk to inmate health or safety." <u>Id.</u> at 837; <u>see also</u> <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1985) (holding that conduct must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" to constitute deliberate indifference to a serious medical need). "The official must be both aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837. "[G]eneral knowledge of facts creating a substantial risk of harm is not enough," rather, the "official must also draw the inference between those general facts and the specific risk of harm." <u>Johnson v. Quinones,</u> 145 F.3d 164, 168 (4th Cir. 1998); <u>see also</u> <u>Rich v. Bruce</u>, 129 F.3d 336, 340 (4th Cir. 1997).

It is undisputed that COVID-19 poses significant health risks to both the world community at large, as well as to prison populations. However, while those general health risks may be relevant, they are not "repugnant to the conscience of mankind," <u>Estelle</u>, 429 U.S. at 105–06, or "contrary to current standards of decency," <u>Helling</u>, 509 U.S. at 35. This is particularly so in the context of a worldwide pandemic that led health officials to advise issuing stay-at-home orders and to issue guidance to

correctional facilities to, among other things, **not** transfer prison inmates.  <u>See</u> Centers for Disease Control and Prevention Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities [hereinafter "CDC Interim Guidance"], 9.[14]

COVID-19 poses risks confronting not only prisoners but law abiding citizens nationwide, including front-line workers and vulnerable nursing home patients.  The CDC has issued guidance for appropriately mitigating the risks in correctional facilities, which includes detailed recommendations about proper hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine.  CDC Interim Guidance, 3.  The CDC guidance explains that inmates may continue to be detained in "housing units" in which bunks "ideally" are separated by at least six feet, but that such separation and other "social distancing strategies" involving recreation, meals, and other activities "need to be tailored to the individual space in the facility."  CDC Interim Guidance, 11 (emphasis omitted).  That expert guidance directly contradicts Petitioners' self-serving rendition, as well as their contention that the perceived risks at FCC Butner are such that contemporary societal standards wholly forbid them.[15]

---

[14] CDC Interim Guidance is available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[15] CDC guidance provides a useful benchmark in determining whether the facility's policies and procedures are appropriate.  Although Respondents have followed the guidelines recommended by the CDC, any alleged hypothetical failure to follow such guidelines simply does not, without more, state a constitutional violation.  <u>See e.g.</u> <u>Hickox v. Christie</u>, 205 F.Supp.3d 579 (D.N.J. Sept. 2, 2016).

Moreover, since January 2020 and in order to combat the spread of COVID-19 at its institutions, BOP has been coordinating with subject-matter experts at multiple organizations and agencies, including the CDC – a fact that, alone, undercuts Petitioner's unfounded claims of deliberate indifference.[16] As a result of these ongoing efforts, BOP implemented a multi-phased operational Action Plan seeking to "mitigate the spread of COVID-19" among inmates and staff, continue effective operations of the federal prison system, and ensure that staff remain healthy and available for duty. Id. Regarding implementation of the Action Plan, personnel at FCC Butner are using an entire team of medical professionals to diagnose, treat, and mitigate the spread of COVID-19. See Stock Decl., R.A. 094–95 ¶ 24. BOP has also established several quarantine units at FCC Butner, engaged in comprehensive testing and symptom checks, purchased specialized cleaning products, distributed personal protective equipment, and disseminated information on how to protect both inmates and staff from infection. See Stock Decl., R.A. 104–05 ¶¶ 61–66; Harden Decl., R.A. 353 ¶ 5; Martinez Decl., R.A. 358, 360 ¶¶ 8–9, 14. Under these circumstances, there is no legal basis to conclude BOP is violating "current standards of decency" or that BOP is taking actions that "constitute an unnecessary and wanton infliction of pain or [are] repugnant to the conscience of mankind." Helling, 509 U.S. at 35; Estelle, 429 U.S. at 35.

---

[16] See Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited June 2, 2020).

