IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-HC-2088-FL

| | | |
|---|---|---|
| CHARLES HALLINAN, JOSEAN KINARD, ARNOLD J. HILL, BENJAMIN D. McRAE, JOHN DAILEY, LEE M. AYERS, GEORGE B. RIDDICK, JORGE LUIS MALDONADO, ANTWAN HARRIS, ANTHONY BUTLER, and TROY A. TITUS, on behalf of themselves and similarly situated individuals, | ) | ORDER |
| Petitioners/Plaintiffs, | ) | |
| v. | ) | |
| WARDEN THOMAS SCARANTINO, MICHAEL CARVAJAL, and JEFFERY ALLEN, | ) | |
| Respondents/Defendants. | ) | |

This matter is before the court on motion for temporary restraining order, preliminary injunction, and writ of habeas corpus, filed May 28, 2020, by petitioners/plaintiffs ("petitioners"). (DE 24). Issues raised are ripe for ruling. For the following reasons, petitioners' motion is denied.

**STATEMENT OF THE CASE**

Petitioners Charles Hallinan ("Hallinan"), Josean Kinard ("Kinard"), Arnold J. Hill ("Hill"), Benjamin D. McRae ("McRae"), John Dailey ("Dailey"), Lee M. Ayers ("Ayers"), George B. Riddick ("Riddick"), Jorge Luis Maldonado ("Maldonado"), Antwan Harris ("Harris"), Anthony Butler ("Butler"), and Troy A. Titus ("Titus"), federal inmates represented by counsel, filed May 26, 2020, petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and class

action complaint for injunctive and declaratory relief. Petitioners allege respondents Thomas Scarantino ("Scarantino"), the warden of the Federal Correctional Complex in Butner, North Carolina ("FCC-Butner"), Michael Carvajal ("Carvajal"), the Federal Bureau of Prisons ("FBOP") director, and Jeffrey Allen ("Allen"), the FBOP medical director, are violating their rights under the Eighth Amendment to the United States Constitution. Specifically, petitioners assert respondents have failed to control the spread of the virus that causes COVID-19 within FCC-Butner, thus exposing them to a substantial risk of contracting the disease.

Petitioners seek to represent a class of similarly situated federal inmates at FCC-Butner and a "medically vulnerable subclass" of inmates over age 50 or who have certain preexisting health conditions that expose them to greater risk of complications if they contract COVID-19. The petition seeks immediate injunctive and declaratory relief pursuant to 28 U.S.C. §§ 1331, 2201-02, and 2243.

On May 29, 2020, the court completed its initial review of the petition and ordered respondents to file expedited responsive pleading on or before June 3, 2020. On May 30, 2020, petitioners filed the instant motion for temporary restraining order, preliminary injunction, and writ of habeas corpus pursuant to Federal Rule of Civil Procedure 65 and 28 U.S.C. § 2241. Petitioners request that the court immediately order the following relief: 1) order respondents to identify, within one day, all people incarcerated at FCC-Butner who fit within the medically vulnerable subclass; 2) appoint an expert to determine appropriate categories of release for each subclass member within 48 hours of entering the order or injunction; 3) require release, without quarantining at FCC-Butner, of all persons identified as appropriate for release within 24 hours of creation of the expert list; and 4) order respondents to prepare a COVID-19 mitigation plan to be

submitted to the court within 48 hours and overseen by a qualified public health expert pursuant to Federal Rule of Evidence 706.

Petitioners define "release" as the discharge of subclass members from FCC-Butner, which may include enlargement of custody to home confinement or community corrections placements (halfway houses), release to community supervision, or furloughs to another medical facility, hospital, or halfway house. Petitioners' proposed mitigation plan contains numerous public health directives designed to prevent the spread of COVID-19 at FCC-Butner, and proposals for providing medical care to those inmates who have developed the disease.

In support of the instant motion, petitioners rely upon 1) their personal declarations, with exhibits thereto; 2) declarations of current and former inmates Roger Duane Goodwin ("Goodwin"), Michael Harrington ("Harrington"), Lewis Donnell Huntley ("Huntley"), John Krokos ("Krokos"), Randy Flores Ortiz ("Ortiz"), and William Robert Whyte ("Whyte"); 3) declarations of proposed experts Chris Breyer, M.D., M.P.H., Joe Goldenson, M.D., and Dan Pacholke, with exhibits thereto; 4) FBOP press releases; 5) memoranda from Attorney General William Barr to respondent Carvajal; 6) memorandum from Andre Matevousian and L. Cristina Griffith to FBOP executive officers; 7) Centers for Disease Control and Prevention's ("CDC") guidelines, information sheets, and reports regarding COVID-19; 8) court filings and orders in United States v. El-Hanafi, No. 1:10-CR-162-KMW (S.D.N.Y.), United States v. Thompson, No. 1:15-CR-448 (E.D. Ill.), and United States v. Krokos, No. 12-CR-527 (C.D. Cal.); and 9) screenshots of the FBOP's coronavirus website as of March 31 and April 27, 2020.

On May 29, 2020, the court directed respondents to file response to the instant motion by June 3, 2020. On May 29, June 1, June 2, and June 4, 2020, petitioners filed notices of subsequent

facts and supplemental declarations of counsel reporting six inmate deaths and one staff death at FCC-Butner related to COVID-19.

On June 3, 2020, respondents timely filed their opposition to the instant motion for temporary restraining order or preliminary injunction. That same day, respondents filed motion to dismiss or in the alternative for summary judgment. In support of both filings, respondents rely upon statement of material facts and appendix comprising the following: 1) declaration of Phillip Clark ("Clark"), FCC-Butner's case management coordinator, with exhibits thereto; 2) declaration of Andrew Stock ("Stock"), clinical director of the Federal Medical Center at Butner; 3) declaration of Mary Strassel ("Strassel"), assistant supervisor of education and team leader of the FCC-Butner planning section team, with exhibits thereto; 4) declaration of Kellie Harden ("Harden"), director of quality management and supervisory health systems specialist for FCC-Butner; 5) declaration of Luis Martinez ("Martinez"), acting environmental and safety compliance administrator at FCC-Butner, with exhibits thereto; and 6) declaration and supporting exhibits from Christina Kelley ("Kelley"), senior attorney at FCC-Butner.

Petitioners filed reply on June 8, 2020, relying upon declaration of Jeffery Wilkerson ("Wilkerson"), counsel for petitioners, with exhibits thereto.

## STATEMENT OF THE FACTS

The factual background, drawn from the parties' extensive filings, is summarized below.

A. Petitioners

Petitioner are 11 federal inmates incarcerated at FCC-Butner. FCC-Butner is a federal prison complex comprising five institutions: a federal medical center ("FMC-Butner"); two medium custody facilities ("FCI Butner-medium I" and "FCI Butner-medium II"); a low-security

institution ("FCI Butner-low"); and a federal prison camp ("FPC Butner"). (Clark Decl. (DE 37-1) ¶ 6). As of June 3, 2020, FCC-Butner housed approximately 4,360 inmates. (Id. ¶ 5). The complex generally is over capacity by approximately 300 inmates, and FCI Butner-low is over capacity by 172 inmates. (Id. ¶¶, 5, 8).

Petitioner Hallinan is 79 years old and he is incarcerated at FCI Butner-low. He suffers from bladder and prostate cancer, both of which are in remission. He also suffers from hypertension, cardiovascular disease, and celiac disease. He was sentenced to 14 years' imprisonment following convictions for violating the Racketeer Influenced and Corrupt Organizations Act, money laundering, and wire fraud, and his projected release date is July 3, 2030. (See Hallinan Decl. (DE 26-5) ¶¶ 1-7).

Petitioner Kinard is 34 years old and he is incarcerated at FCI Butner-low. He is in good health. He was sentenced to 70 months' imprisonment following convictions for possession with intent to distribute controlled substances and possession of a firearm by a convicted felon, and his projected release date is May 9, 2022. (Kinard Decl. (DE 26-10) ¶¶ 1-4).