Additionally, Petitioners fail to show that Respondents (the Director of the BOP, the Medical Director of the BOP, and the Warden of FCC Butner) had the subjective "intent" to turn the living conditions at FCC Butner, specifically, into "punishment" that violates the Eighth Amendment. Where challenged conditions are "not formally meted out as punishment by the statute or the sentencing judge," officials will impose "punishment" only if they "act with a sufficiently culpable state of mind," Wilson v. Seiter, 501 U.S. 294, 298, 300 (1991), which is demonstrated "only [by] the unnecessary and wanton infliction of pain," Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297); see, e.g., Estelle, 429 U.S. at 104.

Whether an official's conduct can be deemed "'wanton' depends upon the constraints facing the official." Wilson, 501 U.S. at 303 (emphasis omitted); see Whitley, 475 U.S. at 320. "[D]eliberate indifference" can constitute "wanton" intent in prison-condition contexts because "as a general matter" the Government's responsibility to rectify dangerous conditions "'does not ordinarily clash with other equally important governmental responsibilities'" or implicate unusual "constraints" on its action. Wilson, 501 U.S. at 302–03 (quoting Whitley, 475 U.S. at 320). Like the criminal-law "mens rea requirement" for "subjective recklessness," that standard requires proof that officials "know[] of and disregard[] an excessive risk of inmate health or safety," Farmer, 511 U.S. at 836–837, 839–40, i.e., they must "'consciously disregard'" that risk by subjectively recognizing it while failing to "respond[] reasonably." Id. at 839, 844 (brackets and citation omitted). That subjective inquiry

34

"incorporates due regard for [officials'] 'unenviable task of keeping dangerous men in safe custody under humane conditions,'" Farmer, 511 U.S. at 845 (citation omitted), by "leav[ing] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources," Battista v. Clarke, 645 F.3d 449, 453 (1st Cir. 2011). Recognizing that the judiciary is "ill equipped to deal with the difficult and delicate problems of prison management," Thornburgh, 490 U.S. at 407–08 (1989) (internal quotations omitted), the Supreme Court has emphasized that courts must use "caution" in exercising their equitable power and warned that they may not "'enmesh[]'" themselves "'in the minutiae of prison operations,'" Farmer, 511 U.S. at 846–47 (citation omitted). Notably, a "lack of due care" or other "error in good faith" is insufficient to show wantonness. Wilson, 501 U.S. at 299 (citation and emphasis omitted).

Here, Petitioners have not shown wantonness. Aside from generally alleging "knowledge" of the health risks presented by COVID-19, Petitioners have altogether failed to allege any specific facts that even remotely suggest that Respondents—three very high-level BOP officials—have decided to ignore conditions at FCC Butner, specifically, such that they have a subjective intent to punish the inmates housed there. Nor can Petitioners make that showing. To the contrary, the three high-level BOP and FCC Butner officials (and others) have affirmatively sought to mitigate COVID-19's risks by adhering to, and going beyond, BOP and CDC guidelines and

35

recommendations. Their concerted efforts to mitigate the spread of COVID-19 are neither wanton nor punitive.

To the contrary, FCC Butner officials have consciously confronted the risks posed by this public health crisis by modifying its operations to implement CDC Guidelines, the BOP action plans, and the Attorney General's direction for the BOP to immediately review all inmates who have COVID-19 risk factors, as established by the CDC. FCC Butner officials have fully implemented these plans and directives, and have even taken additional preventative steps in an attempt to mitigate the risks of the COVID-19 virus.

Specifically, in January 2020, BOP implemented an action plan consistent with WHO and CDC recommendations, to combat the spread of COVID-19 in individual facilities. See Strassel Decl., R.A. 132–33 ¶ 7. Over the course of the crisis, BOP has updated that plan on several occasions. Currently, BOP has implemented seven phases of the plan. See Strassel Decl., R.A. 155 ¶ 73. As a result of this plan, FCC Butner has initiated screening tools for inmates and staff. See Strassel Decl., R.A. 133, 134–35 ¶¶ 8, 13. FCC Butner also modified operations to ensure social distancing between inmates and staff, including altering inmate movement, so that smaller groups went to dining hall, education, recreation, chapel, and other activities at any given time. See Strassel Decl., R.A. 135 ¶ 14. Each institution across the Complex had modified movement schedules to increase social distancing and limit contact between inmates. See Strassel Decl., R.A. 135 ¶ 14. Subsequently, FCC

36

Butner began satellite feeding all inmates in their assigned units or cells, and small group gatherings were halted for education, chapel, recreation, and all other instances where inmates were previously permitted to meet. FCC Butner began providing those services in a modified manner in the individual cells and housing units. See Strassel Decl., R.A. 137 ¶ 22.