Petitioner Hill is 68 years old and he is incarcerated at FCI Butner-low. He suffers from hypertension, cardiovascular disease, and diabetes. He underwent a triple-bypass cardiac surgery in 2019. He also uses a wheelchair due to a spinal cord injury. He was sentenced to 20 years to life imprisonment following conviction for first-degree murder while armed in violation of the D.C. Code. He was granted parole in 2012, but parole was rescinded when the victim's family objected to his release. (Hill Decl. (DE 26-8) ¶¶ 1-8).

Petitioner McRae is 43 years old and he is incarcerated at FCI Butner-low. He suffers from hypertension, blood clots, and morbid obesity. An inferior vena cava filter has been placed

in his chest to trap large blood clots. He was sentenced to 60 months' imprisonment following his conviction for distributing a controlled substance in violation of the D.C. Code, and his projected release date is January 26, 2022. (McRae Decl. (DE 26-13) ¶¶ 1-7).

Petitioner Dailey is 62 years old and he is incarcerated at FCI Butner-low. He suffers from mycosis fungoides, a rare, terminal form of non-Hodgkin's lymphoma that causes painful lesions. As the lesions develop, they are expected to metastasize to his brain and bones. He also has a congenital heart defect that causes frequent fainting, which has worsened while on chemotherapy. Petitioner Dailey was sentenced to 27 months' imprisonment for Medicare fraud, and his projected release date is August 20, 2021. (Dailey Decl. (DE 26-3) ¶¶ 1-11).

Petitioner Ayers is 37 years old and he is incarcerated at FCI Butner-medium II. He suffers from pernicious anemia, which has caused an abnormal spinal cord, severe stomach pain, and muscle weakness. He also suffers from atrophic gastritis, a chronic autoimmune condition. He was sentenced to 108 months' imprisonment following conviction for assault with a dangerous weapon in violation of the D.C. Code. He is also serving a concurrent term of 72 months' imprisonment for distribution of 50 grams or more of cocaine base. His projected release date is March 5, 2022. (Ayers Decl. (DE 26-2) ¶¶ 1-8).

Petitioner Riddick is 51 years old and he is incarcerated at FCI Butner-medium II. He suffers from lymphoma (in remission), diabetes, asthma, and sleep apnea, and he currently takes an immunosuppressant medication following surgery. He was sentenced to 15 years to life imprisonment following convictions for second-degree murder while armed, possession of a firearm during the commission of a crime, and carrying a pistol without a license. (Riddick Decl. (DE 26-15) ¶¶ 1-9).

Petitioner Maldonado is 52 years old and he is incarcerated at FCI Butner-medium I. As a result of kidney disease, he has received two kidney transplants, which require immunosuppressant medications. He recently noticed blood in his urine, and he is concerned that medical tests suggest his kidneys are failing. However, due to the COVID-19 outbreak, he has not been able to see a nephrologist. He also suffers from malignant hypertension. He was sentenced to 84 months' imprisonment following convictions for conspiracy, wire fraud, theft of government property, aggravated identity theft, and aiding and abetting, and his projected release date is November 20, 2022. (Maldonado Decl. (DE 26-12) ¶¶ 1-25).

Petitioner Harris is 38 years old and he is incarcerated at FCI Butner-low. He suffers from hypertension, pre-diabetes, and he is overweight. He was sentenced 173 months' imprisonment following convictions for possession of a firearm in furtherance of a drug trafficking crime and possession with intent to distribute marijuana, and his projected release date is October 4, 2022. (Harris Decl. (DE 26-7) ¶¶ 1-7).

Petitioner Butler is 35 years old and he is incarcerated at FCI Butner-low. He suffers from diabetes, Hepatitis B, and a heart murmur that causes shortness of breath. He was sentenced to 60 months' imprisonment following convictions for possession of a firearm by a convicted felon and possession of a firearm in furtherance of a drug trafficking crime, and his projected release date is November 1, 2025. (Pet. (DE 1) ¶ 32).

Petitioner Titus is 54 years old and he is incarcerated at FCI Butner-low. He is in good health. He was sentenced to 360 months' imprisonment following conviction for wire fraud, and his projected release date is January 8, 2035. (Titus Decl. (DE 26-16) ¶¶ 1-4).

B. The COVID-19 Pandemic

The novel coronavirus known as SARS-nCoV-2 causes COVID-19, a deadly respiratory infection for which no known cure or vaccine is available. (Beyer Decl. (DE 26-18) ¶¶ 1, 5). The virus has produced a global pandemic, with infections in the United States reaching over 1.4 million people as of May 16, 2020. (Id. ¶¶ 3-4). Approximately 20 percent of people who contract COVID-19 will have more severe disease requiring medical intervention and support. (Id. ¶ 5). In those cases, COVID-19 may cause severe lung damage, including permanent loss of respiratory capacity, as well as damage to the heart, central nervous system, and liver (Id. ¶ 5). Approximately 30 percent of the persons who develop severe COVID-19 progress to Acute Respiratory Distress Syndrome, which is potentially fatal and requires immediate medical intervention. (Id. ¶ 8; Goldenson Decl. (DE 26-19) ¶ 8).

Petitioners' expert estimates the COVID-19 case fatality rate in the United States may be as high as six percent. (Beyer Decl. (DE 26-18) ¶ 5). The rate is higher for persons with certain pre-existing medical conditions, including cardiovascular disease (13.2 percent), diabetes (9.2 percent), hypertension (8.4 percent), chronic respiratory disease (8.0 percent), and cancer (7.4 percent). (Id. ¶¶ 7, 99). The risk of severe complication and death also is higher if the patient has asthma, chronic liver or kidney disease, epilepsy, a compromised immune system, blood disorders, inherited metabolic disorders, stroke, and developmental delay. (Id. ¶ 99). Men and persons over age 50 are particularly vulnerable to developing severe COVID-19 disease. (Id. ¶¶ 7, 98).

The virus is highly infectious. The virus spreads primarily through close contact with an infected person (who may be asymptomatic), including through respiratory droplets produced

when the infected person coughs, sneezes, or talks. (CDC, How COVID-19 Spreads (DE 26-27)). Although less common, the virus can spread through contact with a contaminated surface. (Id.). Each person infected with the virus infects on average three additional persons. (Beyer Decl. (DE 26-18) ¶ 12). The "attack rate," which measures the proportion of people exposed to the virus who develop COVID-19, is estimated at 20 to 30 percent. (Id.). The attack rate may be as high as 80 percent in some settings and populations, such as correctional facilities and nursing homes. (Id.).

The CDC recommends "social distancing" to slow the spread of the virus. (Id. ¶ 13; CDC Social Distancing Guidelines (DE 26-25)). Social distancing involves staying at least six feet apart from other people and avoiding groups, crowded places, and mass gatherings. (CDC Social Distancing Guidelines (DE 26-25)). The CDC also recommends wearing face coverings over the nose and mouth and vigilant hygiene practices including hand washing and disinfecting frequently touched surfaces. (CDC, COVID-19: How to Protect Yourself and Others (DE 26-26)).

C. FBOP and FCC-Butner's Response to the Virus

As early as January 2020, FBOP officials began coordinating with subject matter experts, including the Centers for Disease Control and Prevention and the World Health Organization, to develop a response to the pandemic. (Resp'ts' Stmt. (DE 36) ¶ 10). As a result, the FBOP developed a multi-phased action plan designed to "mitigate the spread of COVID-19" among inmates and staff. (Id.). The FBOP currently is in phase seven of the plan, which requires all inmates to remain in their housing units or cells for a period of 14 days to prevent further spread of the virus. (Id. ¶ 11). Limited group gatherings within housing units are allowed for essential functions including laundry, showers, visiting the commissary, and telephone and computer

access. (Id.). All staff and inmates have been issued appropriate face coverings and are "encouraged" to wear them when social distancing is impossible. (Id.). The FBOP also has developed isolation procedures for inmates who are symptomatic of COVID-19, and quarantine procedures for inmates who are asymptomatic with risk of exposure. (Id. ¶ 12). Social and legal visits also have been suspended. (Id. ¶ 13).