FCC Butner also began quarantining all incoming inmates and established quarantine and isolation units at each institution. See Strassel Decl., R.A. 135–36 ¶¶ 14, 18. FCC Butner has continually educated both staff and inmates on the procedures set up as well as the prevention, contraction, and transmission of the virus. See Strassel Decl., R.A. 136–37 ¶¶ 19, 20. All staff have been provided with Personal Protection Equipment ("PPE") which includes surgical masks and N-95 masks. See Strassel Decl., R.A. 140 ¶ 32. All inmates have been provided with cloth masks which are to be worn at all times. See Strassel Decl., R.A. 148 ¶ 56. FCC Butner is also conducting COVID-19 testing in accordance with CDC guidelines. See Harden Decl. R.A. 353 ¶ 5. FCC Butner is also isolating inmates who present with COVID-19-like symptoms; and quarantining asymptomatic inmates who have contracted the virus. See Stock Decl., R.A. 104–05 ¶¶ 61–67.

During the course of the crisis, FCC Butner also implemented enhanced sanitation plans including daily cleaning and sanitizing all common areas; and providing inmates with disinfectant cleaners, and continuous access to soap, water, and sanitizers. See Martinez Decl., R.A. 358, 360 ¶ 8–9, 14.

37

Additionally, in accordance with the Attorney General's direction to maximize its authority to place inmates on home confinement for service of their sentence of imprisonment, FCC Butner staff have evaluated at least 932 inmates under the CARES Act. See Clark Decl., R.A. 021 ¶ 32. At least 87 inmates have been referred for placement on home confinement, 42 inmates have been transferred to home confinement and 9 inmates have been transferred to Residential Re-entry Centers ("RRC"). See Clark Decl., R.A. 021 ¶ 32. An additional 24 inmates are pending transfer to home confinement of an RRC. See Clark Decl., R.A. 021 ¶ 32. Twenty-four inmates are currently awaiting final decision from the BOP's Residential Reentry Management Office, regarding their referral for home confinement. See Clark Decl., R.A. 022 ¶ 33. Since late March 2020, an additional 56 inmates have been released from FCC Butner via compassionate release granted by the individual's sentencing court based upon various issues, including COVID-19. See Clark Decl., R.A. 022 ¶ 34.

The limited availability of habeas jurisdiction reflects Congress's deference to BOP in the administration of correctional institutions, as well as the reality that courts are "ill equipped to deal with the difficult and delicate problems of prison management." Thornburgh, 490 U.S. at 407–08 (internal quotations omitted). The operation of a correctional complex such as FCC Butner involves a wide range of social and economic considerations, which is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are

peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 84–85 (1987). Simply put, the federal courts are "out of the business of running jails." Benjamin v. Jacobson, 172 F.3d 144, 182 (2d Cir. 1999) (discussing the PLRA) (en banc) (Calabresi, J., concurring); see also Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 655 (1st Cir. 1997) (noting that Congress enacted the PLRA "to oust the federal judiciary from day-to-day prison management").

In many respects, Petitioners' claims hinge on Wilson v. Williams, No. 20-794, 2020 1940882 (N.D. Ohio Apr. 22, 2020). But that case bears no factual resemblance to this case. And the district court's exercise of habeas jurisdiction in that case has been criticized and cannot be reconciled with Fourth Circuit decisions.[17] Moreover, in asserting jurisdiction over the matter, the Wilson court found that the BOP, and specifically FCI Elkton, was deliberately indifferent to the inmate population's needs in light of the COVID-19 pandemic. These facts are in stark contrast to the situation here, where there is absolutely no evidence that Respondents were deliberately indifferent to the global health crisis. Rather, as set forth above, FCC Butner effectively implemented the BOP's Action Plan, using an entire team of medical professionals to diagnose, treat, and mitigate the spread of COVID-19. Thus, the

---

[17] See Livas, 2020 U.S. Dist. LEXIS 71323, *22 n.10. The Wilson court also conceded that it was having difficulty applying the "bright line rules" of habeas jurisdiction given the expedited nature and facts of the case. See Wilson, 2020 U.S. Dist. LEXIS 70674, at *13.