The foregoing procedures have been implemented at FCC-Butner. (Id. ¶ 15). FCC-Butner staff are providing education about the virus to inmates and staff, conducting COVID-19 screenings of staff and inmates, implementing isolation and quarantine procedures, and have ordered enhanced cleaning and medical supplies. (Id.; Stock Decl. (DE 37-10); Strassel Decl. (DE 37-11)). All newly admitted inmates are screened for symptoms and placed in quarantine for 14 days, where they must test negatively for COVID-19 at least twice before their release into the general inmate population. (Stock Decl. (DE 37-10) ¶ 33). Inmates with ongoing work details that require interaction with staff or other inmates undergo screening, including temperature checks, before and after each work shift. (Id. ¶ 40). Staff and visitors also are screened before entering any FCC-Butner institution, with individuals who display a body temperature above 100.4 degrees Fahrenheit or other symptoms consistent with COVID-19 denied entry into the building. (Id. ¶¶ 46, 48). All staff and inmates have been provided with and instructed to wear face coverings when social distancing is impossible. (Id. ¶¶ 45, 51, 52). Staff must follow CDC guidance for mitigating the spread of the virus, including staying home when sick, frequent and thorough hand washing, cleaning commonly touched areas, and social distancing. (Id. ¶¶ 51, 52).

Medical staff "immediately" evaluate all inmates who present with symptoms of COVID-19, and make a clinical determination about whether isolation or testing is appropriate. (Id. ¶ 25).

Inmates exposed to virus also are placed in quarantine and monitored for a period of 14 days. (Id. ¶ 43).

FCC-Butner has obtained two FDA-authorized testing machines for onsite testing of inmates, which return test results within 15 minutes or less. (Harden Decl. (DE 39-25) ¶ 3). Offsite testing also is available. (Id.). Current testing practice is that only inmates who present with symptoms are tested. (Id. ¶ 5). However, due to the recent surge in positive cases at FCI Butner-low, staff have tested all inmates housed in that institution. (Id.). As of June 3, 2020, 1,277 inmates have been tested for COVID-19, out of the 4,360 inmates incarcerated at FCC-Butner. (Id. ¶ 6; Clark Decl. (DE 37-1) ¶ 5).

Finally, respondents have implemented enhanced sanitation practices at FCC-Butner. On March 17, 2020, respondent Scarantino issued a heightened sanitation plan developed in anticipation of COVID-19 reaching FCC-Butner. (Martinez Decl. (DE 40-1) ¶ 9). The plan reminded staff of the required daily cleaning steps that all staff should take at FCC-Butner, and instructed staff and inmates to clean all housing areas, showers, and other common areas. (Id.). The FCC-Butner safety department subsequently issued a sanitation plan that delineated the cleaning/disinfecting schedule, identified the specific products to use during such cleanings, and identified whether inmates or staff are required to clean and disinfect specified areas. (Id. ¶ 11).

The safety department also utilizes "backpack" sprayers to disinfect certain areas of the institution, including corridors, housing units, doors, inmate computers, phones, carts, trash bins, light switches, hand rails, stairs, elevators, housing unit ice machines, housing unit hot water dispensers, inmate and staff bathrooms, housing unit tables, washing machines and dryers, all institutional entrances, and other frequently-touched surfaces. (Id. ¶ 12). A "log" system is in

place to document the frequency with which staff sanitize each area in the institutions. (Id. ¶ 13). Hand sanitizer and soap dispensers are maintained at full capacity on each housing unit. (Id. ¶ 14).

D. COVID-19 at FCC-Butner

Despite the foregoing efforts, the novel coronavirus has spread to FCC-Butner, which is now facing one of the largest outbreaks within the federal prison system. (Beyer Decl. (DE 26-18) ¶ 17). As of June 8, 2020, the FBOP reported 19 inmate deaths and 664 active inmate and staff infections at FCC-Butner. (Wilkerson Decl. Ex. 2 (DE 48-2) at 4).[1] One staff member death also has been reported. (Id.). The majority of the inmates who died suffered from long-term preexisting health conditions that the CDC lists as risk factors for developing more severe COVID-19 disease. (FBOP Press Releases (DE 26-21)). From April 22 to June 8, 2020, the number of inmate infections at FCI Butner-low has increased from 7 to 617 inmates (out of approximately 1,162 total inmates at the institution), indicating a significant outbreak is unfolding. (Wilkerson Decl. Ex. 2 (DE 48-2) at 2-4; see also Harden Decl. (DE-39-25) ¶ 5 (confirming recent "surge" in infections at FCI-Butner-low); Clark Decl. (DE 37-1) ¶ 13).

Petitioners and their experts testify that respondents have failed to adequately protect FCC-Butner inmates from risk of COVID-19 infection. Their testimony focuses on four principal issues: 1) social distancing and hygiene/sanitation; 2) isolation procedures; 3) quarantine procedures; and 4) testing.

[1] Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

1. Social Distancing and Hygiene/Sanitation

At best, social distancing and proper hygiene practices are challenging at FCC-Butner. At FCI Butner-low, inmates live in large open rooms ("dormitories") holding as many as 150 inmates. (Kinard Decl. (DE 26-10) ¶ 5; McRae Decl. (DE 26-13) ¶¶ 8-9; Hill Decl. (DE 26-8) ¶¶ 9-10; Hallinan Decl. (DE 26-5) ¶¶ 8-9; Maldonado Decl. (DE 26-12) ¶¶ 26-27). These dormitories are divided into separate "cubicles" by partial walls approximately six feet high, with each cubicle holding up to three inmates. (Krokos Decl. (DE 26-11) ¶ 17; Kinard Decl. (DE 26-10) ¶ 5; McRae Decl. (DE 26-13) ¶¶ 8-9; Hill Decl. (DE 26-8) ¶¶ 9-10; Hallinan Decl. (DE 26-5) ¶¶ 8-9). Inmates housed in these cubicles sleep within six feet of each other. (Hill Decl. (DE 26-8) ¶¶ 11; Hallinan Decl. (DE 26-5) ¶ 11; Krokos Decl. (DE 26-11) ¶ 18; Dailey Decl. (DE 26-3) ¶ 11). Some inmates in the dormitories sleep in hallways or along walls where other inmates frequently pass within six feet of their beds. (Goodwin Decl. (DE 26-4) ¶ 20; Huntley Decl. (DE 26-9) ¶ 8). The inmates also share bathrooms/showers, computers, and telephones, often standing shoulder-to-shoulder while they wait their turns on the computer or telephone. (Hill Decl. (DE 26-8) ¶¶ 12, 15-16; Hallinan Decl. (DE 26-5) ¶ 12, 18-19; Krokos Decl. (DE 26-11) ¶¶ 33-38; Dailey Decl. (DE 26-3) ¶ 17, 23-25). The common areas and electronic equipment are cleaned once daily in most units, and the phones and computers are not disinfected after each use. (Dailey Decl. (DE 26-3) ¶ 19; Hallinan Decl. (DE 26-5) ¶ 14; Hill Decl. (DE 26-8) ¶¶ 15-16; Krokos Decl. (DE 26-11) ¶¶ 34, 36). Inmates housed in the dormitory units also must line up close together to pick up

meals and medications several times each day. (Hallinan Decl. (DE 26-5) ¶ 16; Hill Decl. (DE 26-8) ¶¶ 13-14).