Wilson case is not instructive.

Similarly, in Martinez-Brooks v. Easter, No. 20-569, 2020 2405350 (D. Conn. May 12, 2020), the district court was confronted with a much different factual scenario than this case. There, the extent to which the warden had "implemented adequate measures to control the COVID-19 outbreak at FCI Danbury and protect inmates [wa]s hotly disputed." Id. at *12. Contrasting those facts, it is abundantly clear that FCC Butner has implemented the BOP's Action Plan and is using an entire team of medical professionals to diagnose, treat, and mitigate the spread of COVID-19. See Stock Decl., R.A. 088–93 ¶ 10–22. BOP has also established several quarantine units throughout the FCC Butner complex, engaged in comprehensive testing and symptom checks, purchased specialized cleaning products, distributed personal protective equipment, and disseminated information on how to protect both inmates and staff from infection. See Stock Decl., R.A. 104–05 ¶¶ 61–66; Harden Decl., R.A. 353 ¶ 5; Martinez Decl., R.A. 358, 360 ¶¶ 8–9, 14. Thus, Martinez-Brooks does not help Petitioners either.

It is indisputable that BOP is taking significant measures to address the spread of coronavirus among the inmate population at FCC Butner. While Petitioners believe more or different actions should be taken, a disagreement about the measures being taken does not rise to the level of deliberate indifference. Indeed, numerous other courts have already rejected similar claims. See Wragg, 2020 WL 2745247; Nellson, 2020 WL 1890670, at *6; see also, Order, Lucero-Gonzalez, et al, v.

40

Kline, et al., No. 2:20-cv-901 (D. Ariz., June 2, 2020) (finding very fact that defendant correctional complex has enacted policies to address the risks posed by COVID-19, supports that they have not been subjectively indifferent to Plaintiffs); Swain v. Junior, 2020 WL 216137, at *4 (11th Cir. May 12, 2020); Valentine v. Collier, 956 F.3d 797, 802 (5th Cir. April 22, 2020); see also Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (noting that an inmate does not establish an Eighth Amendment violation (or, in other words, the existence of deliberate indifference) merely because he disagrees with prison officials' decisions on how to treat a medical condition, or finds such treatment "insufficient").

At its core, Petitioners' Eighth Amendment claim is that FCC Butner has failed to ensure social distancing among the inmate population. Indeed, according to Petitioners, "reducing the Butner population is the only way to halt the serious ongoing and irreparable harm of COVID-19." Pet. Mem. 11; D.E. 25 at 19. However, as the Supreme Court has cautioned, the inability of a defendant to take an action that a plaintiff seeks will likely not constitute a reckless state of mind. Wragg, 2020 WL 2745247, *22, citing Farmer, 511 U.S. at 835. In other words, "[t]hat physical distancing is not possible in a prison setting, as Petitioners urge, does not an Eighth Amendment claim make." Id.; cf. CDC Interim Guidance, 11.

Simply put, Petitioners fail to make out a deliberate indifference claim. Instead, the overwhelming evidence clearly shows that officials within the BOP and at FCC Butner are taking the coronavirus very seriously and have taken critical steps

in an effort to mitigate or prevent the impact of COVID-19 at FCC Butner. Those efforts have been successful. Although the FCC Butner infection rate may be higher than the general population, the FCC Butner mortality rate of approximately 2.1%, is lower than the rates for the general population nationally and in North Carolina, which suggests that FCC Butner's efforts have been effective in managing infections and treating inmates. Accordingly, the Court should grant summary judgment for the United States and dismiss Petitioners' habeas petition.

### D. It is facially apparent that there is no ascertainable class, and the Court should therefore dismiss Petitioners' class allegation.