At the medium-custody facilities, inmates are housed in cells approximately eight feet long and six feet wide, which hold two to four people. (Ayers Decl. (DE 26-2) ¶ 10; Riddick Decl. (DE 26-15) ¶ 14). Inmates in these units share toilets and sinks with their cellmates and showers with everyone on their 120-person units. (Ayers Decl. (DE 26-2) ¶ 15; Riddick Decl. (DE 26-15) ¶ 15). As in the dormitories, inmates in the medium-custody facilities do not socially distance when they are in lines for computers or phones, and the equipment is cleaned approximately once daily. (Ayers Decl. (DE 26-2) ¶¶ 21-22). Meals and medications are delivered to the cells by staff or inmate orderlies, who also have access to other areas of the prison. (Ortiz Decl. (DE 26-14) ¶ 9; Ayers Decl. (DE 26-2) ¶ 20). FBOP staff provide medium-custody inmates with disinfectant spray in order to clean the cells, but these products are not always available. (Ayers Decl. (DE 26-2) ¶ 16).

Inmates and staff also move frequently between units and interact with inmates housed on other units, including isolation areas where inmates presumed to have the virus are housed. (Ayers Decl. (DE 26-2) ¶¶ 29-30; Dailey Decl. (DE 26-3) ¶¶ 33-34). Inmates who work in UNICOR (an FBOP employment program) or kitchen positions frequently come into contact with inmates from other housing units. (Ayers Decl. (DE 26-2) ¶ 29; Hill Decl. (DE 26-8) ¶ 23; Krokos Decl. (DE 26-11) ¶ 63). On or about May 13, 2020, two inmates developed symptoms of COVID-19 while working in the kitchen and had to be placed in isolation. (Hallinan Decl. (DE 26-5) ¶ 23).

2. Isolation of Inmates Displaying COVID-19 Symptoms

FBOP staff place inmates suspected or confirmed of having COVID-19 in isolation in the special housing unit ("SHU"). (Ayers Decl. (DE 26-2) ¶ 26; Hill Decl. (DE 26-8) ¶ 20; Hallinan Decl. (DE 26-5) ¶ 25). According to petitioners' expert, this procedure does not provide appropriate "medical" isolation where the SHU does not permit full isolation between corrections officers and inmates and isolated inmates use common recreational spaces. (Beyer Decl. (DE 26-18) ¶ 82). Furthermore, FBOP staff allegedly only place inmates in SHU isolation if they develop a fever, which is inconsistent with CDC guidance that medical isolation should be activated as soon as a person develops "symptoms" of COVID-19. (Id. ¶ 83). Finally, the SHU procedures allegedly do "not allow for timely notification and management of clinical symptoms should they arise, including some symptoms that can "rapidly deteriorate . . . to severe illness requiring hospitalization and invasive treatment." (Id.).

Inmate Roger Goodwin, for example, was placed in SHU isolation after testing positive for COVID-19. (Goodwin Decl. (DE 26-4) ¶ 26). Goodwin suffers from diabetes and an immunodeficiency disorder, and takes daily medications for those conditions, some of which require emergency use to prevent life-threatening complications. (Id. ¶¶ 5-9). However, when he was placed in the SHU, he was not provided these "self-carry" medications for approximately two days. (Id. ¶¶ 30-34). FBOP medical staff checked Goodwin's temperature, blood pressure, and pulse approximately twice a day, but did not provide treatment for COVID-19. (Id. ¶ 36). After approximately 17 days, Goodwin was transported back to an FCI Butner-low dormitory on a bus with approximately 20 or 30 other inmates. (Id. ¶ 38). He was not retested for COVID-19 prior to his release from the SHU. (Id.).

Additionally, petitioner Maldonado reports he tested negative for the virus, but FCC-Butner staff failed to "segregate" him until five days after receiving the test results. (Maldonado Decl. (DE 26-12) ¶ 44). Another inmate in petitioner Maldonado's housing unit, who initially tested negative, developed a severe cough and remained on the unit for five or six days before FCC-Butner staff removed him. (Id. ¶ 45). While not stated directly, this testimony suggests respondents allowed inmates who tested positive or showed symptoms of the virus to remain in their housing unit for approximately five days after testing positive. (See id.; see also Pet'rs' Mem. (DE 25) at 18 (asserting that "[r]espondents did not move some residents who tested positive until five days after receiving the results" and citing petitioner Maldonado's declaration)).

3. Quarantine Procedures

Respondents also have developed quarantine policies for inmates who are "close contacts of a confirmed or suspected case," new inmate admissions, certain transfer inmates, and inmates releasing to residential reentry centers, home confinement, or full release. (Matevousian Mem. (DE 26-24) at 4). According to petitioners, the designated quarantine areas do not sufficiently protect against spread of the virus, based upon the following:

1) Quarantined inmates in one housing unit share a bathroom with non-quarantined inmates with only a "make-shift wall" separating the groups within the bathroom. (Maldonado Decl. (DE 26-12) ¶ 33).

2) An inmate orderly who is not under quarantine cleans the bathroom used by quarantined inmates, then returns to his housing unit. (Id.).

3) Inmates transferred into FCC-Butner whose COVID-19 status are unknown are quarantined in cells on a floor where cancer patients are housed. (See Ortiz Decl. (DE 26-14) ¶ 7). Inmate orderlies deliver food and medicine to both the cancer patients and the newly transferred patients. (Id. ¶ 9).

4) Of the 15 petitioners and third-party inmates who submitted declarations, most were in close contact with someone who tested positive or was showing symptoms

of having the virus, but they were not placed in quarantine by FBOP officials. (See Ayers Decl. (DE 26-2) ¶¶ 25-26; Dailey Decl. (DE 26-3) ¶ 30; Hallinan Decl. (DE 26-5) ¶ 22; Harrington Decl. (DE 26-6) ¶ 24; Harris Decl. (DE 26-7) ¶ 29; Hill Decl. (DE 26-8) ¶ 20; Huntley Decl. (DE 26-9) ¶¶ 21, 23; Kinard Decl. (DE 26-10) ¶ 19; Maldonado Decl. (DE 26-12) ¶¶ 44-45; Ortiz Decl. (DE 26-14) ¶ 11; Titus Decl. (DE 26-16) ¶ 36; Whyte Decl. (DE 26-17) ¶¶ 52-53).

4. Testing for COVID-19

Petitioners also allege respondents failed to implement adequate testing at FCC-Butner. As of May 8, 2020, FBOP staff had administered 459 tests to FCC-Butner inmates, representing approximately 10 percent of the entire population of inmates. (Wilkerson Decl. Ex. 31 (DE 26-32) at 17). Petitioners attest that respondents only "sporadically" conduct temperature checks and require persons showing symptoms of COVID-19 to request a sick call and pay a co-pay. (See, e.g., Dailey Decl. (DE 26-3) ¶¶ 29-30; Hallinan Decl. (26-5) ¶¶ 24-25; Krokos Dec. (DE 26-11) ¶¶ 53, 55-56, 61). Respondents report that as of June 3, 2020, 1,277 total inmates have been tested, with 702 inmates having tested positive. (Resp'ts' Stmt. (DE 36) ¶ 38; Harden Decl. (DE 39-25) ¶ 6). Respondents also note that CDC guidance does not currently recommend testing of all asymptomatic inmates. (Harden Decl. (DE 39-25) ¶ 5).

E. Home Confinement and Compassionate Release

Petitioners also allege respondents have failed to appropriately exercise their statutory authority to grant home confinement to medically vulnerable inmates. Under 18 U.S.C. § 3624(c)(2), the FBOP may "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." Under 34 U.S.C. § 60541, the FBOP has authority to release eligible elderly or terminally ill offenders to home detention.

On March 26, 2020, Attorney General William Barr issued a memorandum to respondent Carvajal, directing him to prioritize the use of home confinement for certain inmates at risk of

complications from COVID-19. (DE 26-22). In addition to considering the statutory requirements for granting home confinement, the memorandum directs FBOP staff to consider the following non-exclusive factors before granting home confinement:

> 1) The age and vulnerability of the inmate to COVID-19;
>
> 2) The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
>
> 3) The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a [FBOP] violation within the last year not receiving priority treatment . . .;
>
> 4) The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment . . .;
>
> 5) Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her [FBOP] facility; and
>
> 6) The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

(Id. at 2-3). The memorandum also directs that any inmate transferred to home confinement must first complete a 14-day quarantine. (Id. at 3).