Notwithstanding Petitioners' failure to move to certify their putative class, it is evident that it fails to satisfy Rule 23(a)'s requirements of ascertainability, numerosity, commonality, typicality, and adequacy of representation. See EQT Prod. Co. v. Adair, 764 F.3d 347, 359–60 (4th Cir. 2014) (citing Fed. R. Civ. P. 23).

A class action allows representative parties to prosecute not only their own claims, but also the claims of other individuals that present similar issues. Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 318 (4th Cir. 2006). The use of a class action is based upon judicial efficiency because the action can potentially resolve common issues that impact all class members in a single lawsuit. Id. Courts, however, must ensure that "the rights of absent plaintiffs to assert different claims and of defendants to assert facts and defenses specific to individual class members" are protected, which requires courts to "conduct a 'rigorous analysis' of whether a proposed class action meets the requirements of Rule 23 before certifying a class."

42

<u>Robinson v. Nationstar Mortg. LLC</u>, No. CV TDC-14-3667, 2019 WL 4261696, at *15 (D. Md. Sept. 9, 2019) (quoting <u>Thorn</u>, 445 F.3d at 318). Courts need not wait until a plaintiff has formally moved to certify its class to dismiss a class allegation. If it is apparent from the pleadings that there is no ascertainable class, courts may dismiss the class allegation on the pleadings. <u>See</u> <u>John v. Nat'l Sec. Fire and Cas. Co.</u>, 501 F.3d 443, 445 (5th Cir. 2007); <u>cf.</u> <u>Gunnells v. Healthplan Serv., Inc.</u>, 348 F.3d 417, 458 (4th Cir. 2003) (it is the plaintiff's burden to show that all of the necessary prerequisites for a class action have been met).

Here, Petitioners' class allegation should be dismissed. Even if Petitioners eventually move to certify their proposed class, they will not be able to meet the requirements for certification. First, Petitioners' proposed class will not meet the threshold requirement that its members are "readily identifiable" or "ascertainable" by the Court through "objective criteria." <u>See</u> <u>EQT</u>, 764 F.3d at 359–60. Petitioners "seek to represent a class consisting of all current and future incarcerated persons at Butner . . . during the outbreak of COVID-19," which currently stands at 4,386 individuals.[18] <u>See</u> Petition, D.E. 1 at 60 ¶ 223. Petitioners identify this as "the Class," and also identify a subclass they call the "Medically Vulnerable Subclass." <u>Id.</u> at 60–61 ¶ 224. Their subclass includes: all inmates over age 50; or inmates of any age who have conditions that fall into any one of 11 amorphous categories and/or

---

[18] <u>See</u> BOP.gov, https://www.bop.gov/about/statistics/population_statistics.jsp (last viewed June 3, 2020) (the current total of inmates at Butner facilities FMC, LSCI, FCI I, and FCI II is 4,386).

subcategories of medical conditions.[19] Id.

Although it is not necessary for Petitioners to identify every class member for their class to be "ascertainable," their class cannot be certified if its membership will have to be determined through "individualized fact-finding." See EQT, 764 F.3d at 358 (internal quotation marks omitted). In this case, it is impossible to ascertain who the putative class is, with or without fact finding. This Court cannot foresee who the "future incarcerated persons" will be at the end of the "outbreak of COVID-19," nor is it clear what the vague term "outbreak" even means.[20] See Petition, D.E. 1 at 60 ¶ 223. But even if Petitioners only sought to include in the class those inmates who are imprisoned on the date of an order granting their petition, it would still require an exhaustive review of the medical records of every single one of the 4,386 Butner inmates to determine their eligibility for the subclass—and that is true even if the review were as basic as inquiring into the age and health status of the prisoner. That is—at the risk of stating the obvious—a review of individual inmates' medical records will require individualized fact finding with respect to those inmates to determine whether they have one of potentially innumerable underlying conditions that could be categorized as "lung disease" or "heart disease" or "a developmental disability."

---

[19] The most meaningful difference between the class and subclass appears to be that the subclass will be at the front of the line when the process of mass release begins. See generally Petition, D.E. 1 at 66–70 ¶ 258.