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. The CARES Act provides in relevant part that "if the Attorney General finds that emergency conditions will materially affect the functioning of the [FBOP], the Director of the [FBOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of [18 U.S.C. § 3624(c)] as the Director determines appropriate." CARES Act of 2020,

Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516. On April 3, 2020, the Attorney General issued second memorandum to respondent Carvajal, which made the requisite emergency finding under the CARES Act. (DE 26-23 at 2). The April 3 memorandum thus had the effect of expanding the FBOP's authority to grant home confinement to any inmate regardless of whether they are nearing the end of their sentence. (See id.). The Attorney General further noted that "we are experiencing significant levels of [coronavirus] infections at several [FBOP] facilities . . . I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with inmates incarcerated at [FBOP facilities experiencing significant levels of infections]." (Id. at 2-3).

The Attorney General's April 3 memorandum, however, cautioned against "simply releas[ing] prison populations en masse onto the streets," which may compromise public safety. (Id. at 3). Instead, respondent Carvajal was directed to "continue making the careful, individualized determinations [the FBOP] makes in the typical case." (Id. at 4). Under the April 3 memorandum, inmates selected for home confinement should be placed in 14-day quarantine prior to transfer, or in appropriate cases, allowed to self-quarantine at home. (Id. at 3).

In response to these directives, FCC-Butner officials have reviewed 932 inmates for possible placement on home confinement. (Clark Decl. (DE 37-1) ¶ 32). Eighty-seven inmates have been referred for placement in home confinement, 42 have been transferred to home confinement, and nine inmates have been placed in residential reentry centers. (Id.). Twenty-four inmates are pending transfer to home confinement, and an additional 24 inmates are awaiting a final decision from the FBOP's residential reentry management office. (Id. ¶¶ 32-33).

The FBOP also can file motion for compassionate release on behalf of an inmate pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), in the inmate's sentencing court. Alternatively, the inmate may file motion for compassionate release on his own behalf "after [the inmate] has fully exhausted all administrative rights to appeal a failure of the [FBOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of [his] facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

Fifty-six FCC-Butner inmates have been granted compassionate release by their sentencing courts since March 2020. (Clark Decl. (DE 37-1) ¶ 34). The FBOP has refused to seek compassionate release on behalf of petitioners Ayers, Hill and Maldonado, and declarants Goodwin, Harrington, and Krokos, despite their significant medical issues. (Ayers Decl. (DE 26-2) ¶¶ 6-7, 32; Goodwin Decl. (DE 26-4) ¶¶ 5-11, 16-18; Harrington Decl. (DE 26-6) ¶¶ 4-7, 29; Hill Decl. (DE 26-8) ¶¶ 6-8, 25; Maldonado Decl. (DE 26-12) ¶¶ 6-25, 46-47; Krokos Decl. (DE 26-11) ¶¶ 5-10, 68). Declarants Huntley and Krokos's filed motions for compassionate release in their sentencing courts, and the courts granted release over the government's opposition. (Huntley Decl. (DE 26-9) ¶¶ 22, 24; Krokos Decl. (DE 26-11) ¶ 68).

## DISCUSSION

### A. Standard of Review

The court construes the instant motion as a motion for preliminary injunction where respondents received notice of the motion, and the parties fully briefed the issues raised. See Fed. R. Civ. P. 65(a); U.S. Dep't of Labor v. Wolf Run Mining Co., 452 F.3d 275, 283 (4th Cir. 2006). To obtain a preliminary injunction, petitioners must make a "clear showing" "[1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence

of preliminary relief, [3] that the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20, 22 (2008). Injunctive relief is an "extraordinary remedy" and to obtain it, plaintiff must satisfy each of the four factors. Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (2009), vacated 559 U.S. 1089, reinstated in pertinent part 607 F.3d 355 (2010). In addition, "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994); see also Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980).

B. Analysis

1. Petitioners' Claims Are Not Cognizable in a Habeas Proceeding

Petitioners' substantive legal claim is that respondents violated the Eighth Amendment to the United States Constitution by failing to adequately protect against the spread of coronavirus at FCC-Butner. "The Eighth Amendment, which prohibits the infliction of 'cruel and unusual punishments,' applies to claims by prisoners against corrections officials challenging conditions of confinement." Porter v. Clarke, 923 F.3d 348, 355 (4th Cir. 2019) (citation omitted).

As a threshold matter, respondents contend that petitioners' Eighth Amendment claim is not cognizable in a § 2241 proceeding where petitioners are challenging their conditions of confinement. The "essence of habeas corpus" is "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." Preiser v. Rodriguez, 411 U.S. 475, 484 (1973). In other words, the function of a habeas petition is to challenge "the very fact or duration of [the petitioner's] physical imprisonment, and the relief that [the petitioner] seeks is a determination that he is entitled to

immediate release or a speedier release from that imprisonment . . . ." Id. at 500. With respect to conditions of confinement claims, the Supreme Court in Preiser noted that "when a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal." Id. at 499. The Court, however, expressly declined to decide whether conditions of confinement claims can be brought in a habeas corpus proceeding. Id. The question left open in Preiser is squarely presented by the instant petition.

While the United States Court of Appeals for the Fourth Circuit has not addressed the issue in a published opinion, "[s]even of the ten circuits that have addressed the issue in a published decision have concluded that claims challenging conditions of confinement cannot be brought in a habeas petition." Wilborn v. Mansukhani, 795 F. App'x 157, 163 (4th Cir. 2019) (citing Nettles v. Grounds, 830 F.3d 922, 933–34 (9th Cir. 2016); Spencer v. Haynes, 774 F.3d 467, 469–70 (8th Cir. 2014); Cardona v. Bledsoe, 681 F.3d 533, 537 (3d Cir. 2012); Davis v. Fechtel, 150 F.3d 486, 490 (5th Cir. 1998); McIntosh v. U.S. Parole Comm'n, 115 F.3d 809, 811–12 (10th Cir. 1997); Graham v. Broglin, 922 F.2d 379, 381 (7th Cir. 1991); Martin v. Overton, 391 F.3d 710, 714 (6th Cir. 2004)); see also Rodriguez v. Ratledge, 715 F. App'x 261, 265-66 (4th Cir. 2017) (holding claim challenging transfer to a maximum security prison was not cognizable in a habeas corpus proceeding); Braddy v. Wilson, 580 F. App'x 172, 173 (4th Cir. 2014) (holding challenge to conditions of confinement was not cognizable in habeas corpus proceeding); but see Aamer v. Obama, 742 F.3d 1023, 1036 (D.C. Cir. 2014); Jiminian v. Nash, 245 F.3d 144, 146–47 (2d Cir. 2001); Miller v. United States, 564 F.2d 103, 105 (1st Cir. 1977).[2] In Wilborn, the Fourth Circuit

---

2 The court also observes that even in those circuits where conditions of confinement claims are generally

ultimately concluded that "[t]his case presents no basis to deviate from our previous holdings" that conditions of confinement claims are not cognizable in a habeas action. 795 F. App'x at 164. Thus, the weight of authority both within and outside this circuit suggests that, as a general matter, petitioners cannot challenge their conditions of confinement in a habeas corpus proceeding.