[20] When, for example, does an "outbreak" end and the resumption of a "new normal" life (notwithstanding the presence of COVID-19) begin? Petitioners offer no answer to this metaphysical question, and therefore provide no guidance to the Court on how, exactly, to determine the outer bounds of the proposed class.

44

<u>See</u> Petition, D.E. 1 at 60–61 ¶ 224. Because Petitioners cannot satisfy the threshold question of ascertainability, the Court should dismiss the class allegation.[21]

Even if Petitioners could establish that they have an ascertainable class, they must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy. For the purposes of the analysis in this case, commonality and typicality are the only two relevant factors.[22]

To show commonality, "[w]hat matters . . . is not the raising of common questions—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011) (internal quotation marks omitted). That is, to satisfy Rule 23(a)(2), each class member's claim must depend upon a common contention "of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u>; <u>See, e.g.</u>, <u>Flint v. Ally Fin. Inc.</u>, No. 319-CV-00189, 2020 WL 1492701, at *4 (W.D.N.C. Mar. 27, 2020) ("A

---

[21] <u>See, e.g.</u>, <u>Wragg</u>, 2020 WL 2745247, at *28 (rejecting class certification, in part, because "the Court would be required to engage in an intensive, multi-step, individualized inquiry as to whether each prisoner met [the] criteria for conditional release"); <u>see also</u> <u>Money</u>, 2020 WL 1820660, at *14 (refusing to certify class of inmates seeking COVID-19 furlough, noting the problem of "individualized consideration of any inmate's suitability for release and on what conditions"); <u>Sacal-Micha v. Longoria</u>, No. 1:20-cv-37, 2020 WL 1518861, at *5 (S.D. Tex. Mar. 27, 2020) (noting the "fact-specific nature of the analysis" required to release an individual from federal custody based on the presence of COVID-19).

[22] Petitioners appear to satisfy the requirement of numerosity (a proposed class of over 4,386 inmates) and are adequately represented by counsel.

common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees.").

The question of commonality in this instance boils down to the following inquiry: If Butner officials unquestionably failed to provide adequate opportunities for social distancing during the coronavirus pandemic, would it settle the question of whether every inmate's Eighth Amendment rights were violated by the BOP? The answer is no. As explained above, <u>supra</u> Argument, Part C, the alleged lack of adequate social distancing at Butner cannot <u>per se</u> establish "deliberate indifference" on the part of prison officials. <u>See</u> <u>Farmer</u>, 511 U.S. at 828. For inadequate social distancing to be actionable it would have to be complemented by the prison officials' abject failure to make any effort to protect the prison population from the coronavirus.[23] That is certainly not the case here. <u>See generally</u> Stock Decl., R.A. 104–05 ¶¶ 61–66; Strassel Decl. 134 –37; Martinez Decl., R.A. 358, 360 ¶¶ 8–9, 14.

The alleged lack of social distancing might provide supportive **evidence** of indifference, but it is by no means the **answer** to the Eighth Amendment inquiry. Consequently, Petitioners have failed to establish commonality.

---

[23] Petitioners' claim rests, in part, on the idea that there is a static standard for adequate social distancing; but social distancing is a constantly moving target to which governments, private businesses, and individuals are regularly adjusting as this unpredictable pandemic runs its course. The standards necessarily must leave room for flexibility. <u>See, e.g.</u>, CDC Interim Guidance, 11 (stating that prisoner bunks are "ideally" separated by at least six feet and "social distancing strategies . . . need to be tailored to the individual space in the facility").

46

As for typicality, the named Petitioners must be "typical" of the class, such that that the class representative's claims and defenses are "typical of the claims or defenses of the class" in that prosecution of the claims will "simultaneously tend to advance the interests of the absent class members." Fed. R. Civ. P. 23(a)(3); Deiter v. Microsoft Corp., 436 F.3d 461, 466–67 (4th Cir. 2006). Petitioners' claims "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the Petitioners' own individual claims. Id. That is, in the instant case, the goals of the named Petitioners must align closely enough with those of all class members that it is fair to say that the Petitioners are "typical" of all Butner inmates.