Petitioners argue the court has jurisdiction over the § 2241 claims because they are seeking release from confinement at FCC-Butner, which lies within the "essence" of habeas corpus. But the fact that petitioners seek release from custody cannot transform their claims into a cognizable habeas corpus action. Petitioners do not challenge the validity of their sentences or convictions, or the FBOP's administrative calculation of their release dates, which is the traditional "essence" of habeas corpus. See Preiser, 411 U.S. at 484, 498-500. It is the nature of the substantive legal claim itself and the pertinent factual allegations – in addition to the relief sought – that determines whether the claim challenges "the validity of confinement" and thus sounds in habeas corpus. Hill v. McDonough, 547 U.S. 573, 579-81 (2006); see also Muhammad v. Close, 549 U.S. 749, 754-55 (2004) (per curiam) (explaining the plaintiff's substantive legal claims and factual allegations "could not therefore be construed as seeking a judgment at odds with his conviction or with the State's calculation of time to be served" and therefore the plaintiff was not bringing a claim "on which habeas relief could [be] granted on any recognized theory"); Nelson v. Campbell, 541 U.S. 637, 644-46 (2004) (analyzing factual theory of the claim to determine whether it sounded

foreclosed, some exceptions apply. See, e.g., Adams v. Bradshaw, 644 F.3d 481, 483 (6th Cir. 2011) (permitting challenge to conditions of confinement in habeas where petitioners' challenge to method of execution could render death sentence effectively invalid).

in habeas or § 1983). Petitioners' claims challenging unconstitutional conditions of confinement do not sound in traditional habeas corpus, even though they seek release from confinement.

Petitioners also assert their claims are cognizable in a § 2241 petition because they are challenging the "fact" of their confinement, and no set of conditions can remedy the alleged constitutional violations. As noted, Preiser holds that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." 411 U.S. at 500. But read in context and in light of subsequent precedent, the phrase "fact of physical imprisonment" refers to a challenge to the legality vel non of the petitioner's conviction or sentence. See id. at 498-500 (distinguishing between inmate "who is making a constitutional challenge to the conditions of prison life, but not to the fact or length of his custody"); see also Nelson, 541 U.S. at 643 (explaining habeas is proper vehicle for challenging "the fact of [the inmate's] conviction or the duration of his sentence"); Muhammad, 549 U.S. at 754.

Thus, although there "may ultimately be an area of limited substantive overlap between . . . habeas corpus and § 1983," Lee v. Winston, 717 F.2d 888, 892 (4th Cir. 1983), petitioners have failed to establish that their paradigmatic conditions of confinement claims qualify for such special treatment and therefore are cognizable habeas claims.[3] See Nettles, 830 F.3d at 931-32 (discussing importance of distinguishing between core habeas petitions and suits

---

[3] The court recognizes, as discussed above, that the issue of whether conditions of confinement claims are cognizable in a habeas corpus proceeding is unsettled, and the Fourth Circuit has not definitively resolved the question. See, e.g., Aamer v. Obama, 742 F.3d 1023 (D.C. Cir. 2014). Although the court concludes that core conditions of confinement claims of the type presented here are not cognizable in a habeas corpus action, the court also addresses below the merits of petitioners' claims.

challenging conditions of confinement); Wilborn, 795 F. App'x at 163 (explaining "this case" presents no basis for deviating from the Fourth Circuit's prior holdings that conditions of confinement claims are not cognizable in habeas corpus proceedings).

Finally, petitioners argue the court has authority to grant injunctive relief based on the court's purported "inherent authority to order the release of prisoners when necessary to cure an ongoing constitutional violation." (Pet'rs' Mem. (DE 34) at 34-35). Petitioners, however, cite no authority supporting their implied position that they can file a civil action for Eighth Amendment violations on behalf of current federal inmates and invoke the court's "equitable authority" to grant injunctive relief without complying with the Prison Litigation Reform Act ("PLRA"). The PLRA applies to all prisoner civil actions challenging conditions of confinement, and imposes strict requirements regarding filing fees, administrative exhaustion, and carefully crafted restrictions on injunctive relief. See 18 U.S.C. § 3626(a) (providing limits on the court's authority to order injunctive relief in a prisoner civil action); 28 U.S.C. § 1915(b)(1), (h); 42 U.S.C. § 1997e(a). Thus, petitioners' freestanding (non-habeas) claims for Eighth Amendment violations must be filed in a prisoner civil rights action governed by the PLRA. See Porter v. Nussle, 534 U.S. 516, 523-28 (2002). And in the absence of a properly filed civil action that complies with the PLRA, the court lacks jurisdiction to order injunctive relief. Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 327-28 (2015) ("The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (internal quotation and citations omitted)); Brown v. Plata, 563 U.S. 493, 538-39, 541 (2011) (noting the district court's inherent equitable authority is subject to limitations

imposed by the PLRA). Notably, petitioners have expressly resisted converting this action into a prisoner civil rights action under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). (Pet'rs' Reply (DE 47) at 4 n.4).[4]

In sum, the court holds petitioners' conditions of confinement claims are not cognizable habeas claims under § 2241.[5] The court also lacks authority to order petitioners' release under its inherent equitable authority.

2. Likelihood of Success on the Merits

Even assuming an Eighth Amendment conditions of confinement claim is cognizable in a § 2241 proceeding, petitioners have not made a "clear showing" that they are likely to succeed on the merits. Under the Eighth Amendment, prison officials must "provide humane conditions of confinement [by] ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016). To determine whether an inmate's "conditions of confinement amount to 'cruel and unusual punishment,'" the court evaluates the alleged unconstitutional conditions "against 'the

[4] To the extent petitioners alternatively suggest that the court should treat this action as a civil action subject to the PLRA, the court declines to do so. Petitioners do not consent to conversion of this action into a traditional Bivens action, did not pay the appropriate filing fees (or file motions to proceed without prepayment of fees), and admittedly have not exhausted their administrative remedies. 28 U.S.C. § 1915(b); 42 U.S.C. § 1997e; (see also Kelly Decl. (DE 40-6) ¶¶ 9-16 (showing most of the petitioners have not even filed an administrative grievance related to COVID-19 concerns)). Furthermore, even if the court did construe this action as a non-Bivens freestanding Eighth Amendment case subject to the PLRA, the court would not grant the requested relief. Under the PLRA, the court must give "substantial weight to any adverse impact on public safety or operation of the criminal justice system" before granting the requested relief. See 18 U.S.C. § 3626(a)(1); see also Armstrong, 575 U.S. at 327-28 (explaining court's equitable authority to grant injunctive is subject to statutory restrictions). For the reasons set forth in the following section, petitioners have not satisfied this standard.

[5] The court's determination that petitioners' claims are not cognizable in this habeas corpus action is a preliminary determination made in the context of petitioners' emergency motion, on the basis of limited briefing. Accordingly, this conclusion of law is not binding on the parties for purposes the pending motion to dismiss, or in the alternative, for summary judgment. See University of Texas v. Camenisch, 451 U.S. 390, 395 (1981).

evolving standards of decency that mark the progress of a maturing society.'" Id. (quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976)). "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." Farmer, 511 U.S. at 844-45.

As with any Eighth Amendment claim, a conditions of confinement claim has objective and subjective components. Porter, 923 F.3d at 355. "To satisfy the 'objective' prong, an inmate must 'demonstrate that the deprivation alleged was, objectively, sufficiently serious.'" Id. (quoting Scinto, 841 F.3d at 225). And "[t]o be 'sufficiently serious,' the deprivation must be 'extreme' – meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from . . . exposure to the challenged conditions.'" Id. (quoting Scinto, 841 F.3d at 225); see also De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003).

The subjective prong requires a petitioner challenging his conditions of confinement to "demonstrate that prison officials acted with deliberate indifference." Id. at 361; Scinto, 841 F.3d at 225. "To prove deliberate indifference, [petitioners] must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." Id. (quoting Farmer, 511 U.S. at 837). However, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844; Odom v. South Carolina Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003).

Here, petitioners have submitted sufficient evidence to preliminarily establish the objective prong of their claim. As respondents acknowledge, COVID-19 "poses significant health risks to both the world and community at large." (Resp'ts' Opp. (DE 42) at 12; see also Beyer Decl. (DE 26-18) ¶¶ 1-12). The disease's uncontrolled spread within FCC-Butner therefore presents a "substantial risk of serious or substantial" physical injury resulting from the challenged conditions. See Porter, 923 F.3d at 355.