Petitioners' whole premise of class certification is that, under the circumstances, the ideal solution for inadequate social distancing at Butner is releasing prisoners. This view is short-sighted and fails to appreciate the diversity of needs within the prison population. There are inmates—especially the most infirm—who may fare horribly if they are released from prison or transferred to other facilities that lack the medical attention that is customarily available to them at Butner. See Stock Decl., R.A. 114–15 ¶ 116. There are other inmates who may be released into public settings and suffer the devastating impact of being thrust into society overnight in the name of keeping them safe. Many (if not most) of these inmates do not have adequate support systems, job prospects, or the income to face life outside of prison. Without the thoughtful release of prisoners that is provided by

47

Butner's reentry program, inmates will be forced out of prison without an opportunity to prepare for the challenges that come with reentering life outside the walls. <u>See</u> Stock Decl., R.A. 114–15 ¶ 116. Further, shifting inmates to other facilities may result in the loss of programming that may only be available to prisoners at Butner. It may also be in the best interest of the prisoner (and the public) for him to remain incarcerated. Butner inmates have been incarcerated for all manner of crimes and remaining in custody for the full term of their sentences can provide a valuable opportunity for them—not only to face the consequences of their actions and reconsider living a life of crime upon their release—but to get the substance-abuse treatment, sex-offender treatment, vocational training, and other programming they may need (which may not be available at other BOP facilities and may not be affordable in the private sector). Simply put, social distancing by way of immediate release or transfer may actually be the worst thing that could happen to some of the putative class members.

The characteristics and needs of Butner inmates are diverse, and blunt force social distancing demanded by the few is not the answer for the many. Each putative class member comes with a unique situation—different criminal histories, crimes, sentences, release dates, ages, medical histories, disciplinary actions, places of incarceration, nearness to infected inmates, availability of supportive services and shelter outside of the prison, likelihood of transmitting COVID-19 to someone outside

48

of the prison, likelihood of recidivism, and danger to the public.[24]

The one purported concern for the public expressed by Petitioners is that staff members might contract COVID-19, exit the prison after their workday, and potentially expose their communities to the coronavirus. See Petition, D.E. 1 at 7, 58–59. Petitioners are otherwise silent about the impact on community members who will suddenly have to live, work, and socialize in close proximity to prematurely freed convicts. Indeed, Petitioners' entire remedial scheme assumes that release of some kind will provide a blanket solution that resolves the burden that COVID-19 has placed on society. It does not, however, consider the fact that many of the prisoners they seek to release may be asymptomatic, thereby running the risk of infecting community members they come into contact with once they are released. Essentially, Petitioners' proposed remedy reveals a total lack of concern for the public (and even for their fellow proposed class members), and as a matter of public policy, it is inadvisable to certify the action in order to resolve common issues that impact all class members without considering the impact their certification may have on the

---

[24] Two of the eleven Petitioners have been convicted of murder; and as Petitioners anecdotally note, one of the murderers actually had his parole rescinded after the family of his victim objected to Petitioner's release. See Petition, D.E. 1 at 7, 9 ¶¶ 25, 29. Petitioners' reference to this episode appears to infer that an injustice was wrought by the victim's family—an injustice that can only be corrected by the murderer's immediate discharge from incarceration. Moreover, Petitioners' highly abbreviated biographies alone demonstrate that they do not even adequately represent one another, considering the fact that these 11 inmates have different release dates, criminal histories, and medical conditions (if any), and their ages span over 45 years (ages 34 to 79). See Petition, D.E. 1 at 7–10 ¶¶23–36.

public.  As one court recently observed in a nearly identical case:

> Conspicuously absent in Petitioners' analysis is any meaningful discussion of the risks associated with a large scale release of inmates. What would be the plan that addresses the safety and security of the communities to where they are released? Is the proper supervision even available given that the current COVID-19 crisis is just as real to the law enforcement officers in charge of safety and supervision? In the end, the Court finds that the balance of equities and the public interest favor the Respondents who have been charged with maintaining the administration of FCI Fort Dix to include the safety of its inmates. "Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." Turner v. Safley, 482 U.S. 78, 84–85 (1987). "Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint" by this Court. Id.