Turning to the subjective prong, respondents do not dispute that they were aware of the risk posed by COVID-19 as early as January 2020. (See Resp'ts' Stmt. (DE 36) ¶ 10). Accordingly, as to the deliberate indifference analysis, the only issue is whether respondents knew of and disregarded the risk of harm, or, framed differently, whether they responded reasonably to the risk. Farmer, 511 U.S. at 844.

Petitioners have not demonstrated they are likely to succeed on the merits as to the deliberate indifference component of their claim. In response to the COVID-19 outbreak, respondents immediately implemented extensive efforts to limit the spread of the virus and protect inmate health and safety. These efforts included screening inmates, staff and visitors for symptoms; isolating and quarantining inmates exposed to the virus (depending on whether they displayed symptoms); imposing limitations on movements within the facilities and visitation; and conducting inmate and staff testing in accordance with guidelines from the CDC. Respondents also have mandated extensive cleaning efforts, provided access to cleaning supplies and soap/hand sanitizer, educated inmates and staff about the virus, and provided face coverings for staff and inmates.

This evidence shows that respondents have responded reasonably to the risk of harm caused by a rapidly evolving global pandemic. See Farmer, 511 U.S. at 844. In a case remarkably similar to the instant matter, the United States Court of Appeals for the Sixth Circuit held that the precise preventative measures undertaken by respondents here constituted a reasonable response to COVID-19. Wilson v. Williams, __ F. 3d __, 2020 WL 3056217, at *8-11 (6th Cir. June 9, 2020).[6] Accordingly, petitioners have not made a "clear showing" that they are likely to succeed on their Eighth Amendment claim. See id. see also Swain v. Junior, 958 F.3d 1081, 1089-90 (11th Cir. 2020) (per curiam) (staying preliminary injunction where similar preventative measures "likely do not amount to deliberate indifference"); Valentine v. Collier, 956 F.3d 797, 801-03 (5th Cir. 2020) (per curiam) (same).

As thoroughly described above, petitioners submitted numerous declarations, expert witness testimony, and documentary evidence in support of their allegations that petitioners have been deliberately indifferent to the risk of COVID-19. This evidence, however, does not undermine the court's finding that respondents carefully and proactively responded to the pandemic.

For example, petitioners note that FCC-Butner is overcrowded and thus social distancing is impossible, particularly in housing units at FCI Butner-low, where up to 150 inmates may reside in one unit. Petitioners also emphasize the inmates and staff travel between units for work assignments, including some units where inmates are in quarantine or isolation due to exposure to COVID-19. Respondents, however, have reasonably responded to these risks by limiting

---

[6] Notably, petitioners heavily rely on the district court opinion in Wilson in support of their argument that they are likely to succeed on the merits of their claims. The Sixth Circuit, however, held the opposite, and reversed the district court's grant of preliminary injunctive relief.

movement within FCC-Butner to essential activities, increasing cleaning practices, requiring use of masks, and educating inmates and staff about how the virus spreads. Even assuming social distancing is impossible in many situations at FCC-Butner, there is no evidence that respondents deliberately disregarded this risk. The fact that respondents' response may prove inadequate to prevent the spread of COVID-19 does not establish they were deliberately indifferent. See Farmer, 511 U.S. at 844; see also Wilson, 2020 WL 3056217, at *10 ("The [FBOP's] ongoing and dynamic response to a novel threat can hardly [constitute deliberate indifference].").

Petitioners also criticize FCC-Butner's testing, quarantine, and isolation practices. As to the quarantine procedures, petitioners argue that many of them were not quarantined after potential exposure to the virus. The submitted evidence, however, does not indicate respondents were aware of petitioners' alleged exposure to the virus and failed to quarantine. (See Ayers Decl. (DE 26-2) ¶¶ 25-26; Dailey Decl. (DE 26-3) ¶ 30; Hallinan Decl. (DE 26-5) ¶ 22; Harrington Decl. (DE 26-6) ¶ 24; Harris Decl. (DE 26-7) ¶ 20; Hill Decl. (DE 26-8) ¶ 29; Huntley Decl. (DE 26-9) ¶¶ 21, 23; Kinard Decl. (DE 26-10) ¶ 19; Maldonado Decl. (DE 26-12) ¶¶ 44-45; Ortiz Decl. (DE 26-14) ¶ 11; Titus Decl. (DE 26-16); ¶ 36; Whyte Decl. (DE 26-17) ¶¶ 52-53). To the extent petitioner Maldonado arguably alleges that FBOP officials failed to "segregate" him from other inmates who tested positive, this single instance of failure to follow the quarantine policy is hardly sufficient to establish deliberate indifference on the part of high-ranking BOP officials, particularly in the face of an emergent public health crisis. See Swain, 958 F.3d at 1090; Walker v. Peters, 233 F.3d 494, 501 (7th Cir. 2000); cf. Wilson v. Seiter, 501 U.S. 294, 303 (1991) (noting the "constraints facing

official[s]" are relevant to the Eighth Amendment analysis).[7] Additionally, the fact that inmate orderlies are required to move between quarantine and non-quarantine units does not establish deliberate indifference, particularly where respondents have implemented twice daily screenings for all inmate workers. (Stock Decl. (DE 37-10) ¶ 40).

Regarding the isolation practices, petitioners testified that inmates must present with a fever to be placed in isolation. (Ayers Decl. (DE 26-2) ¶ 26; Hill Decl. (DE 26-8) ¶ 20; Hallinan Decl. (DE 26-5) ¶ 25). Petitioners' expert criticizes this procedure as inconsistent with CDC guidance that any person who develops "symptoms" of COVID-19 should be isolated, regardless of whether they have a fever. (Beyer Decl. (DE 26-18) ¶ 83). But this is precisely the type of medical disagreement between experts that does not state a claim for deliberate indifference. Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). The important point, for purposes of the deliberate indifference analysis, is that medical staff are evaluating inmates who develop symptoms and making medical judgment calls about which inmates require isolation.[8]

---

[7] Petitioner Maldonado also expresses concerns that certain inmates who tested positive for COVID-19 returned to his unit after 14 days in isolation. Although they were housed in a different section of the unit, the infected inmates shared the same bathroom with non-quarantined inmates. (Maldonado Decl. (DE 26-12) ¶¶ 32-33). Petitioner Maldonado acknowledges, however, that FCC-Butner staff temporarily moved non-quarantined inmates when the infected inmates showered, installed a "make-shift wall" to separate the infected inmates from the other inmates in the bathroom, and cleaned and disinfected the bathrooms after the showers. (Id. ¶ 33). In any event, these ambiguous assertions suggesting limited intermingling between quarantined and non-quarantined inmates do not rise to the level of deliberate indifference for the reasons described above. Isolated incidents of failure to follow quarantine policy are not sufficient, in this context, to establish an Eighth Amendment violation. See Swain, 958 F.3d at 1090; Walker, 233 F.3d at 501.

[8] Petitioners also allege that isolation is the SHU is not medically sound where the SHU does not provide for full isolation between inmates and staff. But that is a function of prison life itself, as the staff and inmate orderlies must have some limited interaction with inmates. There is no indication, for example, that staff are not provided with personal protective equipment during the required interactions. As to the allegation that the SHU does not provide a system for "timely notification and management of symptoms," the court has not been presented with evidence that prisoners cannot request emergency medical care if they develop symptoms. Inmate Goodwin also testified that he was evaluated twice per day when he was isolated in the SHU. (Goodwin Decl. (DE 26-4) ¶ 36). The court similarly finds no evidence of deliberate indifference in Goodwin's testimony that he was not provided treatment for COVID-

Petitioners also take issue with the FBOP's alleged policy that inmates must pay a $2.00 co-pay before they can obtain an evaluation from a medical provider for potential COVID-19 symptoms. Petitioners, however, present no evidence that any inmates who requested a screening were denied one on the basis of inability to pay the co-pay. As with the isolation practices, the court defers to the FBOP's decision regarding how to implement its screening procedures. The constitution requires the FBOP to provide reasonable screening, leaving the precise implementation to the FBOP's experts. See Farmer, 511 U.S. at 844.