Wragg, 2020 WL 2745247, at *23.

If the named plaintiff satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation under Rule 23(a)—which Petitioners here do not—the Court must still find that the proposed class action fits into one of the categories of class action under Rule 23(b) in order to certify the class.  A class action may be maintained under Rule 23(b)(3) if common questions of law or fact "predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Factors "pertinent" to the predominance and superiority requirements include the "class members' interests in individually controlling" the litigation, whether litigation on the matter has already been begun by other class members, whether concentrating the litigation in one forum is

desirable or undesirable, and the potential difficulties managing the class action presents. Id.

Although similar to Rule 23(a)'s commonality requirement, the test for predominance under Rule 23(b)(3) is "far more demanding" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods. v. Windsor, 521 U.S. 591, 623–24 (1997). Rule 23(b)(3) also requires that the proposed class action be superior to other methods of adjudication so that the class action will "'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Id. at 615. Only if the named plaintiff satisfies all of the Rule 23(a) requirements and the Rule 23(b)(3) requirements, is class certification appropriate.

With respect to the requirement of predominance, in the instant case, although the implementation of allegedly harmful prison procedures by Respondents is common to all class members, Respondents' treatment of individual class members is not. Some prisoners have been evaluated on an individual basis, and in other cases prisoners have been already recommended for home confinement. See Clark Decl., R.A. 021–22 ¶ 30–34. These inconsistencies in the implementation of prison procedures demonstrates that the requirement of predominance has not been satisfied.

With respect to superiority, Petitioners seek the remedy of home confinement

or early release, but absorption of these claims into a class action is an ineffective means of evaluating the suitability of individual prisoners for release. Further, "class members arguably have an interest in being able to submit individual petitions for compassionate release immediately, highlighting their particular conditions and suitability, rather than being required to wait for class-wide resolution." Wragg, 2020 WL 2745247, at *23. Therefore, to the extent that any of Petitioners' claims are viable, they could not be brought on a class-wide basis.

In short, Petitioners fail to meet the requirements for class certification. Therefore, although Petitioners have not moved to certify their class, in the interest of judicial efficiency, this Court should dismiss the class allegation on the pleadings.

## **CONCLUSION**

As set forth above, the Court should dismiss Petitioners' petition for a writ of habeas corpus, in its entirety, for lack of jurisdiction. Alternatively, the Court should dismiss Petitioners' claims for failure to exhaust under the PLRA, or should grant summary judgment for Respondents on the merits. Finally, the Court should dismiss Petitioners' class allegation, as the purported class does not meet the requirements.

Respectfully submitted this 3rd day of June, 2020.

ROBERT J. HIGDON, JR.
United States Attorney

By: /s/ Genna D. Petre
GENNA D. PETRE
Special Assistant United States Attorney
Email: genna.petre@usdoj.gov
N.C. Bar # 49466

By: /s/ Michael Bredenberg
MICHAEL BREDENBERG
Special Assistant United States Attorney
Email: michael.bredenberg@usdoj.gov
N.C. Bar # 26068

By: /s/ Joshua L. Rogers
JOSHUA L. ROGERS
Assistant United States Attorney
Email: Joshua.Rogers4@usdoj.gov
Mississippi Bar # 101468
U.S. Attorney's Office, Civil Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone:    (919) 856-4530
              (919) 575-3900
Facsimile:    (919) 856-4821
Attorneys for the Respondents

Of Counsel:
Mallory Brooks Storus
Special Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that I have this 3rd day of June, 2020, served a copy of the foregoing upon Petitioners' counsel of record by filing the same via the District Court's CM/ECF Document Filing System.

/s/ Genna D. Petre
GENNA D. PETRE
Special Assistant U.S. Attorney
U.S. Attorney's Office
Civil Division
150 Fayetteville Street, Suite 2100
Raleigh, NC  27601
Telephone:   (919) 856-4530
                      (919) 575-3900 x 6076
Facsimile:    (919) 856-4821
Email: genna.petre@usdoj.gov
N.C. Bar # 49466
Attorney for the Respondents

54