As to the alleged lack of testing, respondents' undisputed evidence is that CDC guidelines do not currently advise testing of all inmates. (See Harden Decl. (DE 39-25) ¶ 5). Nevertheless, due to a recent outbreak at FCI Butner-low, FBOP staff now have tested all inmates at that facility. (Id.). This effort at expanded testing in the wake of an outbreak (and without court intervention) does not suggest respondents are acting with deliberate indifference to the risk posed by COVID-19. Wilson, 2020 WL 3056217, at *8.

Respondents argue that the recent increase in infections and deaths at FCC-Butner demonstrate that either respondents are not appropriately implementing the preventative measures discussed above, or that such measures are insufficient. While this evidence is tragic, continued spread of a novel, highly contagious virus cannot standing alone establish respondents failed to reasonably respond to the virus. See Scinto, 841 F.3d at 225–26 (distinguishing subjective and objective components of Eighth Amendment claim); see also Swain, 958 F.3d at 1089-90 (noting district court erred by "collaps[ing] the subjective and objective components" of the Eighth

---

19 while in isolation where there is no indication that he developed symptoms that required treatment. (See Goodwin Decl. (DE 26-4) ¶¶ 30-38).

Amendment analysis and "treat[ing] the increase in COVID-19 infections as proof that defendants deliberately disregarded an intolerable risk"). In other words, that the harm was not ultimately averted does not establish respondents failed to respond reasonably to the risk or otherwise acted with deliberate indifference. See Farmer, 511 U.S. at 844.

Finally, petitioners allege respondents were deliberately indifferent because they failed to transfer enough inmates out of FCC-Butner, either through their home confinement or transfer authority, or by moving for compassionate release in the sentencing court. Petitioners allege, for example, that only one percent of FCC-Butner's population has been approved for home confinement, and thus respondents allegedly have ignored the Attorney General's directive to "maximize" use of home confinement. (See Reply (DE 47) at 7).

The Eighth Amendment does not require FBOP officials to take all conceivable steps to prevent the spread of COVID-19, provided their response to the virus remains reasonable. See Farmer, 511 U.S. at 844. As respondents note, public safety and similar considerations limit their ability to conduct widespread transfers to home confinement or other correctional institutions. Wilson, 501 U.S. at 303 (explaining "constraints facing the official" are relevant consideration in the Eighth Amendment analysis). Accordingly, the fact that respondents have not "maximized" use of home confinement and other release provisions to reduce the FCC-Butner population does not establish an Eighth Amendment violation. See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 309 (4th Cir. 2004) ("As we have often made clear, the question in deliberate indifference cases is not whether the officials could have taken additional precautions . . . but whether they disregarded an excessive risk to health or safety" (internal quotation omitted)); Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2001); see also Wilson, 2020 WL 3056217, at *11 ("In light of the [FBOP's] other

measures to prevent the spread of COVID-19, and given the limitations on the [FBOP's] authority to release inmates, its failure to make robust use of transfer, home confinement, or furlough to remove inmates in the medically-vulnerable subclass from [FCI-Elkton] does not constitute deliberate indifference.").

In sum, petitioners have not made a "clear showing" that they are likely to succeed on the merits of their Eighth Amendment claim. The extensive evidence presented, while raising isolated concerns about the FBOP's failure to enforce its plan to mitigate the spread of COVID-19, does not rise to the level of deliberate indifference to a known risk of harm.

The court's determination that petitioners have not demonstrated likelihood of success on the merits is dispositive, and the instant motion must be denied on that basis alone. See Real Truth About Obama, 575 F.3d at 346. The court, however, proceeds to analyze the remaining factors in the event such analysis is necessary for purposes of appellate review.

3. Irreparable Harm

Turning to irreparable harm, petitioners must establish they are "likely to suffer irreparable harm in the absence of preliminary relief." Winter, 555 U.S. at 20. To satisfy this factor, petitioners "must make a clear showing of irreparable harm and the required irreparable harm must be neither remote nor speculative, but actual and imminent." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 283 (4th Cir. 2002).

The court finds petitioners have sufficiently established likelihood of irreparable harm. The medically vulnerable subclass members are likely to suffer imminent serious medical complications (including death) if they contract COVID-19. (See, e.g., Beyer Decl. (DE 26-18)). An order directing respondents to "release" the subclass members to home confinement, halfway

house, another FBOP facility where COVID-19 is not spreading, or to medical furlough would reduce their chances of contracting COVID-19. (Id.). The risk of irreparable injury also is "likely" where the outbreak at FCC-Butner is worsening by the day. (See, e.g., Wilkerson Decl. (DE 48)). Accordingly, petitioners have made a clear showing they are likely to suffer irreparable harm in the absence of injunctive relief. See Wilson, 2020 WL 3056217, at *11 ("The district court correctly noted that inmates at [FCI-Elkton] face a risk of irreparable injury if they are infected by COVID-19.").[9]

4. Balance of Equities and the Public Interest

The final factors, the balance of the equities and the public interest, "merge" when the government is the party opposing the preliminary injunction. Roe v. Dep't of Def., 947 F.3d 207, 230 (4th Cir. 2020) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)). Petitioners have not made a clear showing that these factors weigh in favor of granting preliminary relief.

As respondents note, "the sweeping relief requested here would undermine [the FBOP's] systemic response to the COVID-19 pandemic; inappropriately insert the judicial branch into policy decisions that have been assigned to expert prison administrators, and require [the FBOP] to defy the CDC's guidance to restrict prisoner movements during the pandemic to avoid the unnecessary risk of spreading the virus." (Resp'ts' Opp. (DE 42) at 24). The public interest also is not served by immediate release of inmates without proper and thorough vetting of their release plans, housing situation, individual medical needs, and likelihood of recidivism. See Wilson,

---

9 As respondents argue, petitioners and other members of the medically vulnerable subclass individually can apply for home confinement, halfway house placement, compassionate release, or medical furloughs. But the evidence here shows that respondents only rarely approve such requests. (Clark Decl. (DE 37-1) ¶¶ 14-49). The relief sought by petitioners would dramatically expedite and expand these release avenues for the medically vulnerable subclass.

2020 WL 3056217, at *11. Although petitioners' requested relief purports to provide review of release plans before release, the expedited review period (only 48 hours) cannot reasonably permit FBOP or an independent expert to fully evaluate all subclass members' release planning needs or threat to public safety.

The court agrees with petitioners that the public interest is served by preventing unnecessary illness and death and slowing the spread of the virus. Respondents, however, have made reasonable efforts to achieve those goals. Particularly in the absence of substantial evidence showing respondents were deliberately indifferent to the spread of COVID-19, the record at this stage does not present "extraordinary circumstances" justifying judicial intervention in the management of FCC-Butner's response to the virus. See Taylor, 34 F.3d at 268 ("It is well established that absent the most extraordinary circumstances, federal courts are not to immerse themselves in the management of state prisons or substitute their judgment for that of the trained penological authorities charged with the administration of such facilities."); see also S. Bay United Pentecostal Church, __ S. Ct. __, 2020 WL 2813056, at *1 (Roberts, C.J., concurring) ("Our constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties, there latitude 'must be especially broad.'") (quoting Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905) and Marshall v. United States, 414 U.S. 417, 427 (1974)). In light of the countervailing public interest concerns set forth above and considering the scope of relief sought, petitioners have not made a "clear showing" that injunctive relief serves the public interest or that the balance of equities tips in their favor.

## CONCLUSION

Based on the foregoing, petitioners' motion for temporary restraining order, preliminary injunction, and writ of habeas corpus (DE 24) is DENIED.

SO ORDERED, this the 11th day of June, 2020.

LOUISE W. FLANAGAN
United States District Judge